Joseph M. Alioto (SBN 42680)
Tatiana V. Wallace (SBN 233939)
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA 94104
Telephone: (415) 434-8900
Email: jmalioto@aliotolaw.com

Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
Cadio Zirpoli (State Bar No. 179108)
David H. Seidel (State Bar No. 307135)
JOSEPH SAVERI LAW FIRM, LLP
601 California Street, Suite 1000
San Francisco, California 94108
Telephone:    (415) 500-6800
Facsimile:    (415) 395-9940
Email: jsaveri@saverilawfirm.com
       swilliams@saverilawfirm.com
       czirpoli@saverilawfirm.com
       dseidel@saverilawfirm.com

[Additional Counsel Listed on Last Page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Christine Whalen, Katherine Arcell, Jose Brito, Jan Marie Brown, Rosemary D'Augusta, Brenda Davis, Pam Faust, Carolyn Fjord, Don Freeland, Donald Fry, Gabriel Garavanian, Harry Garavanian, Jocelyn Gardner, Valarie Jolly, Michael Malaney, Len Marazzo, Lisa McCarthy, Tim Nieboer, Deborah Pulfer, Bill Rubinsohn, Sondra Russell, June Stansbury, Clyde Stensrud, Gary Talewsky, Pam Ward, <br><br>                    Plaintiffs, <br><br>        v. <br><br> Kroger Co., Albertsons Companies, Inc., <br>                    and <br> Cerberus Capital Management, L.P., <br><br>                    Defendants. | Case No.: <br><br> **COMPLAINT CHARGING THE KROGER CO.'S ACQUISITION OF ALBERTSONS AS A VIOLATION OF SECTION 7 OF THE CLAYTON ANTITRUST ACT, 15 U.S.C. §18 and CHARGING CERBERUS' AND THE CONSORTIUM'S SCHEME TO SHUT DOWN ALBERTSONS AS A VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT, 15 U.S.C. §1** |

*Complaint for Violation of Section 7 of the Clayton Act and Section 1 of the Sherman Act*

**INTRODUCTION**

1.      This is a private antitrust action brought under the authority of Section 16 of the Clayton Antitrust Act (15 U.S.C. § 26) charging violations of Section 7 of the Clayton Antitrust Act (15 U.S.C. § 18) and Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) seeking a permanent injunction to prohibit Kroger Co. from acquiring Albertsons Companies, Inc. in violation of Section 7 of the Clayton Act and to void the combination and conspiracy among Cerberus Capital Management, L.P. and the consortium of major stockholders of Albertsons and Kroger to shut down Albertsons, and for prohibition and disgorgement of any unlawful payments coerced from Albertsons, in violation of Section 1 of the Sherman Act.

2.      The "threatened loss or damage" to the Plaintiffs and to the public at-large is the potential elimination of Kroger's competitor, Albertsons.

3.      The proposed acquisition price is not trivial: $24.6 billion in cash.

4.      As part of the Kroger-Albertsons mega-merger transaction, the companies seek to financially cripple Albertsons and to weaken its competitive position relative to Kroger by agreeing that Albertsons shall pay its shareholders a special cash dividend of $6.85 per share, totaling approximately $4 billion—an amount roughly equivalent to all of its liquid assets (including net receivables) and approximately one-third of its market capitalization—to its shareholders, thereby eliminating Albertsons' cash-on-hand and nearly doubling its debt (the "Special Dividend").

5.      Kroger's plan to acquire rival Albertsons will combine the biggest and second-biggest supermarket companies in the country by sales, thereby tending to create a monopoly.

6.      The current trend toward concentration, the lessening of competition and the tendency to create a monopoly in the grocery industry is unmatched and unparalleled.

7.      The proposed acquisition is a violation of Section 7 of the Clayton Antitrust Act (15 U.S.C. § 18) because the direct effect of the elimination of Albertsons may be "substantially to lessen competition or tend to create a monopoly" in the grocery industry by the elimination of a significant competitor in a non-trivial transaction.[1]

8.      Kroger is the largest supermarket operator by revenue, and Albertsons is the second-largest supermarket chain in America after Kroger.  The combination of these two giants will create a supermarket behemoth with a combined market share and control of 36% of the U.S. grocery supermarket operators with a combined annual sales of more than $200 billion. (See Charts Following.)



Domestic Market Share of U.S. Grocery Supermarket Operators*

* As of 2020
Source: www.supermarketnews.com/retail-financial/top-25-supermarket-operators-sales

---

[1] Section 7 of the Clayton Antitrust Act provides in pertinent part as follows: "No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital … where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or tend to create a monopoly." (Emphasis added.)



Rankings of Top U.S. Grocery Supermarket Operators
Annual Sales (Pre-Acquisition - 2021)



Rankings of Top U.S. Grocery Supermarket Operators
Annual Sales (Post-Acquisition)

9.    The proposed acquisition is prohibited by the binding authority of the Supreme Court of the United States as enunciated in its decisions in *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962), *United States v. Philadelphia National Bank*, 374 U.S. 321 (1963), *United States v. Aluminum Company of America*, 377 U.S. 271 (1964), *United States v. Von's Grocery Co.*, 384 U.S. 270 (1966), *United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966), and *United States v. Falstaff Brewing Corporation*, 410 U.S. 526 (1973).

10.     This private action is specifically authorized under Section 16 of the Clayton Antitrust Act (15 U.S.C. § 26) which provides that "any person [including members of the public]…shall be entitled to sue and have injunctive relief …against threatened loss or damage by a violation of the antitrust laws."

11.     The remedy afforded to private plaintiffs includes divestiture, or prohibition, of any potential unlawful acquisition.  As was unequivocally stated by the United States Supreme Court in *California v. American Stores Company*, 495 U.S. 271, 283 (1990), "[T]he literal text of Section 16 is plainly sufficient to authorize injunctive relief [in favor of a private Plaintiff], including an order of divestiture, that will prohibit that conduct from causing that harm."

12.     Private actions to vigorously challenge anticompetitive acquisitions have been encouraged by the Congress and the Supreme Court of the United States in strong and unmistakable language: "The Act's other provisions manifest a clear intent to encourage vigorous private litigation against anticompetitive mergers." *California v. American Stores Company*, 495 U.S. 271, 284 (1990).

13.     Plaintiffs therefore bring this action under the authority of Section 16 of the Clayton Antitrust Act (15 U.S.C. § 26) and allege that the pending elimination of Albertsons by Kroger constitutes a substantial threat of injury to these Plaintiffs because this acquisition may have the effect "substantially to lessen competition" and "tend to create a monopoly" in a "line of commerce" in a "section of the country" in violation of Section 7 of the Clayton Antitrust Act (15 U.S.C. § 18).  In addition, the contract to eliminate Albertsons constitutes a non-trivial transaction between significant rivals, neither of which is a failing company, that eliminates a substantial and growing competitor from the market.

14.     The proposed acquisition substantially affects the interstate and foreign commerce of the United States in that supermarket supplies, food and other consumer items

and all the other necessities of the grocery supermarket industry are in the constant flow of the interstate and foreign commerce of the United States.  Because Defendants transact business in this judicial district, venue is proper in this Court pursuant to 15 U.S.C. §§15, 22 and 26, and 28 U.S.C. § 1391.

15.    Plaintiffs seek an Order from this Court prohibiting the proposed acquisition by Kroger of Albertsons that would eliminate Albertsons as a significant competitor and prohibiting and/or disgorging the Special Dividend payment that gravely weakens Albertsons' ability to compete and that has significant ramifications for consumers and workers as an act in furtherance of the Defendants' violation of Section 7 of the Clayton Act and in violation of Section 1 of the Sherman Act.

16.    The relevant product market is the retail sale of food and other grocery products in supermarkets.  The relevant geographic market is the entire United States for grocery stores, and smaller local relevant geographic markets within individual states.

17.    The grocery supermarket industry is a critical and vital modern necessity to the commercial, social and political well-being of the United States. Competition rather than combination has been and should be enforced in the United States so that these Plaintiffs, and the public at large, may enjoy the benefits of competition, including, *inter alia*, the best possible services at the lowest possible prices.  Vigorous enforcement of the antitrust laws by private persons is an essential part of the Congressional plan to ensure that competition rather than monopoly is, and remains, the rule of trade in the United States, especially in the grocery supermarket industry.

18.    From 1993 to 2019, the number of grocery stores nationwide declined by roughly 30 percent.  Food industry mergers and acquisitions exceeded 300 in 2019 alone.  The U.S. grocery supermarket industry is moving toward complete concentration and monopoly, a

fact that is dramatically illustrated by Defendant Kroger's past mergers and acquisitions (see

Chart Following) and that is further demonstrated in this Albertsons acquisition.



19.     This trend toward concentration was unanimously condemned by Chief Justice

Warren in the Supreme Court opinion in *Brown Shoe Co. v. United States, supra,* which made

it clear that the Court should and would take steps to curtail incipient mergers whose effect

will be to eliminate competition in an industry:  "We cannot avoid the mandate of Congress

that tendencies toward concentration in industry are to be curbed in their incipiency,

particularly when those tendencies are being accelerated through giant steps striding across a

hundred cities at a time.  In the light of the trends in this industry we agree with the

---

2  Source:  Foodandwaterwatch.org *The Economic Cost of Food Monopolies:  The Grocery Cartels. Nov 2021.*

Government and the court below that this is an appropriate place at which to call a halt." *Id.* at 346.

20.    If Kroger's proposed acquisition of Albertsons is consummated, the companies' combined power will be used to increase prices for groceries, decrease the quality of food, eliminate jobs, close stores and offer less choice for consumers due to the overlap in geographic areas.  This acquisition allows for a divestiture of as many as 650 Albertsons stores; however, past supermarket divestitures have struggled within months of being separated and ultimately failed.

21.    Unless this merger of the first and second largest national competitors in retail sales last year among the U.S. food and grocery supermarket operators is prohibited, the unified company will become the largest supermarket by revenue in the United States with a current national market share of 36%.  Albertsons, with a national market share of 12.4%, will be eliminated.

22.    Market concentrations with much lower numbers have in the past been held by the Supreme Court to constitute a violation of Section 7 of the Clayton Act.  *See United States v. Aluminum Company of America*, 377 U.S. 271 (1964) (elimination of Rome Cable with only 1.3% share of national market), *United States v. Von's Grocery Co*, 384 U.S. 270 (1966) (combination of nos. 3 and 6 becoming no. 2 with 7.5% of the Los Angeles market), and *United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966) (nos. 10 and 18 in the national market becoming no. 5 with 4.9%). (See Chart Following.)

## Key Section 7 Cases
## Market Share and Rankings, Pre-Merger vs. Post-Merger

| Acquiring Company Market Share | Acquired Compan(ies) Market Share | Merged Entity Market Share | Result |
|---|---|---|---|
| **VONS.** • 4.7% share • #3 in market | **Shopping Bag** • 4.2% share • #6 in market | • 7.5% share • #2 in market | **ENJOINED** |
| **ALCOA** • 27.8% share • #1 in market | **ROME CABLE** • 1.3% share • #9 in market | • 29.1% share | **ENJOINED** |
| • 5.48% share tri-state • #10 nationwide • #4 statewide (WI) • #7 tri-state (WI, Ill, Mich) | • 5.84% share tri-state • #18 nationwide • #1 statewide (WI) • #6 tri-state (WI, Ill, Mich) | • 11.32% share tri-state • #5 nationwide • #1 statewide (WI) • 4.49% share nationwide • 23.95% share statewide | **ENJOINED** |
| • 6% manufacturing share • #3 in manufacturing | **Kinney shoes** • .05% manufacturing share • #12 in manufacturing • 2% retail share | • 6% manufacturing share • #3 in manufacturing • 9.5% retail share • #2 in retail market | **ENJOINED** |
| **PNB** THE PHILADELPHIA NATIONAL BANK • #2 in market | GIRARD TRUST CORN EXCHANGE BANK • #3 in market | • #1 in market • 36% share (of assets) | **ENJOINED** |

23.     The combination will result in the eradication of consumer choice, and will
have other anticompetitive effects that may, and most probably will, flow from the elimination

-9-
*Complaint for Violation of Section 7 of the Clayton Act and Section 1 of the Sherman Act*

of Albertsons from the market.  If, however, Kroger, instead of combining with Albertsons, were to compete for market share rather than buying its way there, it would have the wherewithal, the experience, the knowledge, and the ability to expand on its own, which would necessarily increase competition, lower prices, necessitate new jobs, increase consumer choice, invite investment, and otherwise enable the consumer to enjoy the benefits that competition always provides.

24.     The United States Supreme Court found it fundamental to free-market economies that "Internal expansion [through competition] is more likely to be the result of increased demand for the company's products and is more likely to provide increased investment in plants, more jobs and greater output. Conversely, expansion through merger is more likely to reduce available consumer choice while providing *no increase in industry capacity, jobs or output.* It was for these reasons, among others, Congress expressed its disapproval of successive acquisitions. Section 7 was enacted to prevent even small mergers that added to concentration in an industry." *Brown Shoe*, 370 U.S. 345, at fn. 72 (emphasis added).

25.     The proposed elimination of Albertsons by Kroger poses a substantial threat to the Plaintiffs, and to the public at large, in that the proposed elimination will only serve, as the Supreme Court warned, to "reduce available consumer choice while providing no increase in industry capacity, jobs or output," and may potentially cause loss to the Plaintiffs, and the public at large, in the form of higher prices on food and other consumer goods, the elimination of consumer choice and other potential anticompetitive effects which deprive the Plaintiffs, and the public at large, of the salutary benefits of competition.

26.     The importance of the products that supermarkets sell and the services and innovations that they provide to residents means that any material reduction in a supermarket

competitor's ability to compete can harm those residents in ways that are far from hypothetical.  As is customary in these acquisitions, the first casualties of the removal of competition will be the firing of employees who were only needed when competition existed. Staffing will decrease, leading to worse service for consumers and worse conditions for workers.  Prices will go up, and promotions will decrease, and that translates directly into the quantity and quality of food that families can put on their tables.

27.     The elimination of Albertsons is manifestly an irreparable harm since the competition from Albertsons would be irretrievably lost.

28.     Should the proposed elimination of Albertsons go unchallenged, the nation would not only lose the competition of Albertsons, but also the potential competition that Kroger would provide by further building its own national presence the old-fashioned way: by competing for customers instead of buying them.  The proposed elimination of Albertsons, therefore, will not only eliminate the stout and particular competition of Albertsons, but will also discourage continued vigorous competition from Kroger and will ultimately lessen the economic ideal espoused by Congress and the Supreme Court of more consumer choice and more availability through competition.

## THE PARTIES

Plaintiffs

29.     The Plaintiffs named below are individual citizens of the cities and states listed. Each Plaintiff is a consumer and customer of the Defendants, all with an express interest and intent in ensuring that Albertsons stores are preserved as a competitive option for them, now and in the future.  Plaintiffs have made purchases at the Defendants' stores within the last four years.  The potential elimination of Albertsons will cause loss and harm to the Plaintiffs, and

to the public at large, of the salutary benefits of the competition that Albertsons brings, as well

as the opportunity to shop at Albertsons.

> Christine Whalen, New Orleans, LA;
> Gabriel Garavanian, Tyngsboro, MA;
> Katherine R. Arcell, New Orleans, LA;
> Jose' M. Brito, Reno, NV;
> Jan-Marie Brown, Carson City, NV;
> Rosemary D'Augusta, Millbrae, CA;
> Brenda K. Davis, Forney, TX;
> Pamela Faust, Loveland, Ohio;
> Carolyn Fjord, Winters, CA;
> Don Freeland, Thousand Palms, CA;
> Donna Fry, Colorado Springs, CO;
> Harry Garavanian, Tyngsboro, MA;
> Yvonne Jocelyn Gardner, Colorado Springs, CO;
> Valarie Ann Jolly, Mabank, TX;
> Michael C. Malaney, Grandville, MI;
> Len Marazzo, Reno, NV;
> Lisa McCarthy, Naples, FL;
> Timothy Niebor, Clarkston, MI;
> Deborah M. Pulfer, Sidney, OH;
> Bill Rubinsohn, Jenkintown, PA;
> Sondra K. Russell, Waco, TX;
> June Stansbury, Reno, NV;
> Clyde D. Stensrud, Kirkland, WA;
> Gary Talewsky, Sharon, MA;
> Pamela S. Ward, Garland, TX.

Defendants

30.     Defendant Kroger Co. (hereinafter "Kroger") is an American retail company

that operates supermarkets and multi-department stores throughout the United States.

Founded in 1883 in Cincinnati, Ohio, Kroger operates 2,721 retail grocery stores under its

various banners and divisions in 35 states and in the District of Columbia, with store formats

that include hypermarkets, supermarkets, superstores, department stores, and jewelry stores.

Kroger operates 33 food processing or manufacturing facilities, 1,618 supermarket fuel

centers, 2,251 pharmacies, and 225 in-store medical clinics.  Kroger's headquarters are located

in Cincinnati.  Kroger is the United States' largest supermarket operator by revenue,

*Complaint for Violation of Section 7 of the Clayton Act and Section 1 of the Sherman Act*

commanding 23.6% of the market.  It ranked 17th on the 2018 Fortune 500 list of the largest

United States corporations by total revenue.  Kroger's family of store banners include Kroger,

Ralphs, Dillons, Smith's, King Soopers, Fry's, QFC, City Market, Owen's, Jay C, Pay Less,

Bakers, Gerbes, Harris Teeter, Pick N' Save, Metro Market, Mariano's, Fred Myers, Food 4

Less and Food Co. (See Charts Following).

## Location of Kroger Stores Nationwide



Source: Kroger Investor Relations

## Location of Kroger Stores by State



Sources: www.thekrogerco.com/newsroom/state-facts, google.com

31.     Defendant Albertsons Companies, Inc. (hereinafter "Albertsons") is an American grocery supermarket operator founded in 1939 and headquartered in Boise, Idaho. With 2,253 stores as of the third quarter of fiscal year 2020 and 270,000 employees as of fiscal year 2019, the company is the second-largest supermarket chain in North America after Kroger, accounting for 12.4 % of the market.  Albertsons ranked 53rd on the 2018 Fortune 500 list of the largest United States corporations by total revenue.  Prior to its January 2015 merger with Safeway Inc. for $9.2 billion, it had 1,075 supermarkets located in 29 U.S. states under 12 different banners.  Albertsons' store base includes such banners as Albertsons, Safeway, Vons, Jewel-Osco, Shaw's, Acme, Tom Thumb, Randall's, United Supermarkets, Pavilions, Star Market, Haggen, Carrs, Kings Food Markets and Balducci's Food Lovers Market. (See Charts Following).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Location of Albertsons Stores Nationwide



Source: Kroger Investor Relations

*Complaint for Violation of Section 7 of the Clayton Act and Section 1 of the Sherman Act*

## Location of Albertsons Stores by State



Source: www.statista.com/statistics/1167508/albertsons-operating-stores-by-state-us

32.     Defendant Cerberus Capital Management, L.P. (hereinafter "Cerberus") is a co-conspirator with Defendants Kroger and Albertsons.  The firm is based in New York City and has affiliate offices in the United States, Europe and Asia.

33.     Cerberus manages an estimated $55 billion in funds and accounts. Investors include government and private sector pension and retirement funds,  educational endowments, insurance companies, and sovereign wealth funds.

34.     Cerberus is a major shareholder / investor in Defendant Albertsons.

35.     "Defendant" or "Defendants" includes, as well as those named herein, all of the named Defendants' predecessors, including each named Defendant's wholly owned or controlled subsidiaries or affiliates.

*Complaint for Violation of Section 7 of the Clayton Act and Section 1 of the Sherman Act*

Co-Conspirators

36.     Various persons, partnerships, firms, and corporations who are members of the consortium of private equity entities which collectively own approximately 75% of Albertsons stock, named as Does in this lawsuit, and other individuals named as Does, the identities of whom are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the illegal contracts, combinations, and conspiracies.  When the names of these co-conspirators have been identified, they will be named as defendants in this complaint.

37.     On October 13, 2022, Albertsons and Kroger (collectively, "Defendants"), who are the two largest horizontal competitors in the sale of groceries and other consumer goods nationally, entered into an "Agreement and Plan of Merger" ("Agreement").  This Agreement is the final and complete agreement between Defendants to consummate an acquisition that they had contemplated and negotiated since June of 2022.  Kroger agreed to pay $24.6 billion in cash to eliminate Albertsons.  This is not a trivial transaction.

38.     As part of their proposed merger, Kroger and Albertsons have agreed that Albertsons will provide a "special dividend" of $4 billion, which is more than one-third of Albertsons' total market capitalization of approximately $11 billion.  Nearly one-third of this payment will go to Albertsons' largest shareholder, the private equity firm Cerberus Capital Management, L.P., and the funds for the dividend will be sourced from $2.5 billion of Albertsons' cash and $1.5 billion in new debt, leading Albertsons' cash and cash receivables of approximately $4 billion to drop to $1.5 billion, and causing its net debt to increase from $4.54 billion to $8.54 billion.

39.     The payment of this Special Dividend will leave Albertsons undercapitalized and will impede Albertsons' ability to compete with other supermarkets, including Kroger,

leaving shoppers to face higher prices, worse services, less innovation, and even closure of Albertsons supermarkets.  Replacing cash with debt will inevitably harm Albertsons' credit rating, making borrowing more expensive.  A financially crippled Albertsons will have dire consequences for consumers, who depend upon supermarkets near their homes, for such essentials as fresh meat and produce, among other groceries.  If Albertsons is strapped for cash, it will be less able to offer promotions on groceries, less able to offer quality services, and less able to maintain staffing and competitive wages and benefits for workers.

40.    According to data compiled by Statista, Kroger ranked first in U.S. food and grocery supermarket retail sales last year with $138 billion in sales for 2021.  Albertsons was second overall with $72 billion in sales last year.

41.    Collectively, Albertsons and Kroger operate nearly 5,000 stores, employ more than 710,000 associates, run 66 distribution centers,  52 manufacturing plants, nearly 4,000 pharmacies and more than 2,000 fuel centers across 48 states and the District of Columbia. The companies' combined market share of 36% of U.S. grocery supermarket sales will have a combined annual sales of more than $200 billion.

42.    Supermarkets are already a consolidated industry in the United States. Albertsons and Kroger are two of its largest players and have been historically fierce competitors in numerous States.  Defendants claim that their transaction will unite "complementary" companies, but even their own map of store locations makes clear the extent of their competitive overlap in properly defined relevant antitrust markets. (See Charts Following.)

# Location of Kroger and Albertsons Stores Nationwide



Source: Kroger Investor Relations

*Complaint for Violation of Section 7 of the Clayton Act and Section 1 of the Sherman Act*

## Location of Kroger and Albertsons Stores by State



Sources: www.thekrogerco.com/newsroom/state-facts, google.com, www.statista.com/statistics/1167508/albertsons-operating-stores-by-state-us

43.     Defendants currently operate competing banners with strong presences across the United States.  In some markets, Kroger-and-Albertsons-owned supermarkets compete head-to-head for shoppers' dollars.  For example, in California, Kroger owns and operates approximately 214 stores under the Ralphs banner and an additional 19 under Food 4 Less. A majority of these stores are located in Southern California.  The Albertsons Company operates approximately 579 grocery stores in California: 125 stores under the Albertsons banner, along with 26 Pavilion, 243 Safeway, and 185 Vons stores.  In Chicago, Kroger runs the Mariano's chain and Albertsons operates the competing Jewel-Osco stores.  In Seattle, Albertsons owns Albertsons and Safeway while Kroger runs Fred Meyer and QFC.

44.     The proposed elimination of competition between these two Defendants will create the country's largest grocery supermarket operator by revenue with 36% of the national market and will effectively eliminate a significant rival from the national and local markets and will operate to raise prices on groceries and other consumer goods where Kroger and Albertsons once used to compete in a plethora of overlapping markets.  Economic research also supports the proposition that increased food retailer concentration increases prices.

45.     The relevant product market is the retail sale of food and other grocery products in supermarkets.

46.     A "Supermarket" is any self-service full-line retail grocery store offering customers substantially all of their weekly food and grocery shopping requirements in a single shopping visit.  Supermarkets are larger and have a wider selection of good than earlier grocery stores, but are smaller and more limited in the range of merchandise offered for sale than a hypermarket or big-box market.

47.     Supermarkets offer a wide variety of food, beverages and household products, organized into sections. Supermarkets typically have at least 10,000 square feet of selling space devoted to providing offerings across many product categories, including but not limited to the following: fresh and prepared meats and poultry; fresh fruits and vegetables; refrigerated food and beverage products; frozen food and beverage products; bread and baked goods; dairy products; shelf-stable food and beverage products, including canned, jarred, bottled, boxed, and other types of packaged products; other grocery products, including nonfood items such as soaps, detergents, paper goods, other household products, and health and beauty aids; and pharmaceutical products and pharmacy services (where provided).

48.     Supermarkets provide distinct products and services and offer consumers convenient one-stop shopping for food and grocery products, typically carrying more than 10,000 different items, referred to as stock-keeping units (SKUs).

49.     Supermarkets compete with other supermarkets that provide one-stop shopping opportunities for food and grocery products and base their prices on the prices of food and grocery products sold at nearby competing supermarkets.

50.     Retail stores other than supermarkets, such as convenience stores, specialty food stores, limited assortment stores, hard-discounters, and club stores, may also sell food and grocery products, and may provide sufficient competition to effectively constrain prices at supermarkets, but these retail stores do not offer a supermarket's distinct set of products and services that provide consumers with the convenience of one-stop shopping for food and grocery products.  Consumers shopping for food and grocery products at supermarkets are not likely to start shopping at other types of stores in response to a small but significant price increase by supermarkets.

51.     The relevant geographic market is the United States, and smaller local relevant geographic markets exist within individual states.

52.     Supermarkets offer consumers convenience.  Competition for supermarkets is local in nature as consumers typically do their grocery shopping at stores located close to where they live or work.  In some jurisdictions, consumers are further limited by the distance they will travel to shop at a supermarket.

53.     In some areas, many residents lack cars and must travel to grocery stores by walking or public transit, which prevents them from traveling outside the community areas in which they work or live to shop at alternative grocery stores.  As a result, the majority of consumers' grocery shopping occurs at stores located very close to where they live or work.

54.     Relevant geographic submarkets may include areas limited to properly defined neighborhoods or city submarkets, and additional urban, suburban, exurban or rural markets throughout the Unitec States.

55.     Food is one of humanity's few true necessities, making competition in the grocery industry unique.  Supermarkets give local residents access to vital grocery products, often competing against each other to provide the best value and service and offering good jobs to workers.

56.     For many neighborhoods and consumers, accessibility of supermarkets by foot or by public transit is critical for the communities' health as a whole.  Yet, access to adequate high-quality food and grocery stores is already an issue for some jurisdictions, creating the problem of "food deserts"—areas located more than a half mile from a grocery store or supermarket with low rates of car access and high poverty rates, which merit policymakers' special attention because of the dire welfare implications for people living in them.

57.     The proposed acquisition will eliminate Albertsons as a substantial competitor in the national and local relevant markets, and will reduce the intensity of price competition market wide.  Although Kroger has stated it will pass consolidation savings on to customers, economic studies have shown that post-merger prices do not decrease but rather increase between 3 and 7 percent.

58.     Because of the essential and constant need for food, even a short-term reduction in competition in the urban neighborhoods, especially those where Kroger and Albertsons compete, can result in higher prices and reductions in quality that can significantly harm consumers' pocketbooks and health.

59.     As a result of this reduced competition, consumers likely will pay more for their groceries, and enjoy fewer promotions, worse service, and fewer quality-improving investments than they would otherwise.

60.     The companies say their newly combined power would not be used to raise prices. Yet Kroger's CFO, Gary Millerchip, told shareholders in October: "We've been very comfortable with our ability to pass on the increases we've seen at this point. And we would expect that to continue to be the case."

61.     Food is among the goods that have seen the highest, most sustained price hikes over the past year.  An average grocery trip costs 13% more than it did a year ago, with the highest jumps impacting supermarket staples (milk and bread are up 15%, chicken is up 17%, and eggs 31%).  Kroger CEO Rodney McMullen has argued that "a little bit of inflation is always good in our business" because "customers don't overly react to that."  At the same time, his counterpart at Albertsons, Vivek Sankaran, has said, "Businesses like ours have done well when in periods where the inflation was 3% to 4%." Last year, he offered this market prediction: "My sense is this inflation will just be passed through" to customers.

62.     This acquisition will also affect the stores' employees as well as consumer prices.  Local residents depend on employment by these companies.  The reduced need for employees and suppressed wages from reduced competition for labor by these employers following a merger will also constitute a significant competitive harm.  Workers will experience lower wage growth and worse working conditions than they would otherwise. Albertsons' current contribution to the prevailing competitive dynamic among supermarkets is, as shown by its market presence and the jobs it provides, critical.

63.     If Albertsons is eliminated, Kroger will operate in a highly concentrated market.  As a consequence, the potential for effective collusion among the remaining grocery

*Complaint for Violation of Section 7 of the Clayton Act and Section 1 of the Sherman Act*

supermarket chains may substantially increase while food quality and consumer choices may be cut, and prices may rise.

64.     If Albertsons is eliminated, Kroger's potential competition with Albertsons itself is also eliminated and the benefits of that competition are extinguished.

65.     Ultimately, Kroger's proposed elimination of its rival competitor Albertsons may, and probably will, result in significant and irreparable harm and inconvenience to consumers, including the Plaintiffs, by propelling grocery prices higher, reducing consumer choices due to overlap in geographic areas and decreasing food quality.

66.     Moreover, the payment of the Special Dividend has no competitive benefit to Albertsons as a company, let alone to consumers and workers, that may be weighed against the Special Dividend's anti-competitive effect on Albertsons' cash flow and its ability to vigorously compete.  The dividend strips Albertsons of nearly all its cash-on-hand during an economic downturn when it will be difficult for the company to obtain additional capital. Without cash, Albertsons cannot advertise, promote, increase services, refurbish, or reorganize stores to make them more attractive to consumers.  As a substitute for credit, it would have to rely on higher prices to raise cash for reinvestment, thereby harming consumers.  It may have to close stores, leaving customers with fewer choices and, as a result, higher prices, inferior selection and quality, or both.

67.     The decrease in the number of major grocery retailers over the past several years reflects a persistent and deliberate pattern of concentration and reduction of competition in the U.S. grocery supermarket industry, a trend which the Supreme Court has said must be arrested in its incipiency.

68.     The elimination of Albertsons by Kroger will result in the elimination of a vibrant competitor and the creation of the largest grocery supermarket giant by revenue in the

*Complaint for Violation of Section 7 of the Clayton Act and Section 1 of the Sherman Act*

United States with 36% of all U.S. sales in an already highly concentrated market.  The resulting concentration of market share is unacceptably high and will ineluctably lead to collusion.

69.     Market concentration is one indicia of the level of competition in a market. The more concentrated a market, and the more a transaction may increase concentration in a particular market, the more likely it is that a transaction may result in a meaningful lessening in competition.

70.     Kroger and Albertsons currently have extensive overlapping markets.  If Albertsons is eliminated, this acquisition may likely eliminate the actual and potential competition between Kroger and Albertsons in these markets, significantly harming consumers in the process.  In addition, the loss of Albertsons' competition in these markets may increase the likelihood that the remaining grocery retailers will coordinate with one another to raise prices, reduce output and diminish the quality of their products, thereby lessening competition in these overlapping markets.

71.     In addition, Kroger's elimination of Albertsons will be virtually certain to cause substantial irreparable injury to Plaintiffs and to all consumers for grocery and other retail products in the relevant geographic and product markets in that, among other reasons, Albertsons, and the consumer choices that go with it, will be gone, and once gone, cannot be reconstituted.

72.     If Albertsons is eliminated, Plaintiffs will sustain irreparable harm for which damages will be inadequate to compensate Plaintiffs in that the competition from a rival competitor will be extirpated and customer choice for grocery options eradicated.  In addition, Kroger's acquisition threatens to substantially reduce the work force of the two grocery chains through employee layoffs due to the elimination of competition.

73.     Neither Kroger nor Albertsons is a failing company.  Both Kroger and Albertsons are strong, vigorous and viable actual and potential competitors in all grocery markets, and each is and has been ready, willing and able to compete against the other grocers for market share.

74.     As a result, there simply is no competitive need to eliminate Albertsons as a competitor.  To the contrary, the continued vigorous competition of Albertsons is one of the few, if not the principal, remaining competitive forces in a highly concentrated market. Its continued existence in the market is needed to preserve and protect the minimal amount of competition that exists in the grocery industry today.

75.     Accordingly, Plaintiffs bring this action for both preliminary and permanent injunctive relief against Defendants' proposed elimination of Albertsons and seek an order prohibiting Kroger from acquiring Albertsons.

## VIOLATIONS ALLEGED

### Count One
Clayton Act, Section 7, 15 U.S.C. § 18

76.     Plaintiffs hereby incorporate the allegations of paragraphs 1 through 75 above and paragraphs 81 through 89 below as if fully set forth herein.

77.     The effect of the proposed acquisition may be substantially to lessen competition, or tend to create a monopoly, in interstate trade and commerce in the relevant markets in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

78.     Unless enjoined, the proposed acquisition may, and most probably would, have the following potential effects in the relevant markets, among others:

(a) actual and potential competition between Kroger and Albertsons may be eliminated;

(b) the elimination of Albertsons, a significant competitor in a non-trivial transaction, may substantially lessen competition, or tend to create a monopoly in the grocery supermarket industry;

(c) competition in general among other grocers may be lessened substantially;

(d) grocery prices may be higher than they otherwise would be;

(e) consumer choices may be lower than they otherwise would be; and

(f) food quality may be lessened.

79.     By reason of this violation, the Plaintiffs are threatened with loss or damage in the form of potentially higher grocery prices, employee layoffs, diminished consumer choices, the potential elimination of a favored supermarket, as well as additional irreparable harm for which damages will be inadequate to compensate Plaintiffs.   Plaintiffs are entitled to bring suit under Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26, to obtain preliminary and permanent injunctive relief against this proposed acquisition, and to recover their costs of suit, including a reasonable attorney's fee.

<u>Count Two</u>

Sherman Act, Section 1, 15 U.S.C. § 1

80.     Plaintiffs hereby incorporate the allegations of paragraphs 1 through 79 above as if set forth fully herein.

81.     Albertsons is a publicly traded company. It is effectively controlled by a consortium of private equity entities, which collectively own approximately 75% of Albertsons stock.  This consortium includes Defendant and co-conspirator Cerberus Capital Management, L.P., an American private equity firm. (Cerberus is named after the mythological three-headed dog that guarded the gates of Hell and protected all those who were in it.)

82.     On October 14, 2022, Kroger and Albertsons announced that they had "entered into an Agreement" whereby  Kroger would acquire Albertsons, its significant rival, for $24.6 billion.  The Albertsons and Kroger acquisition agreement is memorialized in the "Agreement and Plan of Merger" document dated October 13, 2022.

83.     The Defendants Kroger and Albertsons have admitted that, as part of the acquisition transaction, Albertsons will pay a special cash dividend of up to $4 billion to the investor consortium of private equity entities, principally the co-conspirator and defendant Cerberus, and other shareholders.

84.     One of the purposes of this scheme to pay out a cash dividend (in addition to the profit gauging by Cerberus and other major investors) is to hamper, cripple and shut-down Albertsons as the number two supermarket competitor to Kroger in the United States in order to fraudulently claim that Albertsons is a failing company - a defense in support of its planned acquisition that is not available to Kroger as a matter of law.

85.     The dividend agreement constitutes a contract and combination and conspiracy in restraint of trade.  The scheme, which was intended to be and was in fact made in derogation of Albertsons' minority shareholders and also in derogation of the integrity of Albertsons as an ongoing entity, is itself a violation of Section 1 of the Sherman Antitrust Act and has been implemented in furtherance of defendants' violation of Section 7 of the Clayton Antitrust Act which otherwise prohibits Kroger from acquiring Albertsons.

86.     One of the purposes of the dividend agreement is to enrich the majority shareholders of Albertsons, including co-conspirator and defendant Cerberus, which is the primary beneficiary of the agreed-upon $4 billion Special Cash Dividend.

87.     Another purpose of this scheme is to falsely create the supposed defense that Albertsons is a failing company by sucking the lifeblood from a viable company.

88.     Another purpose of this scheme is to eliminate Albertsons' cash-on-hand and to nearly double its debt, putting Albertsons in a weakened competitive position relative to Kroger, and thereby harming grocery consumers and workers throughout United States.

89.      Defendants have indicated that, unless enjoined, they will proceed immediately to distribute the dividend to Cerberus and to the consortium of private equity firms.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief from this Honorable Court:

A.     Declaring, finding, adjudging, and decreeing that the agreement of Kroger to acquire Albertsons violates Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18, and is enjoined.

B.     Permanently enjoining Kroger from consummating the acquisition of Albertsons;

C.     Ordering disgorgement of any of the $4 billion in payments made to the consortium of private equity entities;

D.     Permanently enjoining Albertsons from making a Special Dividend payment to the consortium of private equity entities led by Cerberus as an act in furtherance of the Defendants' violation of Section 7 of the Clayton Act.

E.     Declaring void any agreement to pay the consortium of private equity entities led by Cerberus any amount by reason of the failure of the Albertsons acquisition as an act in furtherance of the violations alleged;

F.      Declaring the merger contract between the Defendants to be null and void;

G.     Awarding to Plaintiffs their costs of suit, including a reasonable attorney's fee, as provided by Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26; and

*Complaint for Violation of Section 7 of the Clayton Act and Section 1 of the Sherman Act*

1

H.     Granting to Plaintiffs such other and further relief to which they may be

2

entitled and which the Court finds to be just and proper.

3

4

DATED:  January 31, 2023       By: /s/ Joseph M. Alioto

5

                                       Joseph M. Alioto, Esq. (SBN 42680)

6

                                       Tatiana V. Wallace, Esq. (SBN 233939)
ALIOTO LAW FIRM
One Sansome Street, Suite 3500

7

                                       San Francisco, CA 94104
Telephone: (415) 434-8900

8

                                       Email: jmalioto@aliotolaw.com

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Complaint for Violation of Section 7 of the Clayton Act and Section 1 of the Sherman Act*

1

ADDITIONAL PLAINTIFFS COUNSEL:

2

Lawrence G. Papale (SBN 67068)
LAW OFFICES OF LAWRENCE G. PAPALE

3

1308 Main Street, Suite 117

4

St. Helena, CA 94574
Telephone: (707) 963-1704

5

Email: lgpapale@papalelaw.com

6

Joseph R. Saveri (State Bar No. 130064)

7

Steven N. Williams (State Bar No. 175489)
Cadio Zirpoli (State Bar No. 179108)

8

David H. Seidel (State Bar No. 307135)
JOSEPH SAVERI LAW FIRM, LLP

9

601 California Street, Suite 1000
San Francisco, California 94108

10

Telephone:      (415) 500-6800

11

Email:          jsaveri@saverilawfirm.com
                swilliams@saverilawfirm.com

12

                czirpoli@saverilawfirm.com
                dseidel@saverilawfirm.com

13

14

Theresa Moore (SBN 99978)
LAW OFFICE OF THERESA D. MOORE PC

15

One Sansome Street, 35th Floor
San Francisco, CA 94104

16

Phone: (415) 613-1414
tmoore@aliotolaw.com

17

18

Josephine Alioto (SNB 282989)
THE VEEN FIRM

19

20 Haight Street
San Francisco CA 94102

20

Telephone: (415) 673-4800
Email: jalioto@veenfirm.com

21

Christopher A Nedeau (SBN 81297)

22

NEDEAU LAW PC

23

154 Baker Street
San Francisco, CA 94117-2111

24

Telephone: (415) 516-4010
Email: cnedeau@nedeaulaw.net

25

26

27

28

*Complaint for Violation of Section 7 of the Clayton Act and Section 1 of the Sherman Act*