1
2
3
4

Joseph M. Alioto (SBN 42680)
Tatiana V. Wallace (SBN 233939)
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone: (415) 434-8900
Email:  jmalioto@aliotolaw.com

5
6
7
8
9
10
11
12
13

Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
Cadio Zirpoli (State Bar No. 179108)
Elissa Buchanan (State Bar No. 249996)
David H. Seidel (State Bar No. 307135)
JOSEPH SAVERI LAW FIRM, LLP
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Email: jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
czirpoli@saverilawfirm.com
eabuchanan@saverilawfirm.com
dseidel@saverilawfirm.com

14

[Additional Counsel Listed on Last Page]

15
16

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

17
18
19
20
21
22
23
24
25
26
27
28

Christine Whalen, Katherine Arcell, Jose Brito, Jan Marie Brown, Rosemary D'Augusta, Brenda Davis, Pam Faust, Carolyn Fjord, Don Freeland, Donald Fry, Gabriel Garavanian, Harry Garavanian, Jocelyn Gardner, Valarie Jolly, Michael Malaney, Len Marazzo, Lisa McCarthy, Tim Nieboer, Deborah Pulfer, Bill Rubinsohn, Sondra Russell, June Stansbury, Clyde Stensrud, Gary Talewsky, Pam Ward,

                                    Plaintiffs,

                         v.

Kroger Co., Albertsons Companies, Inc., and Cerberus Capital Management, L.P.,

                                    Defendants.

Case No.:  23-cv-00459-VC

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR A PRELIMINARY INJUNCTION AND ORDER TO SHOW CAUSE WHY INJUNCTION SHOULD NOT ISSUE**

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

Date:          April 27, 2023
Time:          10:00 a.m.
Courtroom:  4, 17th Floor

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ..........................................................1

INTRODUCTION .................................................................................................................1

FACTUAL BACKGROUND ................................................................................................8

LEGAL STANDARD .........................................................................................................11

ARGUMENT ......................................................................................................................12

A.    Plaintiffs are likely to succeed on the merits.................................................12

      1.    The Clayton Act Codifies Congress' Intent to Prohibit Mergers Through Direct Private Actions Such as This ..........................................13

      2.    Plaintiff's Burden Under Section 7 Is Low ...............................................14

      3.    Plaintiffs Need Only Show a Reasonable Probability of a Lessening of Competition in a Single Product Market; Defendants Must Establish There Will Be No Lessening of Competition in Any Market ....................................................................17

      4.    The Merger Will Substantially Lessen Competition in the Relevant Geographic Market ....................................................................18

      5.    The Merger Will Substantially Lessen Competition in the Relevant Product Market…………………………………………….. 18

      6.    The Merger Will Substantially Lessen Competition in Each of the Relevant Markets …………………………………………… 19

B.    The Special Dividend is a Violation of Section 1 of the Sherman Act ……………… 21

C.    Plaintiffs Are likely to Suffer Irreparable Harm Without Preliminary Relief...............23

D.    The Balance of Equities Tips in Plaintiffs Favor and Preliminary Relief Is in the Public Interest...........................................................................................24

CONCLUSION ...................................................................................................................25

# TABLE OF AUTHORITIES

**CASES**

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, (9th Cir. 2011)................................. 11,13

*American Tobacco Co. v. United States,* 328 U.S. 781 (1946)…………………………….22

*Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, (9th Cir. 2016) ........................................... 24

*Brown Shoe Co. v. United States*, 370 U.S. 294, (1962) …………….…....................*passim*

*California v. Federal Power Comm'n*, 369 U.S. 482, (1962) ................................... 11,14,17,24

California v. American Stores, 495 U.S. 271 (1990)……………………………………….14

*FTC v. Elders Grain, Inc.*, 868 F.2d 901, (7th Cir. 1989) ......................................................... 15

*FTC v. Warner Communications, Inc., 742 F.2d 1156 (9th Cir. 1984)*…………...……..12

*Hoffman v. Int'l Longshoremen's & Warehousemen's Union,*
*Local No. 10*, 492 F.2d 929,(9th Cir. 1974)...................................................................... 11

*Hosp. Corp. of Am. v. F.T.C.*, 807 F.2d 1381, (7th Cir. 1986) ........................................... 17,20

*Olin Corp. v. F.T.C.*, 986 F.2d 1295, (9th Cir. 1993)...................................................... 15,17,20

*St. Alphonsus Med. Center-Napa Inc. v. St. Luke's Health Sys., Ltd.*,

778 F.3d 775 (9th Cir. 2015) ......................................................................................... 18,21

*Pennsylvania Sugar Refinery v. American Sugar Refining Co.,* 166 F. 254 (SDNY 1908).22,23

*United States v. Aluminum Co. of Am.*, 377 U.S. 271, (1964)................................... 15,16,19,20

*United States v. Continental Can Co., 378 U.S. 441 (1964)*……………………….....12,16

*United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966) ....................................... 16,19,20,23

*United States v. Penn-Olin Chem. Co, 378 U.S. 158 (1964)*…………………………….12

*United States v. Philadelphia National Bank, 374 U.S. 321 (1963)* ..…………………………17

*United States v. Topco Associates*, 405 U.S. 596, (1972).......................................................... 25

*United States v. Trib. Publ'g Co.*, 2016 WL 2989488, (C.D. Cal. Mar. 18, 2016) .................. 11

*United States v. Von's* Grocery Co., 384 U.S. 270 (1966)……………………………….*passim*

**STATUTES**

15 U.S.C. §§ 1 ................................................................................................ *passim*

15 U.S.C. §§ 4 ........................................................................................................ 11

15 U.S.C. §§18…………………………………………………………………*passim*

15 U.S.C. §§25 ...................................................................................................... 11

15 U.S.C. §§26 .............................................................................................. 1,11,14

Federal Rule of Civil Procedure 65 .................................................................. 1,6,11

1

## MOTION

2

**PLEASE TAKE NOTICE** that on Thursday, April 27, 2023, at 10:00 a.m., or as soon

3

thereafter as the matter may be heard, in Courtroom 4 of the Honorable Vince Chhabria at the

4

United States District Court for the Northern District of California, 17th Floor, 450 Golden

5

Gate Avenue, San Francisco, CA 94102, Plaintiffs shall and hereby do move the Court for a

6

7

preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a), prohibiting the

8

proposed acquisition of Albertsons Companies, Inc. ("Albertsons") by Kroger Co. ("Kroger")

9

under the authority of Sections 7 and 16 of the Clayton Act, 15 U.S.C. §§ 18 and 26 and

10

prohibiting and/or disgorging the payment of a $4 billion dividend to Albertsons' majority

11

stockholder, Defendant Cerberus Capital Management, L.P. ("Cerberus").

12

This Motion is made based upon this Notice of Motion and Motion and on the grounds

13

set forth in the accompanying Memorandum of Points and Authorities; the Declaration of

14

Joseph M. Alioto; all the pleadings and papers filed in this action; the argument of counsel;

15

and further evidence as the Court may consider at or before a hearing regarding this motion or

16

17

at the hearing regarding the Order to Show Cause and preliminary injunction requested herein.

18

## MEMORANDUM OF POINTS AND AUTHORITIES
## INTRODUCTION

19

The largest grocery operator in the United States is buying the second largest grocery

20

operator in the United States to become the largest grocery supermarket in the United States.

21

22

This motion is brought under Section 7 of the Clayton Act.  The proposed merger is between two

23

American companies that provide essential food services to residents throughout the country.

24

Congress prohibited all mergers and acquisitions where the effect "may be substantially

25

to lessen competition, or to tend to create a monopoly." 15 U.S.C. §18. The Supreme Court has

26

held that Congress specifically sanctioned this broad language requiring only that a Plaintiff show

27

that a merger *may* have a reasonable probability of lessening competition or *may* tend to create a

28

monopoly for it to be held unlawful. *Brown Shoe Co. v. United States*, 370 U.S. 294, 317 (1962).

The history of the Clayton Act, as explained by numerous Supreme Court cases, shows without question that Congress meant to clamp down with vigor on the growing trend towards market concentration through mergers and acquisitions.  (*See* Exhibit A – Collection of Section 7 Supreme Court Cases.)  By implementing this modest and direct standard, "may be substantially to lessen competition, or to tend to create a monopoly",  Congress specifically intended to stop market concentration in its incipiency, based on the simple but powerful policy that, in these United States, economic expansion shall be achieved by *competition rather than by combination* or merger. Expansion through competition is inherently preferred over concentration through mergers and acquisitions, and that concentration must be stopped long before it reaches monopolistic levels.[1]

And as part of Congress' statutory plan to prevent market concentration in its incipiency, Congress enshrined the individual, private right of action as part of its enforcement scheme. Congress authorized private Plaintiffs who may be threatened with loss or harm from the decay of competition to seek and obtain injunctive relief from the courts. As the Supreme Court has held, "[p]rivate enforcement of the [Clayton] Act was in no sense an afterthought; it was an integral part of the congressional plan for protecting competition." *California v. American Stores*, 495 U.S. 271, 275 (1990).  Section 16 and other provisions of the Clayton Act "manifest a clear intent to encourage vigorous private litigation against anti-competitive mergers," and to "subject mergers to searching scrutiny." *Id*.

---

[1] "A company's history of expansion through mergers presents a different economic picture than a history of expansion through unilateral growth. Internal expansion is more likely to be the result of increased demand for the company's products and is more likely to provide increased investment in plants, more jobs and greater output. Conversely, expansion through merger is more likely to reduce available consumer choice while providing no increase in industry capacity, jobs or output. It was for these reasons, among others, Congress expressed its disapproval of successive acquisitions. Section 7 was enacted to prevent even small mergers that added to concentration in an industry. See S. Rep. No. 1775, 81st Cong., 2d Sess. 5. *Cf. United States v. Jerrold Electronics Corp*., 187 F.Supp. 545, 566 (D. C. E. D. Pa.) aff'd, 365 U.S. 567; *United States v. Bethlehem Steel Corp.*, 168 F.Supp. 576, 606 (D. C. S. D. N. Y.)."  *Brown Shoe Co. v. United States*, 370 U.S. 294, fn. 72 (1962).

As this Motion shows, Kroger's acquisition of Albertsons easily satisfies this Section 7 standard. The Supreme Court has repeatedly struck down mergers with far less risk of lessening competition than is the case here.  (*See* Exhibit A – Collection of Section 7 Supreme Court Cases.)

In addition, Plaintiffs charge that the shareholders of Cerberus must disgorge the $4 billion dividend that is being paid to Albertsons' majority shareholder, Cerberus, the "Hound of Hades".

The parties have proposed that Albertsons issue a "special dividend."  Payment of this special dividend must be stopped as it threatens significant anticompetitive harm by leaving Albertsons undercapitalized, both during the pendency of the proposed acquisition and beyond, and it will have the effect of impeding Albertsons from competing with other supermarkets, including its major competitor Kroger. Reduced competition among grocery stores will leave shoppers with higher prices, worsening services, less innovation, and even closure of their local Safeway or other Albertsons supermarket. A financially crippled Albertsons will have dire consequences for consumers who depend upon supermarkets near their homes for essential services, such as fresh meats and produce, among other staples.

If Albertsons is strapped for cash because of the payment of the dividend, it will be less able to offer promotions on groceries, less able to offer quality services, and less able to maintain staffing and competitive wages and benefits for workers. With Albertsons operating at a disadvantage created by its agreement with Kroger to pay the dividend, competition between the two and with others will be lessen or be eliminated in violation of Section 1 of the Sherman Act.

Plaintiffs respectfully submit that a very serious question is presented that requires this merger to be enjoined pending further discovery and a trial on the permanent injunction. Justice Black underscored the Supreme Court's concern in *United States v. Von's Grocery*

*Co.*, 384 U.S. 270, 278 (1966)[2] when it acted quickly to stop the concerted concentration in the United States grocery industry in its incipiency:

> "Appellees' primary argument is that the merger between Von's and Shopping Bag is not prohibited by s 7 because the Los Angeles grocery market was competitive before the merger, has been since, and may continue to be in the future. Even so, s 7 'requires not merely an appraisal of the immediate impact of the merger upon competition, but a prediction of its impact upon competitive conditions in the future; this is what is meant when it is said that the amended s 7 was intended to arrest anti-competitive tendencies in their 'incipiency." *United States v. Philadelphia Nat. Bank*, 374 U.S. 321, 362, 83 S.Ct. 1715, 1741. It is enough for us that Congress feared that a market marked at the same time by both a continuous decline in the number of small businesses and a large number of mergers would slowly but inevitably gravitate from a market of many small competitors to one dominated by one or a few giants, and competition would thereby be destroyed. Congress passed the Celler-Kefauver Act to prevent such a destruction of competition. Our cases since the passage of that Act have faithfully endeavored to enforce this congressional command.  We adhere to them now." *Id*. at 278.

In *Von's*, as in this case, the "grocery business was being concentrated into the hands of fewer and fewer owners, the small companies were continually being absorbed by the larger firms through mergers." *Id*. at 273.  In *Von's*, the many acquisitions and mergers in the Los Angeles grocery industry from 1954 through 1961 . . .  all among the 10 leading chains in the area . . . [were] enough to cause us to conclude contrary to the District Court that the Von's-Shopping Bag merger did violate s 7." (*Id*. at 274.)

Plaintiffs make this motion in the context of the underlying and formative policy of these United States and the history and purpose of the Clayton Act as summed-up in *Von's*.

> "From this country's beginning there has been an abiding and widespread fear of the evils which flow from monopoly—that is the concentration of economic power in the hands of a few. On the basis of this fear, Congress in 1890, when many of the Nation's industries were already concentrated into what it deemed too few hands, passed the Sherman Act in an attempt to prevent further concentration and to preserve competition among a large number of sellers. Several years later, in 1897, this Court emphasized this policy of the Sherman Act by calling attention to the tendency of powerful business combinations to restrain competition 'by driving out of business the small dealers and worthy men whose lives have been spent therein, and who might be unable to readjust themselves to their altered surroundings.' *United States v. Trans-Missouri Freight Ass'n.*, 166 U.S. 290, 323, 17 S.Ct. 540, 552, 41 L.Ed. 1007.7 The

---

[2] On this appeal, Judge Richard A. Posner represented the United States and Judge William W. Alsup represented Von's Grocery Co. before the Supreme Court.

Sherman Act failed to protect the smaller businessmen from elimination through the monopolistic pressures of large combinations which used mergers to grow ever more powerful. As a result in 1914 Congress, viewing mergers as a continuous, pervasive threat to small business, passed s 7 of the Clayton Act which prohibited corporations under most circumstances from merging by purchasing the stock of their competitors. Ingenious businessmen, however, soon found a way to avoid s 7 and corporations began to merge simply by purchasing their rivals' assets. This Court in 1926, over the dissent of Justice Brandeis, joined by Chief Justice Taft and Justices Holmes and Stone approved this device for avoiding s 7 and mergers continued to concentrate economic power into fewer and fewer hands until 1950 when Congress passed the Celler-Kefauver Anti-Merger Act now before us. *Id.* at 275.

"Like the Sherman Act in 1890 and the Clayton Act in 1914, the basic purpose of the 1950 Celler-Kefauver Act was to prevent economic concentration in the American economy by keeping a large number of small competitors in business.  In stating the purposes of their bill, both of its sponsors, Representative Celler and Senator Kefauver, emphasized their fear, widely shared by other members of Congress, that this concentration was rapidly driving the small businessman out of the market. The period from 1940 to 1947, which was at  the center of attention throughout the hearings and debates on the Celler-Kefauver bill, had been characterized by a series of mergers between large corporations and their smaller competitors resulting in the steady erosion of the small independent business. L.Ed.2d 915; United States v. Alcoa, 377 U.S. 271, 280, 84 S.Ct. 1283, 1289, 12 L.Ed.2d 314. Representative Celler, in introducing the bill on the House floor, remarked: 'Small, independent, decentralized business of the kind that built up our country, of the kind that made our country great, first, is fast disappearing, and second, is being made dependent upon monster concentration.' 95 Cong. Rec. 11486. Senator Kefauver expressed the same fear on the Senate floor: 'I think that we are approaching a point where a fundamental decision must be made in regard to this problem of economic concentration. Shall we permit the economy of the country to gravitate into the hands of a few corporations * * *? Or on the other hand are we going to preserve small business, local operations, and free enterprise?' 96 Cong. Rec. 16450. References to a number of other similar remarks by other Congressmen are collected in Brown Shoe Co. v. United States, 370 U.S. 294, 316, n. 28, 82 S.Ct. 1502, 1519, 8 L.Ed.2d 510. Thatcher Manufacturing Co. v. Federal Trade Commission, 272 U.S. 554, 560, 47 S.Ct. 175, 178, 71 L.Ed. 405.

"Like the Sherman Act in 1890 and the Clayton Act in 1914, the basic purpose of the 1950 Celler-Kefauver Act was to prevent economic concentration in the American economy by keeping a large number of in our economy. As we said in Brown Shoe Co. v. United States, 370 U.S. 294, 315, 82 S.Ct. 1502, 1518, 8 L.Ed.2d 510, 'The dominant theme pervading congressional consideration of the 1950 amendments was a fear of what was considered to be a rising tide of economic concentration in the American economy.' To arrest this 'rising tide' toward concentration into too few hands and to halt the gradual demise of the small businessman, Congress  decided to clamp down with vigor on mergers. It both revitalized s 7 of the Clayton Act by 'plugging its loophole' and broadened its scope so as not only to prohibit mergers between competitors, the effect of which 'may be substantially to lessen competition, or to tend to create a monopoly' but to prohibit all mergers having that effect. By using these terms in s 7 which look not merely to the actual present effect of a merger but instead to its effect upon future competition,

Congress sought to preserve competition among many small businesses by arresting a trend toward concentration in its incipiency before that trend developed to the point that a market was left in the grip of a few big companies. Thus, where concentration is gaining momentum in a market, we must be alert to carry out Congress' intent to protect competition against ever increasing concentration through mergers. *Id.* at 275-277.

"What we have . . . is simply the case of two already powerful companies merging in a way which makes them even more powerful than they were before. If ever such a merger would not violate s 7, certainly it does when it takes place in a market characterized by a long and continuous trend toward fewer and fewer owner-competitors which is exactly the sort of trend which Congress, with power to do so, declared must be arrested. *Id.* at 278.

In *Von's* the defendants merged to become the second largest grocery chain in Los Angeles. The Defendants here are likewise already powerful grocery chains whose combination will create the largest grocery chain in the United States. This merger, if permitted, will overwhelmingly, and perhaps unstoppably, exacerbate the undeniable trend toward untenable concentration in the United States grocery market.

*See* Exhibit B to Alioto Declaration, showing a comparison between the proposed merger and the merger in *United States v. Von's Grocery Co.*

Pursuant to Federal Rule of Civil Procedure 65(a), Plaintiffs therefore seek an order temporarily arresting the acquisition of Albertsons Companies, Inc. ("Albertsons") by Kroger Co. ("Kroger") and preventing Albertsons from issuing the announced "special cash dividend" ("Special Dividend") to Defendant Cerberus, Albertsons' majority shareholder, or, if already paid, ordering that the dividend be disgorged by Defendant Cerberus, until such time as the Court can complete an accelerated trial on the merits. By temporarily stopping this acquisition and by preventing Albertsons from issuing or disgorging an estimated $4 billion dividend to its majority shareholders — an amount roughly equivalent to all its liquid assets — the Court will ensure that the status quo is maintained and that irreparable harm to competition and to the Plaintiffs will not ensue before Plaintiffs can demonstrate at trial that this acquisition is unlawful under Section 7 of the Clayton Act, 15 U.S.C. §18. Indeed, under the holding of the Supreme Court's opinion in

*Von's* alone, there is no question that his combination should be enjoined.  *United States v. Von's Grocery Co.*, 384 U.S. 270 (1966).

Adam Smith, the great champion of English economic principles, agrees that competition rather than concentration among a multitude of grocers contributes to the common good:

> "If [] capital is divided between two different grocers, their competition will tend to make both of them sell cheaper than if it were in the hands of one only; and if it were divided among twenty, their competition would be just so much the greater, and the chance of their combining together, in order to raise the price, just so much the less. Their competition might perhaps ruin some of themselves; but to take care of this is the business of the parties concerned, and it may safely be trusted to their discretion. It can never hurt either the consumer or the producer; on the contrary, it must tend to make the retailers both sell cheaper and buy dearer than if the whole trade was monopolized by one or two persons. . . . It is not the multitude of ale-houses, to give the most suspicious example, that occasions a general disposition to drunkenness among the common people; but that disposition arising from other causes necessarily gives employment to a multitude of ale-houses."  Adam Smith, *The Wealth of Nations*, Book Two, Chapter V, Glasgow Edition, page 362.

Kroger is the dominant player in the grocery industry. Albertsons is its chief rival. Kroger's offer to pay almost $25 billion for Albertsons is not a trivial transaction. The combination in which the number one supermarket in the United States combines with the number two will eliminate an independent, significant competitor, and will likely lessen competition in the retail grocery market. In addition, the payment of the "Special Dividend" is unlawful under Section 1 of the Sherman Act (15 U.S.C. §1) because it is an agreement in restraint of trade that will financially cripple Albertsons, sucking its lifeblood and inhibiting its ability to compete effectively during the pendency of the merger and beyond. *Pennsylvania Sugar Refinery v. American Sugar Refining Co.*, 166 F. 254 (SDNY 1908).  The negative ramifications for consumers and workers are significant, immediate, and long-term.

The trend in the United States toward hegemony in the grocery market is not only bad economics, it is unlawful.  In 1988, Von's Grocery bought Safeway's stores in Southern California and Nevada in exchange for Safeway taking a stake in Von's.  Thereafter, Albertsons bought Safeway while agreeing to spin-off stores (which turned into a recognized economic

disaster).  In the purchase of Safeway, Albertsons became the number two supermarket operator in the country.   Kroger – which had grown by consuming such competitors as Ralph's, Fred Meyers, King, and Pick and Save, among others – now seeks to consume Albertsons, thereby creating the largest grocery supermarket in the country with over four times the annual sales of its next largest competitor.  (See Exhibit G to Alioto Declaration, - Rankings of Top Supermarket Operators Post-Acquisition.)

An injunction is warranted, therefore, because (1) Plaintiffs are likely to prevail on the merits; (2) without the requested relief, Plaintiffs and all consumers will suffer irreparable harm by propelling grocery prices higher, reducing consumer choices in overlapping geographic areas and decreasing food quality; (3) the balance of equities tips in favor of an injunction since, without one, the public will likely suffer both price increases and deteriorating customer services from a weakened Albertsons, while granting it would do no harm to Defendants' operations; and (4) the injunction will further a strong public interest by maintaining competition in the grocery market.

## **FACTUAL BACKGROUND**

Albertsons and Kroger (collectively, "Defendants") are the two largest horizontal competitors in the sale of groceries and other consumer goods nationally.   Albertsons is a publicly traded company and is effectively controlled by a consortium of private equity entities which collectively own approximately 75% of Albertsons stock.  These private equity entities include Albertsons' largest shareholder, Defendant Cerberus Capital Management, L.P. ("Cerberus"), ironically named after the mythological three-headed dog that guarded the gates of Hell and protected those who resided therein.

On October 13, 2022, the Defendants entered into an "Agreement and Plan of Merger by and Among Albertsons Companies, Inc., The Kroger Co., And Kettle Merger Sub, Inc."

("Agreement"), pursuant to which Kroger agreed to pay $24.6 billion in cash to eliminate Albertsons.

This is not a trivial transaction. As part of their proposed merger, and pending completion, the companies have sought to financially cripple Albertsons and to weaken its competitive position relative to Kroger by agreeing that Albertsons will provide a "special dividend" of $4 billion, an amount roughly equivalent to all its liquid assets and approximately a third of its market capitalization, to be paid to Albertsons' shareholders thereby eliminating Albertsons' cash-on-hand and nearly doubling its debt.  Nearly one-third of this payment will go to Defendant Cerberus.

The payment of this Special Dividend, besides enriching Cerberus and other major investors, will leave Albertsons undercapitalized and will impede its ability to compete with other supermarkets, including Kroger, leaving shoppers to face higher prices, worse services, less innovation, and closure of Albertsons supermarkets.  Replacing cash with debt will inevitably harm Albertsons' credit rating, making borrowing more expensive.  A financially crippled Albertsons will have dire consequences for consumers, who depend on supermarkets near their homes for essentials food items such as fresh meat and produce, among other groceries.  If Albertsons is strapped for cash, it will be less able to offer promotions on groceries, less able to offer quality services, and less able to maintain staffing and competitive wages and benefits for workers.

Importantly, neither Kroger nor Albertsons is a failing company.  Kroger is the largest supermarket operator by revenue in the United States with 23.6% market share and $138 billion in sales in 2021.  Albertsons is the second-largest supermarket chain in North America after Kroger controlling over 12.4% of the market and $72 billion in sales in 2021. *See* Chart attached as Exhibit C to Alioto Declaration - Domestic Market Share of US Grocery Operators and Chart

attached as Exhibit D to Alioto Declaration - Rankings of Top Supermarket Operators Pre-Acquisition.

Collectively, Albertsons and Kroger operate nearly 5,000 stores, employ more than 710,000 associates, run 66 distribution centers, 52 manufacturing plants, nearly 4,000 pharmacies and more than 2,000 fuel centers across 48 states and the District of Columbia. *See* Chart attached as Exhibit E to Alioto Declaration – Location of Kroger and Albertsons Stores Nationwide.

Kroger's plan to acquire its primary rival would combine the biggest and second-biggest supermarket companies in the country by sales creating a textbook monopoly. *See* Chart attached as Exhibit F to Alioto Declaration – The Grocery Cartels. Supermarkets are already a consolidated industry in the United States. The U.S. grocery supermarket industry is moving toward complete concentration and monopoly, which is dramatically illustrated by Defendant Kroger's past mergers and acquisitions.

Albertsons and Kroger are two of the market's largest players and are fierce competitors. They currently operate competing banners with strong presences across the United States. Unless this merger of the first and the second largest national competitors in retail sales among the U.S. food and grocery supermarket operators is prohibited, the unified company will become the largest supermarket by revenue in the United States with a national market share of 36%, while Albertsons, with a current national market share of 12.4%, will be eliminated. *See* Chart attached as Exhibit G to Alioto Declaration - Rankings of Top Supermarket Operators Post-Acquisition.

The payment of the Special Dividend will inevitably leave Albertsons with lower liquidity and less access to capital, while the acquisition of Albertsons will result in the eradication of consumer choice. The proposed acquisition poses a substantial threat to the Plaintiffs and to the public at large in that it may cause higher prices for food and other consumer

goods, and will result in the elimination of consumer choices, fewer promotions, lesser quality products, employee layoffs and other potential anticompetitive effects.

## **LEGAL STANDARD**

Congress has authorized preliminary relief in antitrust cases by including language in both the Sherman Act and the Clayton Act providing that "the court may at any time make such temporary restraining order or prohibition as shall be deemed just in the premises." 15 U.S.C. §§ 4, 25. "Consequently, it is the duty of the District Court before which an antitrust suit is pending to pass on the desirability of temporary relief in order to avoid later problems of 'unscrambling,'" *California v. Federal Power Comm'n*, 369 U.S. 482, 495 (1962). If not enjoined, Albertsons will be stripped of its assets and exsanguinated of its lifeblood. Kroger will absorb Albertsons and thus engage in the "scrambling" that the statute seeks to avoid.

The Court may grant a preliminary injunction under Federal Rule of Civil Procedure 65(a) and under Section 16 of the Clayton Act, 15 U.S.C. § 26. In deciding whether to grant a preliminary injunction, courts must consider four factors: (1) the movant's likelihood of success on the merits; (2) the movant's likelihood of irreparable harm if the preliminary injunction is not issued; (3) a balancing of the equities; and (4) the public interest. *See, e.g.*, *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011; *United States v. Trib. Publ'g Co.*, 2016 WL 2989488, at *2 (C.D. Cal. Mar. 18, 2016).

Here, all four conditions are met and support the preliminary relief requested by the Plaintiffs to "preserve the status quo pending a hearing." *Hoffman v. Int'l Longshoremen's & Warehousemen's Union, Local No. 10*, 492 F.2d 929, 933 (9th Cir. 1974), *aff'd sub nom. Muniz v. Hoffman*, 422 U.S. 454 (1975).

That is all that the Plaintiffs seek here—the maintenance of ongoing competition among long-standing competitors while both sides conduct the necessary preparations for a hearing on the merits of the Plaintiffs' antitrust claims.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ARGUMENT**

**A.  Plaintiffs Are Likely to Succeed on the Merits.**

Kroger's proposed acquisition of Albertsons violates Section 7 of the Clayton Act because it may substantially lessen competition or tend to create a monopoly. In fact, the merger is a textbook example of a merger slouching towards monopoly. If the merger is allowed, it would eliminate competition between Kroger and Albertsons, the two largest supermarkets in the United States and would result in Kroger controlling approximately 36 percent of all U.S. grocery supermarket operator sales in an already highly concentrated market.  (Exhibits B and F to Alioto Decl.)

The Clayton Act outlaws all mergers and acquisitions that "may substantially lessen competition or tend to create a monopoly." 15 U.S.C. § 18.  Because of "may be" language in the statute, Section 7 analysis is founded upon "probabilities, not certainties." *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962); *see also United States v. Penn-Olin Chem. Co*., 378 U.S. 158, 171 (1964) (Section 7's "requirements are satisfied when a 'tendency' toward monopoly or the 'reasonable likelihood' of a substantial lessening of competition in the relevant market is shown"); *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984) ("It is well established that a section 7 violation is proven upon a showing of reasonable probability of anticompetitive effect."). "Where a merger is of such a size as to be inherently suspect, elaborate proof of market structure, market behavior and probable anticompetitive effects may be dispensed with in view of § 7's design to prevent undue concentration." *United States v. Cont'l Can Co*., 378 U.S. 441, 458 (1964).  *See* Exhibit A - Section 7 Cases, for examples of inherently suspect market shares.

Under the Supreme Court's binding precedent, Congress' use of this expansive definition was meant to ensure that the growing trend towards concentration in markets was stopped in its incipiency, even before it may be clear whether a merger would lessen competition, and reflects a

policy judgment that competition among numerous market participants and small businesses is preferable to concentrating markets through mergers and acquisitions. Here, after years of unchecked concentration in the grocery supermarket industry, the largest supermarket operator in the United States has announced it will eliminate its main rival by acquiring the second largest supermarket chain in the United States.

Further, the Defendants' horizontal agreement requiring Albertsons to issue approximately $4 billion as a special dividend will weaken Albertsons' ability to compete and therefore, in and of itself, constitutes an unreasonable restraint of trade in violation of the Act. The agreement to hamper Albertsons' ability to compete by making it cash-poor (in effect, to cripple Albertsons) is a violation of Section 1 of the Sherman Act which is being perpetrated in furtherance of the Defendants' violation of Section 7 of the Clayton Act.

Plaintiffs must show a likelihood of prevailing on the merits. But when as here the balance of hardships tips sharply in Plaintiffs' favor, Plaintiffs need only show that "serious questions" are raised as to whether this acquisition may substantially lessen competition or tend to create a monopoly. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, at 1131.

Here, given that the merger will eliminate the substantial and direct competition between Kroger and Albertsons and given its enormous potential for further anticompetitive effects, Plaintiffs, even at this stage of the proceedings, have exceeded their burden by presenting not merely a reasonable probability of success, but also demonstrating a clear case that this merger is unlawful.

### 1.   The Clayton Act Codifies Congress' Intent to Prohibit Mergers Through Direct Private Actions Such as This

As part of Congress' statutory scheme to prohibit all mergers and acquisitions that may substantially lessen competition, Congress established a private right of action as an important means to stop anticompetitive mergers that, through incremental concentrations, slowly but

surely destroy competition and tend to lead to monopolies and oligopolies in markets. Thus, Section 16 of the Clayton Act provides in relevant part that "[a]ny person . . . shall be entitled to sue for and have injunctive relief against threatened loss or damage" from an unlawful merger or acquisition. 15 U.S.C.A. § 26. As explained in *California v. American Stores*, the Clayton Act's provisions "manifest a clear intent to encourage vigorous private litigation against anti-competitive mergers." 495 U.S. 271, 275 (1990). By encouraging vigorous private litigation to police unlawful mergers, Congress sought to "subject mergers to searching scrutiny" through private lawsuits such as this. *Id.* Indeed, "[p]rivate enforcement of the [Clayton] Act was in no sense an afterthought; it was an integral part of the congressional plan for protecting competition." *Id.*

Congress understood the broad and pervasive harms inherent in economic concentration through mergers and acquisitions. *See Brown Shoe Co. v. United States,* 370 U.S. 294, 317 (1962) ("[A] keystone in the erection of a barrier to what Congress saw was the rising tide of economic concentration, was its provision of authority for arresting mergers at a time when the trend to a lessening of competition in a line of commerce was still in its incipiency."). Congress therefore "sought to assure the courts the power to break this force at its outset and before it gathered momentum." *Id.*

### 2. Plaintiff's Burden Under Section 7 Is Low

To effectuate the Clayton Act's statutory scheme to stop economic concentration through merger and thereby "preserve competition among many small businesses," Congress enshrined an expansive definition of unlawful acquisitions. *United States v. Von's Grocery Co.*, 384 U.S. 270, 277 (1966).

Section 7 makes unlawful all mergers and acquisitions, the effect of which "may be substantially to lessen competition or tend to create a monopoly." 15 U.S.C. § 18. Congress's use of the term "may" in Section 7 was meant to ensure that litigants would not need to prove

anticompetitive effects but would merely need to show a "reasonable probability" that competition would be lessened. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962). Outlawing all mergers with merely a reasonable probability of lessening competition was a "necessary element in any statute which seeks to arrest restraints of trade in their incipiency and before they develop into full-fledged restraints violative of the Sherman Act." *Id* at 323 n.39. Indeed, requiring a Clayton Act Plaintiff to show "certainty and actuality of injury to competition" would be "incompatible" with Section 7's aim to go beyond liability under the Sherman Act "by reaching incipient restraints." *Id.* That is why Section 7 ultimately requires merely a "prediction" as to whether competition may be lessened, and "doubts are to be resolved against the transaction." *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989).

Congress's expansive definition of unlawful mergers was no linguistic accident. Congress meant to "clamp down with vigor on mergers." *United States v. Von's* Grocery Co., 384 U.S. 270 (1966).

The very objective of Section 7 of the Clayton Act was to "prevent accretions of power," even those "which 'are individually so minute as to make it difficult to use the Sherman Act test against them.'" *United States v. Aluminum Co. of Am.*, 377 U.S. 271, 280 (1964). That is why the Supreme Court has noted that a plaintiff's burden under Section 7 is particularly low, *American Stores*, 495 U.S. at 275, and that is why Supreme Court case after Supreme Court case has prohibited mergers with far less potential harm to competition than here.

In *Brown Shoe*, for example, the Court prohibited a merger between the third and eighth largest shoe sellers in the United States, where the eighth-largest shoe company manufactured less than 0.5% and retailed less than 2% of all shoes. 370 U.S. 294, 298 (1962). The Court held that it could not "avoid the mandate of Congress that tendencies toward concentration in industry are to be curbed in their incipiency." *Id.* at 345. In *Von's*, the Court prohibited the merger of two grocery store chains, each with less than 5% of the market. Based solely on the market shares of

the merging grocery store chains and the growing trend toward concentration in the market, the Court held that "these facts alone are enough to cause us to conclude that the [merger] did violate §7." *Von's Grocery Co.*, 384 U.S. at 274. In *United States v. Continental Can Co.*, the Court prohibited an acquisition of the sixth largest competitor by the second largest, where the acquisition would increase the acquiring entity's market share from 21.9% to 25%. 378 U.S. 441, 461 (1964). In *United States v. Aluminum Co. of Am.*, 377 U.S. 271, 280–81 (1964), the Court prohibited the acquisition of the ninth-largest producer of aluminum conductor, which held only 1.3% of the market, by the largest producer of aluminum conductor, which held 27.8% of the market.

The Court held that "[p]reservation of [the ninth-largest producer], rather than its absorption by one of the giants, will keep it 'as an important competitive factor,'" and thus, the small aluminum conductor producer with only 1.3% market share "seems to us the prototype of the small independent that Congress aimed to preserve" through Section 7. *Aluminum Co. of Am.*, 377 U.S. at 281. Finally, in *United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966), the Court held unlawful the acquisition of the eighteenth-largest brewer by the tenth-largest brewer, which when combined, became the fifth-largest brewer with a combined national share of only 4.49%.

These cases all confirmed that Section 7 of the Clayton Act meant precisely what Congress had enacted: that concentration in economic markets through mergers and acquisitions was inherently suspect, and that all mergers and acquisitions that may substantially lessen competition or tend to create a monopoly were thereinafter unlawful. The Clayton Act enshrined into law a policy that unilateral economic expansion through competition was inherently preferable to expansion through mergers and acquisitions. (*See* Supreme Court quote in text, supra from *Brown Shoe*, 370 U.S. at 346 n.72 (1962). As Plaintiffs' complaint shows, this is no "small merger," and Kroger's plan to acquire rival Albertsons would combine the biggest and second-biggest supermarket companies in the country creating a supermarket giant with a

combined market share and control of 36% of the U.S. grocery supermarket operators. Compl. ¶8, p. 3.

Judge Posner, recognizing the exceptionally low threshold for unlawfulness, summarized the Supreme Court precedent interpreting Section 7 of the Clayton Act in this way: "[T]aken as a group," the Supreme Court cases "establish the illegality of any nontrivial acquisition of a competitor, whether or not the acquisition was likely either to bring about or shore up collusive or oligopoly pricing." *Hosp. Corp. of Am. v. F.T.C.*, 807 F.2d 1381, 1385 (7th Cir. 1986). "The elimination of a significant rival was thought by itself to infringe the complex of social and economic values conceived by a majority of the Court to inform the statutory words "may substantially lessen competition." *Id.* Here there is no dispute that Kroger and Albertsons are significant rivals. Nor is there any dispute that this $24.6 billion merger is not trivial.

### 3. Plaintiffs Need Only Show a Reasonable Probability of a Lessening of Competition in a Single Product Market; Defendants Must Establish There Will Be No Lessening of Competition in Any Market

Section 7 of the Clayton Act requires merely the reasonable probability of lessening of competition "in any line of commerce" or "in any activity affecting commerce" anywhere in the country. 15 U.S.C. § 18.

The Supreme Court has recognized that an unlawful merger or acquisition might affect multiple relevant markets, and Courts must consider whether the merger might lessen competition in any one of them. *See, e.g.*, *Brown Shoe*, 370 U.S. at 325–28; *Aluminum Co. of Am.*, 377 U.S. at 276; *Continental Can*, 378 U.S. at 457–58; *Olin Corp. v. F.T.C.*, 986 F.2d 1295, 1304 (9th Cir. 1993).

Kroger cannot discredit or overcome a lessening of competition in one geographic market by showing increased competition in another. *See United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1963). So long as Plaintiffs can identify a single market in which competition might be substantially lessened by the merger, Plaintiffs must prevail regardless of any pro-competitive

effects in another market. *Id.* (holding that "anticompetitive effects in one market" cannot justify "procompetitive consequences in another."). Thus, Kroger must establish that there is no reasonable probability that the merger might lessen competition in any relevant product or geographic market. And here, since the merger concerns the largest supermarket operator acquiring the second largest supermarket chain in the country, it is no surprise that the merger will lessen competition in numerous markets in which Kroger and Albertsons compete.

### 4.   The Merger Will Substantially Lessen Competition in the Relevant Geographic Market

The proper geographic market must "correspond to the commercial realties of the industry and be economically significant." *Id.* at 336-37 (citations omitted). The relevant geographic market is the "area of effective competition where buyers can turn for alternate sources of supply." *St. Alphonsus Med. Center-Napa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015). In other words, the relevant geography is where "the group of sellers or producers who have the actual or potential ability to deprive each other of significant levels of business," compete.

The relevant geographic market for analyzing the proposed merger in this case is the entire United States because Kroger and Albertsons are two national-level grocery giants that compete against each other on a national scale. However, regional, and local relevant geographic markets may also exist across and within individual states. Competition for supermarkets is also local in nature as consumers typically do their grocery shopping at stores located close to where they live or work. The relevant geographic submarkets may include areas limited to properly defined neighborhoods or city submarkets, and additional urban, suburban, exurban, or rural markets throughout the United States.  Compl. ¶¶ 51, 54, pp. 22-23.

### 5.   The Merger Will Substantially Lessen Competition in the Relevant Product Market

Here, the relevant product market is the retail sale of food and other grocery products in supermarkets, which are any retail grocery stores offering customers substantially all their weekly food and grocery shopping requirements in a single shopping visit. Compl. ¶ 45, p. 21.

Supermarkets compete with other supermarkets that provide one-stop shopping opportunities for food and grocery products and base their prices on the prices of food and grocery products sold at nearby competing supermarkets. Compl. ¶ 46, p 21. Retail stores that sell food items other than supermarkets are distinct and are not in the same product market.

**6.    The Merger Will Substantially Lessen Competition in Each of the Relevant Markets**

The decrease in the number of major grocery retailers over the past several years reflects a persistent and deliberate pattern of concentration and reduction of competition in the U.S. grocery supermarket industry, a trend which Section 7 of the Clayton Act was aimed at arresting in its incipiency. Market concentration is one indicia of the level of competition in a market. The more concentrated a market, and the more a transaction may increase concentration in a particular market, the more likely it is that a transaction may result in a meaningful lessening in competition.

Under the Supreme Court's Section 7 analysis, the concentration the national market alone is more than sufficient to show beyond a doubt that the merger will substantially lessen competition.  Through the acquisition, Kroger will add 12.4% of the market to its current control of 23.6%, for a combined total of 36% of the national market.  See Exhibits B and F. This is far greater concentration than the Supreme Court has previously held unlawful under Congress's clear mandate to stop concentration through merger. *See* cases cited *infra* at pages 13-14, and Exhibit A. Moreover, these cases did not turn on complicated economic analysis. They turned on the market share statistics of the merging entities in combination with the trend towards concentration in the markets, and the fact that a viable competitor would be eliminated.

Here, Kroger's acquisition of Albertsons will raise Kroger's market share in the grocery supermarket industry well beyond the concentration rates already deemed unlawful by numerous Supreme Court cases, and beyond the 30% presumption declared under *Philadelphia National Bank*. See cases cited *infra* at pages 14-16.

The significant concentration among the grocery supermarkets that will be realized through this acquisition is particularly concerning given the recent and steady trend towards concentration in the industry. As the Supreme Court has held, Section 7 was specifically intended to prevent a lessening of competition in its incipiency. Thus, whether a market has a trend towards concentration is highly relevant in determining whether a particular merger might lessen competition or tend to create a monopoly. In *Von's*, the Court held: "Congress sought to preserve competition among many small businesses by arresting a trend toward concentration in its incipiency before that trend developed to the point that a market was left in the grip of a few big companies. Thus, where concentration is gaining momentum in a market, we must be alert to carry out Congress' intent to protect competition against ever increasing concentration through mergers." 384 U.S. at 277*; see also Pabst Brewing Co.,* 384 U.S. at 552–53 ("We hold that a trend toward concentration in an industry, whatever its causes, is a highly relevant factor in deciding how substantial the anti-competitive effect of a merger may be.").

Kroger and Albertsons have become the giants that they are through numerous prior mergers in an industry that has already seen substantial concentration. Compl. ¶ 18, p. 7. This further supports the finding that Kroger's proposed acquisition, which seeks to purchase 12.4% of the U.S. grocery store market and which will eliminate the vigorous competition of a significant rival, is without question unlawful under Section 7.

Further, as described in the Complaint, the proposed acquisition will eliminate Albertsons as a substantial competitor in the national and local relevant markets and will inevitably reduce the intensity of price competition market wide.

Kroger and Albertsons currently have extensive overlapping markets. *See* Exhibit E. If Albertsons is eliminated, this acquisition will by definition eliminate the actual and potential competition between Kroger and Albertsons in these markets as well, significantly harming consumers in the process.

In addition, the loss of Albertsons' competition in these markets may increase the likelihood that the remaining grocery retailers will coordinate with one another to raise prices, reduce output, and diminish the quality of their products, thereby further lessening competition in these overlapping markets. Compl. ¶¶ 44, 70, pp. 21, 26.

While the Defendants say that their newly combined power will not be used to raise industry prices, Kroger's CFO, Gary Millerchip, told shareholders in October of last year: "We've been very comfortable with our ability to pass on the increases we've seen at this point. And we would expect that to continue to be the case." Compl. ¶ 60, p. 24.

Food is among the goods that have seen the highest, most sustained price hikes over the past year due to inflation. Albertsons CEO, Vivek Sankaran, has said: "My sense is this inflation will just be passed through" to customers. Compl. ¶ 61, p. 24. This acquisition will provide an opportunity to raise prices.

This acquisition will also affect employees. Residents depend on employment by these companies. Kroger and Albertsons compete against each other to hire and retain employees, which this merger will eliminate. The reduced need for employees and suppressed wages from reduced competition for labor by these employers following a merger will constitute a lessening of competition in violation of Section 7. Workers are reasonably likely to experience lower wage growth and worse working conditions than they would otherwise.

**B.     The Special Dividend is a Violation of Section 1 of the Sherman Act**

The special $4 billion dividend that Albertsons will pay to its shareholders - primarily Defendant Cerberus – is an integral part of the merger agreement between Albertsons and

Kroger.  As such, it constitutes an agreement in restraint of trade in violation of Section 1 of the Sherman Act.

In *Pennsylvania Sugar Refinery v. American Sugar Refining Company*, 166 F. 254 (SDNY 1908), the defendant American Sugar obtained control of the plaintiff corporation to prevent it from becoming a viable competitor by inducing the plaintiff's directors to be unfaithful to the duties of their office and compelling the directors of Pennsylvania Sugar to shut down its own $30 million plant slated to compete with American Sugar by taking control of the plaintiff's company through loans to directors and shareholders and by conspiring with the majority shareholders of the plaintiff corporation to cease operation of its sugar plants.  *Id*. at 261.

Here the majority shareholders led by Cerberus voted to suck the lifeblood from Albertsons and thereby guarantee its demise, just as was done in Pennsylvania Sugar, where the majority stockholders voted to shut down the factory that would have competed with Pennsylvania Sugar.  Kroger has conspired with Defendant Cerberus, Albertsons' majority shareholder, to vote the issuance of a dividend that will in effect cripple Albertsons' ability to compete against Kroger, thereby necessitating the merger.  This agreement is stated in writing within the merger document itself.

This is a violation of Section 1 that is being perpetrated in furtherance of the conspiracy to deplete Albertsons ability to compete in order to compel a merger with Kroger.  Even if the issuance of the dividend could be said to be wholly innocent, which it is not, it  nonetheless constitutes an illegal act under *American Tobacco Co. v. United States, 328 U.S. 781 (1946)* which holds that a wholly innocent act, when perpetrated by Kroger as a part and parcel of a scheme to eliminate its principal competitor, Albertsons, may be a violation of the law:

> "It is not the form of the combination or the particular means used but the result to be achieved that the statute condemns. It is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful. Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the

statute forbids, they come within its prohibition. No formal agreement is necessary to constitute an unlawful conspiracy. Often crimes are a matter of inference deduced from the acts of the person accused and done in pursuance of a criminal purpose." *Id*. at 809.

The payment of the Special Dividend provides no competitive benefit to Albertsons, let alone to its consumers and workers, that may be weighed against the Special Dividend's anti-competitive effect on Albertsons' cash flow and on its ability to vigorously compete. The dividend strips Albertsons of nearly all its cash-on-hand during an economic downturn, when it will be difficult for the company to obtain additional capital. Without cash, Albertsons cannot advertise, promote, or increase its services, refurbish, or reorganize stores to make them more attractive to consumers, or support customer loyalty programs. As a substitute for credit, it would have to rely on higher prices to raise cash for reinvestment, harming consumers.

Albertsons may have to close stores, leaving customers with fewer choices and, as a result, higher prices from remaining incumbents in the marketplace, inferior selection and quality, or both. Compl. ¶ 66, p. 25. The most obvious result of this illegal dividend will be to mortally damage Albertsons' ability to compete against its largest rival, Kroger, thereby precipitating the necessity of merger. *See  Pennsylvania Sugar Refinery v. American Sugar*, 166 F. 254 (1908).

**C.**     **Plaintiffs Are likely to Suffer Irreparable Harm Without Preliminary Relief**

Plaintiffs will suffer irreparable harm if Kroger's proposed acquisition of Albertsons is allowed to proceed.  Plaintiffs are consumers and customers of the Defendants.  Plaintiffs have an interest in ensuring that the Albertsons stores are preserved as a competitive option, now and in the future.  Once Albertsons is gone, consumer choice is eliminated, and the harm is irreparable. In addition, Kroger's acquisition threatens to substantially reduce the work force of the two grocery chains through employee layoffs which heightens the irreparable injury.

The special dividend, if permitted, creates irreparable injury since it would alter Albertsons' capital structure in a way that may harm its ability to compete with other grocers on price during the pendency of the proposed acquisition which could last nearly two years, since

the merger agreement contemplates the closing occurring as late as January 13, 2024, with a possibility of it being extended up to an additional 270 days. *See* Agreement § 8.1(e).

Ultimately, the fact that the Supreme Court has held that the "lessening of competition 'is precisely the kind of irreparable injury that injunctive relief under section 16 of the Clayton Act was intended to prevent'" is dispositive of the issue of irreparable injury. *California v. Am. Stores Co.*, 492 U.S. 1301, 1304 (1989). In *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016 the Ninth Circuit also held that "A lessening of competition constitutes an irreparable injury under our case law." Thus, because Kroger's acquisition may substantially lessen competition in the relevant markets, Plaintiffs have shown the requisite threatened irreparable harm and are entitled to injunctive relief under Section 16.

**D.     The Balance of Equities Tips in Plaintiffs' Favor and Preliminary Relief Is in the Public Interest**

Preserving the status quo by maintaining Albertsons as a separate competitor and thereby preserving competition in the relevant markets exemplifies the kind of preliminary relief that is in the public interest. First, the balance of equities tips sharply in Plaintiffs' favor because, if a preliminary injunction is not granted and the merger is allowed to proceed yet Plaintiffs ultimately prevail at trial, competition within these important markets across the United States will have been irretrievably lost. On the other hand, if the Court issues a preliminary injunction merely until an accelerated trial on the merits is heard, yet the Plaintiffs ultimately lose on the merits, Kroger will only face the possible delay of its acquisition. It is much less disruptive of the industry and less harmful to competition to maintain the status quo by delaying an acquisition than to allow a merger to proceed immediately and to then be unable to undue the unlawful merger later. *See, e.g.*, *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016). In addition, the Defendants will not suffer any serious harm if the payment of the special dividend is temporarily enjoined, or ordered disgorged, but Plaintiffs and all consumers will suffer serious

harm if it is not, since the special dividend impairs Albertsons' ability to adequately compete against its most significant rivals, like Kroger. Preliminary relief would simply maintain the status quo without interfering with Defendants' proposed merger, while leaving Albertsons with sufficient cash reserves to continue to adequately compete.

Second, a preliminary injunction and the preservation of Albertsons as a well-capitalized supermarket furthers the public interest by ensuring that there are no unreasonable restraints on competition. As the Ninth Circuit has held, "the central purpose of the antitrust laws, state and federal, is to preserve competition," which is "vital to the public interest." *Id.* at 1024.

Indeed, Justice Thurgood Marshall captured this fundamental premise succinctly when he said: "Antitrust laws are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms." *United States v. Topco Associates*, 405 U.S. 596, 610 (1972).

Plaintiffs will show that Kroger's multi-billion acquisition of the second largest supermarket chain in the United States is reasonably likely to lessen competition among grocery supermarkets. Prohibiting this merger from proceeding and maintaining the status quo until Plaintiffs can prevail on the merits is in the public interest.

<u>**CONCLUSION**</u>

Plaintiffs respectfully submit that a very serious question is presented that requires this merger to be enjoined to preserve the status quo pending further discovery and a trial on the permanent injunction. At the present, Plaintiffs request only that this Court issue an order enjoining Kroger from finalizing its acquisition of Albertsons, or in any way taking control of or gaining access to Albertsons' assets, and enjoining and/or disgorging the payment of the special dividend to Defendant Cerberus or to any others until Plaintiffs have had sufficient time to conduct appropriate discovery and to prove the merits of their case at trial.

Dated:  March 23, 2023                    ALIOTO LAW FIRM


                                By:  /s/ *Joseph M. Alioto*
                                    Joseph M. Alioto (SBN 42680)
                                    Tatiana V. Wallace (SBN 233939)
                                    One Sansome Street, Suite 3500
                                    San Francisco, CA  94104
                                    Telephone: (415) 434-8900
                                    Attorneys for Plaintiffs


ADDITIONAL PLAINTIFFS COUNSEL:

Lawrence G. Papale (SBN 67068)
LAW OFFICES OF LAWRENCE G. PAPALE
1308 Main Street, Suite 117
St. Helena, CA 94574
Telephone: (707) 963-1704
Email: lgpapale@papalelaw.com

Theresa Moore (SBN 99978)
LAW OFFICE OF THERESA D. MOORE PC
One Sansome Street, 35th Floor
San Francisco, CA 94104
Phone: (415) 613-1414
tmoore@aliotolaw.com

Josephine Alioto (SNB 282989)
THE VEEN FIRM
20 Haight Street
San Francisco CA 94102
Telephone: (415) 673-4800
Email: jalioto@veenfirm.com

Christopher A Nedeau (SBN 81297)
NEDEAU LAW PC
154 Baker Street
San Francisco, CA 94117-2111
Telephone: (415) 516-4010
Email: cnedeau@nedeaulaw.net