IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DISTRICT OF COLUMBIA, et al,                    Civil Action
                                                No. 1:22-3357
              Plaintiffs,

       vs.
                                                November 8, 2022
KROGER, CO., et al,                             3:08 p.m

              Defendants.                       Washington, DC

----------------------------

TRANSCRIPT OF PRELIMINARY INJUNCTION
BEFORE THE HONORABLE CARL J. NICHOLS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Plaintiffs:           Adam Gitlin
                          Carl Margrabe
                          Elizabeth Gentry Arthur
                          Geoffrey Comber
                          Kathleen M Konopka
                          Jessie Zweben
                            OFC OF THE ATTNY GENERAL - D.C.
                            400 6th Street NW
                            Washington, DC 20001
                            415-956-1000

For Plaintiff
State of Illinois:        Elizabeth Louise Maxeiner - by phone
                          Paul Harper - by phone
                          ILLINOIS ATTORNEY GENERAL'S OFC
                          100 West Rudolph Street
                          Chicago, IL 60601
                          872-276-3598

For Plaintiff
State of California:      Paula Lauren Gibson - by phone
                          CALIFORNIA ATTORNEY GENERAL'S OFC
                          300 South Spring Street
                          Suite 1720
                          Los Angeles, CA 90013
                          (213) 269-6040

APPEARANCES (CONT'D)
For Defendant
Kroger's:                          Adam B. Banks
                                     WEIL, GOTSHAL & MANGES, LLP
                                     2001 M Street, NW, Suite 600
                                     Washington, DC 20036
                                     202-682-7511


                                   Matthew M. Wolf
                                   Michael B. Bernstein
                                   Sonia Kuester Pfaffenroth
                                   Jason C. Ewart
                                     ARNOLD & PORTER KAYE SCHOLER LLP
                                     601 Massachusetts Avenue NW
                                     Washington D.C., DC 20001-37
                                     202-942-5227

For Defendant
Albertson's:                       Edward David Hassi
                                   Leah S. Martin
                                     DEBEVOISE & PLIMPTON LLP
                                     801 Pennsylvania Avenue NW
                                     Washington, DC 20004
                                     202-383-8135


                                   Stephen Ascher
                                   Gabriel K. Gillett - by phone
                                   William Goldstein - by phone
                                     JENNER & BLOCK LLP
                                     353 North Clark Street
                                     Chicago, IL 60654
                                     312-840-7220


Also present:                      Paul Harper - by phone


Reported By:                       LORRAINE T. HERMAN, RPR, CRC
                                     Official Court Reporter
                                     U.S. District & Bankruptcy Cts.
                                     333 Constitution Avenue NW
                                     Room 6720
                                     Washington, D.C. 20001
                                     202-354-3196


*** Proceedings recorded by stenotype shorthand.
*** Transcript produced by computer-aided transcription.

1                    P R O C E E D I N G S

2          DEPUTY CLERK:   Good afternoon, Your Honor.   This

3    is Civil Case Year 2022-3357, District of Columbia, et. al.,

4    versus Kroger Company, et. al.

5          Counsel present by telephone for the plaintiffs

6    are Paul Harper, Elizabeth Maxeiner and Paula Gibson.

7          Counsel present by telephone for the defense is

8    Gabriel Gillette and William Goldstein.   All other counsel,

9    please come forward and introduce yourselves for the record,

10   beginning with the plaintiffs.

11         MR. GITLIN:   Good afternoon, Your Honor.   My name

12   is Adam Gitlin.   I represent the District of Columbia.   With

13   me at counsel's table are Elizabeth Arthur, Geoffrey Comber,

14   Will Margrabe, Kathleen Konopka, and Jessie Zweben.   I also

15   have the privilege today or representing the states of

16   California and Illinois.

17         THE COURT:   Yes, good afternoon.   Will you be

18   taking the lead for plaintiffs today?

19         MR. GITLIN:   I will, Your Honor.

20         THE COURT:   Thank you.

21         MR. HASSI:   Good afternoon, Your Honor.   Ted Hassi

22   with Debevoise & Plimpton here in Washington, D.C.   With me

23   at counsel table are Steven Ascher of Jenner & Block in New

24   York, Leah Martin with my firm, representing Albertsons.   In

25   the second row are my clients, the general counsel, and the

1    chief litigation counsel of Albertsons.

2            THE COURT:   Good afternoon.

3            MR. HASSI:   Thank you, Your Honor.

4            MR. WOLF:   Good afternoon, Your Honor.   Matthew

5    Wolf with Arnold & Porter for Kroger.   With me at counsel

6    table is Sonia Pfaffenroth.   Thank you.

7            THE COURT:   Good afternoon, everyone.

8            This is how I plan to proceed today:   I've

9    reviewed all of the papers.   I've reviewed the briefs, the

10   declarations, including the expert declarations, the merger

11   agreement, the various exhibits that the parties have

12   submitted, so I'm pretty familiar with the written record.

13   I plan to hear from the plaintiffs.   Present whatever

14   argument you'd like.   I will then hear from the defendants.

15   I will likely give plaintiffs a short time for rebuttal.

16           At that time I will likely take a brief recess to

17   consider whether I'm in a position to rule on the motion

18   orally today or if I need to take it under advisement.   That

19   recess will probably be pretty short, no matter what I do.

20   And then I will either come back and tell you that I am not

21   prepared to rule today or that I am, and I'll give you my

22   ruling.

23           So I will hear from plaintiffs in one second.

24           I do want to make one very brief disclosure, and

25   that is that -- I just want to disclose to the plaintiffs

1   that I am an acquaintance, or friend, depending on how you

2   read the ABA formal opinion 488, of one of the lawyers for

3   one of the defendants, Michael Bernstein, who is a partner

4   at Arnold & Porter.  He and I know each other through the

5   golf club, country club we both belong to.

6           I think we probably count under the Rule as

7   acquaintances, which would not even require the disclosure

8   of the relationship, but for the avoidance of any doubt and

9   because it may very well be that we are friends -- I think

10  we are friends in the most colloquial sense.  I'm not so

11  sure about the -- the way that the formal opinion addresses

12  it.  I thought everyone should at least know about that.

13          I certainly don't see any reason that creates a

14  recusal problem, but I wanted to disclose that to the

15  plaintiffs.

16          So with that, let's hear from plaintiffs,

17  Mr. Gitlin, about why you think I should enjoin the

18  preclosing dividend.

19          MR. GITLIN:  Thank you, Your Honor.

20          So I understand that the Court has had our reply

21  for only a few business hours, but I also appreciate that

22  you've had the opportunity to read the papers.  So I will be

23  brief.

24          Plaintiffs are seeking a temporary restraining

25  order to enjoin Albertsons from paying a $4 billion special

1    dividend to its shareholders in connection with its merger

2    agreement with Kroger.  I think it is important to note

3    here, because it's been the focus of our briefing, if not

4    defendants', that payment of that dividend together with

5    specific restrictions that the merger agreement places on

6    Albertson's ability to raise capital will reduce Albertsons'

7    ability and incentive to compete now and at least through

8    2024 when the parties project that the merger will close,

9    assuming it does.

10          THE COURT:  What is the exact agreement that you

11   say that the defendants have entered into?

12          MR. GITLIN:  It's the merger agreement, Your

13   Honor, because the merger agreement incorporates the special

14   dividend and also includes the specific provisions that

15   restrict Albertsons from raising capital for the pendency of

16   the merger review.

17          THE COURT:  If I conclude that -- it seems clear

18   to me -- and I'll hear from the defendants on this -- that

19   the parties have reached a series of agreements regarding

20   Albertsons' ability to engage in certain financial

21   transactions, to include how it might refinance or

22   otherwise -- refinance debt or otherwise raise capital.

23          If, however, I were to find that they did not

24   reach an agreement to pay the preclosing dividend, would you

25   still have a Section 1 claim?

1          MR. GITLIN:  I think we would, Your Honor, because

2     the agreement can't actually be dismembered.  I mean,

3     there's fairly extensive Section 1 precedent on this.  We

4     are not talking about challenging the merger under Section 7

5     at this time.  We are talking about an agreement -- and this

6     is a written agreement -- that incorporates the dividend,

7     and it also incorporates the other restrictions, and they

8     work together, because on the one hand they deprive

9     Albertson of the capital it has today.  And on the other

10    hand, they restrict it from pursuing capital tomorrow and

11    until the merger closes.

12         THE COURT:  Okay.  Is it your position that the

13    payment of the dividend would violate Delaware law?  I take

14    it the answer is not, independent of Section 1.  Correct?

15         MR. GITLIN:  I've seen no evidence, no authority

16    from the parties that it would.  I think it is very telling

17    that they can cite plenty of authority that there's a

18    declared -- once a dividend is declared, there's a right to

19    it, but they cite no authority that says that once a Court

20    orders that a dividend not be paid, that there's some

21    violation of law.

22         But I think the general proposition stands that

23    you don't get to violate antitrust law simply because you

24    have concerns about a Delaware State law or under numerous

25    antitrust precedents like Indiana Federation of Dentists, a

1      state policy --

2                 THE COURT:  I agree with that, but I think -- this

3      is a different question, really, which is -- at least as it

4      seems to me -- the defendants have taken the position that

5      the dividend complies with Delaware law, together with all

6      of the reasons for, and restrictions on, the payment of

7      dividends like this one.  I'm just making sure that the

8      plaintiffs aren't contending otherwise.

9                 That is to say that I -- for purposes of my

10     decision, I have to assume, I think, that the payment of the

11     dividend would, in fact, be consistent with Delaware law.

12                MR. GITLIN:  Your Honor, our claims are under the

13     antitrust laws.  We don't take an opinion on whether or not

14     the dividend was properly declared pursuant to all of the

15     provisions of Delaware law.

16                The point is that they are not a means for

17     circumventing the antitrust laws.

18                THE COURT:  Do you -- do you agree that under

19     Delaware law, now that Albertsons' has announced the

20     dividend, even if it were enjoined by me or the Court in

21     Washington, that Albertsons' would still have a liability of

22     some sort to shareholders?

23                MR. GITLIN:  I don't believe Albertsons' would,

24     Your Honor.

25                First of all, I don't understand how under a

1    10(b)(5) case they are actually going to have liability in

2    the sense of anybody being able to prove scienter.

3                    THE COURT:   No.  I don't think that's the

4    argument.  I think your argument to the contrary is

5    missing -- I think their point -- I will ask defendants'

6    lawyer about this.

7                    Their point, as I understand it, is that when you

8    are thinking about Albertsons' future liquidity or ability

9    to raise capital, even if I enter a TRO, they are still

10   going to have some obligation with respect to the dividend.

11   And so even if I entered an injunction, they would still be

12   hampered in their ability to compete in, effectively, the

13   same way that they would be if I don't enter a TRO.

14                   MR. GITLIN:  I don't think that's the case, Your

15   Honor.

16                   THE COURT:   Why?

17                   MR. GITLIN:   Albertsons' today has approximately

18   $4 billion of cash on hand in liquidity that allows it to

19   compete during the pendency of the review.

20                   I don't think that there's that equivalence

21   between how they are today and if you issue an injunction

22   that prevents them from paying the dividend.

23                   What you end up doing is protecting consumers,

24   workers, the State's ability to have an uninfected right to

25   properly review the merger based on the status quo, in the

1   same way that the premerger notification statute essentially

2   imposes a whole separate obligation on the parties while

3   merger review takes place.  That's -- that's what -- that's

4   what you get if you issue an injunction today.

5               THE COURT:  But their point is, that as a -- I

6   think -- I think their point is that as a matter of Delaware

7   law, having now announced the dividend, that they are, as a

8   matter of Delaware law and probably corporate governance or

9   accounting rules, they are required to -- for lack of a

10  better word, I'm going to use the colloquial term, "keep the

11  dividend on their books" as a liability.

12              And if that's right, if they're right about that,

13  then why doesn't that have the same effect on their ability

14  in the future to compete, raise capital and the like, as if

15  I didn't enter the TRO?

16              MR. GITLIN:  I understand.

17              I don't -- I don't think, Your Honor, that it's

18  got quite the same effect if you allow them to pay money

19  that they are never getting back versus if there is --

20              THE COURT:  But isn't the point that that

21  $4 billion is essentially incumbered by this liability and

22  while, yes, they haven't paid it out, they are still -- it

23  affects their financial position and has a similar, at

24  least, affect on their ability to compete?

25              MR. GITLIN:  Well, we don't -- we don't accept

1   that it has -- that it has that affect; that is to say, we

2   don't accept that Albertsons' is going to necessarily have

3   this liability on the books.

4           So take, for example, the BAX case that they cite.

5   Right?  In that case the Court struck a number of the

6   defenses that were raised by the defendant company in the

7   securities litigation.   Right?

8           But one defense that they didn't strike, that the

9   Court did not strike, was whether -- was the defense the

10  dividend had been unlawful declared.  Right?  Because it

11  turned out for reasons perhaps not knowable to the

12  corporation at the time, that they were declaring a

13  dividend, but that it was unlawful to do so.  That's a

14  defense that they can raise with respect to ever having to

15  pay this dividend.

16          THE COURT:  What -- so, obviously, the defendants

17  take the position that the payment of the dividend is a

18  unilateral decision by Albertsons.  The only reason that

19  it's addressed in the merger agreement is to ensure that the

20  price paid by Kroger's at closing is net of that dividend

21  payment.  It was planned to pay the dividend before there

22  was a merger agreement, and Kroger's has no -- I'm

23  paraphrasing -- no right to control whether and to what

24  extent a dividend payment is made.  And if no dividend

25  payment is made, Krogers has no claim.

1          So what's your argument for why the parties have

2     -- or what's your best evidence for why the parties have

3     agreed that there will be a dividend payment of $4 billion?

4          MR. GITLIN:  So the agreement between the parties,

5     Your Honor, is the merger agreement.  Right?  There are --

6          THE COURT:  Okay.  So where does the merger

7     agreement obligate Albertsons to make any -- any preclosing

8     dividend payment, let alone one of a particular amount?

9          MR. GITLIN:  The definition of the preclosing

10    dividend in the merger agreement says how much -- what is

11    the maximum that it can reach, and it's referenced in, I

12    think, 15 different places.

13         THE COURT:  Right.  That's so that one knows that

14    Krogers -- excuse me -- Albertsons can't pay more than

15    $4 billion, and it's also a -- it's a defined term, so that

16    when you later look at what the closing payment or the --

17    basically the transaction price will be, you know that it

18    has to take account of that preclosing dividend.

19         MR. GITLIN:  Yes, but --

20         THE COURT:  Where is there an agreement that

21    Albertsons' must make this dividend payment?

22         MR. GITLIN:  Your Honor, if the question under --

23    I don't know that there is a place in the merger

24    agreement -- it's pretty long -- I don't know that the

25    merger agreement has a place where it says that -- where it

1  tells Albertsons the conditions under which it must make the
2  payment.
3      THE COURT:  Is it your position that Albertsons --
4  that the parties -- put aside the merger agreement.  Is it
5  the government's position that the parties agree that
6  Albertsons must pay the dividend?
7      MR. GITLIN:  The parties have negotiated the
8  amount of the dividend.  They have negotiated its inclusion
9  into the merger agreement, and the merger agreement contains
10 the dividend and contains other restrictions that applies to
11 Albertsons.
12     THE COURT:  Do you agree that Albertsons is free
13 to not pay the dividend or would have been free to not pay
14 the dividend if it had not made the announcement made?
15     MR. GITLIN:  I don't know about what Albert- --
16 how Albertsons decided, despite the fact that they
17 started --
18     THE COURT:  I want your -- what is the
19 government's -- is it the government's position that if
20 Albertsons had wanted not to pay the dividend, it could have
21 done so?
22     In other words, it was Albertsons' decision, and
23 if Albertson would have -- had decided not to pay the
24 dividend, that it would have acted consistent with the
25 parties' agreement or inconsistent with it?

1    MR. GITLIN:  I don't have an opinion on that, Your

2    Honor.  It's not --

3    THE COURT:  But isn't that -- isn't that almost

4    fatal to your claim?  I mean, I thought your position was

5    the parties had agreed that there would be a dividend

6    payment, and that necessarily means that Albertson is

7    oblig- --  was obligated to make this payment.

8    MR. GITLIN:  Yes.  The parties have an agreement.

9    It includes the dividend.  It includes the other restrictive

10   provisions, and that -- and our understanding is that,

11   again, antitrust is not looking at the formalities of the

12   contract.  It's looking at what is the agreement of the

13   parties and what is its practical --

14   THE COURT:  I agree.  I am trying to understand

15   what the agreement was.  I totally agree with you that it

16   need not be expressly put in the merger agreement.  Parties

17   could have an agreement that's parallel conduct, or it could

18   be an unwritten agreement.  I just want to understand in

19   your view what the agreement was about the dividend.

20   MR. GITLIN:  Yes.

21   THE COURT:  Is Albertsons' -- as a result of this

22   agreement, did the parties agree that Albertsons is

23   obligated to pay the dividend or not?

24   MR. GITLIN:  The parties have represented to us

25   that Albertsons is obligated to pay the dividend.

1             And our position has been, since the beginning,

2    that Albertsons should not, because it would be an antitrust

3    violation to do so.  It would be part of an antitrust

4    violation to do so.

5             THE COURT:  Okay.  So let's assume there is --

6    there's an ex- -- just to make it easy, assume that the

7    parties expressly agree that Albertsons would.  Put that to

8    the side.  Crystal clear from the merger agreement.

9    Albertsons shall pay a $4 billion preclosing dividend.

10            Defendants have put in their expert report and two

11   declarations from very senior employees saying the theory of

12   injury to competition depends on our inability to compete,

13   because we are going to be illiquid, or we are going to have

14   liquidity problems.

15            What is your response to that argument?

16            MR. GITLIN:  So our response to that argument is

17   twofold, Your Honor.

18            So, first of all, obviously, we've presented an

19   expert declaration from Dr. Michael Weisbach.  It goes into

20   a fair amount of detail, including on certain analysis,

21   specifically of Albertsons' financial condition that I don't

22   believe has been rebutted or even addressed by -- not by

23   defendant's expert, not by defendant's briefing, and not by

24   any of defendant's executives.  It's the last few paragraphs

25   of his declaration.  I believe they are 24 to 30.  They are

1  redacted in the public versions of his declaration, so I

2  think as a fact matter, it's -- it's questionable.

3  And, second, I think they answer a question that

4  we didn't ask and that the antitrust laws don't actually

5  ask, which is not whether or not Albertsons is going to be a

6  going concern or whether Albertsons is going to be in some

7  deep financial distress, but whether or not there is going

8  to be a reduction in its competitiveness pending the review

9  of the merger.

10  THE COURT:  So walk me through your argument for

11  why it will be less competitive.

12  MR. GITLIN:  Sure.

13  If Albertsons does not have -- Albertsons is now

14  entering a period of economic downturn.  Right?  Together

15  with the rest of the country, that is.  Not one specific to

16  Albertsons.

17  THE COURT:  As is every competitor of Albertsons.

18  MR. GITLIN:  That's -- that's right.  The

19  difference between Albertsons and some of its competitors is

20  that some of them have investment-grade ratings on their

21  bonds, so they're going to have an easier time accessing --

22  accessing capital.

23  Companies like Albertsons are going to have a

24  harder time accessing capital.  That is the reason that

25  companies with non-investment grade ratings on their bonds

1   hold on to more liquid assets during times of economic

2   downturn when they see those times coming or, in general,

3   because they know that their cost of accessing capital is

4   higher.

5          Now, you are going to take away all of the money

6   they have on hand to compete.  You're going to put in a

7   bunch of restrictions that say they also can't borrow to

8   make up for any of that loss, and now they are going to go

9   into a -- an economic downturn, when increased pressure on

10  margins is going to apply, and they are going to have to

11  compete with others who may invest more in stores,

12  promotional campaigns, service levels, quality of service,

13  the quality of the products they have on their shelves,

14  openings.

15         Albertsons is not going to have that flexibility,

16  that ability to compete as fully.  And this is -- and not

17  only that, but it's not just about Albertsons' ability to

18  compete.  The anti-competitive harm is to the market as a

19  whole.  There is empirical research.  It is discussed in our

20  complaint that -- it is discussed by Dr. Weisbach that

21  specifically looks at how in the retail supermarket

22  industry, when you see one entity become significantly more

23  leveraged, the other competitors realize that it has got a

24  lesser ability to compete, and they soften their

25  competitiveness as well.

1           THE COURT:  Doesn't that -- am I right that that

2    theory turns on the idea that as a result of paying the

3    dividend, Albertsons will have so substantially less access

4    to capital or will be so substantially less liquid that it

5    will affect its ability to compete?  And the defendants have

6    put in pretty substantial financial data to suggest that,

7    for example -- your expert ignores the effect of EBITDA and

8    the fact that Albertsons, for example, is supposed to have

9    $75 million in gross revenue, which will spin off cash that

10   will allow it to serve its liquidity needs, as reflected in

11   its financial statements.

12          MR. GITLIN:  So I don't think that the $75 billion

13   figure, in terms of their revenues, is exactly what they

14   have available to cover their liquidity needs in the sense

15   that it's accounted for in liabilities that they also have

16   to cover, Your Honor.

17          THE COURT:  I don't think -- and they are not

18   suggesting they have $75 billion in cash.

19          MR. GITLIN:  Right.

20          THE COURT:  But $75 billion with their current

21   financial situation is expected -- and I think the market

22   expects -- that it will result in not insubstantial net

23   revenue.

24          MR. GITLIN:  Yes, Your Honor, but every year they

25   are operating -- even though they have revenues of on the

1    order of $70 billion, their actual net operating income is a

2    few billion dollars, you know.   And if it was really,

3    really, that they had also, you know, all of these revenues

4    coming in with which they could cover their liquidity needs,

5    why not -- why is it that the special dividend is taking one

6    and a half billion dollars from their revolving credit

7    facility which, you know, accrues at a rate of LIBOR plus up

8    to a point and a half, so I think that's almost 7 percent.

9    That's going to add $100 million a year to their balance

10   sheet.   Why are they doing that instead of just, you know,

11   taking from the $75 billion --

12            THE COURT:   Isn't that a question of Delaware

13   corporate law and whether they -- the board should have

14   approved this deal and whether the CFO is doing his job

15   well?   Why is it an antitrust question?

16            MR. GITLIN:   Your Honor --

17            THE COURT:   Unless you can prove that that

18   judgment will have anticompetitive effects.

19            MR. GITLIN:   This is not about second-guessing the

20   judgment of this board, except for the fact that perhaps

21   they should not have timed a special dividend of this

22   magnitude that would draw this much liquidity from the

23   company at the same time as a merger.

24            The question here is whether or not there is a

25   reduction to Albertsons' competitiveness, and that is not

1   about whether or not they are a going concern.  That is not

2   about whether they are in some kind of deep distress or they

3   have to close a whole bunch of stores.

4                 You have to remember that in -- when -- in

5   antitrust law, when we look at how competition can be

6   reduced, we are not looking at whether or not some

7   competitors totally cease to compete.  We are looking at

8   whether or not there is a reduction to competition and how

9   that is felt by consumers.

10                THE COURT:  Do you agree that if Albertsons had

11  unilaterally decided to pay the special dividend and there

12  was no merger agreement whatsoever, you would have no

13  antitrust claim?

14                MR. GITLIN:  Um -- if it didn't have the other

15  strictures -- you know, I would need to know a little bit

16  more, obviously, about if there were any other surrounding

17  circumstances, but likely we would not.

18                THE COURT:  Right.  So then -- I mean, in a sense,

19  it does -- this obviously does depend on your position that

20  there is an agreement -- an agreement to, among other

21  things, pay the special dividend.

22                MR. GITLIN:  Yes, an agreement that was negotiated

23  between the parties that was announced at the same time as

24  the merger, that Albertsons announced as being in connection

25  with the merger, and that was where the amount, the actual

1    amount of the dividend, was negotiated between the parties.

2    I don't see how that's not part of the agreement.

3                    THE COURT:   But isn't there a difference between

4    being part of an agreement in the sense that it is addressed

5    because it has an affect and actually agreeing on something?

6                    I mean, if, for example, Albertsons took a step

7    two months from now that Krogers viewed as having the effect

8    of negatively affecting the business, such that it triggered

9    one of the covenants in Section VI, would you view that

10   as -- I mean, I don't think in any way would that be viewed

11   as an agreement between the parties for Albertsons to take

12   that step, even though the agreement would address it or

13   have a provision that covers it.

14                   MR. GITLIN:   Your Honor, if there was -- if this

15   was just a normal merger agreement, there are, of course,

16   covenants that the parties can include that make sure that

17   they essentially do what we are trying to do here, which is

18   trying to preserve the status quo, make sure that both

19   companies are competing at full steam while the merger

20   review happens.

21                   If that was all that was happening -- I don't have

22   a particular opinion on -- you know, we don't have a view on

23   whether or not a particular term would be enforceable by one

24   against the other.   But those are -- those are normal terms.

25                   What is not normal is to have a -- this immediate

1    drain of all of Albertsons' liquidity at the same time that

2    you impose all of these conditions.  At the very least, you

3    would say that if you are going to impose this special cash

4    dividend that is so unusual and that has such an affect on

5    Albertsons' balance sheet, you shouldn't have included the

6    same boilerplate that they include in other merger

7    agreements that says that you have -- that you can't take

8    out any unusual liabilities, you can't take out any unusual

9    indebtedness, and so forth.  It's the pairing that creates

10   the antitrust violation.

11           THE COURT:  Why -- why would -- I guess -- let me

12   ask you a different question.

13           What is the government's -- or the state's and the

14   District's theory about why the parties entered into this

15   agreement, the agreement that you say they entered into?

16   Did they -- because it's a little unclear to me what you

17   think the reason for this -- the dividend is.

18           Is it your view that the parties entered into this

19   agreement for the purpose of weakening Albertsons'

20   competitiveness position.

21           MR. GITLIN:  Your Honor, this merger was announced

22   on October 13th.  We filed our complaint last week.  We have

23   tried to get what precomplaint discovery we could from the

24   parties.  At this point, you know, we know what we know.

25   But the antitrust laws don't actually decide whether or not

1    an agreement is permissible or not based on what the

2    parties' intent is --

3              THE COURT:  What as the -- what's the parties' --

4    putting aside what the actual evidence is, because I totally

5    understand your position, that this is early from a

6    fact-gathering perspective.  But what is your theory around

7    the parties' incentives to enter into this agreement?

8              MR. GITLIN:  The incentives --

9              THE COURT:  Because the defendants say the

10   incentives -- you have the incentives all wrong.  Krogers

11   has no incentive to buy a substantially weakened Albertsons.

12   And since Albertsons doesn't know if the merger is going to

13   close, it has no incentive to be substantially weakened,

14   because if the transaction doesn't close, then it's

15   substantially weakened.

16             MR. GITLIN:  So I think we laid some of this out

17   in our reply brief, Your Honor, towards the end.  I think it

18   is important to remember that we're not alleging that

19   Albertsons goes broke, only that it can't compete as fully,

20   so even if it's extremely weakened --

21             THE COURT:  But that -- I didn't say "broke."  I

22   said "substantially weakened."

23             I mean, your theory --

24             MR. GITLIN:  So --

25             THE COURT:  -- your theory is that Albertsons -- I

1    assume your theory must be that Albertsons will be a

2    weakened competitor as a result of the payment of special

3    dividend.   Correct?

4              MR. GITLIN:   Correct, Your Honor.

5              THE COURT:   And that will have a negative

6    financial consequence to Albertsons, I assume.

7              MR. GITLIN:   I don't -- I don't have --

8              THE COURT:   You think Albertsons will do better?

9              MR. GITLIN:   It's not -- I don't think Albertsons

10   will do better, Your Honor, but it's not about how

11   Albertsons does.   It's about how consumers do.   Albertsons,

12   if it's faced with --

13             THE COURT:   No, but I'm trying to understand the

14   incentives for Albertsons to enter into the agreement that

15   you are alleging.

16             MR. GITLIN:   Sure.   Albertsons is entering an

17   agreement that it gets paid a lot of money to enter.   Its

18   private equity owners get to exit the asset.   They -- that

19   is for them, if I understand, you know, reports correct, the

20   goal.   But that's not actually part of the antitrust

21   analysis.

22             What matters is the fact that these assets, right,

23   during the pendency of the merger review, are going to be

24   somewhat weakened.   Kroger is still going to get them at the

25   end of the day if the merger goes through.   And if the

1    merger does not go through, Kroger still gets a weakened

2    competitor.   And regardless, it gets a weakened competitor

3    for the pendency of the merger review, because it's tied

4    the hands of one of its main competitors.   Not only that,

5    but it's reserved the right to consult on any refinancing of

6    debt of more than $100 million, which in any other context,

7    I think, would potentially, you know, get you something much

8    closer to per se condemnation.

9              We usually don't let --

10             (Speaking simultaneously)

11             THE COURT:   Do you think -- would you be

12    challenging that provision absent the special dividend?

13             MR. GITLIN:   Again, Your Honor, the claim that is

14    before Your Honor is the one that we have brought.

15             THE COURT:   No, so the -- the problem is you have

16    to separate out the exact agreement you are challenging now

17    versus the merger agreement generally, because the merger

18    agreement is subject to merger review.   It's not before me.

19    The merger itself is not.

20             So you have to be very precise, I think, about

21    what it is about the near-term agreement -- what the

22    near-term agreement is that creates the antitrust problem.

23             And so I understand it's all within the umbrella,

24    in your view, of the merger agreement, but I'm just trying

25    to understand the specific terms of what the parties agree

1    to.   And I take it your view is that they agreed -- they

2    agreed -- I'm not saying it is necessarily in the merger

3    agreement, but that they agreed that Albertsons would or,

4    indeed, was obligated to pay a $4 billion dividend.

5            MR. GITLIN:   Your Honor, their agreement is -- the

6    fact that the merger agreement contains other terms doesn't

7    change the fact that the merger agreement memorializes a

8    dividend that they negotiated, together with other

9    restrictions on Albertsons.

10           So there is no obligation on plaintiffs to

11   separate out each piece.

12           THE COURT:   Do you those -- do you think that the

13   dividend and those other obligations were essentially

14   negotiated together or were a piece of the same discussion?

15   Or you don't know?   Do you have a view?

16           MR. GITLIN:   It doesn't matter.   As long as they

17   end up basically being memorialized together in an agreement

18   that the defendants have entered into now, it's an

19   anticompetitive agreement, and it violates Section 1.

20           When Courts review joint ventures, it doesn't

21   really matter whether or not the parties were cooperating

22   with respect to one thing first or another thing second.

23   The question is, was there a point at which they violated

24   the antitrust laws?

25           THE COURT:   Anything else you would like to add,

1   Counsel?

2          As I said, I will give you an opportunity for

3   rebuttal.

4          MR. GITLIN:   The only thing I'd add, Your Honor,

5   because I was rereading the Tribune case -- this is the

6   Department of Justice's 2016 case where they sought

7   temporary restraining order to block a merger on roughly a

8   comparable timeline and obtained it -- is -- with respect to

9   Your Honor's questions about whether or not if Albertsons

10  had done something earlier, if they'd declared the dividend

11  earlier, if there are other circumstances under which there

12  might not be a problem from the perspective of the states,

13  there's a line there that caught my eye, which is, "Tribune

14  evidently anticipated potential antitrust issues long ago

15  because it secured antitrust counsel, yet it appears that it

16  failed to vet intentions with the government voluntarily."

17         Essentially, the Court goes on to issue the

18  retraining order but saying that, perhaps, the parties could

19  have avoided it.

20         What we have is what the parties actually decided

21  to do.   All right?   And the parties decided to make a

22  promise that they agreed on with respect to payment of this

23  dividend in conjunction with other terms that limit

24  Albertsons.   That's where we are, and that's why we are here

25  today.

1          THE COURT:  Thank you very much, Counsel.

2          MR. GITLIN:  Thank you.

3          MR. HASSI:  Good afternoon, Your Honor.

4          THE COURT:  Good afternoon.

5          MR. HASSI:  I'm Ted Hassi from Debevoise on behalf

6    of Albertsons.

7          Albertsons is a Fortune 100 company.  It had

8    revenues in the trailing 12 months exceeding $75 billion.

9    It went public in 2020 and has been doing quite well ever

10   since.

11         If you look at its liquidity over the last three

12   years, it's increased from 3.9 billion to 7.2 billion.

13         So about a year ago, in November of last year,

14   Albertsons' board looked at that liquidity and said, We

15   should engage in a special review and consider returning

16   some of that capital to our shareholders, because that's how

17   grocery stores, which are slow-growth industry stores, grow,

18   is by promising returns on capital to their shareholders to

19   get shareholders to continue to invest in them.

20         And so they embarked on a special strategic review

21   starting in November, which they publicly announced in

22   February, and that review culminated in an October 13th

23   board meeting, and the board took two actions.  The first

24   action, it voted to merge with Kroger, to sell itself to

25   Kroger, for $34.10 a share.

1          Second, it voted to approve -- and this was

2    unilateral -- a special dividend of $6.85 per share.  So it

3    returned capital in two ways:  One, a short-term return with

4    a dividend, which was due to be paid this past --

5          THE COURT:  I understand all of that.  So you just

6    used the word "unilateral."  But it is the case, is it not,

7    that the parties, meaning Krogers and Albertsons, discussed

8    and, frankly, to some extent agreed upon, at least the

9    maximum amount that the dividend would be.  Correct?

10         MR. HASSI:  Your Honor, they absolutely

11   discussed -- they discussed the dividend at their very first

12   meeting, as is clear from the declarations from both CFOs.

13   Albertsons said, Look we are doing this.  We are returning

14   capital to our shareholders, so take that into account in

15   the merger agreement.

16         That's not an agreement.  That's, Look, this is

17   something we are going to do --

18         THE COURT:  Didn't Kroger's have input and, in

19   fact, pushed back on the amount of the dividend, because it

20   was obviously an interested party, because the amount of the

21   dividend would affect the value of Albertsons post-closing.

22         MR. HASSI:  Your Honor, as the record reflect,

23   there were times where Kroger indicated that if Albertsons

24   was going to issue a dividend, that it would prefer that

25   that dividend be lower.

1          But at the end of the day, the amount of the

2     dividend was Albertsons' decision, and there is no evidence

3     to the contrary that the decision to pay the dividend was

4     Albertsons and Albertsons alone.

5          And the plaintiff states recognize that in the

6     papers they filed last night.  If you look on Page 4 of

7     their brief, they use the word "may."  "Albertsons may pay

8     the dividend," because that's what the agreement reflects.

9          You've got an agreement.  It's over 100 pages

10    long.  It's a written agreement.  We don't deny that there

11    is a merger agreement between these two parties.

12          THE COURT:  Your point is -- and I was asking

13    plaintiffs' counsel questions about this -- your point is

14    Albertsons was never obligated to Kroger in any way, shape

15    or form, to pay the dividend, or to pay a particular amount

16    of the dividend.  And when it decided to do so, it did so

17    unilaterally.

18          MR. HASSI:  That's correct, Your Honor.

19          THE COURT:  But the plaintiffs say, um, hold on.

20    There are -- first of all, the merger agreement does

21    include, in Section VI, some things that are clearly

22    agreements between the parties that restrict Albertsons'

23    ability to engage in certain financial transactions

24    post-signing, and the facts surrounding the negotiations,

25    the press release, the timing and the like, are enough to

1    conclude that there is, in fact, an agreement between the

2    parties that the dividend would be paid.

3              And why isn't that enough to at least get them

4    over the hurdle on whether there's an agreement for Section

5    1 purposes?

6              MR. HASSI:  For a couple reasons, Your Honor.

7    First of all, there are several -- there are several

8    agreements here that plaintiffs talk about in their papers,

9    and they really -- they really conflate the three.

10             There is an overall merger.  Right?  In their

11   papers when they start talking about the Harris Teeters and

12   the Safeway in Adams Morgan, that has to do with a merger

13   that's not before Your Honor today.  And I think Your Honor

14   has indicated you recognize that.

15             Second, there is a merger agreement.  It's a

16   written document.  It's got four corners to it.  And, yes,

17   it refers to the dividend, and I am happy to walk through

18   the provisions that refer to the dividend.

19             Third, they try and conflate the unilateral

20   decision to issue a dividend, because what the merger

21   agreement says, it's permissive.  "May issue a dividend,"

22   and it does have a cap in the agreement on how much of that

23   dividend, if -- if Albertsons exceeded that cap, Kroger has

24   the right to walk away from the merger.

25             So, yes, there is a cap.  But that doesn't mean

1   there is an agreement to pay a dividend.  It doesn't mean

2   there is an agreement to pay off $4 billion agreement

3   dividend, and it certainly doesn't mean that there was an

4   agreement between these two companies to harm Albertsons

5   during the pendency of the merger.

6          And that's the unlawful agreement that the

7   plaintiffs are indicating here.  They claim there is an

8   unlawful agreement.  Not just an agreement, but an unlawful

9   agreement, between these two companies to damage Albertsons,

10  pending a merger review.

11         THE COURT:  Well, I think -- I think they say two

12  things.  I think they say there's an agreement between the

13  parties to pay the dividend.  The payment of the dividend

14  will have certain affects that are anti-competitive; that's

15  enough.

16         And I think alternatively -- and I don't mean to

17  put words in their mouth, but I think alternatively they

18  say, the point of the -- of that deal or the agreement

19  was -- and maybe you would say this is an addendum to it, is

20  to -- is to weaken Albertsons.

21         But I'm not sure that they -- I don't think their

22  theory is dependent -- or at least as it has been

23  articulated in my view -- on that last piece, that the

24  purpose of the agreement had to be to weaken Albertsons.

25         I believe their theory is, they agreed on this

1    thing.  This thing will harm competition, because it weakens

2    Albertsons.  Full stop.  We win.

3              MR. HASSI:  Your Honor, we have a written

4    agreement here.  Right?  And so let's -- let's talk about

5    evidence for a minute, because as a matter of antitrust law,

6    you can have direct evidence or you can have circumstantial

7    evidence.  No question, the merger agreement, direct

8    evidence of an agreement, and it says what it says, and it's

9    permissive as to the dividend.

10             So what they want to do is bootstrap from that

11   written agreement to an unlawful agreement.  And that

12   agreement is lawful, and we can talk about the ordinary

13   course covenants and the restrictions that are placed on

14   parties every day in merger agreements so that the buyer is

15   protected from the seller taking actions outside of the

16   ordinary course.  That's ancillary to the merger agreement

17   and should be viewed in the context of the entire --

18             THE COURT:  I do want to put a placeholder down.

19   I don't want to have you do it right now.

20             I would like you to take me through some of those

21   covenants in Section 5 and just where they line up with, for

22   example, Professor Smith's views about the availability of

23   sources of liquidity and whether and to what extent those

24   covenants impact those sources of liquidity.  But I don't

25   want you to do it yet.  I'd like you to keep going.

1      MR. HASSI:  I would be pleased to do that, Your

2  Honor.

3          But I was saying in judging the evidence with

4  respect to the merger, with respect to direct evidence, you

5  look at that direct evidence.  You look at the merger

6  agreement.

7          With respect to the circumstantial evidence, you

8  ask the type of questions Your Honor was asking.  What's the

9  motive -- if we are saying that we can infer from a press

10  release that says, In connection with the merger -- and

11  let's face it, if you are going to tell the public about a

12  dividend and a merger on the same day, and the merger price

13  is affected by the dividend, you want to make sure that the

14  public connects the two for transparency sake.

15          THE COURT:  You might even be obligated to.  I

16  don't know.

17          MR. HASSI:  You might -- and I'm not a secure --

18  I'm an antitrust lawyer.

19          THE COURT:  I'm not either.

20          MR. HASSI:  Not a securities lawyer, Your Honor.

21  There are some good ones in the house back at Jenner helping

22  us.

23          But you cannot infer from that -- and that's what

24  they are asking you to do -- is to infer that there is an

25  agreement; that there was a conscious commitment to a common

1    scheme, not to enter into a merger agreement because then

2    we're back to the direct evidence, but a conscious

3    commitment to a common scheme to enter into an unlawful

4    agreement.  So not the merger agreement, which is lawful,

5    but an unlawful agreement.

6            What makes it unlawful?  If its purpose or effect

7    is to damage competition; i.e., to damage Albertsons.

8            So what they are saying is -- and this is where,

9    as I said, they are conflating at least those two agreements

10   and sometimes pulling the merger into it as well in talking

11   about the stores and Adams Morgan, but they are conflating

12   those to try and suggest that there is this agreement to --

13   and they said it in their papers -- to weaken Albertsons in

14   such a way that -- and this is in their Complaint -- that it

15   would qualify for the failing firm defense.

16           Now, when we saw that, I will tell you, we emailed

17   the plaintiff states and said there is no failing firm

18   defense here.  We are never going to be insolvent.  We are

19   not going to claim that.  We would like to take that off the

20   table.  But unfortunately didn't resolve -- resolve things,

21   and here we are today.

22           But you have the CFO whose declared this company

23   is not going to be -- not going to be insolvent.  And that

24   was not -- my point is, that was not the purpose or intent

25   of this agreement, and it won't be the effect of this

1   agreement, and we shouldn't take that circumstantial

2   evidence of the press release, of the timing of these two,

3   which part of a single, singular strategic review, and the

4   culmination of a singular strategic review, the fact that

5   they were announced at the same time, that should not

6   convince Your Honor that, therefore, they are tied together

7   in such a way as to be illegal and unlawful.

8           The dividend, standing on its own, and -- you

9   know, I'm sorry that the states can't commit to this, but

10  had we announced the dividend standing on its own, there's

11  never been a challenge to a dividend, under antitrust law,

12  that I am aware of.

13          THE COURT:  I'm not aware of one either.

14          MR. HASSI:  And I think if we'd announced the

15  dividend four days earlier, we wouldn't be here -- we

16  wouldn't be here today.  But the fact was, this is the way

17  words operate.  They did the strategic review.  They

18  evaluated how to return capital.  And, candidly, we didn't

19  know until last minute whether this merger agreement was

20  going to be signed or not.

21          So they were announced at the same -- they were

22  announced at the same time, but one shouldn't draw

23  conclusions from that that are anything other than what is

24  obvious.  The board got together, the board took two votes,

25  two unanimous votes; one to approve the dividend, and one to

1     approve the merger agreement.

2            THE COURT:   Do you agree -- put the question of an

3     agreement to the side, but if we are just talking about

4     Albertsons' ability to compete in the future, that if

5     Albertsons and Krogers had, in fact, reached an agreement to

6     pay a dividend, that there is a dividend amount that would

7     be so substantial that it could have the affect of lessening

8     Albertsons' ability to compete?

9            In other words, if they agreed to pay a

10    dividend -- if the parties agreed that Albertsons would pay

11    a dividend of $25 billion -- or pick your number; that that

12    would be such a substantial amount that Albertsons actually

13    would be significantly hamstrung in its ability to compete.

14            Do you agree with that?

15            MR. HASSI:   Assuming there were -- assuming there

16    were an agreement and a board dumb enough to agree to that,

17    there's a number.

18            THE COURT:   Exactly.

19            I understand from your perspective I've assumed

20    away a lot.   But if we just isolate that question, then, the

21    issue is, from your perspective, whether the $4 billion

22    dividend is substantial enough to have the affect on

23    Albertsons that would then have the affect on competition.

24    And your view, of course, is that it's not substantial

25    enough.

1              MR. HASSI:   That's correct, Your Honor.

2              THE COURT:   So walk me through that and the

3     numbers.   And then -- not the numbers, but the sources that

4     Albertsons has or might have to remain competitive at the

5     level you think it should remain.

6              And as you do that, if you could, if you could

7     just sort of note places where the merger agreement and

8     the -- the agreement, or the limitations on Albertsons,

9     might kick in.

10             MR. HASSI:   I will, Your Honor.

11             Does Your Honor have a copy of the slides that

12    we --

13             THE COURT:   I do, yes.

14             MR. HASSI:   These are -- they are excerpts --

15    they're largely excerpts from documents, but it may be

16    helpful -- and these are -- some of these are under seal.

17    That's why we wanted to do it this way.

18             THE COURT:   Yeah, we will do our best to not -- I

19    won't say anything that is clearly sealed.   I assume the

20    plaintiffs have copies?

21             MR. HASSI:   They do, Your Honor, yes.

22             THE COURT:   Thank you.

23             MR. HASSI:   If you look at the first slide, and

24    it's entitled "Albertsons has access to sufficient liquidity

25    to pay the special dividend."

1          What this is is a graphical representation of its

2   liquidity over the last several years.  And as I said at the

3   outset, and as it says at the top here, Liquidity has

4   increased from 3.9 billion to 7.2 billion.

5          So in dark blue you have cash and cash equivalence

6   increasing year over year, and above that you have the ABL.

7   And the ABL -- I think it increases a little bit, but

8   basically they don't draw down on the ABL, and their cash

9   and cash equivalents are increasing.

10          And for the record, this is part of the reason

11   that Albertsons sat out on a strategic review to pay this

12   dividend is they have cash on their -- they have cash on

13   their books that they are not using.

14          THE COURT:  As a general proposition, shareholders

15   don't love when the company they own sit on cash.  I mean, I

16   understand there are times when they want to, but

17   shareholders do like cash returned to them

18          MR. HASSI:  Right.

19          THE COURT:  At times.

20          MR. HASSI:  So as part of the special review, the

21   strategic review, the company thought there are ways to --

22   there are ways to return this cash.  Tender offer, buy-back

23   shares.  That was considered.

24          As I mentioned, if you go to the second slide,

25   this just goes to the agreement issue which we've already

1    talked about, but just to emphasize it, this second slide

2    is -- um, was prepared for Kroger's board after the first

3    conversation.

4            And if you look at it, it says in the middle

5    bullet:  "Following discussion with Acorn's advisors" --

6    Acorn is Albertsons' -- "Acorn is currently contemplating

7    the following options with a plan to announce by earnings in

8    mid to late July."  Back then we thought the merger might

9    get done this summer.

10            "Number one, issue a special dividend (financed

11   via debt and cash on hand)."  That's what they are doing

12   now.  "And, (underlined) considering one, alongside two or

13   three, raise third-party equity or a potential merger with

14   Kettle."

15            And my point is -- and Kettle is, as you might

16   imagine, Krogers.

17            So the point is, at this point in time, we were

18   clear -- Albertsons was clear -- we are going to do -- we're

19   going to do a return.  We may do a merger.  We may do both.

20   Those are -- those are all our options.

21            But if you flip now -- and so if you flip now

22   to -- there's a slide with a bunch of numbers, projected

23   cash flow and balance sheet.  It has the page number 6, but

24   these aren't -- because they are excerpts -- not numbered

25   consecutively.

1    That's from roughly that same period of time.

2    This is from -- I believe it is a June 10th document that

3    was presented to the Albertsons' board.  And they were

4    considering -- as was indicated in their prior document, and

5    as they told Kroger at the outset, they were considering

6    returning cash to shareholders.  At the time they were

7    considering a tender offer, because that's a better way --

8    that is a better way to do it at that point in time than a

9    dividend.

10    You can't do a tender offer while you're doing a

11    public company merger, because there are securities law

12    issues that could arise with respect to inside information

13    related to the merger, as I understand it.  Again, I am an

14    antitrust lawyer, not a securities lawyer.

15    But this was vetted by company management,

16    reviewed and prepared by the bankers, and then presented to

17    the board.  And if you look at this, it reflects -- so this

18    is a distribution of 4.5 billion, so a half a billion more

19    than the special dividend we are talking about today.

20    If you go to the bottom of the page, if you look

21    at ending cash -- so at the end of 2022, they estimate that

22    they will have cash on the books of a half a billion after

23    paying the dividend.  And that's what they will -- what they

24    would have today had they paid the dividend out on Monday.

25    That ending cash goes up year, over year, over

1   year, and that's because -- and this is the central issue

2   that plaintiffs and their experts missed; and that is -- I

3   talk about this as being a $75 billion business, because as

4   Your Honor recognized, it throws off a certain amount of

5   cash.  Not all of that $75 billion is available to the

6   company, but based on its past record, what you see in the

7   last several years is, the company has invested in itself.

8   It has paid its workers.  It has redone its stores.  It has

9   competed fiercely with not just Kroger, but everybody out

10  there:  Walmart, Amazon, everybody.

11          And it has gained excess cash on its books.  It

12  expects to do that in the future, even after paying this

13  dividend.  And that's what this document shows.  It shows

14  cash going up.  Just below that, total debt going down.  And

15  at the bottom, net debt decreases year, over year, over

16  year.  And the company's leverage gets better as time goes

17  on.

18          So when the plaintiff states talk about going to

19  the debt markets and borrowing to pay the dividend, there's

20  no borrowing necessary.  This company is not expecting to go

21  to the debt markets.  This company doesn't need to go to the

22  debt markets because it's doing quite well.

23          Now, they may choose, as a matter of corporate

24  finance, to go to the debt markets.  But the point is they

25  don't have to.

1        And the CFO has tried to say that seven different

2   ways from Sunday in her declaration.  I mean, the company

3   has a three-year plan.  That plan is not changing one iota

4   as a result of this dividend.  They will continue to pay

5   their workers.  They will continue to invest in stores, and

6   they will continue to compete.  They just returned some cash

7   to the shareholders, as they are entitled to do under

8   Delaware law.

9        And your Honor asked the question.  The company

10  ran the Delaware corporate law analysis under Delaware

11  General Corporate Law, Section 170.  It ran it two different

12  ways, and it found it had surplus cash that, as a matter of

13  law, as a Delaware corporation, it was entitled to return to

14  its shareholders.

15       And that's what the plaintiff states are asking

16  you to invade.  And they are asking you to invade that based

17  on some concern about the future.  That concern, by the way,

18  hangs on a recession.  And as Your Honor knows, during

19  recession, we all still eat.  We all still go to grocery

20  stores.  And there is not one wit of evidence in their

21  papers about how grocery stores perform during a recession.

22  They actually do pretty well, because we all still eat.

23       We might get rid of the discretionary spending.

24  We might not go out to restaurants, but we're still buying

25  our Cheerios in the morning.  So this idea that a recession

1    is -- winter is coming and that they're going to need to

2    borrow, that's not what the company expects.

3            So you asked about the merger agreement and

4    Section 6.1 --

5            THE COURT:  Yes.

6            MR. HASSI:  -- which is those covenants, and if

7    you'll give me a second, I will try to find them in my

8    papers.

9            I'm going to refer to the -- I appreciate the

10   plaintiffs putting in the full-text version, which my eyes

11   can deal a little bit better with -- Section 6.1, which in

12   the Plaintiffs' version is on Page 59.

13           THE COURT:  Yes.

14           MR. HASSI:  These are ordinary course covenants.

15   These are entered into -- I see a lot of merger agreements

16   in my work.  I see these all the time.  We, as antitrust

17   lawyers, check them to make sure that they're not -- there

18   is not gun-jumping here; that they are not allowing the

19   buyer to control the seller.  But the buyer has a right to

20   make sure that the seller is going to operate in the

21   ordinary course, and if you are going to go outside the

22   ordinary course.

23           For example, going to the debt markets to take on

24   a bunch of debt.  Right?  Kroger doesn't want to buy a

25   debt-laden company.  It wants to buy a company that's got a

1    nicely, not too levered balance sheet.

2            And by the way, Kroger guides to a 2.5X net

3    EBITDA-to-debt ratio. This company, after the payment of

4    the dividends -- excuse me, Albertsons, after the payment of

5    the dividend, will be at 1.9.

6            It had several years ago been much, much higher.

7    It's been going down, down, down. They've been taking debt

8    down even as the cash has been going up. So both things

9    have been happening at the same time in recent years.

10           But back to the covenants.

11           So section 6.1 talks about the conduct of the

12   company, and it says you have to operate in the ordinary

13   course. And if you are going to operate outside of one of

14   these covenants -- and this is the last part of Section 6.1

15   before you get to 6.1(a). There is a Roman numeral VII.

16   And it says, "With the prior written consent of parent

17   (that's Kroger) which consent will not be unreasonably

18   withheld, conditioned, or delayed."

19           So if the company has to go to the debt markets,

20   and we'll talk about that provision in just a second, and

21   they want to borrow -- and this -- sorry. I should just go

22   there.

23           It's, um, it's on Page 62 is 6.1(n), and it talks

24   about a restriction on the company refinancing -- entering

25   into definitive agreements for any such refining

1    indebtedness that is in a principal amount exceeding $100

2    million.   So if the company wants to go to the debt markets

3    for more than $100 million, they have got to go to Kroger

4    first.   Yes.   Now, Kroger can give its prior written

5    consent, and it can't unreasonably withhold that consent.

6           So this is not a be-all and end-all constraint;

7    you can't do it.   It's, simply put, before you go loading

8    the company down with debt -- because Kroger's doesn't

9    want -- it wants a financially vibrant company.   It's not

10   buying Albertsons to be a rundown supermarket chain.   It's

11   buying a crown jewel set of supermarkets.

12          And so we have the right, with their consent, to

13   go to the debt markets should it be necessary.   But again, I

14   want to stress this point, the company doesn't plan on doing

15   that, and its ordinary course documents show that.

16          It generates free cash flow, enough to pay its

17   ongoing responsibilities, including those in its three-year

18   plan and doesn't need additional cash such that it expects

19   going to the markets.

20          I don't know if Your Honor has other questions

21   about 6.1.   I'm happy to --

22          THE COURT:   I have one question.   I was trying to

23   find the precise terminology for it, but, um, the provision

24   you were just talking about, the $100 million provision in

25   N, does that have anything to do with the -- and again, I've

1    forgotten the name of it -- but the debt vehicle, for lack

2    of a better word, from which Albertsons intends to fund part

3    of the special dividend?

4                MR. HASSI:   No.   The ABL is the --

5                THE COURT:   Yes.   Sorry.

6                MR. HASSI:   -- term you are thinking of Your

7    Honor.

8                THE COURT:   Yes.

9                MR. HASSI:   No, the ABL is a line of credit.   It's

10   actually considered part of the company's liquidity.

11   Companies -- there's actually a slide on this.

12               THE COURT:   Right.   I thought that was right.   I

13   just wanted to make sure.   So the ABL is -- is it fair to

14   say, is presently unaffected at all by the provisions in

15   6.1(n) or is it affected if, for example, Albertsons wanted

16   to refinance it, for lack of a better word?

17               MR. HASSI:   My understanding -- and I'll want to

18   get back to Your Honor on this with -- talk to a corporate

19   lawyer and just confirm my understanding is correct -- is

20   that the company has the right under the merger agreement to

21   use the ABL.   That's an assumed -- an assumed right, and

22   they are using that ABL, 1.5 -- 4 billion of the ABL to help

23   pay the dividend, assuming we get a chance to pay the

24   dividend.

25               But it's basically -- the way I think of it is is

1    a line of credit, Your Honor.  It's a floating line of

2    credit which the company can use and can pay back, and it

3    doesn't have the same defined debt terms that you see, you

4    know, in a longer-term bond.

5            My understanding is this provision we've been

6    talking about, N, is that sort of a longer-term lending

7    vehicle going to the bond markets, in other words, Your

8    Honor.

9            THE COURT:  Thank you.

10           So one question I have is, if -- and I could have

11   asked plaintiffs this, but I think, you know, they are not

12   in that case.  But can you just bring me up to speed -- I

13   get this is really not a substantive question; it's a

14   relationship question -- with what is exactly happening in

15   Washington.

16           Obviously, I saw the -- the order from the Court.

17   Are the parties still set to have a -- in Washington, a

18   preliminary injunction hearing on Thursday?

19           MR. HASSI:  I'm not sure, Your Honor.  The State

20   of Washington, as we were heading over to this courthouse,

21   asked for a meet and confer because they want to call

22   witnesses in that case.

23           That matter was set for 3:00 on Thursday

24   afternoon.  We know from our prior experience that the King

25   County Courthouse closes pretty religiously not long after

1    4:00.   In fact, we were worried about the lights going out

2    because our last hearing went past 4:00.   If there were

3    going to be witnesses, I -- it may get -- it may get pushed

4    to another date.   They wanted -- they wanted -- and I think

5    they are meeting and conferring as we speak.

6           So I don't know -- and we'll provide Your Honor

7    with the -- we'll let the -- we won't do it ex parte.   We

8    will let the plaintiffs know, we'll provide Your Honor with

9    an update as we have it.

10          But at present time, we expect to be before

11   Judge Schubert 3:00 on Thursday for a PI hearing.   It's this

12   witness piece that is throwing me a little bit for a loop in

13   terms of predicting whether that's going to happen or not.

14          THE COURT:   But whether it's Thursday or some

15   other day, the status quo in Washington is, there is a

16   restraining order against payment of the dividend, and that

17   has affect, and it still does, and that unless and until

18   that is converted into a PI or expires, I suppose, the

19   companies are -- or Albertsons is precluded from paying the

20   dividend.

21          MR. HASSI:   Yes, Your Honor.   And maybe just a

22   couple of words about that.

23          One, as a matter of state court procedure in the

24   State of Washington, we were before -- we were in the ex

25   parte part for the hearing.   We were not before the same

1    judge.  We were before a judge who, as I understand it,

2    ordinarily hears probate cases.  You know, these things get

3    picked up by the judge who is available as a result of the

4    emergency.

5              And, you know -- and, again, this was my

6    understanding of what happened.  It was pretty clear he was

7    making an effort to maintain the status quo until we could

8    get in front of Judge Schubert.

9              I want to be clear, as I think Your Honor picked

10   up, based on your questioning to Mr. Gitlin, the status quo

11   has harmed the company.  The company does have a liability

12   on its books because we made a promise to our shareholders,

13   the shareholders of record as of the 24th of October are

14   entitled to be paid that dividend of $4 billion.

15             We've been hearing from those shareholders, as you

16   might imagine.  Not happy.  Some of these are -- you know,

17   it's a publicly-traded company.  There are millions of

18   shares.  They float out there.  They are the real ones that

19   are being injured by that.  They are people that bought

20   shares with the expectation of getting a $6.80 dividend on

21   Monday, and they don't have their money.

22             And the reason -- you know, the company has --

23   that liability is sitting on the company's books.  If we did

24   have to go to the debt markets, Your Honor is exactly right.

25   It's out there.  It is -- the company has to reserve against

1   that, because it -- as a matter of Delaware law, there is an

2   expectation that will pay that.

3          I am not saying that Mr. Gitlin is wrong that if

4   we get sued in Delaware Court, that we won't raise an

5   injunction as a defense.  We will raise every defense we can

6   think of, and we'll do our best.  But as a matter of

7   Delaware corporate law, made a promise to our shareholders.

8   The date for keeping that promise has passed.

9          THE COURT:  And not to get into the weeds on

10  accounting or the like, but at least for present purposes,

11  even now, with an injunction from Washington State, I assume

12  your position is that Albertsons is treating the statement

13  that it would pay the dividend as having created a liability

14  presently --

15         MR. HASSI:  Well --

16         THE COURT:  -- is what I do.  But that same would

17  be true for me.  If I were to enter a TRO, you would -- it

18  would be the promise to pay the dividend, or the statement

19  to pay the dividend, would create, on it books at least for

20  Albertsons, a liability, and that would have an effect --

21  I'm not sure that we've really figured out what the effect

22  would be exactly, but it would have some effect on

23  Albertsons' liquidity, I would expect.

24         MR. HASSI:  I would expect the same, Your Honor.

25  And, again, antitrust lawyer --

1          THE COURT:  It may not be as -- it may not be as

2    significant as the payment of the dividend, but I -- it

3    seems to me it would be more than a zero effect.

4          MR. HASSI:  That is my understanding, Your Honor,

5    yes.

6          THE COURT:  Is there anything else you would like

7    to add?

8          I expect that counsel for Kroger's would like to

9    speak and, of course, I want to give plaintiffs an

10   opportunity to rebut.

11         MR. HASSI:  Unless Your Honor has further

12   questions.

13         THE COURT:  I don't.  Thank you very much.

14         MR. HASSI:  Thank you.

15         MR. WOLF:  Thank you, Your Honor.  And I will be

16   very brief.

17         My client has been accused of committing an

18   antitrust violation.  From day one, Albertsons told my

19   client that they were strongly considering issuing a

20   dividend.  We were told that immediately, candidly, openly.

21         Our response was twofold.  We said, if you issue

22   such a special dividend then, of course, that will affect

23   the purchase price we are willing to pay.

24         And secondly, if you go over a certain threshold,

25   then we are going to reserve the rights to walk away from

1   the deal.  Those two if-then statements worked their way

2   into the merger agreement.

3           That is not an agreement to issue a dividend.

4   That was not our request that they issue a dividend.  That

5   was not our demand that they issue a dividend, and it

6   certainly wasn't an agreement.

7           Absent an agreement, there cannot be an unlawful

8   agreement.  So substantively, there was no agreement.  At

9   all times, Albertsons was in control of the decision-making

10  regarding the dividend.  When?  Where?  How much?  If?

11          Now, one other procedural point, Your Honor, and

12  then I'll let counsel rebut.  It's a procedural point, but

13  it's an important one.  The -- and, of course, we are here

14  under extraordinary circumstances.  A TRO, by definition, is

15  an extraordinary request.

16          Plaintiffs needed to lay out the basis for their

17  assertion that my client and Albertsons had committed an

18  antitrust violation.  And their allegations, as laid out in

19  their TRO papers and, for example, we can look to the

20  operative titles of the sections.  In its opening brief, at

21  Page 7, "The special dividend Violates Section 1."

22          Under that title, we hear what the purported

23  violation was.  They summarize that unlawful conduct as,

24  "Defendants' horizontal agreement for Albertsons to issue

25  the dividend."  That's at Page 7 of the TRO.

1       Now, in our respective oppositions, we pointed out

2   the fundamental flaw with that theory, and I just addressed

3   that in the opening remarks, Your Honor.  The authority to

4   pay the preclosing dividend rested solely with Albertsons at

5   all times, and that the merger agreement does not require

6   Albertsons to pay.

7       If they had chosen not to pay the dividend, that

8   was fine.  That was their entitlement.  That is the state of

9   affairs, as it always was and it always be will.

10      When we made those arguments, we saw a

11  not-so-subtle shift in the theory of plaintiffs' case.

12      The commensurate title to the opening brief, which

13  you'll recall was "The special dividend violates Section 1,"

14  in commensurate title in the reply was "Defendants merger

15  agreement restrains competition to the special dividend and

16  related terms."

17      And frankly, we heard counsel this morning go to

18  that almost immediately.  These -- as he called it,

19  boilerplate -- and he's right.  These boilerplate merger

20  terms, that he says somehow they create a penumbra or they

21  work hand-in-glove.  I'm still not sure how this is supposed

22  to work, but somehow it's the special extra terms that are

23  admittedly boilerplate that turns a non-agreement into an

24  agreement that turns a dividend into an antitrust violation.

25      Your Honor, if they believe that these additional

1    terms were somehow important to their allegation, they

2    should have made it in their TRO papers.

3            Instead, the only reference to these additional

4    terms was in a single paragraph where they say -- they

5    somehow exacerbate the effects of the purportedly violative

6    dividend.

7            Your Honor, my client did not, has not, committed

8    an antitrust violation, nor has Mr. Hassi's, and therefore

9    the rest of the discussion of the TRO is unnecessary.

10           Thank you for your time.

11           THE COURT:   Let me just confirm one thing.

12           MR. WOLF:   Yes, of course.

13           THE COURT:   And you basically said it, but --

14           MR. WOLF:   Yes, Your Honor.

15           THE COURT:   -- your position is -- Krogers'

16   position is, Albertsons is free and Krogers has no claim

17   against it if it pays no dividend whatsoever or if it pays a

18   dividend of an amount between $1 and $4 billion?

19           MR. WOLF:   That's exactly right, Your Honor.

20           THE COURT:   And if and only if the dividend is

21   more than $4 billion does Krogers have any rights whatsoever

22   with respect to the dividend.   And if it goes above

23   $4 billion, Krogers has the option of walking away.

24           Of course, if the amount is $4 billion or less,

25   that affects the purchase price.   Right?

1      MR. WOLF:  Correct, Your Honor.  That's exactly
2  right.
3              THE COURT:  But Kroger's, in your view, has no
4  right to obligate Albertsons to make a payment at all.
5              MR. WOLF:  That's right.  That's in their business
6  judgment what makes sense for their business to do.
7              THE COURT:  Okay.  Thank you, Counsel.
8              MR. WOLF:  Thank you, Your Honor.
9              MR. GITLIN:  Thank you, Your Honor.
10             I will start with Mr. Wolf's last points, because
11 I think defendants are in a tough spot having essentially
12 waived whether or not we are likely to succeed --
13             THE COURT:  No.  Wait a second.  You put that -- I
14 wouldn't even attempt to make that argument, because you
15 have, at best, an oblique reference to those other
16 provisions in the merger agreement in one paragraph in your
17 motion.
18             I didn't think that you were arguing that the
19 provisions in Section 6 were somehow part of the unlawful
20 agreement here.  And I think it was quite reasonable for
21 defendants not to focus on that --
22             MR. GITLIN:  Your Honor --
23             THE COURT:  -- so I do not think your waiver
24 argument goes anywhere.
25             MR. GITLIN:  Your Honor, the temporary restraining

1    order, respectfully, is to block the payment of the

2    dividend.

3              I don't need to block the merger from going

4    through at this juncture.   Right?

5              So we seek the temporary restraining order with

6    respect to payment of the dividend, but we made clear in our

7    opening motion -- this is Pages 9 to 10 of the brief.   We

8    make clear in our complaint that these provisions work

9    together.   And I can refer the Court by turning to the

10   complaint.

11             THE COURT:   I understand your point, but I am not

12   going to hold that the defendants waived their response

13   about Section 6 because you put it in a paragraph obliquely

14   and they didn't respond to it.

15             So I wouldn't take more time.

16             MR. GITLIN:   Understood, Your Honor.

17             My -- I do think it's important to make clear what

18   plaintiffs' theory of harm is here, because from what I

19   heard from your discussion with Mr. Hassi, I think some

20   clarification is in order, so --

21             THE COURT:   Can we just stay on the agreement for

22   a second?

23             MR. GITLIN:   Sure, Your Honor.

24             THE COURT:   That's why I ask these questions at

25   the very beginning.

1      Plaintiffs -- the current challenge, plaintiffs'

2      position is that the defendants agreed to have a special

3      dividend of $4 billion paid by Albertsons, and to restrict

4      Albertsons' ability to raise capital, as restricted through

5      Section 6.1(n).   Correct?

6          MR. GITLIN:   That's correct, Your Honor.

7      Albertsons announced this dividend on the same day as the

8      merger.   Kroger acquiesced to the amount of the dividend

9      after the two negotiated the agreement, and the agreement

10     contains both the restrictions and the dividend.

11         We are agnostic in our complaint as to the --

12     whether there was a specific purpose to weaken Albertsons as

13     a competitor.   I think the portion of the introduction that

14     Mr. Hassi is referring to is where we say the discovery may

15     reveal that the special dividend reflects a calculated

16     effort to leave Albertsons in --

17         THE COURT:   I take it your theory -- I think the

18     theory is a perfectly legitimate one, which is -- I mean,

19     whether it is supported by the evidence in another Court,

20     but I think the theory is a legitimate one, which is the

21     parties agreed to pay a special dividend and have these

22     restrictions.

23         Doing so will have the effect of substantially or

24     whatever -- use whatever adverb you want -- of weakening

25     Albertsons and thereby harming competition.   That's an

1     antitrust violation.

2              MR. GITLIN:  That's correct, Your Honor.

3              I think there are a couple of other points I'd

4     like to address.

5              So, you know, at the moment, it's not -- it's not

6     the case that there is some conclusion that's been reached

7     with respect to the merger agreement.  So I heard counsel

8     say that, well, that there's -- that the merger agreement

9     itself as a broader matter, is perfectly lawful.  That's

10    not -- we are not taking a position one way or another on

11    that.

12             THE COURT:  And I am not either, or would not be.

13             MR. GITLIN:  I want to highlight again that the

14    Delaware law, whatever -- whatever the case may be in this

15    instance, whatever their obligations, this is a harm to the

16    extent that Albertsons thinks it's suffering a harm, it is

17    of their own making.  It's not just that they can't get

18    around antitrust laws; it's that they knew that -- they

19    consciously decided to time this dividend with the merger --

20    with announcing the merger, because the two were part of the

21    same agreement.

22             And then I just want to go back to some of your

23    discussion with Mr. Hassi and the deck that defendants

24    provided.

25             But the first thing is something I heard that,

1    frankly, didn't make sense to me, given what I understood to

2    be defendants' argument.  My understanding of defendants'

3    argument is that paying $4 billion, even though 1 and a half

4    billion of it is borrowed from the revolving credit

5    facility; but, in general, is not going to have an impact --

6    any discernible impact on Albertsons' business, on

7    Albertsons' competitiveness.  Nothing.

8            So when Your Honor asked whether or not there

9    would be an impact, a liquidity impact, in some way if you

10   granted the TRO and essentially this money was -- even

11   though it's a liability that's on the books, it was

12   unavailable to them, Mr. Hassi said there would be some

13   impact.

14           I think you said it wouldn't be quite -- it may

15   not be very great, but there would be an impact.  I don't

16   understand how the $4 billion, when it gets paid to the

17   shareholders, has no impact on their balance sheet, but when

18   it gets sequestered, essentially, by virtue of Court order,

19   it does have an impact and therefore harms them.

20           Let me turn to Slide 2 of their presentation.

21           One thing that is clear is that for whatever

22   reason, and whatever its function, the ABL facility has

23   never been used by Albertsons in the last few years.  It's

24   set at a certain amount, and it's never been tapped.

25           If they really have no liquidity concerns, why is

1    one and a half of the $4 billion that they are going to use

2    to pay the special dividend, coming from this -- why is it

3    coming at a time when it is going to add to their balance

4    sheet?  Why -- if we go on and look at the options that they

5    were considering, on Page 3 and the fact that they were

6    considering a variety of options.  And I think Mr. Hassi

7    discussed that they had a tender offer.  Why did they

8    consider -- why did they not continue the discussions of the

9    tender offer?  Why is it that the agreement without -- with

10   Kroger results in a different path?

11            The way we have understood the sequencing here,

12   they reached an agreement with Kroger, and part of the

13   agreement is paying the special dividend in lieu of other

14   options, and that is negotiated with Kroger.

15            I think that is all I had with respect to -- with

16   respect to their presentation, Your Honor.

17            THE COURT:  Let me just ask this question.  So

18   take a look at -- I guess it's Deck Slide 2.  That reflects

19   over $7 billion of liquidity.

20            Do you dispute that that's an accurate reflection

21   of Albertsons' current financial position?

22            MR. GITLIN:  Your Honor, I saw this today, like

23   you did.  My understanding is that they have, yes, several

24   billion dollars today, before they pay the dividend, of

25   cash.  Right?  So this is not reflecting a post-dividend

1    world.  Right?  They have several billion dollars today of

2    cash that reflects their current liquidity, and they have

3    certain access to the ABL at an interest rate that, you

4    know, is a function -- is a market rate.  It's not like

5    Ms. McCollam's declaration says with respect to most of

6    their other debts where it is fixed.  This is actually

7    market-determined.  As I understand it, it's LIBOR plus some

8    certain amount.  And that for whatever reason, as much as

9    they've considered it cash before, they haven't accessed it

10   previously.

11           THE COURT:  But that amount, which you have no

12   reason to dispute or doubt, is almost double the dividend.

13   And even if the dividend is paid, still leaves 3.15 billion

14   in liquidity if nothing else changes.

15           MR. GITLIN:  That's --

16           THE COURT:  And then -- and then, if you take a

17   look at -- I guess it's this slide deck 6.  Now, granted,

18   these are -- these are projections, but do you have any

19   reason to believe that these projections were cooked up or

20   were not the company's or Credit Suisse and Goldman's best

21   estimates at the time of the future cash positions of

22   Albertsons even after a distribution that, as reflected

23   here, was going to be $500 million more than the current

24   distribution is contemplated to be?

25           In other words, are you disputing in any way that

1    this was the company's and its advisor's best estimate of

2    its future financial positions?

3              MR. GITLIN:  Your Honor, we have not had the

4    chance to interrogate any of this.  But even if it were

5    true, right, what is also true is that Albertsons projects

6    $6 billion in needs for liquidity over the course of the

7    year.  Right?

8              And the cash that they generate in the form of

9    revenues cannot be used for additional store improvements,

10   worker salaries and the like that they need to do if they

11   are going to compete -- if they need to respond to

12   competition.

13             THE COURT:  Do you have a position on what a

14   reasonable dividend would have been to pay?

15             MR. GITLIN:  I don't need to have one, Your Honor.

16   All I need -- in fact, I don't even need to have a position

17   on what a reasonable net debt ratio is relative to other

18   companies.

19             What matters is how Albertsons is doing today

20   versus how Albertsons is doing if it pays the dividend,

21   particularly when it's an amount that is consummate with the

22   amount of cash it has on hand.

23             THE COURT:  Won't its net debt ratio be better

24   than many competitors, even after payment of the

25   distribution?

1            MR. GITLIN:  Again, Your Honor, it doesn't matter

2  with --

3            THE COURT:  No, it's just a question.  My question

4  is, is that true?

5            MR. GITLIN:  I think it depends what you -- what

6  you mean.  I've seen their analysis that with respect to --

7            THE COURT:  Do you have a different one?

8            MR. GITLIN:  -- with respect to other companies,

9  that, you know, it depends how you define "competitor" but

10  with respect to certain other companies, it may be

11  comparable.

12            But again, what matters is that Albertsons'

13  executives have decided, have made decisions that led it to

14  the point today where it can be competitive with the

15  $4 billion it has in cash on hand.  And what it's going to

16  have tomorrow is $4 billion less in a year that it

17  anticipates needing $6 billion and in a year that it's going

18  to have trouble accessing capital.

19            THE COURT:  Thank you, Counsel.

20            Anything else from the defendants?

21            MR. HASSI:  Not unless Your Honor has questions

22  about the 4 billion or any of that, but --

23            MR. WOLF:  Nothing else, Your Honor.

24            THE COURT:  Okay.  Thank you.

25            So as I said at the beginning, I am going to take

1   a brief recess, consider whether I am in a position to

2   decide the motion orally.  If I'm not, I will take it under

3   advisement and write something.  If I am, I will decide it

4   orally.  So we are in recess.

5           (Recess starting at 4:29 p.m. to 4:36 p.m.)

6           THE COURT:  Thank you, Ms. Lesley.  We will let

7   everybody else come on in.

8           (Brief pause)

9               So after consideration of the arguments and the

10   parties' briefs at the hearing today and considering the

11   entire record, including the parties' declarations and the

12   exhibits on which the parties rely, I am prepared to rule

13   orally this afternoon.  And I will deny plaintiffs' motion

14   for temporary restraining order, and I will lay out my

15   reasons for doing so.

16               A party seeking temporary restraining order, of

17   course, bears the burden of demonstrating that it is a

18   substantial likelihood, if succeeding on the merits, it will

19   suffer irreparable harm if the injunction is not granted;

20   other interested parties will not suffer substantial harm,

21   if the injunction is granted; and the public interests would

22   be furthered by the injunction.

23               Obviously, Courts have talked about sliding scales

24   with respect to these factors, but it is, of course, always

25   very important to consider a likelihood of successful on the

1    merits and irreparable harm.

2            In my view, plaintiffs' case for a TRO fails on

3    the first part of this test because they have failed to

4    demonstrate a substantial likelihood of success on the

5    merits.

6            Plaintiffs don't allege that payment of the

7    preclosing dividend would violate Delaware law.  Indeed,

8    they do not contest defendants' arguments that payment of

9    the preclosing dividend is consistent with Delaware law.

10            Instead, they contend that payment of the

11    preclosing dividend would violate Section 1 of the Sherman

12    Act and its state law analogs.

13            One of the elements of the Section 1 claim, of

14    course, is an agreement or conspiracy between two actors.

15    But plaintiffs have failed to demonstrate an agreement or

16    conspiracy between Kroger and Albertsons to pay the

17    preclosing dividend to Albertsons' shareholders and/or an

18    agreement to make Albertsons "cash poor."

19            There is no evidence of an agreement between

20    Albertsons and Kroger to pay the pre-closing dividend.  In

21    fact, the evidence before the Court points to an independent

22    decision by Albertsons to return value to its shareholders.

23            The primary evidence submitted by the plaintiffs

24    is the merger agreement and the accompanying press release.

25    But the merger agreement does not require the payment of the

1    preclosing dividend.  The merger agreement caps the amount

2    of the dividend to $4 billion and explains how the purchase

3    price will be adjusted if the dividend is paid.

4           This all makes good sense.  Kroger, knowing that

5    Albertsons was considering the payment of such dividend,

6    needed to ensure first that the preclosing dividend would

7    not harm the company it was seeking to acquire; and, two,

8    that Kroger was not overpaying to acquire Albertsons.

9           As for the press release, it states that the

10   "Dividend has been declared in connection with the

11   company -- that's Albertsons -- entering into an agreement

12   and plan of merger."

13          This is consistent with the fact that Albertsons

14   had determined to pay the dividend unilaterally and that the

15   dividend would affect the purchase price, not an agreement

16   between Kroger and Albertsons, that Albertsons was required

17   to pay the dividend.

18          In fact, the evidence before this Court weighs

19   against defining of an agreement obligating Albertsons to

20   pay the dividend.

21          First, and again, nothing in the merger agreement

22   obligates Albertsons to do so.

23          If, for example, Albertsons did not pay the

24   dividend or decided to pay a smaller amount, Kroger would

25   have no right to require its payment or to require payment

1    of $4 billion.

2          Second, the unrebutted declarations from

3    Albertsons' President and CFO and Kroger's Senior VP and CFO

4    state expressly that the parties never agreed that

5    Albertsons was required to pay the dividend.

6          Instead, the essentially unrebutted declaration of

7    Albertsons' president and CFO, Sharon McCollam, states that

8    Albertsons had long considered a capital return strategy and

9    that it wanted to maintain the flexibility to pay a dividend

10   to its shareholders even if it entered into the merger

11   agreement, but Albertsons recognized, as I noted before,

12   that Kroger would want to adjust the purchase price if such

13   a payment was made.

14          And the essentially unrebutted declaration of

15   Kroger's senior Vice President and CFO, Gary Millerchip,

16   similarly states that Albertsons had long made clear to

17   Kroger that it "intended to pay the preclosing dividend

18   regardless of whether or not there was a transaction with

19   Kroger" -- that's Paragraph 12 -- and that quote, "The

20   authority to declare and pay the preclosing dividend rests

21   solely with Albertsons."

22          Based on the record before me, the relevance of

23   the preclosing dividend's inclusion in the merger agreement

24   was not to reflect that the parties had agreed that

25   Albertsons was obligated to pay the dividend in order to

1    facilitate the merger or otherwise; but its inclusion was,

2    rather, to take account of how it would affect the purchase

3    price based on the value of Albertsons' assets at the time

4    of the acquisition.  Neither the merger agreement nor the

5    press release show anything more, and the declaration of the

6    two CFOs weigh against any potential inference to the

7    contrary.

8          Plaintiffs do rely to some extent on certain other

9    agreements -- these are, in fact, agreements -- between

10   Kroger and Albertsons in Section 6 of the merger agreement

11   relating to Albertsons' ability to undertake certain

12   financial transactions before the deal closes.

13         But it is unclear whether plaintiffs' claim that

14   those agreements, without more, could support a Section 1

15   claim.  I think that's unlikely, but I do think that their

16   claim is dependent on an agreement that there would be a

17   payment of the preclosing dividend.

18         Second, in any event, even if there were evidence

19   of an agreement to pay the preclosing dividend, or to pay

20   the preclosing dividend and otherwise restrict Albertsons'

21   ability to raise capital, there is insufficient evidence

22   that Albertsons will not be able to effectively compete, or

23   will otherwise restrain trade, during the pendency of the

24   merger review.

25         Plaintiffs' argument is that Albertsons will be

1    undercapitalized after paying the special dividend and, as a

2    result, will be unable to compete as vigorously while the

3    transaction is reviewed.

4          As defendants note, payment of the dividend was

5    reviewed by Goldman Sachs and by Credit Suisse, two

6    respected companies who served as financial advisors to

7    Albertsons regarding the payment.

8          The dividend was also separately approved by the

9    Board independently of the merger.  And, as I noted before,

10   plaintiffs do not contest defendants' position that the

11   special dividend is consistent with Delaware law, which

12   provides that, "the directors of every corporation may

13   declare and pay dividends upon the shares of its capital

14   stock out of its surplus."

15         Albertsons calculated its surplus using different

16   methods, but the more conservative approach, using the book

17   value of its net assets, still calculated a surplus of $4.7

18   billion, which is more than the special dividend of

19   $4 billion.

20         More important, plaintiffs have failed to show

21   that after payment of the preclosing dividend, Albertsons

22   will have insufficient liquidity to compete.

23         Plaintiffs essentially ignored that as a result of

24   Albertsons' substantial operating revenues of approximately

25   $69.7 billion in 2020 and $71.9 billion in 2021, which rose

1       to $75 billion for the rolling four quarters ended September

2       10, 2022, Albertsons generates significant excess cash flow.

3                    In fact, Albertsons had earnings before interest,

4       taxes, depreciation, and amortization, EBITDA, of about $15

5       billion from fiscal year 2018 through September 2022,

6       including about $4.6 billion in the last four quarters.

7                    And according to Professor Smith's essentially

8       unrebutted declaration, consensus analyst estimates project

9       that Albertsons will generate $76.6 billion in revenue with

10      4.4 billion in EBITDA in FY2022 and 77.6 billion with 4.4

11      billion in EBITDA in FY2023.

12                   As a result, Albertsons may be able to meet its

13      projected liquidity needs even after taking account of the

14      preclosing dividend using excess cash flow, but Albertsons

15      also has access to capital in other ways.

16                   Albertsons intends to pay for the dividend, as we

17      heard today, with cash in an already-established line of

18      credit, but even then it will have at least $2.6 billion of

19      that existing asset-based lending facility.

20                   Plaintiffs have, at times, suggested that

21      defendants won't -- (indiscernible) -- Albertsons that is

22      not a necessary component of their claim, but I do think

23      that incentives matter.  In my view, neither Kroger nor

24      Albertsons has an incentive to economically weaken

25      Albertsons during the pendency of the merger review.

1       The record shows that Albertsons and Kroger are
2   only direct competitors in a few markets.  Most of their
3   geographic markets do not overlap.  It does not make sense
4   to me that Kroger would want to weaken Albertsons during the
5   two-year period of merger review before the acquisition is
6   final and then pay almost $25 billion to acquire a weakened
7   Albertsons.

8       Albertsons, of course, is aware that the merger
9   may not be approved by regulators, so Albertsons has no
10  incentive to weaken its own economic status during the next
11  two years of merger review.

12      Plaintiffs have also raised the possibility that a
13  weakened Albertsons would allow the parties to make a
14  "failing firm defense" in connection with the merger review.
15  In my view, at this point, that is essentially a non-issue
16  because both companies have represented to this Court, and
17  apparently to the plaintiffs here, that they will not raise
18  such an argument or defense in connection with regulators'
19  review.  So, in my view, plaintiffs fail at prong one,
20  likelihood of success on the merits.

21      The next factor, of course, is irreparable harm.
22  In my view, plaintiffs have failed to satisfy their burden
23  of proof on this prong, because they have failed to show
24  that irreparable harm would be done if a TRO is not entered
25  for essentially the same reasons I have already described

1    above -- and I'm not going to go through it again.

2             Plaintiffs have not established that payment of

3    the preclosing dividend is likely to result in a lessening

4    of competition, and that is the irreparable harm that they

5    assert here.

6             The other two factors in my view aren't

7    particularly critical in light of my determination that

8    plaintiffs have failed to satisfy the first two factors,

9    because plaintiffs cannot demonstrate a likelihood of

10   success on the merits and because they cannot demonstrate

11   that there will be harm to competition from payment of the

12   preclosing dividend, in my view plaintiffs have failed to

13   show that it is in the public interest to enter a temporary

14   restraining order.

15            It's not clear to me that there is really any

16   other parties that matter a lot here, but obviously, the --

17   a TRO prohibiting the payment of the dividend would

18   interfere with Albertsons' board's and corporate decision

19   that's the special dividends are in the company's and

20   shareholders' interest.  So it would harm Albertsons.

21            And the TRO would harm at least certain

22   shareholders, whether new or long-standing, who acted in

23   reliance on the commitment to pay the dividend.

24            So in light of all of these factors and taking

25   account of all of the evidence before me, I deny the

1    plaintiffs' motion for a temporary restraining order.   A

2    written order, a very basic written order, will issue.

3              Having said all of that, is there anything else we

4    should discuss today from the plaintiffs' perspective?

5              MR. GITLIN:   Nothing, Your Honor.

6              THE COURT:   Thank you.   From the defendants'

7    perspective?

8              MR. HASSI:   Nothing, Your Honor.

9              MR. WOLF:   Nothing, Your Honor.

10             THE COURT:   Okay.   Thank you, all.

1              C E R T I F I C A T E

2

3          I, Lorraine T. Herman, Official Court Reporter,

4    certify that the foregoing is a true and correct transcript

5    of the record of proceedings in the above-entitled matter.

6

7

8

9

10    __November 9, 2022__          __/s/_____
                DATE                        Lorraine T. Herman

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DEPUTY CLERK: [1]
3/2
MR. GITLIN: [62]  3/11
3/19 5/19 6/12 7/1 7/15
8/12 8/23 9/14 9/17
10/16 10/25 12/4 12/9
12/19 12/22 13/7 13/15
14/1 14/8 14/20 14/24
15/16 16/12 16/18
18/12 18/19 18/24
19/16 19/19 20/14
20/22 21/14 22/21 23/8
23/16 23/24 24/4 24/7
24/9 24/16 25/13 26/5
26/16 27/4 28/2 56/9
56/22 56/25 57/16
57/23 58/6 59/2 59/13
61/22 62/15 63/3 63/15
64/1 64/5 64/8 74/5
MR. HASSI: [36]  3/21
4/3 28/3 28/5 29/10
29/22 30/18 31/6 33/3
34/1 34/17 34/20 36/14
37/15 38/1 38/10 38/14
38/21 38/23 39/18
39/20 44/6 44/14 47/4
47/6 47/9 47/17 48/19
49/21 51/15 51/24 52/4
52/11 52/14 64/21 74/8
MR. WOLF: [10]  4/4
52/15 55/12 55/14
55/19 56/1 56/5 56/8
64/23 74/9
THE COURT: [103]

**$**

$1 [1]  55/18
$100 [5]  19/9 25/6 46/1
46/3 46/24
$15 [1]  71/4
$2.6 [1]  71/18
$25 [2]  37/11 72/6
$34.10 [1]  28/25
$4 [23]  5/25 9/18 10/21
12/3 12/15 15/9 26/4
32/2 37/21 50/14 55/18
55/21 55/23 55/24 58/3
60/3 60/16 61/1 64/15
64/16 67/2 68/1 70/19
$4 billion [20]  10/21
12/3 12/15 15/9 26/4
32/2 37/21 50/14 55/18
55/21 55/23 55/24 60/3

67/2 68/1 70/19
$4.6 [1]  71/6
$4.7 [1]  70/17
$500 [1]  62/23
$6 [2]  63/6 64/17
$6.80 [1]  50/20
$6.85 [1]  29/2
$69.7 [1]  70/25
$7 [1]  61/19
$70 [1]  19/1
$71.9 [1]  70/25
$75 [9]  18/9 18/12
18/18 18/20 19/11 28/8
42/3 42/5 71/1
$76.6 [1]  71/9

**/**

/s [1]  75/10

**1**

1.5 [1]  47/22
1.9 [1]  45/5
10 [3]  9/1 57/7 71/2
100 [3]  1/20 28/7 30/9
1000 [1]  1/7
10th [1]  41/2
12 [2]  28/8 68/19
13th [2]  22/22 28/22
15 [1]  12/12
170 [1]  43/11
1720 [1]  1/24
1:22-3357 [1]  1/3

**2**

2.5X [1]  45/2
20001 [2]  1/17 2/22
20001-37 [1]  2/9
20004 [1]  2/13
2001 [1]  2/3
20036 [1]  2/4
2016 [1]  27/6
2018 [1]  71/5
202-354-3196 [1]  2/23
202-383-8135 [1]  2/13
202-682-7511 [1]  2/4
202-942-5227 [1]  2/9
2020 [2]  28/9 70/25
2021 [1]  70/25
2022 [5]  1/5 41/21 71/2
71/5 75/10
2022-3357 [1]  3/3
2024 [1]  6/8
213 [1]  1/25
24 [1]  15/25

269-6040 [1]  1/25

**3**

3.15 [1]  62/13
3.9 [2]  28/12 39/4
30 [1]  15/25
300 [1]  1/24
312-840-7220 [1]  2/17
3196 [1]  2/23
333 [1]  2/21
3357 [2]  1/3 3/3
353 [1]  2/16
3598 [1]  1/21
37 [1]  2/9
3:00 [2]  48/23 49/11
3:08 [1]  1/6

**4**

4.4 [2]  71/10 71/10
4.5 [1]  41/18
400 [1]  1/16
415-956-1000 [1]  1/17
488 [1]  5/2
4:00 [2]  49/1 49/2
4:29 p.m [1]  65/5
4:36 p.m [1]  65/5

**5**

5227 [1]  2/9
59 [1]  44/12

**6**

6.1 [9]  44/4 44/11
45/11 45/14 45/15
45/23 46/21 47/15 58/5
600 [1]  2/3
601 [1]  2/8
6040 [1]  1/25
60601 [1]  1/21
60654 [1]  2/17
62 [1]  45/23
6720 [1]  2/22
6th [1]  1/16

**7**

7.2 [2]  28/12 39/4
7220 [1]  2/17
7511 [1]  2/4
77.6 [1]  71/10

**8**

801 [1]  2/12
8135 [1]  2/13
872-276-3598 [1]  1/21

**9**

90013 [1]  1/25

**A**

ABA [1]  5/2
ability [19]  6/6 6/7
6/20 9/8 9/12 9/24
10/13 10/24 17/16
17/17 17/24 18/5 30/23
37/4 37/8 37/13 58/4
69/11 69/21
ABL [11]  39/6 39/7
39/8 47/4 47/9 47/13
47/21 47/22 47/22
60/22 62/3
ABL is [2]  47/4 47/13
able [3]  9/2 69/22
71/12
about [52]  5/11 5/12
5/17 7/4 7/5 7/24 9/6
9/8 10/12 13/15 14/19
17/17 19/19 20/1 20/2
20/16 22/14 24/10
24/11 25/20 25/21 27/9
28/13 30/13 31/8 31/11
33/4 33/12 33/22 34/11
35/11 37/3 40/1 41/19
42/3 42/18 43/17 43/21
44/3 45/11 45/20 45/24
46/21 46/24 48/6 49/1
49/22 57/13 64/22
65/23 71/4 71/6
above [4]  39/6 55/22
73/1 75/5
above-entitled [1]
75/5
absent [2]  25/12 53/7
absolutely [1]  29/10
accept [2]  10/25 11/2
access [4]  18/3 38/24
62/3 71/15
accessed [1]  62/9
accessing [5]  16/21
16/22 16/24 17/3 64/18
accompanying [1]
66/24
according [1]  71/7
account [5]  12/18
29/14 69/2 71/3 73/25
accounted [1]  18/15
accounting [2]  10/9
51/10
accrues [1]  19/7
accurate [1]  61/20

**A**

accused [1] 52/17
Acorn [2] 40/6 40/6
Acorn's [1] 40/5
acquaintance [1] 5/1
acquaintances [1] 5/7
acquiesced [1] 58/8
acquire [3] 67/7 67/8 72/6
acquisition [2] 69/4 72/5
Act [1] 66/12
acted [2] 13/24 73/22
action [2] 1/3 28/24
actions [2] 28/23 33/15
actors [1] 66/14
actual [3] 19/1 20/25 23/4
actually [12] 7/2 9/1 16/4 21/5 22/25 24/20 27/20 37/12 43/22 47/10 47/11 62/6
Adam [3] 1/13 2/2 3/12
Adams [2] 31/12 35/11
add [5] 19/9 26/25 27/4 52/7 61/3
addendum [1] 32/19
additional [4] 46/18 54/25 55/3 63/9
address [2] 21/12 59/4
addressed [4] 11/19 15/22 21/4 54/2
addresses [1] 5/11
adjust [1] 68/12
adjusted [1] 67/3
admittedly [1] 54/23
adverb [1] 58/24
advisement [2] 4/18 65/3
advisor's [1] 63/1
advisors [2] 40/5 70/6
affairs [1] 54/9
affect [13] 10/24 11/1 18/5 21/5 22/4 29/21 37/7 37/22 37/23 49/17 52/22 67/15 69/2
affected [2] 34/13 47/15
affecting [1] 21/8
affects [3] 10/23 32/14 55/25
after [13] 40/2 41/22 42/12 45/3 45/4 48/25

58/9 62/2 69/24 69/9
70/1 70/21 71/13
afternoon [11] 3/2 3/11 3/17 3/21 4/2 4/4 4/7 28/3 28/4 48/24 65/13
again [12] 14/11 25/13 41/13 46/13 46/25 50/5 51/25 59/13 64/1 64/12 67/21 73/1
against [6] 21/24 49/16 50/25 55/17 67/19 69/6
agnostic [1] 58/11
ago [3] 27/14 28/13 45/6
agree [13] 8/2 8/18 13/5 13/12 14/1 14/15 14/22 15/7 20/10 25/25 37/2 37/14 37/16
agreed [14] 12/3 14/5 26/1 26/2 26/3 27/22 29/8 32/25 37/9 37/10 58/2 58/21 68/4 68/24
agreeing [1] 21/5
agreement [148]
agreements [11] 6/19 22/7 30/22 31/8 31/14 35/9 44/15 45/25 69/9 69/9 69/14
aided [1] 2/25
al [4] 1/3 1/6 3/3 3/4
Albert [1] 13/15
Albertson [3] 7/9 13/23 14/6
Albertson's [2] 2/11 6/6
Albertsons [144]
Albertsons' [38] 6/6 6/20 8/19 8/21 8/23 9/8 9/17 11/2 12/21 13/22 14/21 15/21 17/17 19/25 22/1 22/5 22/19 28/14 30/2 30/22 37/4 37/8 40/6 41/3 51/23 58/4 60/6 60/7 61/21 64/12 66/17 68/3 68/7 69/3 69/11 69/20 70/24 73/18
all [36] 3/8 4/9 8/5 8/14 8/25 15/18 17/5 19/3 21/21 22/1 22/2 23/10 25/23 27/21 29/5 30/20 31/7 40/20 42/5 43/19

46/6 47/14 53/9 54/5 56/4 61/15 63/16 67/4 73/24 73/25 74/3 74/10
allegation [1] 55/1
allegations [1] 53/18
allege [1] 66/6
alleging [2] 23/18 24/15
allow [3] 10/18 18/10 72/13
allowing [1] 44/18
allows [1] 9/18
almost [5] 14/3 19/8 54/18 62/12 72/6
alone [2] 12/8 30/4
alongside [1] 40/12
already [3] 39/25 71/17 72/25
already-established [1] 71/17
also [13] 2/18 3/14 5/21 6/14 7/7 12/15 17/7 18/15 19/3 63/5 70/8 71/15 72/12
alternatively [2] 32/16 32/17
always [3] 54/9 54/9 65/24
am [15] 4/20 4/21 5/1 14/14 18/1 31/17 36/12 41/13 51/3 57/11 59/12 64/25 65/1 65/3 65/12
Amazon [1] 42/10
among [1] 20/20
amortization [1] 71/4
amount [24] 12/8 13/8 15/20 20/25 21/1 29/9 29/19 29/20 30/1 30/15 37/6 37/12 42/4 46/1 55/18 55/24 58/8 60/24 62/8 62/11 63/21 63/22 67/1 67/24
analogs [1] 66/12
analysis [4] 15/20 24/21 43/10 64/6
analyst [1] 71/8
ancillary [1] 33/16
Angeles [1] 1/25
announce [1] 40/7
announced [12] 8/19 10/7 20/23 20/24 22/21 28/21 36/5 36/10 36/14 36/21 36/22 58/7

announcement [1] 13/14
announcing [1] 59/20
another [4] 26/22 49/4 58/19 59/10
answer [2] 7/14 16/3
anti [2] 17/18 32/14
anti-competitive [2] 17/18 32/14
anticipated [1] 27/14
anticipates [1] 64/17
anticompetitive [2] 19/18 26/19
antitrust [30] 7/23 7/25 8/13 8/17 14/11 15/2 15/3 16/4 19/15 20/5 20/13 22/10 22/25 24/20 25/22 26/24 27/14 27/15 33/5 34/18 36/11 41/14 44/16 51/25 52/18 53/18 54/24 55/8 59/1 59/18
any [23] 5/8 5/13 12/7 12/7 15/24 17/8 20/16 21/10 22/8 22/8 25/5 25/6 30/14 45/25 55/21 60/6 62/18 62/25 63/4 64/22 69/6 69/18 73/15
anybody [1] 9/2
anything [8] 26/25 36/23 38/19 46/25 52/6 64/20 69/5 74/3
anywhere [1] 56/24
apparently [1] 72/17
APPEARANCES [2] 2/1 2/1
appears [1] 27/15
applies [1] 13/10
apply [1] 17/10
appreciate [2] 5/21 44/9
approach [1] 70/16
approve [3] 29/1 36/25 37/1
approved [3] 19/14 70/8 72/9
approximately [2] 9/17 70/24
are [126]
are ordinary [1] 44/14
aren't [3] 8/8 40/24 73/6
arguing [1] 56/18
argument [13] 4/14

A

argument... [12]  9/4
9/4 12/1 15/15 15/16
16/10 56/14 56/24 60/2
60/3 69/25 72/18
arguments [3]  54/10
65/9 66/8
arise [1]  41/12
ARNOLD [3]  2/8 4/5
5/4
around [2]  23/6 59/18
Arthur [2]  1/14 3/13
articulated [1]  32/23
as [97]
Ascher [2]  2/14 3/23
aside [2]  13/4 23/4
ask [7]  9/5 16/4 16/5
22/12 34/8 57/24 61/17
asked [5]  43/9 44/3
48/11 48/21 60/8
asking [5]  30/12 34/8
34/24 43/15 43/16
assert [1]  73/5
assertion [1]  53/17
asset [2]  24/18 71/19
asset-based [1]  71/19
assets [4]  17/1 24/22
69/3 70/17
assume [7]  8/10 15/5
15/6 24/1 24/6 38/19
51/11
assumed [3]  37/19
47/21 47/21
assuming [4]  6/9
37/15 37/15 47/23
attempt [1]  56/14
ATTNY [1]  1/16
ATTORNEY [2]  1/20
1/23
authority [5]  7/15 7/17
7/19 54/3 68/20
availability [1]  33/22
available [3]  18/14
42/5 50/3
Avenue [3]  2/8 2/12
2/21
avoidance [1]  5/8
avoided [1]  27/19
aware [3]  36/12 36/13
72/8
away [5]  17/5 31/24
37/20 52/25 55/23

B

back [11]  4/20 10/19
29/19 34/21 35/2 39/22
40/8 45/10 47/18 48/2
59/22
balance [6]  19/9 22/5
40/23 45/1 60/17 61/3
bankers [1]  41/16
Bankruptcy [1]  2/21
Banks [1]  2/2
based [8]  9/25 23/1
42/6 43/16 50/10 68/22
69/3 71/19
basic [1]  74/2
basically [5]  12/17
26/17 39/8 47/25 55/13
basis [1]  53/16
BAX [1]  11/4
be [94]
be-all [1]  46/6
bears [1]  65/17
because [49]  5/9 6/3
6/13 7/1 7/8 7/23 11/10
15/2 15/13 17/3 21/5
22/16 23/4 23/9 23/14
25/3 25/17 27/5 27/15
28/16 29/19 29/20 30/8
31/20 33/1 33/5 35/1
40/24 41/7 41/11 42/1
42/3 42/22 43/22 46/8
48/21 49/2 50/12 51/1
56/10 56/14 57/13
57/18 59/20 66/3 72/16
72/23 73/9 73/10
become [1]  17/22
been [21]  6/3 11/10
13/13 15/1 15/22 28/9
32/22 36/11 45/6 45/7
45/7 45/8 45/9 48/5
50/15 52/17 59/6 60/23
60/24 63/14 67/10
before [22]  1/10 11/21
25/14 25/18 31/13
45/15 46/7 49/10 49/24
49/25 50/1 61/24 62/9
66/21 67/18 68/11
68/22 69/12 70/9 71/3
72/5 73/25
beginning [4]  3/10
15/1 57/25 64/25
behalf [1]  28/5
being [6]  9/2 20/24
21/4 26/17 42/3 50/19
believe [7]  8/23 15/22

5/25 9/25 11/25 54/29 79/1 of 93
62/19
believe their [1]  32/25
belong [1]  5/5
below [1]  42/14
Bernstein [2]  2/6 5/3
best [6]  12/2 38/18
51/6 56/15 62/20 63/1
best to [1]  38/18
better [10]  10/10 24/8
24/10 41/7 41/8 42/16
44/11 47/2 47/16 63/23
between [19]  9/21
12/4 16/19 20/23 21/1
21/3 21/11 30/11 30/22
31/1 32/4 32/9 32/12
55/18 66/14 66/16
66/19 67/16 69/9
billion [62]  5/25 9/18
10/21 12/3 12/5 15/9
18/12 18/18 18/20 19/1
19/2 19/6 19/11 26/4
28/8 28/12 28/12 32/2
37/11 37/21 39/4 39/4
41/18 41/18 41/22 42/3
42/5 47/22 50/4 55/18
55/21 55/23 55/24 58/3
60/3 60/4 60/16 61/1
61/19 61/24 62/1 62/13
63/6 64/15 64/16 64/17
64/22 67/2 68/1 70/18
70/19 70/25 70/25 71/1
71/5 71/6 71/9 71/10
71/10 71/11 71/18 72/6
bit [4]  20/15 39/7
44/11 49/12
block [5]  2/16 3/23
27/7 57/1 57/3
blue [1]  39/5
board [12]  19/13 19/20
28/14 28/23 28/23
36/24 36/24 37/16 40/2
41/3 41/17 70/9
board's [1]  73/18
boilerplate [4]  22/6
54/19 54/19 54/23
bond [2]  48/4 48/7
bonds [2]  16/21 16/25
book [1]  70/16
books [9]  10/11 11/3
39/13 41/22 42/11
50/12 50/23 51/19
60/11
bootstrap [1]  33/10

17/7 44/2
45/21
borrowed [1]  60/4
borrowing [2]  42/19
42/20
both [7]  5/5 21/18
29/12 40/19 45/8 58/10
72/16
bottom [2]  41/20 42/15
bought [1]  50/19
brief [11]  4/16 4/24
5/23 23/17 30/7 52/16
53/20 54/12 57/7 65/1
65/8
briefing [2]  6/3 15/23
briefs [2]  4/9 65/10
bring [1]  48/12
broader [1]  59/9
broke [2]  23/19 23/21
brought [1]  25/14
bullet [1]  40/5
bunch [4]  17/7 20/3
40/22 44/24
burden [2]  65/17 72/22
business [6]  5/21 21/8
42/3 56/5 56/6 60/6
buy [4]  23/11 39/22
44/24 44/25
buy-back [1]  39/22
buyer [3]  33/14 44/19
44/19
buying [3]  43/24 46/10
46/11

C

CA [1]  1/25
calculated [3]  58/15
70/15 70/17
California [3]  1/23
1/23 3/16
call [1]  48/21
called [1]  54/18
campaigns [1]  17/12
can [20]  7/17 11/14
12/11 19/17 20/5 21/16
33/6 33/6 33/12 34/9
44/11 46/4 48/2 48/2
48/12 51/5 53/19 57/9
57/21 64/14
can't [11]  7/2 12/14
17/7 22/7 22/8 23/19
36/9 41/10 46/5 46/7
59/17
candidly [2]  36/18

C

candidly... [1]  52/20
cannot [5]  34/23 53/7
63/9 73/9 73/10
cap [3]  31/22 31/23
31/25
capital [22]  6/6 6/15
6/22 7/9 7/10 9/9 10/14
16/22 16/24 17/3 18/4
28/16 28/18 29/3 29/14
36/18 58/4 64/18 68/8
69/21 70/13 71/15
caps [1]  67/1
CARL [2]  1/10 1/13
case [14]  3/3 9/1 9/14
11/4 11/5 27/5 27/6
29/6 48/12 48/22 54/11
59/6 59/14 66/2
cases [1]  50/2
cash [38]  9/18 18/9
18/18 22/3 39/5 39/5
39/8 39/9 39/12 39/12
39/15 39/17 39/22
40/11 40/23 41/6 41/21
41/22 41/25 42/5 42/11
42/14 43/6 43/12 45/8
46/16 46/18 61/25 62/2
62/9 62/21 63/8 63/22
64/15 66/18 71/2 71/14
71/17
caught [1]  27/13
cease [1]  20/7
central [1]  42/1
certain [13]  6/20 15/20
30/23 32/14 42/4 52/24
60/24 62/3 62/8 64/10
69/8 69/11 73/21
certainly [3]  5/13 32/3
53/6
certify [1]  75/4
CFO [7]  19/14 35/22
43/1 68/3 68/3 68/7
68/15
CFOs [2]  29/12 69/6
chain [1]  46/10
challenge [2]  36/11
58/1
challenging [3]  7/4
25/12 25/16
chance [2]  47/23 63/4
change [1]  26/7
changes [1]  62/14
changing [1]  43/3
check [1]  44/17

Cheerios [1]  49/25
Chicago [2]  1/21 2/17
chief [1]  4/1
choose [1]  42/23
chosen [1]  54/7
circumstances [3]
20/17 27/11 53/14
circumstantial [3]
33/6 34/7 36/1
circumventing [1]
8/17
cite [3]  7/17 7/19 11/4
Civil [2]  1/3 3/3
claim [13]  6/25 11/25
14/4 20/13 25/13 32/7
35/19 55/16 66/13
69/13 69/15 69/16
71/22
claims [1]  8/12
clarification [1]  57/20
Clark [1]  2/16
clear [13]  6/17 15/8
29/12 40/18 40/18 50/6
50/9 57/6 57/8 57/17
60/21 68/16 73/15
clearly [2]  30/21 38/19
client [4]  52/17 52/19
53/17 55/7
clients [1]  3/25
close [4]  6/8 20/3
23/13 23/14
closer [1]  25/8
closes [3]  7/11 48/25
69/12
closing [4]  11/20
12/16 29/21 66/20
club [2]  5/5 5/5
CO [1]  1/6
colloquial [2]  5/10
10/10
COLUMBIA [4]  1/1 1/3
3/3 3/12
Comber [2]  1/14 3/13
come [3]  3/9 4/20 65/7
coming [5]  17/2 19/4
44/1 61/2 61/3
commensurate [2]
54/12 54/12
commit [1]  36/9
commitment [3]  34/25
35/3 73/23
committed [2]  53/17
55/7
committing [1]  52/17

Cheerios [1]  49/25
common [2]  34/25
35/3
companies [12]  16/23
16/25 21/19 32/4 32/9
47/11 49/19 63/18 64/8
64/10 70/6 72/16
company [35]  3/4 11/6
19/23 28/7 35/22 39/15
39/21 41/11 41/15 42/6
42/7 42/20 42/21 43/2
43/9 44/2 44/25 44/25
45/3 45/12 45/19 45/24
46/2 46/8 46/9 46/14
47/20 48/2 50/11 50/11
50/17 50/22 50/25 67/7
67/11
company's [6]  42/16
47/10 50/23 62/20 63/1
73/19
comparable [2]  27/8
64/11
compete [22]  6/7 9/12
9/19 10/14 10/24 15/12
17/6 17/11 17/16 17/18
17/24 18/5 20/7 23/19
37/4 37/8 37/13 43/6
63/11 69/22 70/2 70/22
competed [1]  42/9
competing [1]  21/19
competition [11]
15/12 20/5 20/8 33/1
35/7 37/23 54/15 58/25
63/12 73/4 73/11
competitive [5]  16/11
17/18 32/14 38/4 64/14
competitiveness [5]
16/8 17/25 19/25 22/20
60/7
competitor [6]  16/17
24/2 25/2 25/2 58/13
64/9
competitors [6]  16/19
17/23 20/7 25/4 63/24
72/2
complaint [6]  17/20
22/22 35/14 57/8 57/10
58/11
complies [1]  8/5
component [1]  71/22
computer [1]  2/25
computer-aided [1]
2/25
concern [4]  16/6 20/1
43/17 43/17

common [2]  34/25
concerns [2]  7/24
60/25
conclude [2]  6/17 31/1
conclusion [1]  59/6
conclusions [1]  36/23
condemnation [1]
25/8
condition [1]  15/21
conditioned [1]  45/18
conditions [2]  13/1
22/2
conduct [3]  14/17
45/11 53/23
confer [1]  48/21
conferring [1]  49/5
confirm [2]  47/19
55/11
conflate [2]  31/9 31/19
conflating [2]  35/9
35/11
conjunction [1]  27/23
connection [6]  6/1
20/24 34/10 67/10
72/14 72/18
connects [1]  34/14
conscious [2]  34/25
35/2
consciously [1]  59/19
consecutively [1]
40/25
consensus [1]  71/8
consent [5]  45/16
45/17 46/5 46/5 46/12
consequence [1]  24/6
conservative [1]  70/16
consider [5]  4/17
28/15 61/8 65/1 65/25
consideration [1]  65/9
considered [4]  39/23
47/10 62/9 68/8
considering [9]  40/12
41/4 41/5 41/7 52/19
61/5 61/6 65/10 67/5
consistent [5]  8/11
13/24 66/9 67/13 70/11
conspiracy [2]  66/14
66/16
Constitution [1]  2/21
constraint [1]  46/6
consult [1]  25/5
consumers [3]  9/23
20/9 24/11
consummate [1]  63/21
CONT'D [1]  2/1

**C**

contains [4] 13/9
13/10 26/6 58/10
contemplated [1]
62/24
contemplating [1]
40/6
contend [1] 66/10
contending [1] 8/8
contest [2] 66/8 70/10
context [2] 25/6 33/17
continue [5] 28/19
43/4 43/5 43/6 61/8
contract [1] 14/12
contrary [3] 9/4 30/3
69/7
control [3] 11/23 44/19
53/9
conversation [1] 40/3
converted [1] 49/18
convince [1] 36/6
cooked [1] 62/19
cooperating [1] 26/21
copies [1] 38/20
copy [1] 38/11
corners [1] 31/16
corporate [8] 10/8
19/13 42/23 43/10
43/11 47/18 51/7 73/18
corporation [3] 11/12
43/13 70/12
correct [13] 7/14 24/3
24/4 24/19 29/9 30/18
38/1 47/19 56/1 58/5
58/6 59/2 75/4
cost [1] 17/3
could [13] 13/20 14/17
14/17 19/4 22/23 27/18
37/7 38/6 38/6 41/12
48/10 50/7 69/14
counsel [17] 3/5 3/7
3/8 3/23 3/25 4/1 4/5
27/1 27/15 28/1 30/13
52/8 53/12 54/17 56/7
59/7 64/19
counsel's [1] 3/13
count [1] 5/6
country [2] 5/5 16/15
County [1] 48/25
couple [3] 31/6 49/22
59/3
course [20] 21/15
33/13 33/16 37/24
44/14 44/21 44/22

53/13 55/12 55/24 63/6
65/17 65/24 66/14 72/8
72/21
court [19] 1/1 2/10
5/20 7/19 8/20 11/5
11/9 27/17 48/16 48/20
49/23 51/4 57/9 58/19
60/18 66/21 67/18
72/16 75/3
Courthouse [1] 48/25
Courts [2] 26/20 65/23
covenants [9] 21/9
21/16 33/13 33/21
33/24 44/6 44/14 45/10
45/14
cover [3] 18/14 18/16
19/4
covers [1] 21/13
CRC [1] 2/20
create [2] 51/19 54/20
created [1] 51/13
creates [3] 5/13 22/9
25/22
credit [8] 19/6 47/9
48/1 48/2 60/4 62/20
70/5 71/18
critical [1] 73/7
crown [1] 46/11
Crystal [1] 15/8
Cts [1] 2/21
culminated [1] 28/22
culmination [1] 36/4
current [5] 18/20 58/1
61/21 62/2 62/23
currently [1] 40/6

**D**

D.C [4] 1/16 2/9 2/22
3/22
damage [3] 32/9 35/7
35/7
dark [1] 39/5
data [1] 18/6
date [3] 49/4 51/8
75/10
David [1] 2/11
day [7] 24/25 30/1
33/14 34/12 49/15
52/18 58/7
days [1] 36/15
DC [5] 1/7 1/17 2/4 2/9
2/13
deal [5] 19/14 32/18

DEBEVOISE [3] 2/12
3/22 28/5
debt [23] 6/22 25/6
40/11 42/14 42/15
42/19 42/21 42/22
42/24 44/23 44/24
44/25 45/3 45/7 45/19
46/2 46/8 46/13 47/1
48/3 50/24 63/17 63/23
debt-laden [1] 44/25
debts [1] 62/6
decide [3] 22/25 65/2
65/3
decided [9] 13/16
13/23 20/11 27/20
27/21 30/16 59/19
64/13 67/24
decision [9] 8/10
11/18 13/22 30/2 30/3
31/20 53/9 66/22 73/18
decision-making [1]
53/9
decisions [1] 64/13
deck [3] 59/23 61/18
62/17
declaration [9] 15/19
15/25 16/1 43/2 62/5
68/6 68/14 69/5 71/8
declarations [6] 4/10
4/10 15/11 29/12 65/11
68/2
declare [2] 68/20
70/13
declared [7] 7/18 7/18
8/14 11/10 27/10 35/22
67/10
declaring [1] 11/12
decreases [1] 42/15
deep [2] 16/7 20/2
defendant [3] 2/2 2/10
11/6
defendant's [3] 15/23
15/23 15/24
defendants [20] 1/7
4/14 5/3 6/11 6/18 8/4
11/16 15/10 18/5 23/9
26/18 54/14 56/11
56/21 57/12 58/2 59/23
64/20 70/4 71/21
defendants' [8] 6/4 9/5
53/24 60/2 60/2 66/8
70/10 74/6
defense [10] 3/7 11/8

43/15 46/13 46/15 47/1
47/15 47/17 49/10 49/11
51/5 51/5 72/14 72/18
defenses [1] 11/6
define [1] 64/9
defined [2] 12/15 48/3
defining [1] 67/19
definition [2] 12/9
53/14
definitive [1] 45/25
Delaware [20] 7/13
7/24 8/5 8/11 8/15 8/19
10/6 10/8 19/12 43/8
43/10 43/10 43/13 51/1
51/4 51/7 59/14 66/7
66/9 70/11
delayed [1] 45/18
demand [1] 53/5
demonstrate [4] 66/4
66/15 73/9 73/10
demonstrating [1]
65/17
Dentists [1] 7/25
deny [3] 30/10 65/13
73/25
Department [1] 27/6
depend [1] 20/19
dependent [2] 32/22
69/16
depending [1] 5/1
depends [3] 15/12
64/5 64/9
depreciation [1] 71/4
deprive [1] 7/8
described [1] 72/25
despite [1] 13/16
detail [1] 15/20
determination [1] 73/7
determined [2] 62/7
67/14
did [12] 6/23 11/9
14/22 22/16 30/16
36/17 50/23 55/7 61/7
61/8 61/23 67/23
didn't [11] 10/15 11/8
16/4 20/14 23/21 29/18
35/20 36/18 56/18
57/14 60/1
difference [2] 16/19
21/3
different [8] 8/3 12/12
22/12 43/1 43/11 61/10
64/7 70/15
direct [6] 33/6 33/7
34/4 34/5 35/2 72/2

81

D

directors [1] 70/12
discernible [1] 60/6
disclose [2] 4/25 5/14
disclosure [2] 4/24 5/7
discovery [2] 22/23
58/14
discretionary [1]
43/23
discuss [1] 74/4
discussed [6] 17/19
17/20 29/7 29/11 29/11
61/7
discussion [5] 26/14
40/5 55/9 57/19 59/23
discussions [1] 61/8
dismembered [1] 7/2
dispute [2] 61/20
62/12
disputing [1] 62/25
distress [2] 16/7 20/2
distribution [4] 41/18
62/22 62/24 63/25
DISTRICT [7] 1/1 1/1
1/3 1/10 2/21 3/3 3/12
District's [1] 22/14
dividend [187]
dividend's [1] 68/23
dividends [4] 8/7 45/4
70/13 73/19
do [65] 4/19 4/24 8/18
8/18 11/13 13/12 15/3
15/4 20/10 21/17 21/17
24/8 24/10 24/11 25/11
26/12 26/12 26/15
27/21 29/17 30/16
31/12 33/10 33/18
33/19 33/25 34/1 34/24
37/2 37/14 38/6 38/13
38/17 38/18 38/21
39/17 40/18 40/19
40/19 40/19 41/8 41/10
42/12 43/7 43/22 46/7
46/25 49/7 51/6 51/16
56/6 56/23 57/17 61/20
62/18 63/10 63/13 64/7
66/8 67/22 69/8 69/15
70/10 71/22 72/3
document [4] 31/16
41/2 41/4 42/13
documents [2] 38/15
46/15
does [18] 6/9 12/6
16/13 20/19 20/19

38/11 46/25 49/17
50/11 54/5 55/21 60/19
66/25 72/3
doesn't [17] 10/13
18/1 23/12 23/14 26/6
26/16 26/20 31/25 32/1
32/3 42/21 44/24 46/8
46/14 46/18 48/3 64/1
doesn't matter [1]
64/1
doing [13] 9/23 19/10
19/14 28/9 29/13 40/11
41/10 42/22 46/14
58/23 63/19 63/20
65/15
dollars [4] 19/2 19/6
61/24 62/1
don't [50] 5/13 7/23
8/13 8/23 8/25 9/3 9/13
9/14 9/20 10/17 10/17
10/25 10/25 11/2 12/23
12/24 13/15 14/1 15/21
16/4 18/17 21/8 21/17 21/2
21/10 21/21 21/22
22/25 24/7 24/7 24/9
25/9 26/15 30/10 32/16
32/21 33/19 33/24
34/16 39/8 39/15 42/25
46/20 49/6 50/21 52/13
57/3 60/15 63/15 63/16
66/6
done [4] 13/21 27/10
40/9 72/24
double [1] 62/12
doubt [2] 5/8 62/12
down [8] 33/18 39/8
42/14 45/7 45/7 45/7
45/8 46/8
downturn [3] 16/14
17/2 17/9
Dr. [2] 15/19 17/20
Dr. Michael [1] 15/19
Dr. Weisbach [1]
17/20
drain [1] 22/1
draw [3] 19/22 36/22
39/8
due [1] 29/4
dumb [1] 37/16
during [10] 9/19 17/1
24/23 32/5 43/18 43/21
69/23 71/25 72/4 72/10

each [2] 5/4 26/11
earlier [3] 27/10 27/11
36/15
early [1] 23/5
earnings [2] 40/7 71/3
easier [1] 16/21
easy [1] 15/6
eat [2] 43/19 43/22
EBITDA [5] 18/7 45/3
71/4 71/10 71/11
economic [4] 16/14
17/1 17/9 72/10
economically [1]
71/24
Edward [1] 2/11
effect [11] 10/13 10/18
18/7 21/7 35/6 35/25
51/20 51/21 51/22 52/3
58/23
effectively [2] 9/12
69/22
effects [2] 19/18 55/5
effort [2] 50/7 58/16
either [4] 4/20 34/19
36/13 59/12
elements [1] 66/13
Elizabeth [4] 1/14 1/19
3/6 3/13
else [7] 26/25 52/6
62/14 64/20 64/23 65/7
74/3
emailed [1] 35/16
embarked [1] 28/20
emergency [1] 50/4
emphasize [1] 40/1
empirical [1] 17/19
employees [1] 15/11
end [7] 9/23 23/17
24/25 26/17 30/1 41/21
46/6
end-all [1] 46/6
ended [1] 71/1
ending [2] 41/21 41/25
enforceable [1] 21/23
engage [3] 6/20 28/15
30/23
enjoin [2] 5/17 5/25
enjoined [1] 8/20
enough [7] 30/25 31/3
32/15 37/16 37/22
37/25 46/16
ensure [2] 11/19 67/6
enter [10] 9/9 9/13

10/9 23/7 24/14 24/17
35/1 35/3 51/17 73/13
entered [9] 6/11 9/11
22/14 22/15 22/18
26/18 44/15 68/10
72/24
entering [4] 16/14
24/16 45/24 67/11
entire [2] 33/17 65/11
entitled [5] 38/24 43/7
43/13 50/14 75/5
entitlement [1] 54/8
entity [1] 17/22
equity [2] 24/18 40/13
equivalence [2] 9/20
39/5
equivalents [1] 39/9
essentially [14] 10/1
10/21 21/17 26/13
27/17 56/11 60/10
60/18 68/6 68/14 70/23
71/7 72/15 72/25
established [2] 71/17
73/2
estimate [2] 41/21
63/1
estimates [2] 62/21
71/8
et [4] 1/3 1/6 3/3 3/4
evaluated [1] 36/18
even [24] 5/7 8/20 9/9
9/11 15/22 18/25 21/12
23/20 34/15 42/12 45/8
51/11 56/14 60/3 60/10
62/13 62/22 63/4 63/16
63/24 68/10 69/18
71/13 71/18
event [1] 69/18
ever [2] 11/14 28/9
every [5] 16/17 18/24
33/14 51/5 70/12
everybody [3] 42/9
42/10 65/7
everyone [2] 4/7 5/12
evidence [23] 7/15
12/2 23/4 30/2 33/5
33/6 33/7 33/8 34/3
34/4 34/5 34/7 35/2
36/2 43/20 58/19 66/19
66/21 66/23 67/18
69/18 69/21 73/25
evidence in [1] 58/19
evidently [1] 27/14
Ewart [1] 2/7

**E**

ex [3]  15/6 49/7 49/24
exacerbate [1]  55/5
exact [2]  6/10 25/6
exactly [7]  18/13 37/18
 48/14 50/24 51/22
 55/19 56/1
example [9]  11/4 18/7
 18/8 21/6 33/22 44/23
 47/15 53/19 67/23
exceeded [1]  31/23
exceeding [2]  28/8
 46/1
except [1]  19/20
excerpts [3]  38/14
 38/15 40/24
excess [3]  42/11 71/2
 71/14
excuse [2]  12/14 45/4
executives [2]  15/24
 64/13
exhibits [2]  4/11 65/12
existing [1]  71/19
exit [1]  24/18
expect [4]  49/10 51/23
 51/24 52/8
expectation [2]  50/20
 51/2
expected [1]  18/21
expecting [1]  42/20
expects [4]  18/22
 42/12 44/2 46/18
experience [1]  48/24
expert [5]  4/10 15/10
 15/19 15/23 18/7
experts [1]  42/2
expires [1]  49/18
explains [1]  67/2
expressly [3]  14/16
 15/7 68/4
extensive [1]  7/3
extent [5]  11/24 29/8
 33/23 59/16 69/8
extra [1]  54/22
extraordinary [2]
 53/14 53/15
extremely [1]  23/20
eye [1]  27/13
eyes [1]  44/10

**F**

face [1]  34/11
faced [1]  24/12
facilitate [1]  69/1
facility [4] 60/8 60/9
 60/22 71/19
fact [22]  8/11 13/16
 16/2 18/8 19/20 23/6
 24/22 26/6 26/7 29/19
 31/1 36/4 36/16 37/5
 49/1 61/5 63/16 66/21
 67/13 67/18 69/9 71/3
fact that [1]  13/16
fact-gathering [1]  23/6
factor [1]  72/21
factors [4]  65/24 73/6
 73/8 73/24
facts [1]  30/24
fail [1]  72/19
failed [8]  27/16 66/3
 66/15 70/20 72/22
 72/23 73/8 73/12
failing [3]  35/15 35/17
 72/14
fails [1]  66/2
fair [2]  15/20 47/13
fairly [1]  7/3
familiar [1]  4/12
fatal [1]  14/4
February [1]  28/22
Federation [1]  7/25
felt [1]  20/9
few [5]  5/21 15/24 19/2
 60/23 72/2
fiercely [1]  42/9
figure [1]  18/13
figured [1]  51/21
filed [2]  22/22 30/6
final [1]  72/6
finance [1]  42/24
financed [1]  40/10
financial [13]  6/20
 10/23 15/21 16/7 18/6
 18/11 18/21 24/6 30/23
 61/21 63/2 69/12 70/6
financially [1]  46/9
find [3]  6/23 44/7
 46/23
fine [1]  54/8
firm [4]  3/24 35/15
 35/17 72/14
first [15]  8/25 15/18
 26/22 28/23 29/11
 30/20 31/7 38/23 40/2
 46/4 59/25 66/3 67/6
 67/21 73/8
fiscal [1]  71/5
fixed [1]  62/6
flaw [1]  54/2
flexibility [2]  17/15
 68/9
flip [2]  40/21 40/21
float [1]  50/18
floating [1]  48/1
flow [4]  40/23 46/16
 71/2 71/14
focus [2]  6/3 56/21
following [2]  40/5 40/7
foregoing [1]  75/4
forgotten [1]  47/1
form [2]  30/15 63/8
formal [2]  5/2 5/11
formalities [1]  14/11
forth [1]  22/9
Fortune [1]  28/7
forward [1]  3/9
found [1]  43/12
four [4]  31/16 36/15
 71/1 71/6
frankly [3]  29/8 54/17
 60/1
free [4]  13/12 13/13
 46/16 55/16
friend [1]  5/1
friends [2]  5/9 5/10
front [1]  50/8
full [3]  21/19 33/2
 44/10
full-text [1]  44/10
fully [2]  17/16 23/19
function [2]  60/22
 62/4
fund [1]  47/2
fundamental [1]  54/2
further [1]  52/11
furthered [1]  65/22
future [7]  9/8 10/14
 37/4 42/12 43/17 62/21
 63/2
FY2022 [1]  71/10
FY2023 [1]  71/11

**G**

Gabriel [2]  2/15 3/8
gained [1]  42/11
Gary [1]  68/15
gathering [1]  23/6
general [7]  1/16 3/25
 7/22 17/2 39/14 43/11
 60/5
GENERAL'S [2]  1/20
 1/23
generally [1]  25/17
generate [2]  63/8 71/9
generates [2]  46/16
 71/2
Gentry [1]  1/14
Geoffrey [2]  1/14 3/13
geographic [1]  72/3
get [21]  7/23 10/4
 22/23 24/18 24/24 25/7
 28/19 31/3 40/9 43/23
 45/15 47/18 47/23
 48/13 49/3 49/3 50/2
 50/8 51/4 51/9 59/17
gets [6]  24/17 25/1
 25/2 42/16 60/16 60/18
getting [2]  10/19 50/20
Gibson [1]  1/23 3/6
Gillett [1]  2/15
Gillette [1]  3/8
Gitlin [5]  1/13 3/12
 5/17 50/10 51/3
give [6]  4/15 4/21 27/2
 44/7 46/4 52/9
given [1]  60/1
glove [1]  54/21
go [22]  17/8 25/1
 39/24 41/20 42/20
 42/21 42/24 43/19
 43/24 44/21 45/19
 45/21 46/2 46/3 46/7
 46/13 50/24 52/24
 54/17 59/22 61/4 73/1
goal [1]  24/20
goes [9]  15/19 23/19
 24/25 27/17 39/25
 41/25 42/16 55/22
 56/24
going [63]  9/1 9/10
 10/10 11/2 15/13 15/13
 16/5 16/6 16/6 16/7
 16/21 16/23 17/5 17/6
 17/8 17/10 17/10 17/15
 19/9 20/1 22/3 23/12
 24/23 24/24 29/17
 29/24 33/25 34/11
 35/18 35/19 35/23
 35/23 36/20 40/18
 40/19 42/14 42/14
 42/18 44/1 44/9 44/20
 44/21 44/23 45/7 45/8
 45/13 46/19 48/7 49/1
 49/3 49/13 52/25 57/3
 57/12 60/5 61/1 61/3
 62/23 63/11 64/15

## G

going... [3] 64/17 64/25 73/1
Goldman [1] 70/5
Goldman's [1] 62/20
Goldstein [2] 2/15 3/8
golf [1] 5/5
good [11] 3/2 3/11 3/17 3/21 4/2 4/4 4/7 28/3 28/4 34/21 67/4
got [7] 10/18 17/23 30/9 31/16 36/24 44/25 46/3
GOTSHAL [1] 2/3
governance [1] 10/8
government [1] 27/16
government's [4] 13/5 13/19 13/19 22/13
grade [2] 16/20 16/25
granted [4] 60/10 62/17 65/19 65/21
graphical [1] 39/1
great [1] 60/15
grocery [3] 28/17 43/19 43/21
gross [1] 18/9
grow [1] 28/17
growth [1] 28/17
guess [3] 22/11 61/18 62/17
guessing [1] 19/19
guides [1] 45/2
gun [1] 44/18
gun-jumping [1] 44/18

## H

had [27] 5/20 5/22 11/10 13/14 13/20 13/23 14/5 19/3 20/10 27/10 28/7 32/24 36/10 37/5 41/24 43/12 45/6 53/17 54/7 61/1 61/15 63/3 67/14 68/8 68/16 68/24 71/3
half [6] 19/6 19/8 41/18 41/22 60/3 61/1
hampered [1] 9/12
hamstrung [1] 37/13
hand [8] 7/8 7/10 9/18 17/6 40/11 54/21 63/22 64/15
hands [1] 25/4
hangs [1] 43/18
happen [1] 49/13

happened [1] 36/6
happening [3] 21/21 45/9 48/14
happens [1] 21/20
happy [3] 31/17 46/21 50/16
harder [1] 16/24
harm [16] 17/18 32/4 33/1 57/18 59/15 59/16 65/19 65/20 66/1 67/7 72/21 72/24 73/4 73/11 73/20 73/21
harmed [1] 50/11
harming [1] 58/25
harms [1] 60/19
Harper [3] 1/19 2/18 3/6
Harris [1] 31/11
has [60] 5/20 7/9 8/19 9/17 10/23 11/1 11/1 11/22 11/25 12/18 12/25 15/1 15/22 17/23 21/5 22/4 23/11 23/13 28/9 31/12 31/4 31/23 32/22 38/4 38/24 39/3 40/23 42/7 42/8 42/8 42/8 42/11 43/1 43/3 44/19 45/8 45/19 46/20 47/20 49/17 50/11 50/22 50/25 51/8 52/11 52/17 55/7 55/8 55/16 55/23 56/3 60/17 60/22 63/22 64/15 64/21 67/10 71/15 71/24 72/9
Hassi [8] 2/11 3/21 28/5 57/19 58/14 59/23 60/12 61/6
Hassi's [1] 55/8
have [145]
haven't [2] 10/22 62/9
having [6] 10/7 11/14 21/7 51/13 56/11 74/3
he [4] 5/4 50/6 54/18 54/20
he's [1] 54/19
heading [1] 48/20
hear [6] 4/13 4/14 4/23 5/16 6/18 53/22
heard [5] 54/17 57/19 59/7 59/25 71/17
hearing [6] 48/18 49/2 49/11 49/25 50/15 65/10
hears [1] 50/2

helpful [1] 38/16
helping [1] 34/21
her [1] 43/2
here [22] 3/22 6/3 19/24 21/17 27/24 31/8 32/7 33/4 35/18 35/21 36/15 36/16 39/3 44/18 53/13 56/20 57/18 61/11 62/23 72/17 73/5 73/16
HERMAN [3] 2/20 75/3 75/10
higher [2] 17/4 45/6
highlight [1] 59/13
his [3] 15/25 16/1 19/14
hold [3] 17/1 30/19 57/12
Honor [89]
Honor's [1] 27/9
HONORABLE [1] 1/10
horizontal [1] 53/24
hours [1] 5/21
house [2] 34/21 48/20
how [25] 4/8 5/1 6/21 8/25 9/21 12/10 13/16 17/21 20/5 20/8 21/2 24/10 24/11 28/16 31/22 36/18 43/21 53/10 54/21 60/16 63/19 63/20 64/9 67/2 69/2
however [1] 6/23
hurdle [1] 31/4

## I

I'd [3] 27/4 33/25 59/3
I'll [4] 4/21 6/18 47/17 53/12
I'm [23] 4/12 4/17 5/10 8/7 10/10 11/22 24/13 25/24 26/2 28/5 32/21 34/17 34/18 34/19 36/9 36/13 44/9 46/21 48/19 51/21 54/21 65/2 73/1
I've [6] 4/8 4/9 7/15 37/19 46/25 64/6
i.e [1] 35/7
idea [2] 18/2 43/25
idea that [1] 43/25
ignored [1] 70/23
ignores [1] 18/7
IL [2] 1/21 2/17

illegal [1] 36/7
Illinois [3] 1/19 1/20 3/16
illiquid [1] 15/13
imagine [2] 40/16 50/16
immediate [1] 21/25
immediately [2] 52/20 54/18
impact [9] 33/24 60/5 60/6 60/9 60/9 60/13 60/15 60/17 60/19
important [7] 6/2 23/18 53/13 55/1 57/17 65/25 70/20
impose [2] 22/2 22/3
imposes [1] 10/2
improvements [1] 63/9
inability [1] 15/12
incentive [5] 6/7 23/11 23/13 71/24 72/10
incentives [6] 23/7 23/8 23/10 23/10 24/14 71/23
include [4] 6/21 21/16 22/6 30/21
included [1] 22/5
includes [3] 6/14 14/9 14/9
including [5] 4/10 15/20 46/17 65/11 71/6
inclusion [3] 13/8 68/23 69/1
income [1] 19/1
inconsistent [1] 13/25
incorporates [3] 6/13 7/6 7/7
increased [3] 17/9 28/12 39/4
increases [1] 39/7
increasing [2] 39/6 39/9
incumbered [1] 10/21
indebtedness [2] 22/9 46/1
indeed [2] 26/4 66/7
independent [2] 7/14 66/21
independently [1] 70/9
Indiana [1] 7/25
indicated [3] 29/23 31/14 41/4

**I**

indicating [1] 32/7
indiscernible [1] 71/21
industry [2] 17/22 28/17
infer [3] 34/9 34/23 34/24
inference [1] 69/6
information [1] 41/12
injunction [10] 1/9 9/11 9/21 10/4 48/18 51/5 51/11 65/19 65/21 65/22
injured [1] 50/19
injury [1] 15/12
input [1] 29/18
inside [1] 41/12
insolvent [2] 35/18 35/23
instance [1] 59/15
instead [4] 19/10 55/3 66/10 68/6
insubstantial [1] 18/22
insufficient [2] 69/21 70/22
intended [1] 68/17
intends [2] 47/2 71/16
intent [2] 23/2 35/24
intentions [1] 27/6
interest [4] 62/3 71/3 73/13 73/20
interested [2] 29/20 65/20
interests [1] 65/21
interfere [1] 73/18
interrogate [1] 63/4
introduce [1] 3/9
introduction [1] 58/13
invade [2] 43/16 43/16
invest [3] 17/11 28/19 43/5
invested [1] 42/7
investment [2] 16/20 16/25
investment-grade [1] 16/20
iota [1] 43/3
irreparable [5] 65/19 66/1 72/21 72/24 73/4
is [317]
isn't [6] 10/20 14/3 14/3 19/12 21/3 31/3

isolate [1] 39/20
issue [17] 9/21 10/4 27/17 29/24 31/20 31/21 37/21 39/25 40/10 42/1 52/21 53/3 53/4 53/5 53/23 72/15 74/2
issues [2] 27/14 41/12
issuing [1] 52/19
it [229]
it's [73] 6/3 6/12 10/17 11/19 12/11 12/15 12/15 12/24 14/2 14/2 15/24 16/2 16/2 17/17 18/15 22/9 22/16 23/14 23/20 24/9 24/10 24/11 24/12 25/3 25/5 25/18 25/23 26/18 28/12 30/9 30/10 31/15 31/16 31/21 33/8 37/24 38/24 42/22 45/7 45/23 45/23 46/7 46/9 46/10 47/9 47/25 48/1 48/13 49/11 49/14 50/17 50/25 53/12 53/13 54/22 57/17 59/5 59/5 59/16 59/17 59/18 60/11 60/23 60/24 61/18 62/4 62/7 62/17 63/21 64/3 64/15 64/17 73/15
its [43] 6/1 6/1 13/8 14/13 16/8 16/19 18/5 18/10 18/11 24/17 25/4 28/11 35/6 36/8 36/10 37/13 39/1 42/8 42/8 42/8 42/11 43/1 43/14 46/4 46/15 46/16 46/17 50/12 53/20 60/22 63/1 63/2 63/23 66/12 66/22 67/25 68/10 69/1 70/13 70/14 70/15 70/17 71/12 72/10
itself [4] 25/19 28/24 42/7 59/9

**J**

Jason [1] 2/7
JENNER [3] 2/16 3/23 34/21
Jessie [2] 1/15 3/14
jewel [1] 46/11
job [1] 19/14
joint [1] 26/20
judge [6] 1/10 49/11

son [1] 39/20
Judge Schubert [1] 49/11
judging [1] 34/3
judgment [3] 19/18 19/20 56/6
July [1] 40/8
jumping [1] 44/18
juncture [1] 57/4
June [1] 41/2
just [33] 4/25 8/7 14/18 15/6 17/17 19/10 21/15 25/24 29/5 32/8 33/21 37/3 37/20 38/7 39/25 40/1 42/9 42/14 43/6 45/20 45/21 46/24 47/13 47/19 48/12 49/21 54/2 55/11 57/21 59/17 59/22 61/17 64/3
Justice's [1] 27/6

**K**

Kathleen [2] 1/15 3/14
KAYE [1] 2/8
keep [2] 10/10 33/25
keeping [1] 51/8
Kettle [2] 40/14 40/15
kick [1] 38/9
kind [1] 20/2
King [1] 48/24
knew [1] 59/18
know [37] 5/4 5/12 12/17 12/23 12/24 13/15 17/3 19/2 19/3 19/7 19/10 20/15 20/15 21/22 22/24 22/24 22/24 23/12 24/19 25/7 26/15 34/16 36/9 36/19 46/20 48/4 48/11 48/24 49/6 49/8 50/2 50/5 50/16 50/22 59/5 62/4 64/9
knowable [1] 11/11
knowing [1] 67/4
knows [2] 12/13 43/18
Konopka [2] 1/15 3/14
KROGER [35] 1/6 3/4 4/5 6/2 24/24 25/1 28/24 28/25 29/23 30/14 31/23 41/5 42/9 44/24 45/2 45/17 46/3 46/4 58/8 61/10 61/12 61/14 66/16 66/20 67/4 67/8 67/16 67/24 68/12

son [1] 39/20
Kroger's [10] 2/2 11/20 11/22 29/18 40/2 46/8 52/8 56/3 68/3 68/15
Krogers [10] 11/25 12/14 21/7 23/10 29/7 37/5 40/16 55/16 55/21 55/23
Krogers' [1] 55/15
Kuester [1] 2/7

**L**

lack [3] 10/9 47/1 47/16
laden [1] 44/25
laid [2] 23/16 53/18
largely [1] 38/15
last [14] 15/24 22/22 28/11 28/13 30/6 32/23 36/19 39/2 42/7 45/14 49/2 56/10 60/23 71/6
late [1] 40/8
later [1] 12/16
Lauren [1] 1/23
law [26] 7/13 7/21 7/23 7/24 8/5 8/11 8/15 8/15 10/7 10/8 19/13 20/5 33/5 36/11 41/11 43/8 43/10 43/11 43/13 51/1 51/7 59/14 66/7 66/9 66/12 70/11
lawful [3] 33/12 35/4 59/9
laws [6] 8/13 8/17 16/4 22/25 26/24 59/18
lawyer [7] 9/6 34/18 34/20 41/14 41/14 47/19 51/25
lawyers [2] 5/2 44/17
lay [2] 53/16 65/14
lead [1] 3/18
Leah [2] 2/11 3/24
least [13] 5/12 6/7 8/3 10/24 22/22 29/8 31/3 32/22 35/9 51/10 51/19 71/18 73/21
leave [1] 58/16
leaves [1] 62/13
led [1] 64/13
legitimate [2] 58/18 58/20
lending [2] 48/6 71/19

## L

Lesley [1]  65/6
less [5]  16/11 18/3
18/4 55/24 64/16
lessening [2]  37/7
73/3
lesser [1]  17/24
let [10]  12/8 22/11 25/9
49/7 49/8 53/12 55/11
60/20 61/17 65/6
let's [5]  5/16 15/5 33/4
33/4 34/11
level [1]  38/5
levels [1]  17/12
leverage [1]  42/16
leveraged [1]  17/23
levered [1]  45/1
liabilities [2]  18/15
22/8
liability [10]  8/21 9/1
10/11 10/21 11/3 50/11
50/23 51/13 51/20
60/11
LIBOR [2]  19/7 62/7
lieu [1]  61/13
light [2]  73/7 73/24
lights [1]  49/1
like [18]  4/14 7/25 8/7
10/14 16/23 26/25
30/25 33/20 33/25
35/19 39/17 51/10 52/6
52/8 59/4 61/22 62/4
63/10
likelihood [5]  65/18
65/25 66/4 72/20 73/9
likely [5]  4/15 4/16
20/17 56/12 73/3
likely to [1]  56/12
limit [1]  27/23
limitations [1]  38/8
line [6]  27/13 33/21
47/9 48/1 48/1 71/17
liquid [2]  17/1 18/4
liquidity [25]  9/8 9/18
15/14 18/10 18/14 19/4
19/22 22/1 28/11 28/14
33/23 33/24 38/24 39/2
39/3 47/10 51/23 60/9
60/25 61/19 62/2 62/14
63/6 70/22 71/3
litigation [2]  4/1 11/7
little [5]  20/15 22/16
39/7 44/11 49/12
LLP [4]  2/3 2/8 2/12

loading [1]  46/7
long [8]  12/24 26/16
27/14 30/10 48/25 68/8
68/16 73/22
long-standing [1]
73/22
longer [2]  48/4 48/6
longer-term [2]  48/4
48/6
look [16]  12/16 20/5
28/11 29/13 29/16 30/6
34/5 34/5 38/23 40/4
41/17 41/20 53/19 61/4
61/18 62/17
looked [1]  28/14
looking [4]  14/11
14/12 20/6 20/7
looks [1]  17/21
loop [1]  49/12
LORRAINE [3]  2/20
75/3 75/10
Los [1]  1/25
loss [1]  17/8
lot [4]  24/17 37/20
44/15 73/16
Louise [1]  1/19
love [1]  39/15
lower [1]  29/25

## M

made [12]  11/24 11/25
13/14 13/14 50/12 51/7
54/10 55/2 57/6 64/13
68/13 68/16
magnitude [1]  19/22
main [1]  25/4
maintain [2]  50/7 68/9
make [22]  4/24 12/7
12/21 13/1 14/7 15/6
17/8 21/16 21/18 27/21
34/13 44/17 44/20
47/13 56/4 56/14 57/8
57/17 60/1 66/18 72/3
72/13
makes [3]  35/6 56/6
67/4
making [4]  8/7 50/7
53/9 59/17
management [1]  41/15
MANGES [1]  2/3
many [1]  63/24
margins [1]  17/10
Margrabe [2]  1/13 3/14

marked [4]  41/23 81/20
62/4 62/7
market-determined [1]
62/7
markets [13]  42/19
42/21 42/22 42/24
44/23 45/19 46/2 46/13
46/19 48/7 50/24 72/2
72/3
Martin [2]  2/11 3/24
Massachusetts [1]  2/8
matter [18]  4/19 10/6
10/8 16/2 26/16 26/21
33/5 42/23 43/12 48/23
49/23 51/1 51/6 59/9
64/1 71/23 73/16 75/5
matters [3]  24/22
63/19 64/12
Matthew [2]  2/6 4/4
Maxeiner [2]  1/19 3/6
maximum [2]  12/11
29/9
may [20]  5/9 17/11
30/7 30/7 31/21 38/15
40/19 40/19 42/23 49/3
49/3 52/1 52/1 58/14
59/14 60/14 64/10
70/12 71/12 72/9
maybe [2]  32/19 49/21
McCollam [1]  68/7
McCollam's [1]  62/5
me [27]  3/13 3/22 4/5
6/18 8/4 8/20 12/14
16/10 22/11 22/16
25/18 33/20 38/2 44/7
45/4 48/12 49/12 51/17
52/3 55/11 60/1 60/20
61/17 68/22 72/4 73/15
73/25
mean [14]  7/2 14/4
20/18 21/6 21/10 23/23
31/25 32/1 32/3 32/16
39/15 43/2 58/18 64/6
meaning [1]  29/7
means [2]  8/16 14/6
meet [2]  48/21 71/12
meeting [3]  28/23
29/12 49/5
memorialized [1]
26/17
memorializes [1]  26/7
mentioned [1]  39/24
merge [1]  28/24
merger [106]

merits [3]  65/18 66/1
66/5 72/20 73/10
methods [1]  70/16
Michael [3]  2/6 5/3
15/19
mid [1]  40/8
middle [1]  40/4
might [11]  6/21 27/12
34/15 34/17 38/4 38/9
40/8 40/15 43/23 43/24
50/16
Millerchip [1]  68/15
million [7]  18/9 19/9
25/6 46/2 46/3 46/24
62/23
millions [1]  50/17
minute [2]  33/5 36/19
missed [1]  42/2
missing [1]  9/5
moment [1]  59/5
Monday [2]  41/24
50/21
money [5]  10/18 17/5
24/17 50/21 60/10
months [2]  21/7 28/8
more [17]  12/14 17/1
17/11 17/22 20/16 25/6
41/18 46/3 52/3 55/21
57/15 62/23 69/5 69/14
70/16 70/18 70/20
Morgan [2]  31/12
35/11
morning [2]  43/25
54/17
most [3]  5/10 62/5
72/2
motion [6]  4/17 56/17
57/7 65/2 65/13 74/1
motive [1]  34/9
mouth [1]  32/17
Mr [1]  56/10
Mr. [9]  5/17 50/10 51/3
55/8 57/19 58/14 59/23
60/12 61/6
Mr. Gitlin [3]  5/17
50/10 51/3
Mr. Hassi [5]  57/19
58/14 59/23 60/12 61/6
Mr. Hassi's [1]  55/8
Ms. [2]  62/5 65/6
Ms. Lesley [1]  65/6
Ms. McCollam's [1]
62/5
much [10]  12/10 19/22

## M

much... [8] 25/7 28/1 31/22 45/6 45/6 52/13 53/10 62/8
must [4] 12/21 13/1 13/6 24/1
my [34] 3/11 3/24 3/25 4/21 8/9 27/13 32/23 35/24 40/15 44/7 44/10 44/16 47/17 47/19 48/5 50/5 52/4 52/17 52/18 53/17 55/7 57/17 60/2 61/23 64/3 65/14 66/2 71/23 72/15 72/19 72/22 73/6 73/7 73/12

## N

name [2] 3/11 47/1
near [2] 25/21 25/22
near-term [2] 25/21 25/22
necessarily [3] 11/2 14/6 26/2
necessary [3] 42/20 46/13 71/22
need [12] 4/18 14/16 20/15 42/21 44/1 46/18 57/3 63/10 63/11 63/15 63/16 63/16
needed [2] 53/16 67/6
needing [1] 64/17
needs [5] 18/10 18/14 19/4 63/6 71/13
negative [1] 24/5
negatively [1] 21/8
negotiated [8] 13/7 13/8 20/22 21/1 26/8 26/14 58/9 61/14
negotiations [1] 30/24
neither [2] 69/4 71/23
net [8] 11/20 18/22 19/1 42/15 45/2 63/17 63/23 70/17
never [7] 10/19 30/14 35/18 36/11 60/23 60/24 68/4
new [2] 3/23 73/22
next [2] 72/10 72/21
nicely [1] 45/1
NICHOLS [1] 1/10
night [1] 30/6
no [35] 1/3 4/19 7/15 7/15 7/19 9/3 11/22 11/23 11/24 11/25
20/12 20/12 23/11 23/13 24/13 25/15 26/10 30/2 33/7 35/17 42/20 47/4 47/9 53/8 55/16 55/17 56/3 56/13 60/17 60/25 62/11 64/3 66/19 67/25 72/9
non [3] 16/25 54/23 72/15
non-agreement [1] 54/23
non-investment [1] 16/25
non-issue [1] 72/15
normal [3] 21/15 21/24 21/25
North [1] 2/16
not [164]
not-so-subtle [1] 54/11
note [3] 6/2 38/7 70/4
noted [2] 68/11 70/9
nothing [7] 60/7 62/14 64/23 67/21 74/5 74/8 74/9
notification [1] 10/1
November [4] 1/5 28/13 28/21 75/10
now [20] 6/7 8/19 10/7 16/13 17/5 17/8 21/7 25/16 26/18 33/19 35/16 40/12 40/21 40/21 42/23 46/4 51/11 53/11 54/1 62/17
number [5] 11/5 37/11 37/17 40/10 40/23
numbered [1] 40/24
numbers [3] 38/3 38/3 40/22
numeral [1] 45/15
numerous [1] 7/24
NW [5] 1/16 2/3 2/8 2/12 2/21

## O

oblig [1] 14/7
obligate [2] 12/7 56/4
obligated [7] 14/7 14/23 14/25 26/4 30/14 34/15 68/25
obligated to [1] 34/15
obligates [1] 67/22
obligating [1] 67/19
obligation [3] 9/10
obligations [2] 26/13 59/15
oblique [1] 56/15
obliquely [1] 57/13
obtained [1] 27/8
obvious [1] 36/24
obviously [8] 11/16 15/18 20/16 20/19 29/20 48/16 65/23 73/16
October [3] 22/22 28/22 50/13
OFC [3] 1/16 1/20 1/23
off [4] 18/9 32/2 35/19 42/4
offer [5] 39/22 41/7 41/10 61/7 61/9
Official [2] 2/20 75/3
Okay [6] 7/12 12/6 15/5 56/7 64/24 74/10
once [2] 7/18 7/19
one [44] 4/23 4/24 5/2 5/3 7/8 8/7 11/8 12/8 12/13 16/15 17/22 19/5 21/9 21/23 25/4 25/14 26/22 29/3 36/13 36/22 36/25 36/25 40/10 40/12 43/23 43/20 45/13 46/22 48/10 49/23 52/18 53/11 53/13 55/11 56/16 58/18 58/20 59/10 60/21 61/1 63/15 64/7 66/13 72/19
ones [2] 34/21 50/18
ongoing [1] 46/17
only [9] 5/21 11/18 17/17 23/19 25/4 27/4 55/3 55/20 72/2
opening [4] 53/20 54/3 54/12 57/7
openings [1] 17/14
openly [1] 52/20
operate [4] 36/17 44/20 45/12 45/13
operating [3] 18/25 19/1 70/24
operative [1] 53/20
opinion [5] 5/2 5/11 8/13 14/1 21/22
opportunity [3] 5/22 27/2 52/10
oppositions [1] 54/1
option [1] 55/23
options [3] 40/7 40/20 61/4 61/6 61/14
orally [4] 4/18 65/2 65/4 65/13
order [17] 5/25 19/1 27/7 27/18 48/16 49/16 57/1 57/5 57/20 60/18 65/14 65/16 68/25 73/14 74/1 74/2 74/2
orders [1] 7/20
ordinarily [1] 50/2
ordinary [7] 33/12 33/16 44/14 44/21 44/22 45/12 46/15
other [38] 3/8 5/4 7/7 7/9 13/10 13/22 14/9 17/23 20/14 20/16 20/20 21/24 22/6 25/6 26/6 26/8 26/13 27/11 27/23 36/23 37/9 46/20 48/7 49/15 53/11 56/15 59/3 61/13 62/6 62/25 63/17 64/8 64/10 65/20 69/8 71/15 73/6 73/16
others [1] 17/11
otherwise [6] 6/22 6/22 8/8 69/1 69/20 69/23
our [27] 5/20 6/3 8/12 14/10 15/1 15/12 15/16 17/19 22/22 23/17 28/16 29/14 38/18 40/20 43/25 48/24 49/2 50/12 51/6 51/7 52/21 53/4 53/5 54/1 57/6 57/8 58/11
out [20] 10/22 11/11 22/8 22/8 23/16 25/16 26/11 39/11 41/24 42/9 43/24 49/1 50/18 50/25 51/21 53/16 53/18 54/1 65/14 70/14
outset [2] 39/3 41/5
outside [3] 33/15 44/21 45/13
over [13] 28/11 30/9 31/4 39/2 39/6 41/25 41/25 42/15 42/15 48/20 52/24 61/19 63/6
overall [1] 31/10
overlap [1] 72/3
overlapping [1] 67/8
overpaying [1] 67/8
own [5] 36/8 36/10 39/15 59/17 72/10

O

owners [1] 24/18

P

p.m [3] 1/6 65/5 65/5
page [8] 30/6 40/23
41/20 44/12 45/23
53/21 53/25 61/5
pages [2] 30/9 57/7
paid [13] 7/20 10/22
11/20 24/17 29/4 31/2
41/24 42/8 50/14 58/3
60/16 62/13 67/3
paid this [1] 29/4
pairing [1] 22/9
papers [10] 4/9 5/22
30/6 31/8 31/11 35/13
43/21 44/8 53/19 55/2
paragraph [4] 55/4
56/16 57/13 68/19
paragraphs [1] 15/24
parallel [1] 14/17
paraphrasing [1]
11/23
parent [1] 45/16
part [15] 15/3 21/2
21/4 24/20 36/3 39/10
39/20 45/14 47/2 47/10
49/25 56/19 59/20
61/12 66/3
parte [2] 49/7 49/25
particular [4] 12/8
21/22 21/23 30/15
particularly [2] 63/21
73/7
parties [45] 4/11 6/8
6/19 7/16 10/2 12/1
12/2 12/4 13/4 13/5
13/7 14/5 14/8 14/13
14/16 14/22 14/24 15/7
20/23 21/1 21/11 21/16
22/14 22/18 22/24
25/25 26/21 27/18
27/20 27/21 29/7 30/11
30/22 31/2 32/13 33/14
37/10 48/17 58/21
65/12 65/20 68/4 68/24
72/13 73/16
parties have [1] 12/1
parties' [6] 13/25 23/2
23/3 23/7 65/10 65/11
partner [1] 5/3
party [3] 29/20 40/13
65/16

passed [1] 31/8
past [3] 29/4 42/6 49/2
path [1] 61/10
Paul [3] 1/19 2/18 3/6
Paula [2] 1/23 3/6
pause [1] 65/8
pay [64] 6/24 10/18
11/15 11/21 12/14 13/6
13/13 13/13 13/20
13/23 14/23 14/25 15/9
20/11 20/21 26/4 30/3
30/7 30/15 30/15 32/1
32/2 32/13 37/6 37/9
37/10 38/25 39/11
42/19 43/4 46/16 47/23
47/23 48/2 51/2 51/13
51/18 51/19 52/23 54/4
54/6 54/7 58/21 61/2
61/24 63/14 66/16
66/20 67/14 67/17
67/20 67/23 67/24 68/5
68/9 68/17 68/20 68/25
69/19 69/19 70/13
71/16 72/6 73/23
paying [9] 5/25 9/22
18/2 41/23 42/12 49/19
60/3 61/13 70/1
payment [41] 6/4 7/13
8/6 8/10 11/17 11/21
11/24 11/25 12/3 12/8
12/16 12/21 13/2 14/6
14/7 24/2 27/22 32/13
45/3 45/4 49/16 52/2
56/4 57/1 57/6 63/24
66/6 66/8 66/10 66/25
67/5 67/25 67/25 68/13
69/17 70/4 70/7 70/21
73/2 73/11 73/17
payment of [1] 45/3
pays [3] 55/17 55/17
63/20
pendency [7] 6/15
9/19 24/23 25/3 32/5
69/23 71/25
pending [2] 16/8 32/10
Pennsylvania [1] 2/12
penumbra [1] 54/20
people [1] 50/19
per [2] 25/8 29/2
percent [1] 19/8
perfectly [2] 58/18
59/9
perform [1] 43/21
perhaps [3] 11/11

period [3] 16/14 41/1
72/5
permissible [1] 23/1
permissive [2] 31/21
33/9
perspective [6] 23/6
27/12 37/19 37/21 74/4
74/7
Pfaffenroth [2] 2/7 4/6
phone [6] 1/19 1/19
1/23 2/15 2/15 2/18
PI [2] 49/11 49/18
pick [1] 37/11
picked [2] 50/3 50/9
piece [4] 26/11 26/14
32/23 49/12
place [3] 10/3 12/23
12/25
placed [1] 33/13
placeholder [1] 33/18
places [3] 6/5 12/12
38/7
plaintiff [6] 1/18 1/22
30/5 35/17 42/18 43/15
plaintiffs [41] 1/4 1/13
3/5 3/10 3/18 4/13 4/15
4/23 4/25 5/15 5/16
5/24 8/8 26/10 30/19
31/8 32/7 38/20 42/2
44/10 48/11 49/8 52/9
53/16 58/1 66/6 66/15
66/23 69/8 70/10 70/20
70/23 71/20 72/12
72/17 72/19 72/22 73/2
73/8 73/9 73/12
plaintiffs' [11] 30/13
44/12 54/11 57/18 58/1
65/13 66/2 69/13 69/25
74/1 74/4
plan [8] 4/8 4/13 40/7
43/3 43/3 46/14 46/18
67/12
planned [1] 11/21
please [1] 3/9
pleased [1] 34/1
plenty [1] 7/7
PLIMPTON [2] 2/12
3/22
plus [2] 19/7 62/7
point [24] 8/16 9/5 9/7
10/5 10/6 10/20 19/8
22/24 26/23 30/12
30/13 32/18 35/24

40/19 40/17 40/17 41/8
42/24 46/14 53/11
53/12 57/11 64/14
72/15
pointed [1] 54/1
points [3] 56/10 59/3
66/21
policy [1] 8/1
poor [1] 66/18
PORTER [3] 2/8 4/5
5/4
portion [1] 58/13
position [23] 4/17 7/12
8/4 10/23 11/17 13/3
13/5 13/19 14/4 15/1
20/19 22/20 23/5 51/12
55/15 55/16 58/2 59/10
61/21 63/13 63/16 65/1
70/10
positions [2] 62/21
63/2
possibility [1] 72/12
possible [1] 72/12
post [3] 29/21 30/24
61/25
post-closing [1] 29/21
post-dividend [1]
61/25
post-signing [1] 30/24
potential [3] 27/14
40/13 69/6
potentially [1] 25/7
practical [1] 14/13
pre [1] 66/20
pre-closing [1] 66/20
precedent [1] 7/3
precedents [1] 7/25
precise [2] 25/20
46/23
preclosing [23] 5/18
6/24 12/7 12/9 12/18
15/9 54/4 66/7 66/9
66/11 66/17 67/1 67/6
68/17 68/20 68/23
69/17 69/19 69/20
70/21 71/14 73/3 73/12
precluded [1] 49/19
precomplaint [1]
22/23
predicting [1] 49/13
prefer [1] 29/24
preliminary [2] 1/9
48/18
premerger [1] 10/1
prepared [4] 4/21 40/2

**P**

prepared... [2] 41/16 65/12

present [6] 2/18 3/5 3/7 4/13 49/10 51/10

presentation [2] 60/20 61/16

presented [3] 15/18 41/3 41/16

presently [2] 47/14 51/14

preserve [1] 21/18

president [3] 68/3 68/7 68/15

press [6] 30/25 34/9 36/2 66/24 67/9 69/5

pressure [1] 17/9

pretty [7] 4/12 4/19 12/24 18/6 43/22 48/25 50/6

prevents [1] 9/22

previously [1] 62/10

price [9] 11/20 12/17 34/12 52/23 55/25 67/3 67/15 68/12 69/3

primary [1] 66/23

principal [1] 46/1

prior [4] 41/4 45/16 46/4 48/24

private [1] 24/18

privilege [1] 3/15

probably [3] 4/19 5/6 10/8

probate [1] 50/2

problem [4] 5/14 25/15 25/22 27/12

problems [1] 15/14

procedural [2] 53/11 53/12

procedure [1] 49/23

proceed [1] 4/8

proceedings [2] 2/24 75/5

produced [1] 2/25

products [1] 17/13

Professor [2] 33/22 71/7

prohibiting [1] 73/17

project [2] 6/8 71/8

projected [2] 40/22 71/13

projections [2] 62/18 62/19

projects [1] 63/5

promise [2] 27/22

50/12 51/7 51/8 51/18

promising [1] 28/18

promotional [1] 17/12

prong [2] 72/19 72/23

proof [1] 72/23

properly [2] 8/14 9/25

proposition [2] 7/22 39/14

protected [1] 33/15

protecting [1] 9/23

prove [2] 9/2 19/17

provide [2] 49/6 49/8

provided [1] 59/24

provides [1] 70/12

provision [6] 21/13 25/12 45/20 46/23 46/24 48/5

provisions [8] 6/14 8/15 14/10 31/18 47/14 56/16 56/19 57/8

public [7] 16/1 28/9 34/11 34/14 41/11 65/21 73/13

publicly [1] 28/21 50/17

publicly-traded [1] 50/17

pulling [1] 35/10

purchase [6] 52/23 55/25 67/2 67/15 68/12 69/2

purported [1] 53/22

purportedly [1] 55/5

purpose [5] 22/19 32/24 35/6 35/24 58/12

purposes [3] 8/9 31/5 51/10

pursuant [1] 8/14

pursuing [1] 7/10

pushed [2] 29/19 49/3

put [12] 13/4 14/16 15/7 15/10 17/6 18/6 32/17 33/18 37/2 46/7 56/13 57/13

putting [2] 23/4 44/10

**Q**

qualify [1] 35/15

quality [2] 17/12 17/13

quarters [2] 71/1 71/6

question [19] 8/3 12/22 16/3 19/12 19/15 19/24 22/12 26/23 33/7

37/21 37/24 43/9 46/22 48/19

questionable [1] 16/2

questioning [1] 50/10

questions [7] 27/9 30/13 34/8 46/20 52/12 57/24 64/21

quite [5] 10/18 28/9 42/22 56/20 60/14

quo [5] 9/25 21/18 49/15 50/7 50/10

quote [1] 68/19

**R**

raise [11] 6/6 6/22 9/9 10/14 11/14 40/13 51/4 51/5 58/4 69/21 72/17

raised [2] 11/6 72/12

raising [1] 6/15

ran [2] 43/10 43/11

rate [3] 19/7 62/3 62/4

rather [1] 69/2

ratings [2] 16/20 16/25

ratio [3] 45/3 63/17 63/23

reach [2] 6/24 12/11

reached [4] 6/19 37/5 59/6 61/12

read [2] 5/2 5/22

real [1] 50/18

realize [1] 17/23

really [10] 8/3 19/2 19/3 26/21 31/9 31/9 48/13 51/21 60/25 73/15

reason [10] 5/13 11/18 16/24 22/17 39/10 50/22 60/22 62/8 62/12 62/19

reasonable [3] 56/20 63/14 63/17

reasons [5] 8/6 11/11 31/6 65/15 72/25

rebut [2] 52/10 53/12

rebuttal [2] 4/15 27/3

rebutted [1] 15/22

recall [1] 54/13

recent [1] 45/9

recess [5] 4/16 4/19 6/5 65/4 65/5

recession [4] 43/18 43/19 43/21 43/25

recognize [2] 30/5

recognized [2] 42/4 68/11

record [10] 3/9 4/12 29/22 39/10 42/6 50/13 65/11 68/22 72/1 75/5

recorded [1] 2/24

recusal [1] 5/14

redacted [1] 16/1

redone [1] 42/8

reduce [1] 6/6

reduced [1] 20/6

reduction [3] 16/8 19/25 20/8

refer [3] 31/18 44/9 57/9

reference [2] 55/3 56/15

referenced [1] 12/11

referring [1] 58/14

refers [1] 31/17

refinance [3] 6/21 6/22 47/16

refinancing [2] 25/5 45/24

refining [1] 45/25

reflect [2] 29/22 68/24

reflected [2] 18/10 62/22

reflecting [1] 61/25

reflection [1] 61/20

reflects [5] 30/8 41/17 58/15 61/18 62/2

regarding [3] 6/19 53/10 70/7

regardless [2] 25/2 68/18

regulators [1] 72/9

regulators' [1] 72/12

related [2] 41/13 54/16

relating [1] 69/11

relationship [2] 5/8 48/14

relative [1] 63/17

release [6] 30/25 34/10 36/2 66/24 67/9 69/5

relevance [1] 68/22

reliance [1] 73/23

religiously [1] 48/25

rely [2] 65/12 69/8

remain [2] 38/4 38/5

remarks [1] 54/3

remember [2] 20/4

**R**

remember... [1] 23/18
reply [3] 5/20 23/17
54/14
report [1] 15/10
Reported [1] 2/20
Reporter [2] 2/20 75/3
reports [1] 24/19
represent [1] 3/12
representation [1]
39/1
represented [2] 14/24
72/16
representing [2] 3/15
3/24
request [2] 53/4 53/15
require [5] 5/7 54/5
66/25 67/25 67/25
required [3] 10/9
67/16 68/5
rereading [1] 27/5
research [1] 17/19
reserve [2] 50/25
52/25
reserved [1] 25/5
resolve [2] 35/20
35/20
respect [19] 9/10
11/14 26/22 27/8 27/22
34/4 34/4 34/7 41/12
55/22 57/6 59/7 61/15
61/16 62/5 64/6 64/8
64/10 65/24
respected [1] 70/6
respectfully [1] 57/1
respective [1] 54/1
respond [2] 57/14
63/11
response [4] 15/15
15/16 52/21 57/12
responsibilities [1]
46/17
rest [2] 16/15 55/9
restaurants [1] 43/24
rested [1] 54/4
restrain [1] 69/23
restraining [9] 5/24
27/7 49/16 56/25 57/5
65/14 65/16 73/14 74/1
restrains [1] 54/15
restrict [5] 6/15 7/10
30/22 58/3 69/20
restricted [1] 58/4
restriction [1] 45/24

restriction [3] 5/10 6/5 7/11
8/6 13/10 17/7 26/9
33/13 58/10 58/22
restrictive [1] 14/9
rests [1] 68/20
result [10] 14/21 18/2
18/22 24/2 43/4 50/3
70/2 70/23 71/12 73/3
results [1] 61/10
retail [1] 17/21
retraining [1] 27/18
return [7] 29/3 36/18
39/22 40/19 43/13
66/22 68/8
returned [3] 29/3
39/17 43/6
returning [3] 28/15
29/13 41/6
returns [1] 28/18
reveal [1] 58/15
revenue [3] 18/9 18/23
71/9
revenues [6] 18/13
18/25 19/3 28/8 63/9
70/24
review [26] 6/16 9/19
9/25 10/3 16/8 21/20
24/23 25/3 25/18 26/20
28/15 28/20 28/22
32/10 36/3 36/4 36/17
39/11 39/20 39/21
69/24 71/25 72/5 72/11
72/14 72/19
reviewed [5] 4/9 4/9
41/16 70/3 70/5
revolving [2] 19/6 60/4
rid [1] 43/23
right [43] 7/18 9/24
10/12 10/12 11/5 11/7
11/10 11/23 12/5 12/13
16/14 16/18 18/1 18/19
20/18 24/22 25/5 27/21
31/10 31/24 33/4 33/19
39/18 44/19 44/24
46/12 47/12 47/12
47/20 47/21 50/24
54/19 55/19 55/25 56/2
56/4 56/5 57/4 61/25
62/1 63/5 63/7 67/25
rights [2] 52/25 55/21
rolling [1] 71/1
Roman [1] 45/15
Room [1] 2/22
rose [1] 70/25

roughly [2] 17/7 41/7
row [1] 3/25
RPR [1] 2/20
Rudolph [1] 1/20
rule [4] 4/17 4/21 5/6
65/12
rules [1] 10/9
ruling [1] 4/22
rundown [1] 46/10

**S**

Sachs [1] 70/5
Safeway [1] 31/12
said [14] 23/22 27/2
28/14 29/13 35/9 35/13
35/17 39/2 52/21 55/13
60/12 60/14 64/25 74/3
sake [1] 34/14
salaries [1] 63/10
same [22] 9/13 10/1
10/13 10/18 19/23
20/23 22/1 22/6 26/14
34/12 36/5 36/21 36/22
41/1 45/9 48/3 49/25
51/16 51/24 58/7 59/21
72/25
sat [1] 39/11
satisfy [2] 72/22 73/8
saw [4] 35/16 48/16
54/10 61/22
say [19] 6/11 8/9 11/1
17/7 22/3 22/15 23/9
23/21 30/19 32/11
32/12 32/18 32/19
32/19 33/4 33/11
47/14 55/4
58/14 59/8
saying [7] 15/11 26/2
27/18 34/3 34/9 35/8
51/3
saying is [1] 35/8
says [14] 7/19 12/10
12/25 22/7 31/21 33/8
33/8 34/10 39/3 40/4
45/12 45/16 54/20 62/5
scales [1] 65/23
scheme [2] 35/1 35/3
SCHOLER [1] 2/8
Schubert [2] 49/11
50/8
scienter [1] 9/2
se [1] 25/8
seal [1] 38/16
sealed [1] 38/19
second [15] 3/25 4/23

24/17 25/9 26/22 29/1
31/15 39/24 40/1 44/7
45/20 56/13 57/22 68/2
69/18
second-guessing [1]
19/19
secondly [1] 52/24
section [23] 6/25 7/3
7/4 7/14 21/9 26/19
30/21 31/4 33/21 43/11
44/4 44/11 45/11 45/14
53/21 54/13 56/19
57/13 58/5 66/11 66/13
69/10 69/14
sections [1] 53/20
secure [1] 34/17
secured [1] 27/15
securities [4] 11/7
34/20 41/11 41/14
see [8] 5/13 17/2 17/22
21/2 42/6 44/15 44/16
48/3
seek [1] 57/5
seeking [3] 5/24 65/16
67/7
seems [3] 6/17 8/4
52/3
seen [2] 7/15 64/6
sell [1] 28/24
seller [3] 33/15 44/19
44/20
senior [3] 15/11 68/3
68/15
sense [9] 5/10 9/2
18/14 20/18 21/4 56/6
60/1 67/4 72/3
separate [3] 10/2
25/16 26/11
separately [1] 70/8
September [2] 71/1
71/5
sequencing [1] 61/11
sequestered [1] 60/18
series [1] 6/19
serve [1] 18/10
served [1] 70/6
service [2] 17/12
17/12
set [4] 46/11 48/17
48/23 60/24
seven [1] 43/1
several [7] 31/7 31/7
39/2 42/7 45/6 61/23
62/1

**S**

shall [1] 15/9
shape [1] 30/14
share [2] 28/25 29/2
shareholders [20] 6/1
8/22 28/16 28/18 28/19
29/14 39/14 39/17 41/6
43/7 43/14 50/2 50/13
50/15 51/7 60/7 66/17
66/22 68/10 73/22
shareholders' [1]
73/20
shares [4] 39/23 50/18
50/20 70/13
Sharon [1] 68/7
sheet [6] 19/10 22/5
40/23 45/1 60/17 61/4
shelves [1] 17/13
Sherman [1] 66/11
shift [1] 54/11
short [3] 4/15 4/19
29/3
short-term [1] 29/3
shorthand [1] 2/24
should [13] 5/12 5/17
15/2 19/13 19/21 28/15
33/17 36/5 38/5 45/21
46/13 55/2 74/4
shouldn't [3] 22/5 36/1
36/22
show [5] 46/15 69/5
70/20 72/23 73/13
shows [3] 42/13 42/13
72/1
side [2] 15/8 37/3
signed [1] 36/20
significant [2] 52/2
71/2
significantly [2] 17/22
37/13
signing [1] 30/24
similar [1] 10/23
similarly [1] 68/16
simply [2] 7/23 46/7
simultaneously [1]
25/10
since [3] 15/1 23/12
28/10
single [2] 36/3 55/4
singular [2] 36/3 36/4
sit [1] 39/15
sitting [1] 50/23
situation [1] 18/21
slide [8] 38/23 39/24
61/18 62/17
slides [1] 38/11
slides that [1] 38/11
sliding [1] 65/23
slow [1] 28/17
slow-growth [1] 28/17
smaller [1] 67/24
Smith's [2] 33/22 71/7
so [94]
soften [1] 17/24
solely [2] 54/4 68/21
some [27] 7/20 8/22
9/10 16/6 16/19 16/20
20/2 20/6 23/16 28/16
29/8 30/21 33/20 34/21
38/16 43/6 43/17 49/14
50/16 51/22 57/19 59/6
59/22 60/9 60/12 62/7
69/8
somehow [5] 54/20
54/22 55/1 55/5 56/19
something [6] 21/5
25/7 27/10 29/17 59/25
65/3
sometimes [1] 35/10
somewhat [1] 24/24
Sonia [2] 2/7 4/6
sorry [3] 36/9 45/21
47/5
sort [3] 8/22 38/7 48/6
sought [1] 27/6
sources [3] 33/23
33/24 38/3
South [1] 1/24
speak [2] 49/5 52/9
Speaking [1] 25/10
special [31] 5/25 6/13
19/5 19/21 20/11 20/21
22/3 24/2 25/12 28/15
28/20 29/2 38/25 39/20
40/10 41/19 47/3 52/22
53/21 54/13 54/15
54/22 58/2 58/15 58/21
61/2 61/13 70/1 70/11
70/18 73/19
specific [5] 6/5 6/14
16/15 25/25 58/12
specifically [2] 15/21
17/21
speed [1] 48/12
spending [1] 43/23
spin [1] 18/9
spot [1] 56/11
standing [3] 36/8
36/10 73/22
stands [1] 7/22
start [2] 31/11 56/10
started [1] 13/17
starting [2] 28/21 65/5
state [11] 1/19 1/23
7/24 8/1 48/19 49/23
49/24 51/11 54/8 66/12
68/4
state's [2] 9/24 22/13
statement [2] 51/12
51/18
statements [2] 18/11
53/1
states [12] 1/1 1/10
3/15 27/12 30/5 35/17
36/9 42/18 43/15 67/9
68/7 68/16
status [6] 9/25 21/18
49/15 50/7 50/10 72/10
statute [1] 10/1
stay [1] 57/21
steam [1] 21/19
stenotype [1] 2/24
step [2] 21/6 21/12
Stephen [1] 2/14
Steven [1] 3/23
still [16] 6/25 8/21 9/9
9/11 10/22 24/24 25/1
43/19 43/19 43/22
43/24 48/17 49/17
54/21 62/13 70/17
stock [1] 70/14
stop [1] 33/2
store [1] 63/9
stores [9] 17/11 20/3
28/17 28/17 35/11 42/8
43/5 43/20 43/21
strategic [6] 28/20
36/3 36/4 36/17 39/11
39/21
strategy [1] 68/8
Street [5] 1/16 1/20
1/24 2/3 2/6
stress [1] 46/14
strictures [1] 20/15
strike [2] 11/8 11/9
strongly [1] 52/19
struck [1] 11/5
subject [1] 25/18
submitted [2] 4/12
66/23
substantial [9] 18/6
37/7 37/12 37/22 37/24
65/18 65/20 66/4 70/24
substantially [7] 18/3
18/4 23/11 23/13 23/15
23/22 58/23
substantive [1] 48/13
substantively [1] 53/8
subtle [1] 54/11
succeed [1] 56/12
succeeding [1] 65/18
success [3] 66/4 72/20
73/10
successful [1] 65/25
such [11] 21/8 22/4
35/14 36/7 37/12 45/25
46/18 52/22 67/5 68/12
72/18
sued [1] 51/4
suffer [2] 65/19 65/20
suffering [1] 59/16
sufficient [1] 38/24
suggest [2] 18/6 35/12
suggested [1] 71/20
suggesting [1] 18/18
Suisse [2] 62/20 70/5
Suite [2] 1/24 2/3
summarize [1] 53/23
summer [1] 40/9
Sunday [1] 43/2
supermarket [2] 17/21
46/10
supermarkets [1]
46/11
support [1] 69/14
supported [1] 58/19
suppose [1] 49/18
supposed [2] 18/8
54/21
sure [15] 5/11 8/7
16/12 21/16 21/18
24/16 32/21 34/13
44/17 44/20 47/13
48/19 51/21 54/21
57/23
surplus [4] 43/12
70/14 70/15 70/17
surrounding [2] 20/16
30/24

**T**

table [4] 3/13 3/23 4/6
35/20
take [24] 4/16 4/18

take... [22]  7/13 8/13
11/4 11/17 12/18 17/5
21/11 22/7 22/8 26/1
29/14 33/20 35/19 36/1
44/23 57/15 58/17
61/18 62/16 64/25 65/2
69/2
taken [1]  8/4
takes [1]  10/3
taking [8]  3/18 19/5
19/11 33/15 45/7 59/10
71/13 73/24
talk [7]  31/8 33/4 33/12
42/3 42/18 45/20 47/18
talked [2]  40/1 65/23
talking [8]  7/4 7/5
31/11 35/10 37/3 41/19
46/24 48/6
talks [2]  45/11 45/23
tapped [1]  60/24
taxes [1]  71/4
Ted [2]  3/21 28/5
Teeters [1]  31/11
telephone [2]  3/5 3/7
tell [3]  4/20 34/11
35/16
telling [1]  7/16
tells [1]  13/1
temporary [8]  5/24
27/7 56/25 57/5 65/14
65/16 73/13 74/1
tender [5]  39/22 41/7
41/10 61/7 61/9
term [9]  10/10 12/15
21/23 25/21 25/22 29/3
47/6 48/4 48/6
terminology [1]  46/23
terms [12]  18/13 21/24
25/25 26/6 27/23 48/3
49/13 54/16 54/20
54/22 55/1 55/4
test [1]  66/3
text [1]  44/10
than [11]  12/14 25/6
36/23 41/8 41/19 46/3
52/3 55/21 62/23 63/24
70/18
than many [1]  63/24
Thank [20]  3/20 4/3
4/6 5/19 28/1 28/2
38/22 48/9 52/13 52/14
52/15 55/10 56/7 56/8
56/9 64/19 64/24 65/6

that [491]
that we [1]  25/14
that's [59]  9/3 9/14
10/3 10/3 10/3 10/12
11/13 12/3 14/17
16/18 16/18 19/8 19/9
21/2 24/20 27/24 27/24
28/16 29/16 29/16 30/8
30/18 31/13 32/6 32/14
33/16 34/23 38/1 38/17
40/11 41/1 41/7 41/23
42/1 42/13 43/15 44/2
44/25 45/17 47/21
49/13 53/25 55/19 56/1
56/5 56/5 57/24 58/6
58/25 59/2 59/6 59/9
60/11 61/20 62/15
67/11 68/19 69/15
73/19
their [65]  9/5 9/7 9/12
10/5 10/6 10/11 10/13
10/23 10/24 15/10
16/20 16/25 17/3 17/13
17/24 18/13 18/14
18/20 19/1 19/4 19/6
19/9 26/5 28/18 29/11
30/7 31/8 31/10 32/7
32/21 32/25 35/13
35/14 39/8 39/12 39/13
41/4 42/2 43/5 43/20
46/12 50/21 53/1 53/16
53/18 53/19 54/8 55/1
55/2 56/5 56/6 57/12
59/15 59/17 60/17
60/20 61/3 61/16 62/2
62/6 64/6 69/15 71/22
72/2 72/22
them [12]  9/22 10/18
16/20 24/19 24/24
28/19 31/3 39/17 44/7
44/17 60/12 60/19
then [20]  4/14 4/20
10/13 20/18 23/14 35/1
37/20 37/23 38/3 40/8
41/16 52/22 52/25 53/1
53/12 59/22 62/16
62/16 71/18 72/6
theory [15]  15/11 18/2
22/14 23/6 23/23 23/25
24/1 32/22 52/25 54/2
54/11 57/18 58/17
58/18 58/20
there [77]

thereof [3]  51/13 71/1
7/18 7/20 9/20 15/6
27/13 31/4 32/12 36/10
37/17 40/22 42/19
47/11 59/8
thereby [1]  58/25
therefore [3]  36/6 55/8
60/19
these [30]  19/3 22/2
24/22 30/11 32/4 32/9
36/2 38/14 38/16 38/16
40/24 44/14 44/15
44/16 45/14 50/2 50/16
54/18 54/19 54/25 55/3
57/8 57/24 58/21 62/18
62/18 62/19 65/24 69/9
73/24
they [171]
they'd [1]  27/10
they're [5]  10/12 16/21
38/15 44/1 44/17
they've [2]  45/7 62/9
thing [8]  26/22 26/22
28/1 33/1 33/1 55/11
59/25 60/21
things [6]  20/21 30/21
32/12 35/20 45/8 50/2
think [66]  5/6 5/9 5/17
6/2 7/1 7/16 7/22 8/2
8/10 9/3 9/4 9/5 9/14
9/20 10/6 10/6 10/17
12/12 16/2 16/3 18/12
18/17 18/21 19/8 21/10
22/17 23/16 23/17 24/8
24/9 25/7 25/11 25/20
26/12 31/13 32/11
32/11 32/12 32/16
32/17 32/21 36/14 38/5
39/7 47/25 48/11 49/4
50/9 51/6 56/11 56/18
56/20 56/23 57/17
57/19 58/13 58/17
59/23 59/3 60/14 61/6
61/15 64/5 69/15 69/15
71/22
thinking [2]  9/8 47/6
thinks [1]  59/16
third [2]  31/19 40/13
third-party [1]  40/13
this [111]
those [19]  17/2 21/24
21/24 26/12 26/13
33/20 33/23 33/24 35/9
35/12 40/20 40/20 44/6

48/17 50/15 53/1 54/10
56/15 69/14
though [4]  18/25
21/12 60/3 60/11
thought [5]  5/12 14/4
39/21 40/8 47/12
three [5]  28/11 31/9
40/13 43/3 46/17
three-year [2]  43/3
46/17
threshold [1]  52/24
through [12]  5/4 6/7
16/10 24/25 25/1 31/17
33/20 38/2 57/4 58/4
71/5 73/1
throwing [1]  49/12
throws [1]  42/4
Thursday [4]  48/18
48/23 49/11 49/14
tied [2]  25/3 36/6
time [25]  4/15 4/16 7/5
11/12 16/21 16/24
19/23 20/23 22/1 36/5
36/22 40/17 41/1 41/6
41/8 42/16 44/16 45/9
49/10 55/10 57/15
59/19 61/3 62/21 69/3
timed [1]  19/21
timeline [1]  27/8
times [8]  17/1 17/2
29/23 39/16 39/19 53/9
54/5 71/20
timing [2]  30/25 36/2
title [3]  53/22 54/12
54/14
titles [1]  53/20
today [23]  3/15 3/18
4/8 4/18 4/21 7/9 9/17
9/21 10/4 27/25 31/13
35/21 36/16 41/19
41/24 61/22 61/24 62/1
63/19 64/14 65/10
71/17 74/4
together [10]  6/4 7/8
8/5 16/14 26/8 26/14
26/17 36/6 36/24 57/9
told [3]  41/5 52/18
52/20
tomorrow [2]  7/10
64/16
too [1]  45/1
took [3]  21/6 28/23
36/24
top [1]  39/3

**T**

total [1]  42/14
totally [3]  14/15 20/7 23/4
tough [1]  56/11
towards [1]  23/17
trade [1]  69/23
traded [1]  50/17
trailing [1]  28/8
transaction [4]  12/17 23/14 68/18 70/3
transactions [3]  6/21 30/23 69/12
transcript [3]  1/9 2/25 75/4
transcription [1]  2/25
transparency [1] 34/14
treating [1]  51/12
Tribune [2]  27/5 27/13
tried [2]  22/23 43/1
triggered [1]  21/8
TRO [14]  9/9 9/13 10/15 51/17 53/14 53/19 53/25 55/2 55/9 60/10 66/2 72/24 73/17 73/21
trouble [1]  64/18
true [5]  51/17 63/5 63/5 64/4 75/4
try [3]  31/19 35/12 44/7
trying [6]  14/14 21/17 21/18 24/13 25/24 46/22
turn [1]  60/20
turned [1]  11/11
turning [1]  57/9
turns [3]  18/2 54/23 54/24
two [26]  15/10 21/7 28/23 29/3 30/11 32/4 32/9 32/11 34/14 35/9 36/2 36/24 36/25 40/12 43/11 53/1 58/9 59/20 66/14 67/7 69/6 70/5 72/5 72/11 73/6 73/8
two-year [1]  72/5
twofold [2]  15/17 52/21
type [1]  34/8

**U**

U.S [1]  2/21

only [5]  20/4 30/19 40/2 45/23 46/23
umbrella [1]  25/23
unable [1]  70/2
unaffected [1]  47/14
unanimous [1]  36/25
unavailable [1]  60/12
unclear [2]  22/16 69/13
under [18]  4/18 5/6 7/4 7/24 8/12 8/18 8/25 12/22 13/1 27/11 36/11 38/16 43/7 43/10 47/20 53/14 53/22 65/2
undercapitalized [1] 70/1
underlined [1]  40/12
understand [19]  5/20 8/25 9/7 10/16 14/14 14/18 23/5 24/13 24/19 25/23 25/25 29/5 37/19 39/16 41/13 50/1 57/11 60/16 62/7
understanding [8] 14/10 47/17 47/19 48/5 50/6 52/4 60/2 61/23
understood [3]  57/16 60/1 61/11
undertake [1]  69/11
unfortunately [1] 35/20
unilateral [4]  11/18 29/2 29/6 31/19
unilaterally [3]  20/11 30/17 67/14
uninfected [1]  9/24
UNITED [2]  1/1 1/10
unlawful [13]  11/10 11/13 32/6 32/8 32/8 33/11 35/3 35/5 35/6 36/7 53/7 53/23 56/19
unless [4]  19/17 49/17 52/11 64/21
unlikely [1]  69/15
unnecessary [1]  55/9
unreasonably [2] 45/17 46/5
unrebutted [4]  68/2 68/6 68/14 71/8
until [4]  7/11 36/19 49/17 50/7
unusual [3]  22/4 22/8 22/8
unwritten [1]  14/18

up [12]  9/25 17/8 19/9 26/17 33/21 41/25 42/14 45/8 48/12 50/3 50/10 62/19
update [1]  49/9
upon [2]  29/8 70/13
us [2]  14/24 34/22
use [6]  10/10 30/7 47/21 48/2 58/24 61/1
used [3]  29/6 60/23 63/9
using [5]  39/13 47/22 70/15 70/16 71/14
usually [1]  25/9
usually don't [1]  25/9

**V**

value [4]  29/21 66/22 69/3 70/17
variety [1]  61/6
various [1]  4/11
vehicle [2]  47/1 48/7
ventures [1]  26/20
version [2]  44/10 44/12
versions [1]  16/1
versus [4]  3/4 10/19 25/17 63/20
very [14]  4/24 5/9 7/16 15/11 22/2 25/20 28/1 29/11 52/13 52/16 57/25 60/15 65/25 74/2
vet [1]  27/16
vetted [1]  41/15
VI [2]  21/9 30/21
via [1]  40/11
vibrant [1]  46/9
Vice [1]  68/15
view [17]  14/19 21/9 21/22 22/18 25/24 26/1 26/15 32/23 37/24 56/3 66/2 71/23 72/15 72/19 72/22 73/6 73/12
viewed [3]  21/7 21/10 33/17
viewed in [1]  33/17
views [1]  33/22
vigorously [1]  70/2
VII [1]  45/15
violate [4]  7/13 7/23 66/7 66/11
violated [1]  26/23
violates [3]  26/19 53/21 54/13

registration [10]  7/21 15/3 15/4 22/10 52/18 53/18 53/23 54/24 55/8 59/1
violative [1]  55/5
virtue [1]  60/18
voluntarily [1]  27/16
voted [2]  28/24 29/1
votes [2]  36/24 36/25
VP [1]  68/3
vs [1]  1/5

**W**

Wait [1]  56/13
waived [2]  56/12 57/12
waiver [1]  56/23
walk [5]  16/10 31/17 31/24 38/2 52/25
walking [1]  55/23
Walmart [1]  42/10
want [23]  4/24 4/25 13/18 14/18 33/10 33/18 33/19 33/25 34/13 39/16 44/24 45/21 46/9 46/14 47/17 48/21 50/9 52/9 58/24 59/13 59/22 68/12 72/4
wanted [8]  5/14 13/20 38/17 47/13 47/15 49/4 49/4 68/9
wants [3]  44/25 46/2 46/9
was [85]
Washington [14]  1/7 1/17 2/4 2/9 2/13 2/22 3/22 8/21 48/15 48/17 48/20 49/15 49/24 51/11
wasn't [1]  53/6
way [19]  5/11 9/13 10/1 21/10 30/14 35/14 36/7 36/16 38/17 41/7 41/8 43/17 45/2 47/25 53/1 59/10 60/9 61/11 62/25
way that [1]  35/14
ways [6]  29/3 39/21 39/22 43/2 43/12 71/15
we [116]
we'd [1]  36/14
we'll [5]  45/20 49/6 49/7 49/8 51/6
we'll let [1]  49/7
we're [4]  23/18 35/2

| | | | |
|---|---|---|---|

**W**

we're... [2]  40/18 43/24
we've [5]  15/18 39/25
48/5 50/15 51/21
weaken [7]  32/20
32/24 35/13 58/12
71/24 72/4 72/10
weakened [11]  23/11
23/13 23/15 23/20
23/22 24/2 24/24 25/1
25/2 72/6 72/13
weakening [2]  22/19
58/24
weakens [1]  33/1
weeds [1]  51/9
week [1]  22/22
weigh [1]  69/6
weighs [1]  67/18
WEIL [1]  2/3
Weisbach [2]  15/19
17/20
well [11]  5/9 10/25
17/25 19/15 28/9 32/11
35/10 42/22 43/22
51/15 59/8
went [2]  28/9 49/2
were [39]  6/23 8/20
11/6 11/12 20/16 26/13
26/14 26/21 29/23 36/5
36/21 36/21 37/15
37/16 40/17 41/3 41/5
41/6 46/24 48/20 49/1
49/2 49/24 49/24 49/25
50/1 51/17 52/19 52/20
55/1 56/18 56/19 59/20
61/5 61/5 62/19 62/20
63/4 69/18
West [1]  1/20
what [67]  4/19 6/10
9/23 10/3 10/4 11/16
11/23 12/10 12/16
13/15 13/18 14/12
14/13 14/15 14/19
15/15 18/13 21/17
21/25 22/13 22/16
22/23 22/24 23/1 23/3
23/4 23/6 24/22 25/21
25/21 25/25 27/20
27/20 30/8 31/20 33/8
33/10 33/23 34/23 35/6
35/8 36/23 39/1 40/11
41/23 41/23 42/6 42/13
43/15 44/2 48/14 50/6
51/16 51/21 53/22 56/6

57/7 57/18 60/1 63/3
63/13 63/17 63/19 64/5
64/5 64/12 64/15
what is [1]  14/13
what's [4]  12/1 12/2
23/3 34/8
whatever [9]  4/13
58/24 58/24 59/14
59/14 59/15 60/21
60/22 62/8
whatsoever [3]  20/12
55/17 55/21
when [22]  6/8 9/7
12/16 17/2 17/9 17/22
20/4 20/5 26/20 30/16
31/11 35/16 39/15
39/16 42/18 53/10
54/10 60/8 60/16 60/17
61/3 63/21
where [16]  12/6 12/20
12/25 12/25 20/25 27/6
27/24 29/23 33/21 35/8
38/7 53/10 55/4 58/14
62/6 64/14
whether [32]  4/17 8/13
11/9 11/23 16/5 16/6
16/7 19/13 19/14 19/24
20/1 20/2 20/6 20/8
21/23 22/25 26/21 27/9
31/4 33/23 36/19 37/21
49/13 49/14 56/12
58/12 58/19 60/8 65/1
68/18 69/13 73/22
which [32]  5/7 8/3
13/1 16/5 18/9 19/4
19/7 21/17 25/6 26/23
27/11 27/13 28/17
28/21 29/4 35/4 36/3
39/25 44/6 44/10 44/11
45/17 47/2 48/2 54/12
58/18 58/20 62/11
65/12 70/11 70/18
70/25
while [5]  10/2 10/22
21/19 41/10 70/2
who [6]  5/3 17/11 50/1
50/3 70/6 73/22
whole [3]  10/2 17/19
20/3
whose [1]  35/22
why [23]  5/17 9/16
10/13 12/1 12/2 16/11
19/5 19/5 19/10 19/15
22/11 22/11 22/14

57/15 57/18 58/1 58/25
60/25 61/2 61/4 61/7
61/8 61/9
will [67]  3/14 3/17 3/19
4/14 4/15 4/16 4/19
4/20 4/23 5/22 6/6 6/8
9/5 12/3 12/17 16/11
18/3 18/4 18/5 18/9
18/10 18/22 19/18 24/1
24/5 24/8 24/10 27/2
32/14 33/1 35/16 38/10
38/18 41/22 41/23 43/4
43/5 43/6 44/7 45/5
45/17 49/8 51/2 51/5
52/15 52/22 54/9 56/10
58/23 65/2 65/5 65/6
65/13 65/14 65/18
65/20 67/3 69/22 69/23
69/25 70/2 70/22 71/9
71/18 72/17 73/11 74/2
William [2]  2/15 3/8
willing [1]  52/23
win [1]  33/2
winter [1]  44/1
wit [1]  43/20
withheld [1]  45/18
withhold [1]  46/5
within [1]  25/23
without [2]  61/9 69/14
witness [1]  49/12
witnesses [2]  48/22
49/3
Wolf [2]  2/6 4/5
Wolf's [1]  56/10
won't [6]  35/25 38/19
49/7 51/4 63/23 71/21
word [5]  10/10 29/6
30/7 47/2 47/16
words [7]  13/22 32/17
36/17 37/9 48/7 49/22
62/25
work [5]  7/8 44/16
54/21 54/22 57/8
worked [1]  53/1
worker [1]  63/10
workers [3]  9/24 42/8
43/5
world [1]  62/1
worried [1]  49/1
would [79]
wouldn't [5]  36/15
36/16 56/14 57/15
60/14
write [1]  65/3

30/10 31/16 33/3 33/11
45/16 46/4 74/2 74/2
wrong [2]  23/10 51/3

**Y**

Yeah [1]  38/18
year [20]  3/3 18/24
19/9 28/13 28/13 39/6
39/6 41/25 41/25 42/1
42/15 42/15 42/16 43/3
46/17 63/7 64/16 64/17
71/5 72/5
years [7]  28/12 39/2
42/7 45/6 45/9 60/23
72/11
yes [21]  3/17 10/22
12/19 14/8 14/20 18/24
20/22 31/16 31/25
38/13 38/21 44/5 44/13
46/4 47/5 47/8 49/21
52/5 55/12 55/14 61/23
yet [2]  27/15 33/25
York [1]  3/24
you [170]
you'd [1]  4/14
you'll [2]  44/7 54/13
you're [2]  17/6 41/10
you've [2]  5/22 30/9
your [128]
yourselves [1]  3/9

**Z**

zero [1]  52/3
Zweben [2]  1/15 3/14