Joseph M. Alioto (SBN 42680)
Tatiana V. Wallace (SBN 233939)
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone: (415) 434-8900
Email:  jmalioto@aliotolaw.com


[Additional Counsel Listed on Last Page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Christine Whalen, et al.,<br><br><br>                    Plaintiffs,<br><br>     v.<br><br><br>Kroger Co., Albertsons Companies, Inc.,<br>and Cerberus Capital Management, L.P.,<br><br>          Defendants. | Case No.:  23-cv-00459-VC<br><br>**REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date:  May 18, 2023<br>Time:             10:00 AM<br>Place:            Courtroom 4, 17th Floor<br>Judge:            Honorable Vince Chhabria<br><br>Complaint Filed: February 2, 2023 |

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................... 1

ARGUMENT ....................................................................................................................... 8

CONCLUSION ................................................................................................................... 15

REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

## CASES

*American Tobacco Co. v. United States,* 328 U.S. 781 (1946)……………………… 5,6

*Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, (9th Cir. 2016)...............................8

*Brown Shoe Co. v. United States*, 370 U.S. 294, (1962) ……………….......................*passim*

*California v. American Stores*, 495 U.S. 271 (1990)……………………………………..12

*Hosp. Corp. of Am. v. F.T.C.*, 807 F.2d 1381, (7th Cir. 1986)....................................................8

*Liu v. Securities and Exchange Commission*, 140 S. Ct. 1936, 1946-47 (2020)……………11

*St. Alphonsus Med. Center-Napa Inc. v. St. Luke's Health Sys., Ltd.*,

778 F.3d 775 (9th Cir. 2015) ...................................................................................................8

*Schine Chain Theatres, Inc. v. United States*, 334 U.S. 110, 128–29 (1948)………………….12

*Pennsylvania Sugar Refinery v. American Sugar Refining Co.,* 166 F. 254 (SDNY 1908)…………………………………………………………………………………….. 10,11

*TFT-LCD (Flat Panel) Antitrust Litig*., No. C 10-4346 SI, 2011 U.S. Dist. LEXIS 76562, 2011 WL 2790179, at *4 (N.D.Cal. July 12, 2011)………………………….13

*United States v. Aluminum Co. of Am.*, 377 U.S. 271, (1964)…………...................................7

*United States v. Continental Ore Co., 370 U.S. 690 (1962)*…… ……………………..... . . . 5

*United States v. Falstaff Brewing Corp*., 410 U.S. 526 (1973)………………………………7

*United States v. Grinnell*, 384 U.S. 563, 577 (1966)………………………………………..12

*United States. v. KeySpan Corp.* 763 F. Supp 2d 633 (SDNY 2011)…………………………13

*United States v. Microsoft*, 253 F.3d 34, 103 (D.C. Cir. 2001) ……………………………..12

*United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966)........................................................7

*United States v. Paramount Pictures*, 334 U.S. 131, 171-72 (1948)…………………………12

*United States v. Philadelphia National Bank, 374 U.S. 321 (1963)* ..………………….7,9

*United States v. United Shoe Machinery Corp*., 391 U.S. 244, 250 (1968)………………...12

*United States v. Von's* Grocery Co., 384 U.S. 270 (1966)……………………………….*3,4,7,9*

**STATUTES**

15 U.S.C. §§ 1 ........................................................................................................................11

**TREATISES**

2A Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, Paragraph 325a (3d ed. 2006). . . . . . . . . . . . . 13

REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

## PRELIMINARY STATEMENT

Nothing is more critical than food.  Hundreds of millions of Americans buy their food at grocery supermarkets.  The supermarket is an American invention.  The largest supermarket operator in the United States is Kroger with $138 billion in sales giving it a 23.6% market share in the United States.  The second largest supermarket operator in the United States is Albertsons controlling over 12.4% of the market with $72 billion in sales in 2021.  Both of these giants have achieved their present position by the acquisition of well-known former competitors.

For example, Kroger has acquired multiple supermarkets since 1983 including Ralphs, Dillons, Smith's, King Soopers, Fry's, QFC, City Market, Owen's, Jay C, Pay Less, Bakers, Gerbes, Harris Teeter, Pick N' Save, Metro Market, Mariano's, Fred Myers, Food 4 Less and Food Co.  *See* Exhibit F (ECF 28-7) to Declaration of Joseph M. Alioto, filed ISO Motion for Preliminary Injunction (ECF 28-1)  ("hereinafter Alioto Decl. I).

Albertsons has acquired Safeway, Vons, Jewel-Osco, Shaw's, Acme, Tom Thumb, Randall's, United Supermarkets, Pavilions, Star Market, Haggen, Carrs, Kings Food Markets and Balducci's Food Lovers Market. *See* Exhibit Q (ECF 28-7) to Declaration of Joseph M. Alioto, filed ISO this Reply Memorandum ("hereinafter Alioto Decl. II)

It becomes painfully obvious from the location of the stores of these two giants in the industry, as noted in the maps attached to the complaint and attached here, that this acquisition would eliminate an actual and potential competitor (Albertsons), leaving the merged company significantly larger than any remaining competitor.  (Please see Charts attached as Exhibits A-F, Alioto Decl. II)  The substantial lessening of competition that *may* result is obvious on its face and constitutes a concentration far more burdensome and oppressive than that which has been found to be enjoined by any other case in which

1

attempted mergers have been enjoined. (Please see Charts attached as Exhibits G, H and R, and I - P, Alioto Decl. II)

There is no question that the purchase amount of $24.6 Billion is a non-trivial amount.

There is no question that the acquisition of Albertsons, the target, eliminates a significant and substantial, actual and potential rival of Kroger.  (Please see Exhibits T and U, Alioto Decl. II.)

And there is no question that this acquisition by the largest supermarket buying the second largest supermarket follows a trend in the industry toward creation of substantial concentration.  (Please see Chart attached as Exhibit Q, Alioto Decl. II).

There is no question that this acquisition would result in the creation of a behemoth in the industry far larger than any its competitors, four times as large as its next largest competitor.  See . (Please see Charts attached as Exhibit G, H and R, Alioto Decl. II).

Plaintiffs seek a preliminary injunction to be able to conduct discovery, including documents and depositions, prior to a trial for a permanent injunction on the merits with full evidentiary hearing.  To date there has been no discovery to help document the extent and impact of Defendant's acquisition.

The combined market share of these two supermarket operators nationally would be 36% (Exhibit R to Alioto Decl. II), with much larger market shares, as yet unquantified by discovery but nonetheless obvious from a review of the sub-geographic markets across the United States in which Defendants currently operate stores in smaller metropolitan areas throughout the United States (Please see Exhibits A - F, Alioto Decl. II).

This market share is well above the mark that has been identified by the Supreme Court in a series of cases, none of which have been overruled, as excessive market concentration.  (Please see Exhibit A (ECF 28-2), Alioto Decl. I.)  In addition, even low percentage shares of a market following a trend in acquisitions in the marketplace will establish sufficient concentration to be a

2

violation of Section 7 of the Clayton Act.  As the Supreme Court said, in furtherance of the public

policy encouraging internal expansion through competition rather than concentration through

acquisition, the Supreme Court said even small mergers are condemned:

> "A company's history of expansion through mergers presents a different economic picture
> than a history of expansion through unilateral growth. Internal expansion is more likely to
> be the result of increased demand for the company's products and is more likely to
> provide increased investment in plants, more jobs and greater output. Conversely,
> expansion through merger is more likely to reduce available consumer choice while
> providing no increase in industry capacity, jobs or output. It was for these reasons, among
> others, Congress expressed its disapproval of successive acquisitions. Section 7 was
> enacted to prevent even small mergers that added to concentration in an industry. See S.
> Rep. No. 1775, 81st Cong., 2d Sess. 5." *Brown Shoe Co. v. United States*, 370 U.S. 294,
> at 395, ft note 72.

On October 13, 2022, the Defendants entered into an "Agreement and Plan of Merger By

and Among Albertson Companies, Inc., The Kroger Co., And Kettle Merger Sub, Inc."

("Agreement"), pursuant to which Kroger agreed to pay $24.6 billion in cash to eliminate

Albertsons.  This is not a trivial transaction.

Defendants' arguments with regard to the relevant market are totally without merit, both

regarding the geographic market and the product market.

The geographic market in this case has been shown to be both national, regional and local,

all of which would be substantially limited by Kroger's acquisition of Albertsons.  (Exhibits A – F,

Alioto Decl. II.)  In the national market, Kroger is the number one supermarket chain and Albertson

is number two.  (Exhibit R, Alioto Decl. II.) Whether this acquisition is judged on the basis of a

national market or regional or local market, the effect is substantially the same.  The decision by the

Supreme Court in the *Von's* case is instructive.  In that case the Von's supermarket was the number

three grocery in the Southern California market with a small 4.7% share.  It attempted to acquire

Shopping Bag which was the number six grocery in the market with approximately 4.2%.  (Exhibits

A, B (ECF 28-2 and 28-3, Alioto Decl. I; Exhibits M and N, Alioto Decl. II.)   That acquisition was

enjoined.  Today, in Southern California the market shares of Kroger and Albertsons are significantly greater than the Von's market ever was, thus demonstrating that that market is now and will  continue to be over-concentrated should the merger be consummated.  Ironically, Albertsons bought Vons and Safeway and now Kroger intends to buy all three.

And with regard to the product market, whether designated as supermarket or grocery retailer, the market shares of Albertsons and Kroger are more than sufficiently significant to demonstrate a plain violation of Section 7 of the Clayton Act, far more so than that which was demonstrated in the prior decision by the Supreme Court in *Vons* which enjoined the acquisition of two competitors with significantly less market share than those presented today.

Albertsons previously purchased both Safeway and Vons and now Kroger attempts to own all three.  (Exhibit Q, Alioto Decl. II.)  This headlong trend to achieve a lessening of competition and this tendency toward monopoly is clear and present;  the acquisition price of $24.6 billion is clearly nontrivial; the elimination of a significant actual and potential rival is explicit; and the anticipated anticompetitive effects in terms of price, quality, and service cannot reasonably be denied.

The Defendants claim that disgorgement is not permitted under the law.  They are plainly mistaken.  It has been recognized as far back as *Zenith* and as reconfirmed by *American Stores* that the power granted to individuals under the Clayton Act allows the full extent of equitable relief, including divestiture, disgorgement and even dissolution. Indeed, the Supreme Court has continually encouraged private parties to question the anticompetitive effects of these mega-mergers.  Nothing else need be said to disprove Defendants' meritless assertion that disgorgement is not a viable remedy under Section 16.  Furthermore, all amounts of disgorgement are payable to the Treasury of the United States to ensure that wrongdoers do not and cannot be allowed to profit from their wrongful conduct.

The defendants have attached a number of declarations of economists who attempt to support their view that the payments are a wholly innocent act.  But even wholly innocent acts, when shown to be a part and parcel of the overall combination, are held to be illegal.  This was made plain by the Supreme Court in *American Tobacco*:

> "It is not the form of the combination or the particular means used but the result to be achieved that the statute condemns. It is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful. Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition. No formal agreement is necessary to constitute an unlawful conspiracy. Often crimes are a matter of inference deduced from the acts of the person accused and done in pursuance of a criminal purpose. Where the conspiracy is proved, as here, from the evidence of the action taken in concert by the parties to it, it is all the more convincing proof of an intent to exercise the power of exclusion acquired through that conspiracy. The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealing or other circumstances as well as in an exchange of words. *United States v. Schrader's Son, 252 U.S. 85.*"  *American Tobacco Co. v. United States*, 328 U.S. 781, 809-810 (1946)

This principal was reconfirmed in *Continental Ore* where acts in furtherance of a violation become part and parcel of the violation because it is the duty of the law to view the conduct of defendants as a whole, and not simply in its separate parts.

> "It is apparent from the foregoing that the Court of Appeals approached Continental's claims as if they were five completely separate and unrelated lawsuits. We think this was improper. In cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. ". . . [T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole. *United States v. Patten, 226 U. S. 525, 544* . . . ; and in a case like the one before us, the duty of the jury was to look at the whole picture and not merely at the individual figures in it." *American Tobacco Co. v. United States,* 147 F. 2d 93, 106 (C. A. 6th Cir.)." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-699 (1962).

The elimination of a competitor constitutes irreparable harm for the simple reason that there is no way that a competitor can be revived, once destroyed, and all of the competition once

afforded by that competitor is no longer available as a benefit to the market.  (Please see Exhibit S, Alioto Decl. II.) All incentives to compete with lower prices, more efficient plants, to acquire machinery, to provide better services, the hiring of labor, innovation, all of these incidents of competition are gone, not to return.  In this case, the most essential of necessities, food itself, *may* be impacted in terms of its availability, quality, cost and distribution.

Plaintiffs seek to enjoin Kroger's acquisition of Albertsons and further seek disgorgement of the $4 billion Special Dividend that Albertsons and Kroger agreed between them to be paid to Albertsons' shareholders, including to Defendant Cerberus Capital Management, L.P. ("Cerberus), one of a consortium of private equity entities which collectively own approximately 75% of Albertsons stock.

In addition, the companies have agreed that if the acquisition is unsuccessful, Kroger will pay Albertsons shareholders $600 million as the quid pro quo for not objecting to the acquisition, all in furtherance of the violation.

## **<u>ARGUMENT</u>**

Under Section 16 of the Clayton Act, the Plaintiffs are entitled to seek an injunction to prohibit the acquisition of Albertsons by Kroger and to seek an order of disgorgement with regard to the Defendants' effort in furtherance of their violation of Section 7 to disable and dismantle the competitive effectiveness of Albertsons.

In support of the Plaintiffs' claim seeking an injunction to prohibit the acquisition of Albertsons by Kroger, there have been a series of decisions, following the Anti-Merger Amendment of 1951, wherein the Supreme Court has consistently prohibited mergers where there has been the elimination of a significant rival or potential rival in a transaction which is not trivial, which is the case here.  These decisions by the Supreme Court, none of which have been

overruled, establish the principle that the elimination of a competitor in a non-trivial transaction

must be enjoined.  They are summarized here:

     1.    *Brown Shoe Co. v. United States,* 370 U.S. 294 (1962) (Brown Shoe and Kinney combined for only 6% of the manufacturing market – merger enjoined).

     2.    *United States v. Philadelphia National Bank,* 374 U.S. 321 (1963), (nos. 1 and 2 in market combined for 36% market share – merger enjoined).

     3.    *United States v. Aluminum Company of America,* 377 U.S. 271 (1964) (elimination of RomeCable with only 1.3% share of national market – merger enjoined).

     4.    *United States v. Von's Grocery Co,* 384 U.S. 270 (1966)(combination of nos. 3 and 6 becoming no. 2 with 7.5% of the Los Angeles grocery market – merger enjoined.)

     5.    *United States v. Pabst Brewing Co.,* 384 U.S. 546 (1966) (nos. 10 and 18 in the national market becoming no. 5 with 4.9% - merger enjoined).

     6.    *United States v. Falstaff Brewing Corp*., 410 U.S. 526 (1973) ( the merger with Narragansett added 20% to Falstaff's 0% market share in New England giving it 20% of the New England market – dismissal reversed).

In *Brown Shoe v. United States*, 370 U.S. 294, at 346 (1962), for example, Chief Justice

Warren observed that "We cannot avoid the mandate of Congress that tendencies toward

concentration in industry are to be curbed in their incipiency, particularly when those tendencies

are being accelerated through giant steps striding across a hundred cities at a time. In the light of

the trends in this industry we agree with the Government and the court below that this is an

appropriate place at which to call a halt."

This is the case here.  The question presented is whether this Court must enjoin the

merger of the two largest competitors in the grocery market in the United States as a violation of

Section 7 of the Clayton Act, pursuant to which Congress prohibited all mergers and acquisitions

where the effect "may be substantially to lessen competition, or to tend to create a monopoly."

The Supreme Court has held that Congress specifically sanctioned this broad language

requiring only that a Plaintiff show that a merger *may* have a reasonable probability of

lessening competition or *may* tend to create a monopoly for it to be held unlawful. *Brown Shoe Co. v. United States*, 370 U.S. 294, 317 (1962).

Section 16 of the Act does not require proof of the fact of damage; rather, it establishes standing upon the Plaintiffs' showing of the threat of probable injury caused by the acquisition, if it is consummated.

This principal has been confirmed in the Ninth Circuit, as well as by the Supreme Court cases.

In *Boardman v. Pacific Seafood Group*, 822 F. 3d 1011, 1021-1023 (9th Cir 2016) the court quoted *Saint Alphonsus*, *Hospital Corp of American* (Posner) and *U.S. v. BNS, Inc*. and held:

> "To prove an unlawful merger claim under § 7 of the Clayton Act, a plaintiff must show that the effect of the challenged  acquisition "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. The plaintiff need not prove that a merger or acquisition has altered prices in the relevant market; rather, "[a]ll that is necessary is that the merger create an appreciable danger of such consequences in the future." *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd*., 778 F.3d 775, 788 (9th Cir.2015) (quoting *Hosp. Corp. of Am. v. FTC,* 807 F.2d 1381, 1389 (7th Cir.1986)).

> \*\*\*

> "A lessening of competition constitutes an irreparable injury under our case law. See *United States v. BNS Inc.,* 858 F.2d 456, 464-66 (9th Cir.1988) ("Koppers has demonstrated that serious questions exist regarding the possibility of irreparable harm to competition in the Irwindale aggregate market if the tender offer is consummated...."). Thus, the district court did not abuse its discretion in finding that Plaintiffs adequately demonstrated a threatened irreparable injury.

> \*\*\*

> "A threat of irreparable harm is sufficiently immediate to warrant preliminary injunctive relief if the plaintiff "is likely to suffer irreparable harm before a decision on the merits can be rendered." See *Winter*, 555 U.S. at 22, 129 S.Ct. 365 (quoting 11A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 (2d ed.1995))."

The effect is one of probability, not actuality. Thus the question is, Might competition be substantially lessened? rather than, Was competition in fact substantially lessened? Likewise, the question is, Did the merger tend to create a monopoly? rather than, Did the merger in fact create a monopoly?

In the *Philadelphia National Bank* case, the court announced this test in assessing the legality of a horizontal merger: "[A] merger which produces a firm controlling an undue percentage share of the relevant market. and results in a significant increase in the concentration of firms in that market is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." In that case, the merger led to a 30 percent share of the commercial banking market in a four-county region around Philadelphia and an increase in concentration by more than one-third, and the court held that those numbers amounted to a violation of Section 7. The court also said that "if concentration is already great, the importance of preventing even slight increases in concentration and so preserving the possibility of eventual de-concentration is correspondingly great."

In this case there has been a demonstrable trend toward concentration.  (Pease see Exhibit Q, Alioto Decl. II.)

In enacting and amending § 7 of the Clayton Act, "Congress sought to preserve competition among many small businesses by <u>arresting a trend towards concentration in its incipiency</u> before that trend developed to the point that a market was left in the grip of a few big companies."  *United States v. Von's Grocery Co.*, 384 U.S. 270, 277 (1966) [emphasis added].  The line of Supreme Court cases relying upon this principle of law has never been overruled and remains controlling law.

In *Von's*, the Supreme Court also determined that, "'The dominant theme pervading congressional consideration of the 1950 amendments was a fear of what was considered to

9

be a rising tide of economic concentration in the American economy.'  To arrest this 'rising

tide' towards concentration into too few hands and to halt the gradual demise of the small

businessman, Congress decided to clamp down with vigor on mergers…Thus, where

concentration is gaining momentum in a market, we must be alert to carry out Congress'

intent to protect competition against ever increasing concentration through mergers."

*United States v. Von's*, *supra,* 384 U.S. at 276-277.

The United States supermarket industry has experienced an undeniable trend in

concentration over the past 15 to 20 years.

Defendants' acquisition would occur in and further concentrate an already

concentrated market, which has been characterized by mergers over the last two decades.  It

is time for this Court to bring this market concentration to a halt.

<u>The Illegal Dividend</u>

In addition to the violation of Section 7 of the Clayton Act in which grocery store

customers, actual and potential, are threatened with the probability that prices may be increased and

services decreased, the Plaintiffs also claim that the principal investors of Albertsons violated their

fiduciary duty and Section 1 of the Sherman Act by forcing Albertsons to pay a $4 Billion dividend

to its shareholders with the purpose and effect of weakening Albertsons' ability to compete so that it

will be forced to merge with Kroger.  This practice is not unusual and has been employed in the past

in furtherance of antitrust violations.

In *Pennsylvania Sugar,* the defendant trust bought shares in a small competitor, put

themselves on the board of directors and then shut down the competitor, closing down the

competitor's plant in violation of the antitrust laws and in violation of their fiduciary duties.  The

court awarded the competitor company over $30 Million.  Here we are asking that the dividend be

returned.

The special $4 billion dividend that Albertsons will pay to its shareholders - primarily to Defendant Cerberus – is an integral part of the merger agreement between Albertsons and Kroger and constitutes an agreement in restraint of trade in violation of Section 1 of the Sherman Act,  15 U.S.C. §1.  *Pennsylvania Sugar Refinery v. American Sugar Refining Company*, 166 F. 254 (SDNY 1908).

Disgorgement is the remedy that is accorded to private plaintiffs to restore the status quo. The Defendants should not profit from their illegal conduct and disgorgement will ensure that will not happen.  *Liu v. Securities and Exchange Commission*, 140 S. Ct. 1936 (2020).  The $4 Billion dollars must be disgorged by those who received it, and it must be returned to Albertsons and / or paid to the Treasury of the United States.

This Court has the authority to grant the equitable monetary relief of disgorgement sought by Plaintiffs. This falls squarely within this Court's inherent powers and is authorized by law.

District Courts may, in their discretion, exercise all inherent equitable powers that "are available for the proper and complete exercise of that jurisdiction," except where prohibited by statute. *Liu v. Securities and Exchange Commission*, 140 S. Ct. 1936, 1946-47 (2020) (*quoting Porter v. Warner Holding Co*., 328 U.S. 395, 398 (1946)). Among those powers, "equity practice [has] long authorized courts to strip wrongdoers of their ill-gotten gains." *Liu*, 140 S. Ct. at 1942. Disgorgement restores "the status quo, thus situating the remedy squarely within the heartland of equity." *Liu*, 140 S. Ct. at 1943 (quotation marks and citation omitted). This remedy is available to the Court, "unless otherwise provided by statute." *Id.* at 1946–47 (*citing Porter*, 328 U.S. at 398) ("[T]he comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command"). There is no such statutory prohibition here.

11

In *California v. American Stores*, 495 U.S 271, at 281 (1990) the Supreme Court agreed that the First Circuit correctly observed that "§16 'states no restrictions or exceptions to the forms of injunctive relief a private plaintiff may seek, or that a court may order. . . . Rather, the statutory language indicates Congress' intention that traditional principles of equity govern the grant of injunctive relief.'" (Citation Omitted.)

Moreover, in *United States v. Paramount Pictures*, 334 U.S. 131, 171-72 (1948) (the Court held that injunctions to deprive the defendant of the fruits of its anticompetitive conduct should include injunctions ordering the defendant to divest property "if the property was acquired as a result of practices which constitute unreasonable restraints of trade. . . . . [T]he requirement that the defendants restore what they unlawfully obtained is no more punishment than the familiar remedy of restitution. See also *United States v. United Shoe Machinery Corp*., 391 U.S. 244, 250 (1968) (the Court stated: "It is of course established that, in a § 2 case, upon appropriate findings of violation, it is the duty of the court to prescribe relief which will . . . deny to the defendant the fruits of its statutory violation. . . ."); *United States v. Grinnell*, 384 U.S. 563, 577 (1966) (the Court held that "adequate relief in a monopolization case should . . . deprive the defendants of any of the benefits of the illegal conduct . . . ."); *Schine Chain Theatres, Inc. v. United States*, 334 U.S. 110, 128–29 (1948) (equitable relief functions include: "It deprives the antitrust defendants of the benefits of their conspiracy."); *United States v. Microsoft*, 253 F.3d 34, 103 (D.C. Cir. 2001) (*en banc*) ("[A] remedies decree in an antitrust case must seek to . . . 'deny to the defendant the fruits of its statutory violation . . . .'").

Furthermore, there is no doubt that equitable antitrust remedies include requiring violators to disgorge any illegally obtained profits. In fact, this Court has already recognized disgorgement as an available antitrust remedy. *See TFT-LCD (Flat Panel) Antitrust Litig*., No. C 10-4346 SI, 2011 U.S. Dist. LEXIS 76562, 2011 WL 2790179, at *4 (N.D.Cal. July 12, 2011)

12

(recognizing state government enforcement actions seeking disgorgement when authorized by state law).

In fact, scholarship agrees that disgorgement is authorized under the law. Philip Areeda and Herbert Hovenkamp, two of the most distinguished antitrust scholars, unequivocally state that "Equity relief may include . . the disgorgement of improperly attained gains." 2A Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, Paragraph 325a (3d ed. 2006).

The disgorgement relief is sought for the benefit the general public as a whole. "The primary purpose of disgorgement is not to compensate [victims] ... [but rather to] forc[e] a defendant to give up the amount by which he was unjustly enriched." *U.S. v. KeySpan Corp.* 763 F. Supp 2d 633 (SDNY 2011).

Further, disgorgement supports the goal of restraining *future* violations. See *U.S. v Carson*, 52 F.3d 1173, 1182 (2d Cir. 1995) where disgorgement was found to be appropriate where "the funds are being used to fund or promote the illegal conduct or constitute capital available for that purpose".

## CONCLUSION

For the reasons stated in Plaintiffs' Motion for Preliminary Injunction and stated as well in this Reply, Plaintiffs submit that the Court should issue Plaintiffs' requested preliminary injunction pending a full hearing and trial on a permanent injunction to be had after modest discovery can be obtained from Defendants and so that witnesses can be presented who will confirm that this acquisition by Kroger of Albertsons must be permanently prohibited by the Court.

Dated:  May 4, 2023                          Respectfully submitted:


                                   By:     *s/ Joseph M. Alioto*
                                           Joseph M. Alioto (Cal.Bar No. 42680)
                                           ALIOTO LAW FIRM
                                           One Sansome Street, Suite 3500
                                           San Francisco, CA 94104
                                           Telephone: (415) 434-8900
                                           Email: jmalioto@aliotolaw.com

                                           *Attorneys for Plaintiffs*



ADDITIONAL PLAINTIFFS COUNSEL:

Lawrence G. Papale (SBN 67068)
LAW OFFICES OF LAWRENCE G. PAPALE
1308 Main Street, Suite 117
St. Helena, CA 94574
Telephone: (707) 963-1704
Email: lgpapale@papalelaw.com

Josephine Alioto (SNB 282989)
THE VEEN FIRM
20 Haight Street
San Francisco CA 94102
Telephone: (415) 673-4800
Email: jalioto@veenfirm.com

Christopher A Nedeau (SBN 81297)
NEDEAU LAW PC
154 Baker Street
San Francisco, CA 94117-2111
Telephone: (415) 516-4010
Email: cnedeau@nedeaulaw.net


                                   14