Joseph M. Alioto (SBN 42680)
Tatiana V. Wallace (SBN 233939)
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone: (415) 434-8900
Email:  jmalioto@aliotolaw.com

[Additional Counsel Listed on Last Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Christine Whalen, Katherine Arcell, Jose Brito, Jan Marie Brown, Rosemary D'Augusta, Brenda Davis, Pam Faust, Carolyn Fjord, Don Freeland, Donald Fry, Gabriel Garavanian, Harry Garavanian, Jocelyn Gardner, Valarie Jolly, Michael Malaney, Len Marazzo, Lisa McCarthy, Tim Nieboer, Deborah Pulfer, Bill Rubinsohn, Sondra Russell, Clyde Stensrud, Gary Talewsky, Pam Ward,<br><br>                    Plaintiffs,<br>          v.<br><br>Kroger Co., Albertsons Companies, Inc., and<br>Cerberus Capital Management, L.P.,<br><br>                    Defendants. | Case No.:  23-cv-00459-VC<br><br>**FIRST AMENDED COMPLAINT CHARGING THE KROGER CO.'S ACQUISITION OF ALBERTSONS AS A VIOLATION OF SECTION 7 OF THE CLAYTON ANTITRUST ACT, 15 U.S.C. §18** |

*First Amended Complaint for Violation of Section 7 of the Clayton Act*

**PROLOGUE**

"The quantity of grocer goods, for example, which can be sold in a particular town, is limited by the demand of that town and its neighbourhood. The capital, therefore, which can be employed in the grocery trade cannot exceed what is sufficient to purchase that quantity.  If this capital is divided between two different grocers, their competition will tend to make both of them sell cheaper, than if it were in the hands of one only; and if it were divided among twenty, their competition would be just so much the greater, and the chance of their combining together, in order to raise the price, just so much the less. . . .  It can never hurt either the consumer, or the producer; on the contrary, it must tend to make the retailers both sell cheaper and buy dearer, than if the whole trade was monopolized by one or two persons."

Adam Smith, *The Wealth of Nations*, Book II, Chapter V,
University of Chicago Press, ed. Edwin Cannan

**INTRODUCTION**

1.      This is a private antitrust action brought under the authority of Section 16 of the Clayton Antitrust Act (15 U.S.C. § 26) charging violations of Section 7 of the Clayton Antitrust Act (15 U.S.C. § 18) seeking a permanent injunction to prohibit Kroger Co. from acquiring Albertsons Companies, Inc. in violation of Section 7 of the Clayton Act and to void the combination and conspiracy among Cerberus Capital Management, L.P. and the consortium of major stockholders of Albertsons and Kroger to shut down Albertsons, and for prohibition and disgorgement of any unlawful payments coerced from Albertsons.

2.      In the absence of the merger, Albertsons would not have paid the $4 billion special dividend to certain special interests and would instead have retained the $4 billion and would have been able to use the money to increase production, lower prices, hire personnel, and enhance the quality of products and services through innovations.  The "threatened loss or damage" to the Plaintiffs and to the public at-large is the potential elimination of Kroger's competitor, Albertsons, and the threat that prices may be raised, production may be limited, services may be curtailed, quality may be lessened, and innovations may not be pursued.

3.      The proposed acquisition price is not trivial: $24.6 billion in cash. There has been a substantial trend of acquisitions in the industry, particularly by Kroger and Albertsons, which have acquired substantial numbers of independent, small, medium and large grocery stores and chains, culminating in the final merger between the largest grocery store chain and the second largest grocery store chain in the United States amounting to an entity that is three times larger than its next closest competitor by revenue and market share.

4.      The proposed merger of Albertsons and Kroger grocery stores is the largest in the US grocery industry in history.  Kroger's acquisition of Albertsons eliminates a significant competitor and rival.

5.      Together, Kroger and Albertsons would form a national company with 4,996 stores, 66 distribution centers, 52 manufacturing plants, 2,015 fuel centers and more than 710,000 associates across 48 states and the District of Columbia. The merged entity also would be the fifth-largest retail pharmacy operator by locations, with 3,972 pharmacies. Currently, over two-thirds of grocery sales in the U.S. go to five corporations.  A merger between Kroger and Albertsons would reduce that number to four.  This market power is hidden in the marketplace because the large corporations hide behind subsidiary "banners".  If you shop at a Ralph's, Food 4 Less, or Smith's Food and Drug, the profits funnel directly into the same company — Kroger.

6.      As part of this Kroger-Albertsons mega-merger transaction, the companies seek to financially cripple Albertsons and to weaken its competitive position relative to Kroger by agreeing that Albertsons shall pay its shareholders a special cash dividend of $6.85 per share, totaling approximately $4 billion—an amount roughly equivalent to all of its liquid assets (including net receivables) and approximately one-third of its market capitalization—to its

shareholders, thereby eliminating Albertsons' cash-on-hand and nearly doubling its debt (the "Special Dividend").

7.      To further the violation and in furtherance of it, and as an incentive to secure the cooperation of Albertsons with the acquisition, Kroger has agreed to pay Albertsons $318,000,000 if the merger is not consummated.

8.      Kroger's plan to acquire rival Albertsons will combine the largest and second-largest supermarket companies in the country by sales, thereby tending to create a monopoly. The current trend toward concentration, the lessening of competition and the tendency to create a monopoly in the grocery industry is unmatched and unparalleled.

9.      The proposed acquisition is a violation of Section 7 of the Clayton Antitrust Act (15 U.S.C. § 18) because the direct effect of the elimination of Albertsons may be "substantially to lessen competition or tend to create a monopoly" in the grocery industry by the elimination of a significant competitor in a non-trivial transaction.[1]

10.     Kroger is the largest supermarket operator by revenue, and Albertsons is the second-largest supermarket chain in America after Kroger.  The combination of these two giants will create a supermarket behemoth with a combined market share and control of 36% of the U.S. grocery supermarket operators with a combined annual sales of more than $200 billion. (See Charts Following.)

---

[1] Section 7 of the Clayton Antitrust Act provides in pertinent part as follows: "No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital … where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or tend to create a monopoly." (Emphasis added.)

*First Amended Complaint for Violation of Section 7 of the Clayton Act*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



*First Amended Complaint for Violation of Section 7 of the Clayton Act*



Rankings of Top U.S. Grocery Supermarket Operators
Annual Sales (Pre-Acquisition - 2021)

Source: www.foodindustry.com/articles/top-10-grocers-in-the-united-states-2019

### Rankings of Top U.S. Grocery Supermarket Operators
Annual Sales (Post-Acquisition)



Source: www.foodindustry.com/articles/top-10-grocers-in-the-united-states-2019

11.     The proposed acquisition is prohibited by the binding authority of the Supreme

Court of the United States as enunciated in its decisions in *Brown Shoe Co. v. United States*,

370 U.S. 294 (1962), *United States v. Philadelphia National Bank*, 374 U.S. 321 (1963),

*United States v. Aluminum Company of America*, 377 U.S. 271 (1964), *United States v. Von's

Grocery Co.*, 384 U.S. 270 (1966), *United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966),

and *United States v. Falstaff Brewing Corporation*, 410 U.S. 526 (1973).

12.     This private action is specifically authorized under Section 16 of the Clayton Antitrust Act (15 U.S.C. § 26) which provides that "any person [including members of the public]…shall be entitled to sue and have injunctive relief …against threatened loss or damage by a violation of the antitrust laws."

13.     The remedy afforded to private plaintiffs includes the prohibition of the potential unlawful acquisition at its incipiency.  As was unequivocally stated by the United States Supreme Court in *California v. American Stores Company*, 495 U.S. 271, 283 (1990), "[T]he literal text of Section 16 is plainly sufficient to authorize injunctive relief [in favor of a private Plaintiff], including an order of divestiture, that will prohibit that conduct from causing that harm."

14.     The merger is ripe to be enjoined under the authority of the Supreme Court which has stated that mergers must be enjoined at their incipiency.

15.     Private actions to vigorously challenge anticompetitive acquisitions have been encouraged by the Congress and the Supreme Court of the United States in strong and unmistakable language: "The Act's other provisions manifest a clear intent to encourage vigorous private litigation against anticompetitive mergers." *California v. American Stores Company*, 495 U.S. 271, 284 (1990).

16.     Plaintiffs therefore bring this action under the authority of Section 16 of the Clayton Antitrust Act (15 U.S.C. § 26) and allege that the pending elimination of Albertsons by Kroger constitutes a substantial threat of injury to these Plaintiffs because this acquisition may have the effect "substantially to lessen competition" and "tend to create a monopoly" in a "line of commerce" in a "section of the country" in violation of Section 7 of the Clayton Antitrust Act (15 U.S.C. § 18).  In addition, the contract to eliminate Albertsons constitutes a

non-trivial transaction between significant rivals, neither of which is a failing company, that eliminates a substantial and growing competitor from the market.

17.     Both Kroger and Albertsons have demonstrated their willingness and intention to expand into markets throughout the United States.  As a result, Kroger and Albertsons directly compete in many sections of the country.  In addition to the actual competition in sections of the country where Kroger and Albertsons are direct competitors, the agreement also eliminates the potential competition of Kroger expanding into markets where Albertsons is, and Albertsons expanding into markets where Kroger is.  For example, as part of the agreement, Kroger would purchase the Albertsons stores in the Northeastern United States rather than expanding and entering that market on its own in competition to the Albertsons that are already there.  By acquiring the Albertsons stores in the northeast United States, the potential competition of Kroger expanding and entering the market on its own in competition to the Albertsons stores is eliminated and Albertsons entering markets where Kroger exists would also be eliminated.

18.     The proposed acquisition substantially affects the interstate and foreign commerce of the United States in that supermarket supplies, food and other consumer items and all the other necessities of the grocery supermarket industry are in the constant flow of the interstate and foreign commerce of the United States.  Because Defendants transact business in this judicial district, venue is proper in this Court pursuant to 15 U.S.C. §§15, 22 and 26, and 28 U.S.C. § 1391.

19.     Plaintiffs seek an Order from this Court prohibiting the proposed acquisition by Kroger of Albertsons that would eliminate Albertsons as a significant actual and potential competitor.

20.     Plaintiffs also seek an order prohibiting and/or disgorging the Special Dividend payment that gravely weakens Albertsons' ability to compete and that has significant ramifications for consumers and workers as an act in furtherance of the Defendants' violation of Section 7 of the Clayton Act.

21.     The relevant product market is the retail sale of food and other grocery products in supermarkets.  The relevant geographic market is the entire United States for grocery stores, and smaller local and regional geographic markets within individual states.

22.     The grocery supermarket industry is a critical and vital modern necessity to the commercial, social and political well-being of the United States. Competition rather than combination has been and should be enforced in the United States so that these Plaintiffs, and the public at large, may enjoy the benefits of competition, including, *inter alia*, the best possible services at the lowest possible prices.  Vigorous enforcement of the antitrust laws by private persons is an essential part of the Congressional plan to ensure that competition rather than monopoly is, and remains, the rule of trade in the United States, especially in the grocery supermarket industry.

23.     From 1993 to 2019, the number of grocery stores nationwide declined by roughly 30 percent.  Food industry mergers and acquisitions exceeded 300 in 2019 alone.  The U.S. grocery supermarket industry is moving toward complete concentration and monopoly, a fact that is dramatically illustrated by Defendant Kroger's past mergers and acquisitions (see Chart Following) and that is further demonstrated in this Albertsons acquisition.



The Economic Cost of Food Monopolies: The Grocery Cartels

**FIG. 2:** How Kroger[b] became the largest U.S. supermarket chain

b  Kroger is the second largest retailer of groceries (behind Walmart Supercenters and Sam's Clubs) and the largest supermarket chain.

[2]

24.    Similar to Kroger, Albertsons has purchased major grocery store chains, including:

Albertsons

Safeway

Vons

Jewel-Osco

Shaw's

Acme

Tom Thumb

Randall's

---

[2]  Source:  Foodandwaterwatch.org *The Economic Cost of Food Monopolies:  The Grocery Cartels. Nov 2021.*

United Supermarkets

Pavilions

Star Market

Haggen

Carrs

Kings Food Markets

Balducci's Food Lovers Market

25.     This trend toward concentration was unanimously condemned by Chief Justice Warren in the Supreme Court opinion in *Brown Shoe Co. v. United States, supra,* which made it clear that the Court should and would take steps to curtail incipient mergers whose effect will be to eliminate competition in an industry and that it is ripe at the point of agreement:  "We cannot avoid the mandate of Congress that tendencies toward concentration in industry are to be curbed in their incipiency, particularly when those tendencies are being accelerated through giant steps striding across a hundred cities at a time.  In the light of the trends in this industry we agree with the Government and the court below that this is an appropriate place at which to call a halt." *Id*. at 346.

26.     If Kroger's proposed acquisition of Albertsons is consummated, the companies' combined power will be used to increase prices for groceries, decrease the quality of food, eliminate jobs, close stores and offer less choice for consumers due to the overlap in geographic areas.

27.     In an attempt to justify the merger and thereby obtain the consent from the Federal Trade Commission,  Kroger announced a deal on September 8, 2023, to divest and sell stores to C&S Wholesale Grocery, LLC for $1.9 billion. The stores are located in 18 states.

28.     As of the date of the filing of this Amended Complaint, despite requests by Plaintiffs, Defendants have refused to identify the specific stores and locations that will be divested to C&S.

29.     Post-merger agreements evidence, however, is not relevant to this case and has been considered of little weight because it is often engineered for litigation purposes:

> "We agree with the Commission that it was not required to take account of a post-acquisition transaction that may have been made to improve Hospital Corporation's litigating position. . . Post-acquisition evidence that is subject to manipulation by the party seeking to use it is entitled to little or no weight. [Citation Omitted.] The Commission was entitled to give it no weight in this case . . . "[3]

30.     In addition, the sale of Kroger and Albertson stores is suspect because (1) it was not bid out; (2) it is contingent on the merger being approved and, if disapproved, the sale to C&S will be annulled and; (3) the proposed purchase is itself a violation of Section 7 because it MAY lessen the actual competition of C&S which would otherwise expand its stores against Kroger and Albertsons in those and other markets. The Defendants are buying and selling markets instead of competing for them.

31.     In addition, this attempted "divestiture" is not even a viable sale.  Past supermarket divestitures have struggled within months of being separated and have ultimately failed.  A good example is the Albertsons acquisition of Safeway in 2015 in which the Safeway stores divested for the purpose of passing muster with the FTC eventually struggled and many have failed.  When the Safeway stores were spun off by Albertsons in its acquisition of Safeway, the entity that purchased the spun off stores was unable to meaningfully compete and soon declared bankruptcy.

---

[3] *Hospital Corporation of America v. FTC*, 807 F.2d 1381, 1384 (7th Cir. 1986).

*First Amended Complaint for Violation of Section 7 of the Clayton Act*

32.     Unless this merger of the first and second largest national competitors in retail sales last year among the U.S. food and grocery supermarket operators is prohibited, the unified company will become the largest supermarket by revenue in the United States with a current national market share of 36%.  Albertsons, with a national market share of 12.4%, will be eliminated.

33.     Market concentrations with much lower numbers have in the past been held by the Supreme Court to constitute a violation of Section 7 of the Clayton Act.  *See United States v. Aluminum Company of America*, 377 U.S. 271 (1964) (elimination of Rome Cable with only 1.3% share of national market), and *United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966) (nos. 10 and 18 in the national market becoming no. 5 with 4.9%). (See Chart Following.)

## Key Section 7 Cases
Market Share and Rankings, Pre-Merger vs. Post-Merger

| Acquiring Company Market Share | Acquired Compan(ies) Market Share | Merged Entity Market Share | Result |
|---|---|---|---|
| **VONS**<br>• 4.7% share<br>• #3 in market | **Shopping Bag**<br>• 4.2% share<br>• #6 in market | • 7.5% share<br>• #2 in market | ENJOINED |
| **ALCOA**<br>• 27.8% share<br>• #1 in market | **ROME CABLE**<br>• 1.3% share<br>• #9 in market | • 29.1% share | ENJOINED |
| • 5.48% share tri-state<br>• #10 nationwide<br>• #4 statewide (WI)<br>• #7 tri-state (WI, Ill, Mich) | • 5.84% share tri-state<br>• #18 nationwide<br>• #1 statewide (WI)<br>• #6 tri-state (WI, Ill, Mich) | • 11.32% share tri-state<br>• #5 nationwide<br>• #1 statewide (WI)<br>• 4.49% share nationwide<br>• 23.95% share statewide | ENJOINED |
| • 6% manufacturing share<br>• #3 in manufacturing | **Kinney shoes**<br>• .05% manufacturing share<br>• #12 in manufacturing<br>• 2% retail share | • 6% manufacturing share<br>• #3 in manufacturing<br>• 9.5% retail share<br>• #2 in retail market | ENJOINED |
| **PNB** THE PHILADELPHIA NATIONAL BANK<br>• #2 in market | GIRARD TRUST CORN EXCHANGE BANK<br>• #3 in market | • #1 in market<br>• 36% share (of assets) | ENJOINED |

14

34.    In two major cases involving the grocery industry, the Supreme Court

condemned the acquisitions as violations of Section 7 of the Clayton Act.  The first was

*First Amended Complaint for Violation of Section 7 of the Clayton Act*

*Von's* in a small area of the country, the Los Angeles market, in *United States v. Von's Grocery Co*, 384 U.S. 270 (1966) where the combination of nos. 3 and 6 groceries becoming no. 2 with 7.5% of the Los Angeles market was outright condemned by the Court.

35.     The second was *American Stores* in which the Court granted an order requiring the parties to operate the stores separately pending resolution of the appeal, and ultimately ordered divestiture of the stores under the merger.

36.     Ironically, both Von's and American Stores were ultimately purchased by Albertsons.

37.     This combination of Albertsons and Kroger will result in the eradication of consumer choice, and will have other anticompetitive effects that may, and most probably will, flow from the elimination of Albertsons from the market.  If, however, Kroger, instead of combining with Albertsons, were to compete for market share rather than buying its way there, it would have the wherewithal, the experience, the knowledge, and the ability to expand on its own, which would necessarily increase competition, lower prices, necessitate new jobs, increase consumer choice, invite investment, and otherwise enable the consumer to enjoy the benefits that competition always provides.

38.     The United States Supreme Court found it fundamental to free-market economies that "Internal expansion [through competition] is more likely to be the result of increased demand for the company's products and is more likely to provide increased investment in plants, more jobs and greater output. Conversely, expansion through merger is more likely to reduce available consumer choice while providing *no increase in industry capacity, jobs or output.* It was for these reasons, among others, Congress expressed its disapproval of successive acquisitions. Section 7 was enacted to prevent even small mergers

that added to concentration in an industry." *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962), at fn. 72 (emphasis added).

39.     The proposed elimination of Albertsons by Kroger poses a substantial threat to the Plaintiffs, and to the public at large, in that the proposed elimination will only serve, as the Supreme Court warned, to "reduce available consumer choice while providing no increase in industry capacity, jobs or output," and may potentially cause loss to the Plaintiffs, and the public at large, in the form of higher prices on food and other consumer goods, the elimination of consumer choice and other potential anticompetitive effects which deprive the Plaintiffs, and the public at large, of the salutary benefits of competition.

40.     The importance of the products that supermarkets sell and the services and innovations that they provide to residents means that any material reduction in a supermarket competitor's ability to compete can harm those residents in ways that are far from hypothetical. As is customary in these acquisitions, the first casualties of the removal of competition will be the firing of employees who were only needed when competition existed. Staffing will decrease, leading to worse service for consumers and worse conditions for workers. Prices will go up, and promotions will decrease, and that translates directly into the quantity and quality of food that families can put on their tables.

41.     The elimination of Albertsons is manifestly an irreparable harm since the competition from Albertsons would be irretrievably lost.

42.     Should the proposed elimination of Albertsons go unchallenged, the nation would not only lose the competition of Albertsons, but also the potential competition that Kroger would provide by further building its own national presence the old-fashioned way: by competing for customers instead of buying them. The proposed elimination of Albertsons, therefore, will not only eliminate the stout and particular competition of Albertsons, but will

also discourage continued vigorous competition from Kroger and will ultimately lessen the economic ideal espoused by Congress and the Supreme Court of more consumer choice and more availability through competition.

## THE PARTIES

<u>Plaintiffs</u>

43.     The Plaintiffs named below are individual citizens of the cities and states listed. Each Plaintiff is a consumer and customer of the Defendants, all with an express interest and intent in ensuring that Albertsons stores are preserved as a competitive option for them, now and in the future.  Plaintiffs have made purchases at the Defendants' stores within the last four years.  The actual and potential elimination of Albertsons will cause loss and harm to the Plaintiffs, and to the public at large, of the salutary benefits of the competition that Albertsons brings, as well as the opportunity to shop at Albertsons.

> Christine Whalen, New Orleans, LA;
> Gabriel Garavanian, Tyngsboro, MA;
> Katherine R. Arcell, New Orleans, LA;
> Jose' M. Brito, Reno, NV;
> Jan-Marie Brown, Carson City, NV;
> Rosemary D'Augusta, Millbrae, CA;
> Brenda K. Davis, Forney, TX;
> Pamela Faust, Loveland, Ohio;
> Carolyn Fjord, Winters, CA;
> Don Freeland, Thousand Palms, CA;
> Don Fry, Tucson, AZ;
> Harry Garavanian, Tyngsboro, MA;
> Yvonne Jocelyn Gardner, Colorado Springs, CO;
> Valarie Ann Jolly, Mabank, TX;
> Michael C. Malaney, Grandville, MI;
> Len Marazzo, Reno, NV;
> Lisa McCarthy, Naples, FL;
> Timothy Nieboer, Clarkston, MI;
> Deborah M. Pulfer, Sidney, OH;
> Bill Rubinsohn, Jenkintown, PA;
> Sondra K. Russell, Waco, TX;
> Clyde D. Stensrud, Kirkland, WA;
> Gary Talewsky, Sharon, MA;
> Pamela S. Ward, Garland, TX.

-17-
*First Amended Complaint for Violation of Section 7 of the Clayton Act*

44.     Plaintiffs are consumers of the Defendants goods. Plaintiffs D'Augusta, Fjord, Stensrud, Marazzo, Gardner, Fry, Davis and Brito shop at the Albertsons owned stores in their local geographic areas.  Plaintiffs G. Garavanian, Talewsky, Brown, Stensrud and Fjord shop at the Kroger owned stores in their local geographic areas.

<u>Defendants</u>

45.     Defendant Kroger Co. (hereinafter "Kroger") is an American retail company that operates supermarkets and multi-department stores throughout the United States. Founded in 1883 in Cincinnati, Ohio, Kroger operates 2,721 retail grocery stores under its various banners and divisions in 35 states and in the District of Columbia, with store formats that include hypermarkets, supermarkets, superstores, department stores, and jewelry stores. Kroger operates 33 food processing or manufacturing facilities, 1,618 supermarket fuel centers, 2,251 pharmacies, and 225 in-store medical clinics.  Kroger's headquarters are located in Cincinnati.

46.     Kroger is the United States' largest supermarket operator by revenue, commanding 23.6% of the market.  It ranked 17th on the 2018 Fortune 500 list of the largest United States corporations by total revenue.  Kroger has expanded by acquisition.  Kroger's family of store banners include Kroger, Ralphs, Dillons, Smith's, King Soopers, Fry's, QFC, City Market, Owen's, Jay C, Pay Less, Bakers, Gerbes, Harris Teeter, Pick N' Save, Metro Market, Mariano's, Fred Myers, Food 4 Less and Food Co. (See Charts Following).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Location of Kroger Stores Nationwide



Source: Kroger Investor Relations

## Location of Kroger Stores by State



Sources: www.thekrogerco.com/newsroom/state-facts, google.com

47.      Defendant Albertsons Companies, Inc. (hereinafter "Albertsons") is an American grocery supermarket operator founded in 1939 and headquartered in Boise, Idaho. With 2,253 stores as of the third quarter of fiscal year 2020 and 270,000 employees as of fiscal year 2019, the company is the second-largest supermarket chain in North America after Kroger, accounting for 12.4 % of the market.  Albertsons ranked 53rd on the 2018 Fortune 500 list of the largest United States corporations by total revenue.  Prior to its January 2015 merger with Safeway Inc. for $9.2 billion, it had 1,075 supermarkets located in 29 U.S. states under 12 different banners.  The Safeway acquisition was the largest grocery merger in US history at the time. It gave Albertsons a significant presence in the Western United States.

48.     Albertsons' acquisitions have helped the company to expand its reach and become the second-largest grocery retailer in the United States. The company now operates over 2,200 stores in 34 states and the District of Columbia.

49.     Albertsons' store base includes such banners as Albertsons, Safeway, Vons, Jewel-Osco, Shaw's, Acme, Tom Thumb, Randall's, United Supermarkets, Pavilions, Star Market, Haggen, Carrs, Kings Food Markets and Balducci's Food Lovers Market. (See Charts Following).

## Location of Albertsons Stores Nationwide



Source: Kroger Investor Relations

*First Amended Complaint for Violation of Section 7 of the Clayton Act*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Location of Albertsons Stores by State



Source: www.statista.com/statistics/1167508/albertsons-operating-stores-by-state-us

50.     Defendant Cerberus Capital Management, L.P. (hereinafter "Cerberus") is a co-conspirator with Defendants Kroger and Albertsons.  The firm is based in New York City and has affiliate offices in the United States, Europe and Asia.

51.     Cerberus manages an estimated $55 billion in funds and accounts. Investors include government and private sector pension and retirement funds,  educational endowments, insurance companies, and sovereign wealth funds.

52.     Cerberus is a major shareholder / investor in Defendant Albertsons.

53.     "Defendant" or "Defendants" includes, as well as those named herein, all of the named Defendants' predecessors, including each named Defendant's wholly owned or controlled subsidiaries or affiliates.

1

Co-Conspirators

2

54.     Co-conspirator C&S Wholesale Grocers LLC ("C&S") is a national

3

4

wholesale grocery supply company in the United States, based in Keene, New Hampshire. In

5

2021 it was the eighth-largest privately held company in the United States, as listed by Forbes.

6

C&S owns the Piggly Wiggly grocery brand, which is independently franchised to store

7

operators, the Grand Union supermarkets brand, as well as several private label brands,

8

including Best Yet. C&S acted in concert with Defendants in furtherance of the violation of

9

Section 7 of the Clayton Act.

10

55.     As of 2021, C&S serviced over 7,700 independent supermarkets, chain stores,

11

12

military bases and institutions with over 137,000 different products, including produce, meat,

13

dairy products, delicatessen products, fresh/frozen bakery items, health and beauty aids,

14

candy, and tobacco.

15

56.     Services range from wholesale procurement, category management, pricing,

16

17

marketing, advertising, merchandising, business and accounting, store design, and

18

engineering. C&S customers include Giant-Carlisle, Giant-Landover, Safeway

19

Inc., Southeastern Grocers, Target Corporation, and independent store/supermarket

20

owner/operators.

21

57.     Over the last 22 years, C&S has bought up or eliminated numerous small

22

23

independent grocery stores.  The acquisitions began in 2001 when C&S purchased the Grand

24

Union supermarket chain.  In 2005, C&S acquired 104 stores from BI-LO, which operated

25

stores under the BI-LO, Bruno's Supermarkets, Food World, FoodMax and Food Fair brand

26

names.  In October 2014, C&S acquired the operations of Piggly Wiggly Carolina Co.  In

27

2014, C&S acquired Associated Wholesalers (AWI) which owned the grocery chain Nell's.  In

28

2019, C&S acquired Olean Wholesale Grocery, which operated in upstate New York and Pennsylvania.

58.     Various additional persons, partnerships, firms, and corporations who are members of the consortium of private equity entities which collectively own approximately 75% of Albertsons stock, named as Does in this lawsuit, and other individuals named as Does, the identities of whom are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the illegal contracts, combinations, and conspiracies.  When the names of these co-conspirators have been identified, they will be named as defendants in this complaint.

59.     On October 13, 2022, Albertsons and Kroger (collectively, "Defendants"), who are the two largest horizontal competitors in the sale of groceries and other consumer goods nationally, entered into an "Agreement and Plan of Merger" ("Agreement").  This Agreement is the final and complete agreement between Defendants to consummate an acquisition that they had contemplated and negotiated since June of 2022.  Kroger agreed to pay $24.6 billion in cash to eliminate Albertsons.  This is not a trivial transaction.

60.     As part of their proposed merger, Kroger and Albertsons have agreed that Albertsons will provide a "special dividend" of $4 billion, which is more than one-third of Albertsons' total market capitalization of approximately $11 billion.  Nearly one-third of this payment will go to Albertsons' largest shareholder, the private equity firm Cerberus Capital Management, L.P., and the funds for the dividend will be sourced from $2.5 billion of Albertsons' cash and $1.5 billion in new debt, leading Albertsons' cash and cash receivables of approximately $4 billion to drop to $1.5 billion, and causing its net debt to increase from $4.54 billion to $8.54 billion.

61.     The payment of this Special Dividend will leave Albertsons undercapitalized and will impede Albertsons' ability to compete with other supermarkets, including Kroger, leaving shoppers to face higher prices, worse services, less innovation, and even closure of Albertsons supermarkets.  Replacing cash with debt will inevitably harm Albertsons' credit rating, making borrowing more expensive.  A financially crippled Albertsons will have dire consequences for consumers, who depend upon supermarkets near their homes, for such essentials as fresh meat and produce, among other groceries.  If Albertsons is strapped for cash, it will be less able to offer promotions on groceries, less able to offer quality services, and less able to maintain staffing and competitive wages and benefits for workers.

62.     According to data compiled by Statista, Kroger ranked first in U.S. food and grocery supermarket retail sales last year with $138 billion in sales for 2021.  Albertsons was second overall with $72 billion in sales last year.

63.     Collectively, Albertsons and Kroger operate nearly 5,000 stores, employ more than 710,000 associates, run 66 distribution centers,  52 manufacturing plants, nearly 4,000 pharmacies and more than 2,000 fuel centers across 48 states and the District of Columbia. The companies' combined market share of 36% of U.S. grocery supermarket sales will have a combined annual sales of more than $200 billion.

64.     Supermarkets are already a consolidated industry in the United States. Albertsons and Kroger are two of its largest players and have been historically fierce competitors in numerous States.  Defendants claim that their transaction will unite "complementary" companies, but even their own map of store locations makes clear the extent of their competitive overlap in properly defined relevant antitrust markets. (See Charts Following.)

## Location of Kroger and Albertsons Stores Nationwide



Source: Kroger Investor Relations

*First Amended Complaint for Violation of Section 7 of the Clayton Act*

## Location of Kroger and Albertsons Stores by State



Sources: www.thekrogerco.com/newsroom/state-facts, google.com, www.statista.com/statistics/1167508/albertsons-operating-stores-by-state-us

65.    Defendants currently operate competing banners with strong presences across the United States.  In some markets, Kroger-and-Albertsons-owned supermarkets compete head-to-head for shoppers' dollars.  For example, in California, Kroger owns and operates approximately 214 stores under the Ralphs banner and an additional 19 under Food 4 Less. A majority of these stores are located in Southern California.  The Albertsons Company operates approximately 579 grocery stores in California: 125 stores under the Albertsons banner, along with 26 Pavilion, 243 Safeway, and 185 Vons stores.  In Chicago, Kroger runs the Mariano's chain and Albertsons operates the competing Jewel-Osco stores.  In Seattle, Albertsons owns Albertsons and Safeway while Kroger runs Fred Meyer and QFC.

66.     The proposed elimination of competition between these two Defendants will create the country's largest grocery supermarket operator by revenue with 36% of the national market and will effectively eliminate a significant rival from the national and local markets and will operate to raise prices on groceries and other consumer goods where Kroger and Albertsons once used to compete in a plethora of overlapping markets.  Economic research also supports the proposition that increased food retailer concentration increases prices.

RELEVANT MARKETS

Relevant Product Market

67.     The relevant product market is the retail sale of food and other grocery products in supermarkets.  Retail supermarket services is a line of commerce or product market under Section 7 of the Clayton Act, 15 U.S.C. § 18.

68.     A "Supermarket" is any self-service full-line retail grocery store offering customers substantially all of their weekly food and grocery shopping requirements in a single shopping visit.  Supermarkets are larger and have a wider selection of good than earlier grocery stores, but are smaller and more limited in the range of merchandise offered for sale than a hypermarket or big-box market.

69.     Supermarkets offer a wide variety of food, beverages and household products, organized into sections. Supermarkets typically have at least 10,000 square feet of selling space devoted to providing offerings across many product categories, including but not limited to the following: fresh and prepared meats and poultry; fresh fruits and vegetables; refrigerated food and beverage products; frozen food and beverage products; bread and baked goods; dairy products; shelf-stable food and beverage products, including canned, jarred,

bottled, boxed, and other types of packaged products; other grocery products, including nonfood items such as soaps, detergents, paper goods, other household products, and health and beauty aids; and pharmaceutical products and pharmacy services (where provided).

70.     Supermarkets provide distinct products and services and offer consumers convenient one-stop shopping for food and grocery products, typically carrying more than 10,000 different items, referred to as stock-keeping units (SKUs).

71.     Supermarkets compete with other supermarkets that provide one-stop shopping opportunities for food and grocery products and base their prices on the prices of food and grocery products sold at nearby competing supermarkets.

72.     Retail stores other than supermarkets, such as convenience stores, specialty food stores, limited assortment stores, hard-discounters, and club stores, may also sell food and grocery products, but these retail stores do not offer a supermarket's distinct set of products and services that provide consumers with the convenience of one-stop shopping for food and grocery products.  Consumers shopping for food and grocery products at supermarkets are not likely to shop at other types of stores in response to a small but significant price increase by supermarkets.

## Relevant Geographic Markets

73.     The entire United States is a relevant geographic market for purposes of this action because supermarket chains, and these defendants, compete among themselves for groceries, goods and other supplies from national suppliers on a national basis.  Supermarket chains compete for suppliers on a national basis.

74.     Although the relevant geographic market is the United States, smaller local relevant geographic markets exist within individual states.  Supermarket chains compete for customers in local areas where their consumer customers are concentrated.

75.     Supermarkets offer consumers convenience.  Supermarkets compete locally for customers as consumers typically do their grocery shopping at stores located close to where they live or work.  Consumers are further limited by the distance they will travel to shop at a supermarket.

76.     In some areas, many residents lack cars and must travel to grocery stores by walking or public transit, which prevents them from traveling outside the community areas in which they work or live to shop at alternative grocery stores.  As a result, the majority of consumers' grocery shopping occurs at stores located very close to where they live or work.

77.     Relevant geographic submarkets may include areas limited to properly defined neighborhoods or city submarkets, and additional urban, suburban, exurban or rural markets throughout the Unitec States.

78.     Food is one of humanity's few true necessities, making competition in the grocery industry unique.  Supermarkets give local residents access to vital grocery products, often competing against each other to provide the best value and service and offering good jobs to workers.

79.     For many neighborhoods and consumers, accessibility of supermarkets by foot or by public transit is critical for the communities' health as a whole.  Yet, access to adequate high-quality food and grocery stores is already an issue for some jurisdictions, creating the problem of "food deserts"—areas located more than a half mile from a grocery store or

supermarket with low rates of car access and high poverty rates, which merit policymakers'

special attention because of the dire welfare implications for people living in them.

ANTICOMPETITIVE EFFECTS OF THE MERGER

80.     The proposed acquisition by Kroger of Albertsons will eliminate Albertsons as

a substantial competitor in the national and local relevant markets, and will reduce the

intensity of price competition market wide.  Although Kroger has stated it will pass

consolidation savings on to customers, economic studies have shown that post-merger prices

do not decrease but rather increase between 3 and 7 percent.

81.     Because of the essential and constant need for food, even a short-term

reduction in competition in the urban neighborhoods, especially those where Kroger and

Albertsons compete, can result in higher prices and reductions in quality that can significantly

harm consumers' pocketbooks and health.

82.     As a result of this reduced competition, consumers likely will pay more for

their groceries, and enjoy fewer promotions, worse service, and fewer quality-improving

investments and innovation than they would otherwise.

83.     The companies have contended that their newly combined power would not be

used to raise prices. Yet Kroger's CFO, Gary Millerchip, told shareholders in October:

"We've been very comfortable with our ability to pass on the increases we've seen at this

point. And we would expect that to continue to be the case."

84.     Food is among the goods that have seen the highest, most sustained price hikes

over the past year.  An average grocery trip costs 13% more than it did a year ago, with the

highest jumps impacting supermarket staples (milk and bread are up 15%, chicken is up 17%,

and eggs 31%).  Kroger CEO Rodney McMullen has argued that "a little bit of inflation is

always good in our business" because "customers don't overly react to that."  At the same

time, his counterpart at Albertsons, Vivek Sankaran, has said, "Businesses like ours have done well when in periods where the inflation was 3% to 4%." Last year, he offered this market prediction: "My sense is this inflation will just be passed through" to customers.

85.     This acquisition will also affect the stores' employees as well as consumer prices.  Local residents depend on employment by these companies.  The reduced need for employees and suppressed wages from reduced competition for labor by these employers following a merger will also constitute a significant competitive harm.  Workers will experience lower wage growth and worse working conditions than they would otherwise. Albertsons' current contribution to the prevailing competitive dynamic among supermarkets is, as shown by its market presence and the jobs it provides, critical.

86.     If Albertsons is eliminated, Kroger will operate in a highly concentrated market.  As a consequence, the potential for effective collusion among the remaining grocery supermarket chains may substantially increase while food quality and consumer choices may be cut, and prices may rise.

87.     If Albertsons is eliminated, Kroger's actual and potential competition with Albertsons itself is also eliminated and the benefits of that competition are extinguished.

88.     Ultimately, Kroger's proposed elimination of its rival competitor Albertsons may, and probably will, result in significant and irreparable harm and inconvenience to consumers, including the Plaintiffs, by propelling grocery prices higher, reducing consumer choices due to overlap in geographic areas and decreasing food quality.

89.     Moreover, the payment of the Special Dividend has no competitive benefit to Albertsons as a company, let alone to consumers and workers, that may be weighed against the Special Dividend's anti-competitive effect on Albertsons' cash flow and its ability to vigorously compete.  The dividend strips Albertsons of nearly all its cash-on-hand during an

economic downturn when it will be difficult for the company to obtain additional capital. Without cash, Albertsons cannot advertise, promote, increase services, refurbish, or reorganize stores to make them more attractive to consumers. As a substitute for credit, it would have to rely on higher prices to raise cash for reinvestment, thereby harming consumers. It may have to close stores, leaving customers with fewer choices and, as a result, higher prices, inferior selection and quality, or both.

90. The decrease in the number of major grocery retailers over the past several years reflects a persistent and deliberate pattern of concentration and reduction of competition in the U.S. grocery supermarket industry, a trend which the Supreme Court has said must be arrested in its incipiency.

91. The elimination of Albertsons by Kroger will result in the elimination of a vibrant competitor and the creation of the largest grocery supermarket giant by revenue in the United States with 36% of all U.S. sales in an already highly concentrated market. The resulting concentration of market share is unacceptably high and will ineluctably lead to collusion.

92. Market concentration is one indicia of the level of competition in a market. The more concentrated a market, and the more a transaction may increase concentration in a particular market, the more likely it is that a transaction may result in a meaningful lessening in competition.

93. Kroger and Albertsons currently have extensive overlapping markets. If Albertsons is eliminated, this acquisition may likely eliminate the actual and potential competition between Kroger and Albertsons in these markets, significantly harming consumers in the process. In addition, the loss of Albertsons' competition in these markets may increase the likelihood that the remaining grocery retailers will coordinate with one

another to raise prices, reduce output and diminish the quality of their products, thereby lessening competition in these overlapping markets.

MARKET CONCENTRATION

The Relevant Markets Are Highly Concentrated and the Proposed Elimination of Albertsons Will Result in Presumptively Unlawful Market Concentrations

94.     The decrease in the number of major supermarkets over the past several years reflects a persistent and deliberate pattern of concentration and reduction of competition in the U.S. grocery industry, a trend which the Supreme Court has said must be arrested in its incipiency.

95.     The elimination of Albertsons by Kroger will result in the creation of the largest supermarket chain in the United States with over 36% of the total revenue in the national grocery market in an already highly concentrated market where the biggest supermarket share is already 24% by revenue.  Such a nearly 66% concentration of market share in five firms is unacceptably high, ineluctably leading to collusion.

96.     Market concentration is an indication of the level of. The more concentrated a market, and the more a transaction may increase concentration in a particular market, the more likely it is that a transaction may result in a meaningful lessening in competition. The Herfindahl-Hirschman Index (HHI), is often widely employed in competition analysis to measure market concentration. HHI is calculated by summing the squared market shares of all firms in the given market which "gives proportionately greater weight to the larger market shares."[4]

97.     Analysis of market concentration "consider[s] both the post-merger level of the HHI and the increase in the HHI resulting from the merger."

---

[4] *St. Alphonsus Medical Center vs. St. Luke's Health System Ltd.,* 778 F.3d 775, at 786 (2015).

98.     Markets in which the HHI exceeds 2,500 points are considered highly concentrated. Post-merger increases in HHI of more than 200 points are presumed to likely enhance market power and to be anticompetitive therefore a merger that increases the HHI by more than 200 points will "establish the [Plaintiffs'] prima facie case that a merger is anticompetitive."

99.     The national supermarket grocery provider market is already concentrated. After the merger of Kroger and Albertsons, the HHI of the national supermarket grocery provider market would increase by over 585 HHI points.

100.    A Kroger-Albertsons merger therefore will result in an increase in concentration levels that far exceed the upper redline threshold for anticompetitive national market dominance and therefore is presumptively illegal.

101.    In four of the local geographic markets in which Albertsons and Kroger currently compete head-to-head and in which Plaintiffs purchase groceries from either Albertsons or Kroger or both, the post-acquisition HHI would exceed 2,500 points and the acquisition would increase the HHI by more than 200 points making them presumptively illegal.

102.    Defendants have supermarkets that compete in several geographic markets where Plaintiffs shop, including  Reno, NV; Tucson, AZ;  Seattle, WA; and Colorado Springs, CO.  The elimination of Albertsons in these local market areas may result in higher prices, less availability of products, and a clear elimination of consumer choice, as well as substantial increases in concentration.

103.    If Albertsons is eliminated, market concentration in at least these four local markets, as well as others, will exceed the thresholds specified in the U.S. Horizontal Merger Guidelines of the U.S. Department of Justice, will be presumptively illegal, and may, and most

*First Amended Complaint for Violation of Section 7 of the Clayton Act*

probably will, lead to adverse competitive effects, including increases in prices, reductions in service and loss of choice.

104.   Before the elimination of Albertsons, the HHI index for the Reno, NV, local market area - defined by the United States Census Bureau as the Reno-Sparks Metropolitan Statistical Area (MSA) - was considered already highly concentrated under the Department of Justice's Horizontal Merger Guidelines.  After Albertsons is eliminated, the HHI will increase by more than 700 points, which is "presumed likely to enhance market power."  Plaintiffs Marazzo and Brito have shopped at the Albertsons owned Safeway store in this local geographic area which will be eliminated.

105.   Before the elimination of Albertsons, the HHI of the Tucson, AZ Tucson-Nogales Metropolitan Statistical Area (MSA) - as defined by the United States Office of Management and Budget (OMB) including the city of Tucson, Arizona, and the surrounding areas in Pima and Santa Cruz counties -  the market was considered already highly concentrated under the Department of Justice's Horizontal Merger Guidelines.  After Albertsons is eliminated, the HHI will increase by more than 1250 points, which is a number "presumed likely to enhance market power."  Plaintiff Fry has shopped at the Kroger and Albertsons owned stores in this local geographic area.

106.   Before the elimination of Albertsons, the HHI of the Colorado Springs, CO, local market is considered already moderately concentrated under the Department of Justice's Horizontal Merger Guidelines.  After Albertsons is eliminated, the HHI will increase by well over 200 points, which is "presumed likely to enhance market power."  Plaintiff Gardner has shopped at the Albertsons owned Safeway stores in this local geographic area.

107.     In the Seattle, WA market, after the merger, the HHI index will increase by well over the 200 points which is "presumed likely to enhance market power."  Plaintiff Stensrud has shopped at the Albertsons owned stores in this local geographic area.

<u>STANDING</u>

108.     Plaintiffs have standing to bring this action under Section 7 of the Clayton Act.

109.     For standing in a Section 7 case  a plaintiff need only show that the effect of the merger "may be substantially to lessen competition … in any line of commerce … *in any section of the country*." [5]

110.     By prohibiting mergers that may substantially lessen competition, Congress "indicate[d] that its concern was with probabilities, not certainties," and courts are to find violations where "the probable future effect of the merger" is to lessen competition[6]  and Section 16 of the Clayton Act authorizes private plaintiffs to obtain injunctive relief for any "threatened loss or damage" resulting from a violation of the antitrust laws[7] "even though the plaintiff has not yet suffered actual injury."[8]  A private plaintiff "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws."[9]

111.     The threatened injury to Plaintiffs and all grocery store consumers throughout the United States in this case is that prices will increase to Plaintiffs and consumers if this merger is consummated.  Studies have shown that prices after mergers normally increase by 12-13% and the quality of services is diminished. This is the very "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts

---

[5] 15 U.S.C. § 18.
[6] *Brown Shoe, supra* at 370 U.S. at 323.
[7] 15 U.S.C. § 26.
[8] *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100 (1969), at 130.
[9] *Id.*

unlawful"[10]  since "'antitrust injury' … means injury from higher prices or lower output, the

principal vices proscribed by the antitrust laws."[11]

112.    In addition, Plaintiffs in this case seek to serve "the high purpose of enforcing

the antitrust laws"[12]  since Section 16 was intended to "encourage vigorous private litigation

against anticompetitive mergers;" "was an integral part of the congressional plan for

protecting competition;" and "fits well in a statutory scheme that … subjects mergers to

searching scrutiny".[13]

113.    The effect on Plaintiffs is in this case probable, not speculative:

Might competition be substantially lessened for Plaintiffs and other consumers? Since

Plaintiffs are direct consumers of Defendants' supermarket services and Plaintiffs purchase the

goods sold by Defendants at their supermarkets Plaintiffs allege that competition might

substantially be lessened for these Plaintiffs and other consumers in the local markets served

by the Defendants.  The potential injury to Plaintiffs in this case, the lessening of competition,

is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action;

and redressable by a favorable ruling.'"[14]  The injury is imminent and "there is a 'substantial

risk' that the harm will occur"[15] if the merger is permitted to go forward since this merger will

eliminate a viable competitor from the marketplace where Plaintiffs are consumers of the

Defendants goods. Plaintiffs D'Augusta, Fjord, Stensrud, Marazzo, Gardner, Fry, Davis and

Brito shop at the Albertsons owned stores in their local geographic areas.  Plaintiffs G.

Garavanian, Talewsky, Brown, Stensrud and Fjord shop at the Kroger owned stores in their

local geographic areas.

---

[10] *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977).
[11] *Ball Memorial Hosp., Inc. v. Mut. Hosp. Ins., Inc.,* 784 F.2d 1325, 1334 (7th Cir. 1986).
[12] *Zenith, supra at* 395 U.S. at 130.
[13] *California v. American Stores,* 495 U.S 271 (1990), at 284-85
[14] *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 409 (2013)
[15] *Susan B. Anthony List v. Driehaus,* 573 U.S. 149, 158 (2014) quoting *Clapper, supra at* 568 U.S. at 415 n.5.

114.    The relevant product market in this case is the retail sale of food and other grocery products in supermarkets. Plaintiffs buy food and other products from Defendants stores. As a result, Plaintiffs participate directly in the market for retail sales in supermarkets. Defendants seek to attract the business of Plaintiffs for their supermarket sales.

115.    Defendants make their money from the sales they make to Plaintiffs and other consumers of grocery products. Defendants' dominance in the grocery sales market gives them the power to control the price goods that they will charge to Plaintiffs and other consumers  The revenue Defendants generate comes from the sale of groceries and other products to Plaintiffs and other consumers.

116.    Prices to Plaintiffs and consumers will rise and the quality of services will decrease if competition for grocery sales is eliminated by this merger.  This fact is borne out by both the authorities and experience:

117.    For example, the US Department of Justice's (DOJ) Antitrust Division states that "mergers can lead to higher prices and reduced innovation." The DOJ also notes that "mergers that eliminate significant competition are more likely to harm consumers."

118.    The Federal Trade Commission (FTC) also has a number of concerns about mergers, including the potential for higher prices. The FTC states that "mergers can reduce competition and lead to higher prices, less innovation, and lower quality goods and services."

119.    In addition to the DOJ and FTC, the European Commission has stated that "mergers can lead to higher prices for consumers, less innovation, and lower quality goods and services."

120.    There is a significant body of economic research that supports the view that mergers can lead to higher prices. For example, a study by the American Economic

Association found that "mergers between two firms in the same industry lead to an average price increase of 4%."

121.    Overall, there is a strong consensus among authorities and economists that mergers can lead to higher prices. This is because mergers reduce the number of competitors in a market, which gives firms more market power and allows them to raise prices.

122.    In addition, there are specific examples of mergers that have led to higher prices:

    a.    The merger of Anheuser-Busch and InBev in 2008 led to higher beer prices in the United States.

    b.    The merger of Dow Chemical and DuPont in 2017 led to higher prices for pesticides and other agricultural chemicals.

    c.    The merger of AT&T and Time Warner in 2018 led to higher prices for cable TV and broadband services.

123.    The Plaintiffs' threatened injury is therefore both particularized and concrete and imminent. Plaintiffs have been threatened with injury by reason of the proposed merger which would eliminate the competition of a viable competitor in the market, and which may result in higher prices, less quality of goods and services and  less variety and innovation in the grocery market.

IRREPARABLE INJURY

124.    The lessening of competition is irreparable harm as Justice O'Connor stated explicitly and unequivocally that the  ". . . lessening of competition 'is precisely the kind of

irreparable injury that injunctive relief under Section 16 of the Clayton Act was intended to prevent'". *California v. American Stores,* Justice O'Connor, 492 U.S. 1301, 1304 (1989).[16]

125.    In addition, Kroger's elimination of Albertsons will be virtually certain to cause substantial irreparable injury to Plaintiffs and to all consumers for grocery and other retail products in the relevant geographic and product markets in that, among other reasons, Albertsons, and the consumer choices that go with it, will be gone, and once gone, cannot be reconstituted.

126.    Plaintiffs and customers are threatened with the loss of (1) the distinctive services offered by Albertsons; (2) a reduction in customer choice; and (3) a reduction and curtailment of competition, and the loss of a vibrant, vigorous and innovative competitor, thereby creating higher prices and potential inconvenience to consumers. The elimination of Albertsons will certainly reduce the number of competing supermarkets servicing the areas where Albertsons and Kroger formerly competed and in so doing, substantially threatens to harm plaintiffs and customers through increases in the price of groceries, potentially translating to billions of dollars of harm to consumers annually, and further threatens to deprive customers of the unique style, affordability, service and experience offered by Albertsons' grocery stores.

127.    If Albertsons is eliminated, Plaintiffs and consumers will sustain irreparable harm for which damages will be inadequate to compensate Plaintiffs in that the competition from a rival competitor will be extirpated and customer choice for grocery options eradicated. The imagination and initiative of Albertsons will be snuffed-out; expansion plans will be jettisoned; customer convenience and satisfaction will be disregarded.  Albertsons services once lost cannot be restored.

---

[16] The *American Stores* case included the acquisitions of the Lucky Store and Alfa Beta chains.

128.    In addition, Kroger's acquisition (1) threatens to derail any proposed expansion into other market by Albertsons, with a concomitant loss of jobs there that would have otherwise been created; (2) threatens to derail any planned expansion of stores by Albertsons, thereby lessening the overall capacity of grocery supply in the relevant markets; and (3) threatens to substantially reduce the work force of the two grocery companies through employee layoffs due to the elimination of competition.

129.    Since the prospect of a new start-up entry into the grocery market is unlikely, the entry of new competitors in the marketplace cannot serve as a basis to mitigate the anticompetitive effects that may result from Kroger's proposed acquisition.  Significant barriers to entry into the grocery market include the time and costs associated with conducting market research, selecting an appropriate location for a supermarket, obtaining the necessary permits and approvals, and constructing the new supermarket.

130.    Kroger as an existing supermarket business chain, however, has the wherewithal, experience, financial ability, intent, and expertise to enter into the very markets and areas that it seeks to gain by its elimination of Albertsons. Such an entry by Kroger into new markets would increase competition, create new jobs, lower fares, increase capacity, increase availability, and enhance consumer choice. The elimination of Albertsons would do exactly the opposite.

131.    Indeed, if there is to be any restoration of competition in the grocery industry as a result of its relentless drive toward consolidation, Albertsons is the company that can cause it.

132.    Accordingly, Plaintiffs bring this action for both preliminary and permanent injunctive relief against Defendants' proposed elimination of Albertsons and seek an order prohibiting Kroger from acquiring Albertsons.

**VIOLATIONS ALLEGED**

<u>Count One</u>

Clayton Act, Section 7, 15 U.S.C. § 18

133.     Plaintiffs hereby incorporate the allegations of paragraphs 1 through 132 above as if fully set forth herein.

134.     The effect of the proposed acquisition may be substantially to lessen competition, or tend to create a monopoly, in interstate trade and commerce in the relevant markets in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

135.     Unless enjoined, the proposed acquisition may, and most probably would, have the following potential effects in the relevant markets, among others:

(a) actual and potential competition between Kroger and Albertsons may be eliminated;

(b) the elimination of Albertsons, a significant competitor in a non-trivial transaction, may substantially lessen competition, or tend to create a monopoly in the grocery supermarket industry;

(c) competition in general among other grocers may be lessened substantially;

(d) grocery prices may be higher than they otherwise would be;

(e) consumer choices may be lower than they otherwise would be; and

(f) food quality may be lessened.

136.     The merger will have the following negative impacts in the national and local markets for supermarket sales:

Impact on consumers and on Plaintiffs:

<u>Higher food prices</u>. The merger would reduce competition in the grocery industry, which would lead to higher food prices for consumers and Plaintiffs.  This is especially concerning given the current high inflation environment.

<u>Fewer choices</u>.  The merger would also reduce the number of grocery chains that consumers and Plaintiffs can choose from.  This would lead to less variety and innovation in the grocery market.

<u>Lower quality products and services and availability</u>.  With the reduced competition, the Kroger markets may have less incentive to provide high-quality products and services to consumers and Plaintiffs and make them available to Plaintiffs and consumers on a timely basis.  There would be a reduction in the number of unique products available for purchase.

Impact on workers:

<u>Job losses</u>.  The merger is expected to lead to job losses, as the combined company consolidates operations and eliminated duplicate positions.  Thousands of workers and employees would be laid off or let go, which could have a severe economic impact on the communities.  This loss of jobs would not only affect the employees, but also local businesses, as people would have less disposable income to spend on their goods and services.

<u>Lower wages</u>.  The merger could also lead to lower wages for grocery store workers, as the combined company would have more bargaining power in labor negotiations.

Impact on suppliers:

<u>Lower prices</u>.  The merged company would have more buying power than either Kroger or Albertsons alone.  This would lead to lower prices for the merged company's suppliers, including farmers and food manufacturers.

<u>Reduced access to market</u>.  The merger would also make it more difficult for smaller suppliers to get their products onto the shelves of the merged company.

137.   Overall, the proposed merger of Albertsons and Kroger has the potential to have a negative impact on Plaintiffs, consumers, workers and suppliers.

138.    In addition, the merger would have a negative impact on innovation in the grocery industry.  With less competition, the Kroger would be less likely to invest in new products and services.  This could lead to a less dynamic and innovative grocery market.

139.    By reason of this violation, the Plaintiffs and all consumers are threatened with loss or damage in the form of potentially higher grocery prices, diminished consumer choices, the potential elimination of a favored supermarket, as well as additional irreparable harm for which damages will be inadequate to compensate Plaintiffs.   Plaintiffs are entitled to bring suit under Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26, to obtain preliminary and permanent injunctive relief against this proposed acquisition, and to recover their costs of suit, including a reasonable attorney's fee.

<u>SPECIAL DIVIDEND PAYMENT</u>
<u>IN FURTHERANCE OF SECTION 7 VIOLATION</u>

140.    Albertsons is a publicly traded company. It is effectively controlled by a consortium of private equity entities, which collectively own approximately 75% of Albertsons stock.  This consortium includes Defendant and co-conspirator Cerberus Capital Management, L.P., an American private equity firm. (Cerberus is named after the mythological three-headed dog that guarded the gates of Hell and protected all those who were in it.)

141.    On October 14, 2022, Kroger and Albertsons announced that they had "entered into an Agreement" whereby  Kroger would acquire Albertsons, its significant rival, for $24.6 billion.  The Albertsons and Kroger acquisition agreement is memorialized in the "Agreement and Plan of Merger" document dated October 13, 2022.

142.    The Defendants Kroger and Albertsons have admitted that, as part of the acquisition transaction, Albertsons will pay a special cash dividend of up to $4 billion to the investor consortium of private equity entities, principally the co-conspirator and defendant

Cerberus, and other shareholders**.** That special dividend, which did not exist prior to the merger, has now in fact been paid pursuant to the merger agreement.  This special dividend would never have been paid, but for the merger, since the special dividend was part of, and inextricably tied to, the acquisition.  If the merger is enjoined, this dividend must be enjoined.

143.    One of the purposes of this scheme to pay out a special dividend (in addition to the profit gauging by Cerberus and other major investors) is to hamper, cripple and shut-down Albertsons as the number two supermarket competitor to Kroger in the United States in order to fraudulently claim that Albertsons is a failing company - a defense in support of its planned acquisition that is not available to Kroger as a matter of law.

144.    The scheme, which was intended to be and was in fact made in derogation of Albertsons' minority shareholders and also in derogation of the integrity of Albertsons as an ongoing entity, was made and implemented in furtherance of defendants' violation of Section 7 of the Clayton Antitrust Act which otherwise prohibits Kroger from acquiring Albertsons.

145.    The payment of the special dividend does not have any procompetitive effects and any arguable benefits of the special dividend are outweighed by their actual and likely anticompetitive effects.

146.    One of the purposes of the special dividend agreement is to enrich the majority shareholders of Albertsons, including co-conspirator and defendant Cerberus, which is the primary beneficiary of the agreed-upon $4 billion Special Cash Dividend.

147.    Another purpose of this scheme is to falsely create the supposed defense that Albertsons is a failing company by sucking the lifeblood from a viable company.

148.    Another purpose of this scheme is to eliminate Albertsons' cash-on-hand and to nearly double its debt, putting Albertsons in a weakened competitive position relative to Kroger, and thereby harming grocery consumers and workers throughout United States.

149.     These Plaintiffs and all consumers are directly injured by reason of this conspiracy to pay the special dividend. The ability of Albertsons to remain a viable company after the payment has been compromised and Albertsons is no longer able to compete.  Many of the Plaintiffs and many consumers depend upon Albertsons for their everyday grocery needs.  If Albertsons is no longer able to provide these services, Plaintiffs and consumers are injured.

150.     Moreover, many individuals depend on employment by these Albertson stores. The reduced need for employees and suppressed wages for labor necessitated by reason of the special dividend payment would constitute a significant competitive harm.  This special dividend has made it more difficult for Albertsons to compete for labor, by reducing Albertsons' ability to offer wage increases, pensions, or store improvements.

151.     Albertsons plans to fund the special dividend by using $2.5 billion in cash and taking on $1.5 billion in new debt.  This payment would eliminate more than half of Albertsons' cash and its available liquidity will be reduced to less than one billion after the dividend. The special dividend payment will increase Albertson's net debt by $4 billion to $8.54 billion.  This lack of cash will hamper Albertsons' ability to compete in the short term and Albertsons will be unable to respond effectively to shifts in the market through promotions and advertising and, more generally, it will have less available cash to pay employee wages and benefits to retain staffing, and will be unable to make necessary investments in its stores.

152.     Albertsons' lack of cash and deteriorating bond ratings will make access to capital harder for Albertsons and will serve to curtail Albertsons' ability to compete on price, services, quality, and innovation. The reduction in Albertsons' competitiveness will reduce the intensity of price competition market-wide and, as a result, Plaintiffs and consumers will

*First Amended Complaint for Violation of Section 7 of the Clayton Act*

likely pay more for their groceries, and enjoy fewer promotions, worse service, and fewer quality-improving investments than they would but for Defendants' agreement to pay the special dividend.

153.    In addition, Albertsons' inability to invest in its stores and its workforce will also likely harm workers who will experience lower wage growth and worse working conditions than they would but for Defendants' agreement to pay the Special Dividend, which will in turn affect Plaintiffs' and consumers' experience while shopping at Albertsons' stores.

154.    It is probable that the $4 billion special dividend, had it not been paid, could have enabled Albertsons to lower prices, increase quality, hire employees, expand stores and increase innovation in products and services – all of the beneficial effects of competition and ensuing consumer welfare – and all of which could be attested to by the chief executive officer of Albertsons upon examination.

155.    This special dividend would never have taken place in the absence of the agreement to be purchased by Kroger.  Kroger agreed to the special dividend because it knew that the special dividend would hamper any potential future completion from Albertsons and solidify their attempt to acquire Albertsons.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief from this Honorable Court:

A.    Declaring, finding, adjudging, and decreeing that the agreement of Kroger to acquire Albertsons violates Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18, and is permanently enjoined.

B.    Permanently enjoining Kroger from consummating the acquisition of Albertsons;

C.      Prohibiting any payment by Kroger to Albertson of any termination fee by reason of this permanent injunction;

D.      Ordering disgorgement of any of the $4 billion in payments made to the consortium of private equity entities;

E.      Permanently enjoining Albertsons from making a Special Dividend payment to the consortium of private equity entities led by Cerberus as an act in furtherance of the Defendants' violation of Section 7 of the Clayton Act.

F.      Declaring void any agreement to pay the consortium of private equity entities led by Cerberus any amount by reason of the failure of the Albertsons acquisition as an act in furtherance of the violations alleged;

G.       Declaring the merger contract between the Defendants to be null and void;

H.      Awarding to Plaintiffs their costs of suit, including a reasonable attorney's fee, as provided by Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26; and

I.      Granting to Plaintiffs such other and further relief to which they may be entitled and which the Court finds to be just and proper.

DATED:  October 2, 2023          By: /s/ Joseph M. Alioto
                                 Joseph M. Alioto, Esq. (SBN 42680)
                                 Tatiana V. Wallace, Esq. (SBN 233939)
                                 ALIOTO LAW FIRM
                                 One Sansome Street, Suite 3500
                                 San Francisco, CA 94104
                                 Telephone: (415) 434-8900
                                 Email: jmalioto@aliotolaw.com


ADDITIONAL PLAINTIFFS COUNSEL:

Lawrence G. Papale (SBN 67068)
LAW OFFICES OF LAWRENCE G. PAPALE
1308 Main Street, Suite 117
St. Helena, CA 94574
Telephone: (707) 963-1704
Email: lgpapale@papalelaw.com

*First Amended Complaint for Violation of Section 7 of the Clayton Act*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Josephine Alioto (SNB 282989)
THE VEEN FIRM
20 Haight Street
San Francisco CA 94102
Telephone: (415) 673-4800
Email: jalioto@veenfirm.com

Christopher A Nedeau (SBN 81297)
NEDEAU LAW PC
154 Baker Street
San Francisco, CA 94117-2111
Telephone: (415) 516-4010
Email: cnedeau@nedeaulaw.net