Russell P. Cohen (SBN 213105)
Joseph D. Trujillo (SBN 305170)
DECHERT LLP
One Bush Street, Ste.1600
San Francisco, CA 94104-4446
Telephone: (415) 262-4500
Fax: (415) 262-4555

Andrew J. Levander (admitted *pro hac vice*)
Dechert LLP
1095 Avenue of the Americas
New York, NY 10036-6797
Telephone: (212) 698-3500
Fax: (212) 698-3599

Thomas J. Miller (admitted *pro hac vice*)
Dechert LLP
2929 Arch Street
Philadelphia, PA 19104
Telephone: (215) 994-4000
Fax: (215) 994-2222

*Attorneys for Defendant Cerberus Capital Management, L.P.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Christine Whalen*, et al.*,<br><br>    Plaintiffs*,*<br><br>*v.*<br><br>Kroger Co., Albertsons Companies, Inc., and Cerberus Capital Management, L.P.,<br><br>    Defendants. | Case No.: 23-cv-00459-VC<br><br>**NOTICE OF MOTION, MOTION, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CERBERUS CAPITAL MANAGEMENT, L.P.'S MOTION TO DISMISS PLAINTIFFS' SECTION 7 CLAIM AGAINST CERBERUS (COUNT ONE)**<br><br>Date: December 7, 2023<br>Time: 10:00 AM<br>Courtroom: 5, 17th Floor |

**NOTICE OF MOTION**

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

Please take notice that on December 7, 2023 at 10:00 a.m., or as soon thereafter as the matter may be heard by the Court, at the courtroom of the Honorable Vince Chhabria, Courtroom 5, 17th Floor, United States District Court, 450 Golden Gate Avenue, San Francisco, California, Defendant Cerberus Capital Management, L.P. will and hereby does move the Court, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for an order dismissing against it Count One of Plaintiffs' First Amended Complaint with prejudice as to Cerberus.  The motion to dismiss is based upon this Notice and Motion, the Memorandum of Points and Authorities, arguments of counsel, and all other matters properly considered by the Court.  This motion to dismiss is brought on the grounds that the First Amended Complaint fails to state a claim against Cerberus upon which relief can be granted, including because: (1) Plaintiffs lack standing under Article III and antitrust standing; (2) Plaintiffs have failed to demonstrate that they are entitled to disgorgement, which is the only relief sought from Cerberus; and (3) Plaintiffs have failed to state a claim that Cerberus violated Section 7 of the Clayton Act.  Cerberus requests that the Court dismiss Plaintiffs' claim against Cerberus with prejudice as they have already amended once and further amendment would be futile.

DATED: October 16, 2023

By: */s/ Russell P. Cohen*
Russell P. Cohen
DECHERT LLP
One Bush Street, Ste.1600
San Francisco, CA 94104-4446
Telephone: (415) 262-4500
Fax: (415) 262-4555

*Attorneys for Defendant Cerberus Capital Management, L.P.*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND .................................................................................................................... 2

    I.    PLAINTIFFS' AMENDED ALLEGATIONS AGAINST CERBERUS ............. 2

    II.    PRIOR LITIGATION OVER THE SPECIAL DIVIDEND ................................ 4

ARGUMENT ......................................................................................................................... 5

    I.    PLAINTIFFS LACK STANDING TO CHALLENGE THE SPECIAL
           DIVIDEND ........................................................................................................ 5

    II.    PLAINTIFFS ARE NOT ENTITLED TO DISGORGEMENT ........................... 9

    III.    PLAINTIFFS HAVE FAILED TO STATE A SECTION 7 CLAIM
           AGAINST CERBERUS ................................................................................... 10

CONCLUSION ...................................................................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bonin v. Calderon*,
   59 F.3d 815 (9th Cir. 1995) ...................................................................................14

*In re California Gasoline Spot Mkt. Antitrust Litig.*,
   No. 20-3131, 2021 WL 1176645 (N.D. Cal. Mar. 29, 2021) ....................................8

*California v. American Stores*,
   495 U.S. 271 (1990)................................................................................................10

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   No. 07-5944, 2016 WL 3648478 (N.D. Cal. July 7, 2016) ......................................9

*City of Oakland v. Oakland Raiders*,
   20 F.4th 441 (9th Cir. 2021) .................................................................................2, 7

*Coalition for ICANN Transparency Inc. v. VeriSign, Inc.*,
   771 F. Supp. 2d 1195 (N.D. Cal. 2011) ...................................................................9

*Demartini v. Microsoft Corp.*,
   No. 22-8991, 2023 WL 2588173 (N.D. Cal. Mar. 20, 2023) ..................................11

*District of Columbia v. Kroger Co.*,
   No. 22-3357, 2022 WL 18911128 (D.D.C. Dec. 13, 2022)......................................5

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
   536 F. Supp. 2d 1129 (N.D. Cal. 2008) ...................................................................8

*Feitelson v. Google*,
   80 F. Supp. 3d 1019 (N.D. Cal. 2015) .....................................................................8

*Foman v. Davis*,
   371 U.S. 178 (1962)................................................................................................14

*Fricke-Parks Press, Inc. v. Fang*,
   149 F. Supp. 2d 1175 (N.D. Cal. 2001) .................................................................12

*Gerlinger v. Amazon.Com, Inc.*,
   311 F. Supp. 2d 838 (N.D. Cal. 2004) ...................................................................12

*Hooper v. Shinn*,
   985 F.3d 594 (9th Cir. 2021) .................................................................................14

*In re Juul Labs, Inc., Antitrust Litig.*,
    555 F. Supp. 3d 932 (N.D. Cal. 2021) ...................................................................12

*McCarthy v. Intercontinental Exch., Inc.*,
    No. 20-cv-05832, 2022 WL 4227247 (N.D. Cal. Sept. 13, 2022) .............................8

*In re Multidistrict Vehicle Air Pollution*,
    538 F.2d 231 (9th Cir. 1976) ....................................................................................9

*Pennsylvania Sugar Refining Co. v. American Sugar Refining Co.*,
    166 F. 254 (2d Cir. 1908)........................................................................................11

*Taleff v. Sw. Airlines Co.*,
    554 F. App'x 598 (9th Cir. 2014) .............................................................................8

*United States v. Coca-Cola Bottling Co. of Los Angeles*,
    575 F.2d 222 (9th Cir. 1978) ..................................................................................12

## Statutes

15 U.S.C. § 18............................................................................................... *passim*

15 U.S.C. § 26..........................................................................................................9

Defendant Cerberus Capital Management, L.P. ("Cerberus") submits this memorandum in support of its Motion to Dismiss Plaintiffs' Clayton Act Section 7 Claim Against Cerberus.

## PRELIMINARY STATEMENT

Plaintiffs' First Amended Complaint simply repeats their baseless claim against Cerberus, adding nothing of substance, instead substituting one flawed legal theory for another. The convoluted claim—that Cerberus, a shareholder of Albertsons, conspired to harm its own investment by arranging for Albertsons to pay an excessively large dividend to all Albertsons shareholders to fatally weaken it, thereby facilitating its acquisition by Kroger—continues to make no sense.[1]  Cerberus' initial motion to dismiss explained that Plaintiffs had failed to plead sufficient facts regarding their implausible and irrational conspiracy, that the disgorgement remedy that Plaintiffs seek is unavailable as a matter of law, and that Plaintiffs lack standing to pursue their claim against Cerberus.  *See* ECF No. 48 (Cerberus Motion to Dismiss Complaint). The Court granted that motion, finding that Plaintiffs lacked standing and expressing skepticism about Plaintiffs' ability to obtain disgorgement.  *See* ECF No. 91 (Order Granting Motions to Dismiss).  Plaintiffs' First Amended Complaint does not cure any of these fundamental failures.

If anything, Plaintiffs have underscored the weakness of their claim by jettisoning the only statutory basis for it.  Plaintiffs originally sued Cerberus under Section 1 of the Sherman Act, a law prohibiting anticompetitive agreements.  Cerberus explained in its original motion to dismiss that there was no agreement, and Plaintiffs did not plead facts to suggest otherwise.  *See* ECF No. 48 at 6-9.  With multiple courts having found that Albertsons acted independently to issue the dividend, Plaintiffs have unsurprisingly dropped their baseless Section 1 claim against

---

[1] Cerberus advises that – as a factual matter – it is not a shareholder in Albertsons.  Cerberus is a registered investment advisor and Cerberus and/or one or more of its affiliates manages certain entities that are indirect shareholders of Albertsons.  See ECF No. 55-1.  To the extent the Complaint alleges otherwise, it is incorrect. But nothing in this motion depends on these facts.

Cerberus altogether.  Instead, they have repackaged the same deficient conspiracy allegations as a violation of Section 7 of the Clayton Act.  Section 7, however, has nothing to do with conspiracies—it is directed to acquisitions that may harm competition.  Yet Cerberus is not a party to the merger agreement and there is no basis for Plaintiffs to shoehorn their claim against Cerberus into their underlying challenge to the proposed Kroger-Albertsons merger.  Nor can Plaintiffs establish standing under Article III, antitrust standing under *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 455 (9th Cir. 2021), or a right to disgorgement, which is not an available remedy under Section 16 of the Clayton Act.  For all these reasons, Plaintiffs' claim against Cerberus should be dismissed once more, this time with prejudice.

## BACKGROUND

### I.    PLAINTIFFS' AMENDED ALLEGATIONS AGAINST CERBERUS

Plaintiffs' First Amended Complaint ("FAC") does not add any new substantive allegations against Cerberus.  The crux of their claim is still based on their purely conclusory allegations that the special dividend paid by Albertsons: (1) "undercapitalizes" Albertsons, inhibiting its "ability to compete" for customers and employees, and thereby allegedly harms consumers;[2] and (2) facilitates the ability of Kroger and Albertsons to invoke a "failing firm" defense to the merger.[3]  As with their original Complaint, Plaintiffs have "offer[ed] no credible allegations to ground these predictions."  ECF No. 91 at 1.

Rather than substantiate their allegations, the FAC, at most, expands upon Plaintiffs' speculation about possible effects of the special dividend with more paragraphs but no more substance.  Plaintiffs allege, just as they did in the initial Complaint, that the dividend will

---

[2]  *Compare* Complaint, ECF No. 1 [hereafter "Compl."] ¶¶ 15, 38, 39, 88 *with* FAC ¶¶ 6, 20, 60, 61, 149.

[3]  *Compare* Compl. ¶¶ 84, 87 with FAC ¶¶ 143, 147.

impact Albertsons' ability to (1) pay higher wages; (2) offer promotions, advertisements, lower

prices, and higher quality goods and service; and (3) access capital.  FAC ¶¶ 149-54.[4]  These

allegations are substantively identical to, and just as conclusory and speculative as, those

previously considered and rejected by the Court.[5]

Plaintiffs have also failed to address the Court's observation that their allegations "say

nothing about Albertsons' financial strength before the dividend or how Albertsons has fared

after."  ECF No. 91 at 1-2.[6]  That omission is unsurprising given that, as Albertsons previously

explained, it has continued to compete vigorously and remains financially strong after paying the

special dividend ***more than nine months ago***.  *See* ECF No. 42 (Memorandum of Defendant

Albertsons Cos. in Support of Motion to Dismiss) at 17-18; ECF No. 75 (Albertsons Reply in

Support of Motion to Dismiss) at 4-6.

The First Amended Complaint repeats Plaintiffs' demonstrably false claim that the

dividend was paid as a part of the merger.[7]  Plaintiffs allege that the special dividend was "part

---

[4] Plaintiffs' allegations about the special dividend leading to decreased wages are not only speculative but irrelevant as Plaintiffs provide no analysis of any relevant labor market.  Further, Plaintiffs do not allege that they are Albertsons employees.

[5] *See, e.g.*, Compl. ¶ 39 and FAC ¶ 61 (both stating that dividend would cause "shoppers to face higher prices, worse services, less innovation, and even closure of Albertsons supermarkets" and make Albertsons "less able to offer promotions on groceries, less able to offer quality services, and less able to maintain staffing and competitive wages and benefits for workers."); Compl. ¶ 66 and FAC ¶¶ 89 & 152 (dividend would affect Albertsons' access to capital); Compl. ¶ 66 and FAC ¶ 153 (dividend would harm Albertsons' ability to invest in its stores, services, and workforce).

[6] Any allegations Plaintiffs added about the effects of the proposed Kroger-Albertsons merger are irrelevant to Plaintiffs' claim against Cerberus, which relates only to the payment of the dividend.  *See, e.g.*, FAC ¶ 136 (listing and speculating about "higher food prices," "fewer choices," "lower quality products and services and availability," and "job losses," among others).

[7] Plaintiffs' Opposition to the Motions to Dismiss stated: "This agreement, which constitutes a Sherman Act violation, is in writing.  Plaintiffs allege that the merger agreement itself, which

of" the proposed Kroger-Albertsons merger. *See* FAC ¶¶ 2, 142, 155 (alleging that the special dividend would not have been paid "but for" the merger "since the special dividend was part of, and inextricably tied to, the acquisition").[8]  As explained in Cerberus' motion to dismiss the initial complaint and below, that is wrong, unsupported by the merger agreement, and contrary to findings from other courts as well as evidence that has already been put before this Court. *See, e.g.*, ECF No. 54-2 (Albertsons' CFO McCollam Declaration) ¶¶ 16, 20; ECF No. 42-10 (Tr. of Nov. 8 Prelim. Inj. (TRO) Hearing, *D.C. v. Kroger Co.*, No. 1:22-3357 (D.D.C. Nov. 8, 2022), filed by Albertsons in Support of Motion to Dismiss) at 65-67; ECF No. 42-12 (*Washington v. Albertsons Cos.*, Case No. 22-2-18046-3, 2022 WL 18587146, at ¶ 10 (Wash. Super. Ct. Dec. 9, 2022), filed by Albertsons in Support of Motion to Dismiss) at 4.

## II.    PRIOR LITIGATION OVER THE SPECIAL DIVIDEND

As previous motions have noted, this not the first lawsuit challenging the special dividend issued by Albertsons.  In one case, the Attorneys General of California, Illinois, and Washington, D.C. sought to enjoin payment of the special dividend in federal district court in Washington, D.C.  At a hearing on a motion for a temporary restraining order, the district court found a lack of any "evidence of an agreement between Albertsons and Kroger to pay the [special dividend]" and that the dividend was consistent with "an independent decision by Albertsons to return value

---

contains the agreement between Albertson and Kroger to pay the $4 Billion [sic] dividend, is the contract, combination and conspiracy in restraint of trade . . ."  *See* ECF No. 72 at 2.

[8] Plaintiffs assert that Kroger and Albertsons have "admitted" that "as part of the acquisition transaction, Albertsons will pay a special cash dividend of up to $4 billion" and that such dividend "would never have been paid, but for the merger."  FAC ¶ 142.  There is no basis for Plaintiffs' allegation. Neither Kroger or Albertsons has made any such admission, ECF No. 42 at 14 n.6; ECF No. 54-2 ¶¶ 16, 20, and multiple courts have found that there was no such agreement to pay the special cash dividend, including after an evidentiary hearing.  ECF No. 42-10 at 65-67; ECF No. 42-12 at 4.

to its shareholders."  ECF No. 42-10 at 66-74; *see also id.* at 23, 71-72 (Albertsons and Kroger had no incentive to weaken Albertsons' economic position).

Likewise, when denying a subsequent motion for a preliminary injunction, the district court rejected the contention that the special dividend was the product of an unlawful agreement rather than independent conduct by Albertsons and rejected the notion that the special dividend left Albertsons financially illiquid.  *See District of Columbia v. Kroger Co.*, No. 22-3357, 2022 WL 18911128, at *1–*2 (D.D.C. Dec. 13, 2022).  Kroger and Albertsons had specifically informed the district court that they would not assert a "failing firm" defense in support of the proposed merger.  *See* ECF 42-10 at 35 ; ECF No. 42 at 15, 18.

In the other case, the Washington State Attorney General sought to enjoin the special dividend in Washington state court.  Ultimately, the superior court denied preliminary injunctive relief, finding after an evidentiary hearing that Kroger and Albertsons "did not agree that Albertsons would issue that special dividend nor did Kroger require Albertsons to do so."  ECF No. 42-12 at 4 .  The superior court likewise rejected the contention that the special dividend would cripple Albertsons.  *Id.* at ¶ 14.  The Washington Supreme Court later denied review of the superior court's decision.  ECF No. 42-14 at 1 (Ex. K attaching Was. Sup. Ct. Order, *Washington* v. *Albertsons Cos.*, Case No. 22-2-18046-3, at 13 (Wash. Sup. Ct. Jan. 17, 2023), filed by Albertsons in Support of Motion to Dismiss).

## ARGUMENT

## I.   PLAINTIFFS LACK STANDING TO CHALLENGE THE SPECIAL DIVIDEND

The Court previously dismissed Plaintiffs' claim challenging the dividend payment—the only aspect of the claim involving Cerberus—on Article III standing grounds because Plaintiffs had failed to offer "credible allegations" supporting their implausible assertion that the dividend will "financially weaken Albertsons, resulting in higher prices, worse services, and the

possibility that Albertsons will make a 'failing firm' defense to support the merger."  ECF No.

91 at 1-2.  The FAC contains **no new allegations** that support these speculative harms.  Instead,

Plaintiffs recycle and repeat, over and over, the same handful of conclusory allegations and

speculative inferences.[9]  To the extent the First Amended Complaint expands the allegations,

they are just more of the same speculation about the supposed financial repercussions of the

dividend, such as assertions that the dividend will result in lower wages for Albertsons

employees or reduced access to capital.[10]  For the Court's convenience, **Appendix A** to this brief

compares Plaintiffs' recycled allegations in the First Amended Complaint with those in the

Complaint.  Plaintiffs' complete failure to credibly support these allegations (which are the same

unsupported allegations as in the Complaint) means they have again failed to establish that they

have Article III standing to pursue their claim against Cerberus arising out of the special

dividend.  *See* ECF No. 91 at 2 (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158

(2014)).

Plaintiffs' failure to allege actual harm from the special dividend is unsurprising.  It was

paid more than nine months ago, and Albertsons continues, as a public company, to regularly

disclose reports of its healthy financial state.[11]  Without retreading all of the evidence that has

---

[9] *See, e.g.*, FAC ¶ 61 ("Replacing cash with debt will inevitably harm Albertsons' credit rating, making borrowing more expensive. A financially crippled Albertsons will have dire consequences for consumers, who depend upon supermarkets near their homes, for such essentials as fresh meat and produce, among other groceries. If Albertsons is strapped for cash, it will be less able to offer promotions on groceries, less able to offer quality services, and less able to maintain staffing and competitive wages and benefits for workers.").

[10] *See* Background, *supra*, at note 3.

[11] *See, e.g.* ECF No. 75 at 9 (explaining that "Albertsons continues to generate significant excess cash from its operations and its most recent SEC filings confirm that Albertsons continues to thrive after payment of the Special Dividend . . . Albertsons also has publicly re-iterated that it has 'significant sources of cash to meet [its] liquidity needs for the next 12 months and for the

been put forward in this case, it is readily apparent that Plaintiffs' theory that the special dividend would hamper Albertsons' ability to compete has no basis in reality.  That evidence follows what other courts concluded before the dividend issued—*i.e.*, that the special dividend would not threaten Albertsons' liquidity and ability to conduct business.[12]  While the Court need not rely on other courts' findings to dismiss Plaintiffs' claim, Plaintiffs' conspicuous failure to even address such evidence, especially when called upon to do so by this Court, is telling.  *See* ECF No. 91 at 2.

Although Plaintiffs' lack of Article III standing is a sufficient ground to dismiss their claim against Cerberus, the speculative nature of Plaintiffs' alleged harm also means they cannot show antitrust standing.  As discussed in Cerberus' original motion to dismiss, Plaintiffs must separately establish that they have antitrust standing to secure injunctive relief, which requires Plaintiffs to show, among other things, that their alleged harm is not too indirect or speculative.  *See* ECF No. 48 at 12-14 (citing *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 455, 458 (9th Cir. 2021)); *see also* ECF No. 91 (citing same).  Plaintiffs' empty allegations that the dividend might someday harm competition are wholly speculative and simply repeat what they alleged in the Complaint.

Plaintiffs' continued effort to argue that the dividend will cause harm by allowing Kroger and Albertsons to "fraudulently claim that Albertsons is a failing company" as a defense to their proposed merger, FAC ¶ 143, is even more meritless.  Setting aside the farfetched proposition that grocery store customers could have standing to sue based on the ***possibility*** of a legal defense being invoked in a future lawsuit, Kroger and Albertsons have made clear to multiple

---

foreseeable future' and 'adequate cash flow to maintain [its] current debt rating and to respond effectively to competitive conditions.').

[12] *See* Factual Background, *supra*, at II.

Courts, including this one, that they will not be invoking the "failing firm" defense.  *See* ECF No. 42 at 18; ECF No. 42-10 at 35.  These are precisely the kind of "indirect" and "remote" harms that are insufficient to confer antitrust standing.[13]

Finally, and as previously briefed, Plaintiffs' claimed injury is not "antitrust injury"—that is "threatened loss or damage 'of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.'"  *See* ECF No. 48 at 13-14 (quoting *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 113 (1986)).  There is no precedent for Plaintiffs' argument that antitrust law affords private plaintiffs the right to challenge the issuance of a dividend on a "dividend undercapitalization" theory of harm to competition.  Indeed, Plaintiffs, who are grocery store customers, do not even participate in any market in which Cerberus operates.  *See In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 536 F. Supp. 2d 1129, 1137 (N.D. Cal. 2008) ("[T]he Ninth Circuit has repeatedly stated that the requirement that a plaintiff's alleged injury be related to anticompetitive conduct requires, 'as a corollary, that the injured party be a participant in the ***same*** market as the alleged malefactors.'").  Indeed, under Plaintiffs' theory, consumers could challenge any corporate dividend under the

---

[13] *See McCarthy v. Intercontinental Exch., Inc.*, No. 20-cv-05832, 2022 WL 4227247, at *3–4 (N.D. Cal. Sept. 13, 2022) (dismissing complaint for lack of antitrust standing where "complaint says nothing about the specific intent of the alleged conspirators, and what the defendants may have gotten out of" the conspiracy (internal quotation marks and citations omitted)); *Feitelson v. Google*, 80 F. Supp. 3d 1019, 1028–29 (N.D. Cal. 2015) (dismissing claim where plaintiffs alleged harm was "entirely too conclusory and speculative" and plaintiffs were "at least one step removed from the preclusive effect" of the challenged conduct).  Courts have also rejected overly speculative claims under Section 16 itself, which requires that a plaintiff demonstrate "a significant threat of injury from an impending violation . . . or from a contemporary violation likely to continue or recur."  *In re California Gasoline Spot Mkt. Antitrust Litig.*, No. 20-3131, 2021 WL 1176645, at *6 (N.D. Cal. Mar. 29, 2021) (internal quotation marks and citations omitted); *see also Taleff v. Sw. Airlines Co.*, 554 F. App'x 598 (9th Cir. 2014) (affirming dismissal of plaintiffs' claim for injunctive relief under Section 16 because plaintiffs "offer[ed] no evidence of threatened or actual specific injuries to themselves, and proffer[ed] no support for their generalized claims of injury to consumers and competition.").

antitrust laws on the theory that the issuing corporation would be less able to compete by virtue

of having less cash on hand.  Plaintiffs did not respond to this argument in the last round of

motion to dismiss briefing, and it affords yet another reason to dismiss their claim with prejudice

now.

## II.    PLAINTIFFS ARE NOT ENTITLED TO DISGORGEMENT

Plaintiffs continue to seek a single remedy against Cerberus: disgorgement of the portion

of the Albertsons special dividend that Cerberus allegedly received (and subsequently distributed

to its investors and others) nine months ago.  *See* FAC at 48-49 (prayer for relief); *see also* ECF

No. 55-1.  Cerberus has repeatedly briefed why Plaintiffs are not entitled to disgorgement as a

matter of law.  *See* ECF No. 48 at 9-12; ECF No. 55 (Cerberus Opposition to Motion for

Preliminary Injunction) at 5-7; ECF No. 76 (Cerberus Reply in Support of Motion to Dismiss) at

3-6.  In short, Plaintiffs are pursuing their claim under Section 16 of the Clayton Act, which

permits private parties to "sue for and have injunctive relief . . . against threatened loss or

damage by a violation of the antitrust laws."  15 U.S.C. § 26.  Section 16, however, does not

authorize backwards-looking monetary relief such as disgorgement.  *See In re Multidistrict*

*Vehicle Air Pollution*, 538 F.2d 231, 234 (9th Cir. 1976) (citation omitted) ("[Section] 16 limits

the equitable remedies available under its terms to those against 'threatened loss or damage.'").

Plaintiffs' effort to have Cerberus—or its affiliated entities, *supra*, n.1—disgorge its purported

portion of the special dividend is precisely the kind of backwards-looking relief that falls outside

the scope of Section 16.  *See Coalition for ICANN Transparency Inc. v. VeriSign, Inc.*, 771 F.

Supp. 2d 1195, 1202 (N.D. Cal. 2011) (citations omitted) ("Disgorgement is a form of

retrospective equitable relief. . . . Such relief is unavailable under Section 16."); *In re Cathode*

*Ray Tube (CRT) Antitrust Litig.*, No. 07-5944, 2016 WL 3648478, at *13 (N.D. Cal. July 7,

2016) (citation omitted) ("The Ninth Circuit disallows private use of Section 16 to pursue

disgorgement."). Plaintiffs' earlier rounds of briefing failed to address this authority. They have never identified a case where a Court ordered disgorgement pursuant to Section 16.

Instead, they rely on inapposite case law, much of it outside the context of antitrust law altogether. *See* ECF No. 76 at 4-5. While Plaintiffs point to *California v. American Stores*, 495 U.S. 271, 281 (1990) as supporting a broad reading of Section 16, *see, e.g.*, ECF No. 72, the context for that case was that the merging parties were holding separate their businesses and the Court merely permitted injunctive relief to prevent a future merger from closing by requiring divestment of shares pending the completion of the investigation. *American Stores did not involve disgorgement at all*, but rather the straightforward application of Section 16 to enjoin a proposed merger. *See American Stores*, 495 U.S. at 285 ("Section 16 . . . regards divestiture as the remedy best suited to redress the ills of an anticompetitive merger"); *id.* at 294, n.28 (divestiture is the "normal and usual remedy against an unlawful merger"). As the Court previously remarked after reviewing the many deficiencies in Plaintiffs' original complaint, "[i]t's difficult to see how the plaintiffs could ever state a claim for disgorgement of the dividend payment." *See* ECF No. 91 at 2-3. Because Plaintiffs are legally barred from pursuing the only remedy they seek against Cerberus, their claim must be dismissed.

## III. PLAINTIFFS HAVE FAILED TO STATE A SECTION 7 CLAIM AGAINST CERBERUS

Plaintiffs initially pursued their conspiracy claim against Cerberus as a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. *See* ECF No. 1. That claim was defective for numerous reasons, including because Plaintiffs failed to plead sufficient facts supporting the existence of a plausible conspiracy. *See* ECF No. 48 at 6-9. The First Amended Complaint echoes the same deficient conspiracy allegations, again without alleging any plausible reason

why Cerberus would conspire to destroy its own investment.[14]  Now, however, Plaintiffs have

made the inscrutable decision to continue pursuing their conspiracy theory against Cerberus

while dropping their Section 1 claim altogether.[15]  The First Amended Complaint now claims

that Cerberus violated Section 7 of the Clayton Act, 15 U.S.C. § 18.

      Plaintiffs' effort to recast their conspiracy theory as a Section 7 claim cannot save their

claim against Cerberus.  Rather, it adds an additional ground to dismiss their claim because there

is no basis to hold Cerberus liable under Section 7.[16]  First, Section 7 is directed solely to

prohibiting acquisitions that may substantially lessen competition.[17]  But **Cerberus is not a party

to the proposed Kroger-Albertsons merger** and therefore cannot be liable under Section 7.[18]  *See*

---

[14] *See* Factual Background, *supra*, at I.

[15] *See, e.g.*, FAC ¶ 1 (Plaintiffs seek to "void the combination and conspiracy among Cerberus Capital Management, L.P. and the consortium of major stockholders of Albertsons and Kroger to shut down Albertsons"); *id.* at ¶ 50 ("Defendant Cerberus Capital Management, L.P. . . . is a co-conspirator with Defendants Kroger and Albertsons.").

[16] In earlier briefing, Plaintiffs made much of an ancient Sherman Act Section 1 case that involved an alleged conspiracy involving a shareholder.  *See* ECF No. 72 at 3 (citing *Pennsylvania Sugar Refining Co. v. American Sugar Refining Co.*, 166 F. 254 (2d Cir. 1908)). But while *Pennsylvania Sugar* did nothing to support their defective Section 1 claim, *see* ECF No. 76 at 8, it predates the Clayton Act altogether and cannot conceivably support their new Section 7 claim against Cerberus.

[17] *See, e.g.*, 15 U.S.C. § 18 ("No person . . . shall acquire, directly or indirectly, the whole or any part of the stock or other share capital . . . or any part of the assets of another person . . . where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.").

[18] *Demartini v. Microsoft Corp.*, No. 22-8991, 2023 WL 2588173, at *6 (N.D. Cal. Mar. 20, 2023) (citation omitted) ("To meet its prima facie burden, a plaintiff must allege facts that plausibly show it is reasonably probable *a merger* will be anticompetitive") (emphasis added); HOVENKAMP AND AREEDA, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION (2022) ¶ 301 ("All three of the Clayton Act's substantive provisions reach conduct only 'where the effect may be substantially to lessen competition or tend to create a monopoly' . . . §7 of the Clayton Act prohibits covered mergers under the same conditions . . . [U]nlike the Sherman Act's general prohibitions of trade restraints and monopolization, the Clayton Act is more specific.").

ECF No. 42-6 (merger agreement).  In certain Section 7 cases seeking injunctive relief, such as

rescission of a challenged merger agreement, Courts have recognized that it may be appropriate

to join the **sellers or other parties to the acquisition** to the litigation to grant effective relief.[19]

Because Cerberus is not a party to the merger agreement, that should be the end of Plaintiffs'

Section 7 claim.[20]

Second, Plaintiffs cannot save their Section 7 claim against Cerberus with unfounded

allegations that the special dividend was "in furtherance of" and "was part of, and inextricably

tied to," the proposed Kroger-Albertsons merger.  *See* FAC ¶¶ 142-44.  There is no legal basis to

challenge the special dividend under Section 7, even under the nebulous (and made up) category

of acts claimed to be "in furtherance of" an acquisition.  Section 7 prohibits acquisitions that may

substantially lessen competition, and there is no authority to expand its scope to encompass

situations like this—i.e., the receipt of a dividend issued by a company that happens to be a party

to a merger agreement.

---

[19] *See United States v. Coca-Cola Bottling Co. of Los Angeles*, 575 F.2d 222, 230 (9th Cir. 1978)
("The fact that sellers in § 7 cases are not technical violators of the law is itself a strong equity
consideration against rescission . . . Nevertheless, if effective implementation of public policy
cannot be decreed without adversely involving third parties, courts in equity may, within limits,
involve such parties in the relief to be granted."); *see also In re Juul Labs, Inc., Antitrust Litig.*,
555 F. Supp. 3d 932, 965 (N.D. Cal. 2021) (citation omitted) (agreeing that seller was "proper
defendant to [Section 7] claim because it was the seller of the acquired assets and a party to the
allegedly illegal acquisition, especially considering plaintiffs' claim for injunctive relief to undo
the anticompetitive agreement.").

[20] Courts have recognized that Section 7 itself is squarely directed at anticompetitive
*acquisitions*.  Indeed, some courts have construed the statute to not even extend, at least in
actions for damages, to *sellers* in those same acquisitions, let alone third parties like Cerberus
who are not parties to the acquisition.  *See e.g.*, *Gerlinger v. Amazon.Com, Inc.*, 311 F. Supp. 2d
838, 852 (N.D. Cal. 2004) ("There can be no [Section 7] claim as a matter of law against Borders
as there is no indication that Borders acquired an asset pursuant to the Agreement."); *Fricke-
Parks Press, Inc. v. Fang*, 149 F. Supp. 2d 1175, 1185 (N.D. Cal. 2001) (noting that "section 7
does not cover claims against sellers for damages").

Nor can Plaintiffs credibly allege that the special dividend was "in furtherance of" or "inextricably tied to" the Kroger-Albertsons merger agreement.  *See* FAC ¶¶ 142-44.  The merger agreement itself does not provide for the payment of the special dividend or make the merger contingent on its issuance.  *See* ECF No. 42-6.  Indeed, the First Amended Complaint offers no factual allegations substantiating an alleged link between the special dividend and the proposed Kroger-Albertsons merger agreement, because it cannot.[21]  While the merger agreement ***references*** the dividend in several provisions, the text of the agreement makes clear that the parties were simply accounting for how consideration for the merger would be adjusted ***if Albertsons unilaterally decided to issue the dividend***.[22]  The dividend itself was not "in furtherance" of the merger or "intertwined" with it or in any way required by the merger agreement.  In short, the Court should reject Plaintiffs' effort to piggyback their baseless claim against Cerberus onto their challenge of the proposed Kroger-Albertsons merger.

---

[21] This is of course consistent with the multiple courts that have already examined the evidence and concluded that the special dividend represented an independent decision by Albertsons to return value to its shareholders, not an implausible plot through which Albertson conspired with its shareholders to harm itself.  *See* Factual Background, *supra*, at I.

[22] The merger agreement permits the Albertsons board to decide to pay a pre-closing dividend in its sole discretion, up to an aggregate cap of $4 billion, and provides for a dollar-for-dollar reduction of the per-share merger consideration Kroger will pay in an amount equal to the value of any capital Albertsons elected to return to its shareholders through payment of such a dividend.  *See* ECF No. 42-6 at 12 (§ 1.1 defining "Common Merger Consideration" as "an amount in cash equal to (a) $34.10 minus . . . the per share amount of the Pre-Closing Dividend").  As the District Court for the District of Columbia explained, it "makes good sense" that the parties would adjust the purchase price if Albertsons chose to issue a special dividend. ECF No. 42-10 at 66-67 ("The merger agreement caps the amount of the dividend to $4 billion and explains how the purchase price will be adjusted ***if*** the dividend is paid.  ***This all makes good sense***.  Kroger, knowing that Albertsons was considering the payment of such dividend, needed to ensure first that the preclosing dividend would not harm the company it was seeking to acquire; and, two, that Kroger was not overpaying to acquire Albertsons.") (emphasis added). As shown by its plain text, the merger agreement neither required nor conditioned the merger on the payment of such a dividend.  *See* ECF No. 42-6 at 42 (§§ 7.1-7.3).

The Court should heed its initial skepticism of Plaintiffs' efforts, ECF No. 91 at 2-3, and dismiss Plaintiffs' claim against Cerberus again, this time with prejudice.  *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995) ("Futility of amendment can, by itself, justify denial of motion for leave to amend."); *Hooper v. Shinn*, 985 F.3d 594, 622, 624 (9th Cir. 2021) (affirming dismissal without leave to amend where plaintiff's claims were "not viable").

## CONCLUSION

Plaintiffs have done nothing to salvage the claim against Cerberus that the Court previously dismissed.  If anything, their First Amended Complaint layers on additional deficiencies by staking their case on a new claim under Section 7 that has no basis in law or fact. The Court should dismiss Plaintiffs' claims against Cerberus again, with prejudice.


Dated:  October 16, 2023

By: */s/ Russell P. Cohen*
Russell P. Cohen
Joseph D Trujillo
DECHERT LLP
One Bush Street, Ste. 1600
San Francisco, CA 94104-4446
Telephone: (415) 262-4500
Fax: (415) 262-4555

Andrew J. Levander (admitted *pro hac vice*)
Dechert LLP
1095 Avenue of the Americas
New York, NY 10036-6797
Telephone: (212) 698-3500
Fax: (212) 698-3599

Thomas J. Miller (admitted *pro hac vice*)
Dechert LLP
2929 Arch Street
Philadelphia, PA 19104
Telephone: (215) 994-4000
Fax: (215) 994-2222
*Attorneys for Cerberus Capital Management, L.P.*

**Appendix A**

| Claimed Harm | Original Complaint (ECF No. 1) | First Amended Complaint (ECF No. 93) |
|---|---|---|
| Increased debt, decreased cash, credit rating, and access to capital. | ¶ 38: Nearly one-third of this payment will go to Albertsons' largest shareholder [Cerberus] . . . and the funds for the dividend will be sourced from $2.5 billion of Albertsons' cash and $1.5 billion in new debt, *leading Albertsons' cash and cash receivables of approximately $4 billion to drop to $1.5 billion, and causing its net debt to increase from $4.54 billion to $8.54 billion.*<br><br>¶ 39: Replacing cash with debt will inevitably harm Albertsons' *credit rating, making borrowing more expensive.*<br><br>¶ 66: The dividend strips Albertsons of nearly all its cash-on-hand during an economic downturn when it will be *difficult for the company to obtain additional capital.* | ¶ 151: Albertsons plans to fund the special dividend by using $2.5 billion in cash and taking on $1.5 billion in new debt. This payment would eliminate more than half of Albertsons' cash and its available liquidity will be reduced to less than one billion after the dividend. *The special dividend payment will increase Albertson's net debt by $4 billion to $8.54 billion. This lack of cash* will hamper Albertsons' ability to compete in the short term . . . .<br><br>¶ 152: Albertsons' *lack of cash and deteriorating bond ratings* will make *access to capital harder* for Albertsons . . . |
| Pricing, employment, quality of goods and services, reinvestment, as well as advertising and promotions. | ¶ 39: The payment of this Special Dividend will leave Albertsons undercapitalized and will impede Albertsons' ability to compete with other supermarkets, including Kroger, leaving shoppers to face *higher prices, worse services, less innovation, and even closure* of Albertsons supermarkets. . . . A financially crippled Albertsons will have dire consequences for consumers, who depend upon supermarkets near their homes, for such essentials as fresh meat and produce, among other groceries. If Albertsons is strapped for cash, *it will be less able to offer promotions on groceries, less able to offer quality services, and less able to maintain staffing and competitive wages and benefits for workers.* | ¶ 2. In the absence of the merger, Albertsons would not have paid the $4 billion special dividend to certain special interests and would instead have retained the $4 billion and would have been able to use the money to *increase production, lower prices, hire personnel, and enhance the quality of products and services through innovations.* The "threatened loss or damage" to the Plaintiffs and to the public at-large is the potential elimination of Kroger's competitor, Albertsons, and the threat that *prices may be raised, production may be limited, services may be curtailed, quality may be lessened, and innovations may not be pursued.* |

| | | |
|---|---|---|
| **Pricing, employment, quality of goods and services, reinvestment, as well as advertising and promotions (continued)** | ¶ 66. Moreover, the payment of the Special Dividend has no competitive benefit to Albertsons as a company, let alone to consumers and workers, that may be weighed against the Special Dividend's anti-competitive effect on Albertsons' cash flow and its ability to vigorously compete. . . . Without cash, Albertsons cannot *advertise, promote, increase services, refurbish, or reorganize stores* to make them more attractive to consumers. As a substitute for credit, it would have to rely on *higher prices to raise cash for reinvestment*, thereby harming consumers. It may have to *close stores*, leaving customers with fewer choices and, as a result, *higher prices, inferior selection and quality, or both*. | ¶ 149: Many of the Plaintiffs and many consumers depend upon Albertsons for their everyday grocery needs. If Albertsons is no longer able to provide *these services*, Plaintiffs and consumers are injured. |
| | | ¶ 150: Moreover, many individuals depend on *employment* by these Albertson stores. The *reduced need for employees and suppressed wages for labor* necessitated by reason of the special dividend payment would constitute a significant competitive harm. This special dividend has made it more difficult for Albertsons to compete for *labor, by reducing Albertsons' ability to offer wage increases, pensions, or store improvements*. |
| | | ¶ 151: Albertsons will be unable to respond effectively to shifts in the market through *promotions and advertising* and, more generally, it will have less available cash to *pay employee wages and benefits to retain staffing*, and will be unable to make *necessary investments* in its stores. |

| Pricing, employment, quality of goods and services, reinvestment, as well as advertising and promotions (continued) | | ¶ 152: Albertsons' lack of cash and deteriorating bond ratings will make access to capital harder for Albertsons and will serve to curtail Albertsons' *ability to compete on price, services, quality, and innovation*. The reduction in Albertsons' competitiveness will reduce the intensity of price competition market-wide and, as a result, Plaintiffs and consumers *will likely pay more for their groceries, and enjoy fewer promotions, worse service, and fewer quality-improving investments* . . . |
| | | ¶ 153: In addition, Albertsons' *inability to invest in its stores and its workforce* will also likely harm workers who will experience *lower wage growth and worse working conditions* . . . which will in turn affect Plaintiffs' and *consumers' experience* while shopping at Albertsons' stores. |
| | | ¶ 154: It is probable that the $4 billion special dividend, had it not been paid, could have enabled Albertsons to *lower prices, increase quality, hire employees, expand stores and increase innovation in products and services* . . . |