Joseph M. Alioto (SBN 42680)
Tatiana V. Wallace (SBN 233939)
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone: (415) 434-8900
Email:  jmalioto@aliotolaw.com

[Additional Counsel Listed on Last Page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| Christine Whalen, et al.,<br><br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br><br>Kroger Co., Albertsons Companies, Inc.,<br>and Cerberus Capital Management, L.P.,<br><br>　　　　　　Defendants. | Case No.:  23-cv-00459-VC<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTIONS OF KROGER AND ALBERTSONS TO DISMISS THE FIRST AMENDED COMPLAINT**<br><br>Hearing Date:　December 7, 2023<br>Time:　　　　　10:00 AM<br>Place:　　　　　Courtroom 4, 17th Floor<br>Judge:　　　　　Honorable Vince Chhabria<br><br><br>Complaint Filed: February 2, 2023 |

i

TABLE OF CONTENTS

INTRODUCTION AND STATEMENT OF THE FACTS................................................. - 1 -

APPLICABLE LAW ........................................................................................................ - 4 -

I. THE ACQUISITION MAY LIKELY INCREASE PRICES, REDUCE OUTPUT AND RESULT IN "CONCRETE" AND "IMMINENT" "ANTITRUST INJURY" ............................................. - 6 -

    A.    Plaintiffs' May Be Injured by the Acquisition's Potential Anticompetitive Effects........... - 6 -

    B.    Plaintiffs Have Alleged the Relevant Product and Geographic Markets............................. - 7 -

    C.    Plaintiffs Have Alleged That the Acquisition May Substantially Lessen Competition.-.8 -

II.   PLAINTIFFS' CLAIM IS RIPE BECAUSE THE SUPREME COURT HAS MANDATED THAT THESE ACQUSITIONS BE ENJOINED AT THEIR "INCIPIENCY".......................... - 14 -

CONCLUSION .............................................................................................................. - 15 -

TABLE OF AUTHORITIES

## CASES

*Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1334
(7th Cir. 1986)..................................................................................................... 5,7

*Brown Shoe Co. v. United States*, 370 U.S. 294, 323, 332
(1962) .................................................................................... 3,5,6,812,15,16

*Brunswick Corp. v. Pueblo Bowl-O- Mat, Inc.*, 429 U.S. 477, 489
(1977)................................................................................................................ 5,6,7

*California v. Am. Stores, Inc.*, 495 U.S. 271, 284
(1990)..................................................................................................................... 4

*California v. American Stores*, 492 U.S. 1301
(1989)..................................................................................................................... 4

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409
(2013)................................................................................................................... 5,6

*F.T.C. v. Elders Grain, Inc.*, 868 F.2d 901, 906
(7th Cir. 1989).................................................................................................. 6,10

*Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1385
(7th Cir. 1986)............................................................................................... 8,14,15

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564
(1992)...................................................................................................................... 5

*St. Alphonsus Medical Center v. St. Luke's Health System, Ltd.*, 778 F.3d 775, 785
(9th Cir. 2015).................................................................................................... 6,7

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158
(2014).................................................................................................................... 6

*United States v. Alcoa*, 377 U.S. 271
(1964)................................................................................................................... 13

*United States v. Aluminum Co. of America*, 377 U.S.271
(1964)................................................................................................................... 15

*United States v. Borden Co*., 347 U.S. 514, 519
(1954)................................................................................................................... 15

*United States v. Continental Can Co*., 378 U.S. 441
(1964)................................................................................................................... 13

*United States v. Falstaff Brewing Corp*., 410 U.S. 526
(1973).............................................................................................................. 13,14-

*United States v. Pabst Brewing Co*., 384 U.S. 546
(1966)............................................................................................................... 13,15

*United States v. Phila. Nat'l Bank,* 374 U.S. 321, 363
(1963)............................................................................................................... 11,15

*United States v. Von's Grocery Co*., 384 U.S. 270, 277
(1966)............................................................................................................... 12,15

*Warth v. Seldin,* 422 U.S. 490, 498-499
(1975).................................................................................................................... 6

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130
(1969)................................................................................................................... 3,5

## STATUTES

15 U.S.C. § 18...........................................................................................................................4

15 U.S.C. § 26.......................................................................................................................- 4

## INTRODUCTION AND STATEMENT OF THE FACTS

The Defendants' motions to dismiss are without merit as a matter of fact and as a matter of law. The Plaintiffs have filed suit pursuant to the authority of Section 16 of the Clayton Act (15 U.S.C. 26) charging that the $24.6 Billion acquisition by Kroger, the largest retail grocery store chain in the United States, of Albertsons, the second largest grocery store chain in the United States, is a plain violation of Section 7 of the Clayton Act. (15 U.S.C. 18) (FAC, Para 3). This acquisition is the largest acquisition in the history of grocery store acquisitions in the United States and culminates a decades-long trend of acquisitions in the grocery store business, including the multiple purchases of local and regional grocery stores by both Kroger and Albertsons. (FAC, Paras. 4, 8, 23 and 90)

Kroger operates 2,721 retail grocery stores under its various banners and divisions in 35 states and in the District of Columbia with revenues of $137 Billion. (FAC, Paras. 10, 45) Kroger has a market share of 23.6% by revenue of the national supermarket market. (FAC, Para 46)

Albertsons operates over 2,200 stores in 34 states and the District of Columbia with revenues of $71 Billion (FAC, Paras. 10, 48) accounting for 12.4 % of the national supermarket market. (FAC, Para 47)

The combined revenue of Albertsons and Kroger will be in excess of $200 Billion, or 36% of total market share (See Pie Chart, FAC, Para 10, p 5; Bar Charts, FAC, Para 10, p. 6), more than four times greater than the next closest competitor, the Dutch company, Ahold Delhaize; more than four times greater than Publix; more than six times greater than H.E.B.; and more than eight times greater than Meijer; and indeed, 29% greater than all of the next four combined. (FAC, Para 10)

The locations of the Kroger stores in the United States are alleged in the map in Paragraph 45, pps. 19, 20, and the locations of the Albertsons stores nationwide are alleged in the map in Paragraph 49, pgs. 21, 22. The combined locations nationwide and by state are alleged in the maps at Paragraph 64, pps. 26, 27.

Pre-acquisition, the top four grocery chains represent more than 53% of market share, which itself demonstrates concentration in the industry. Post-acquisition the top four will increase to 60% of market share, emphasizing the lack of competition. See Pie Chart, Paragraph 10, p. 5.

Plaintiffs have alleged that they are customers and consumers of Defendants' goods and services, many of whom have made purchases at the Defendants' stores within the last four years (FAC, Para 43). Plaintiffs are consumers of the Defendants goods in their local market areas: Plaintiffs D'Augusta, Fjord, Stensrud, Marazzo, Gardner, Fry, Davis and Brito shop at the Albertsons-owned stores in their local geographic areas. Plaintiffs G. Garavanian, Talewsky, Brown, Stensrud and Fjord shop at the Kroger-owned stores in their local geographic areas. (FAC, Paras 44, 113)

Plaintiffs have alleged that Plaintiffs Marazzo and Brito shop at Defendants' stores in the Reno market area (FAC, Para 104); that Plaintiff Fry shops at the Defendants' stores in the Tucson market area (FAC, Para 105); that Plaintiff Gardner shops at Defendants' stores in the Colorado Springs market area (FAC, Para 106); and that Plaintiff Stensrud shops at Defendants' stores in the Seattle market area (FAC, Para 107).

Plaintiffs have alleged that if the merger is consummated, the companies' combined power may be used to increase the price that Plaintiffs pay for groceries, decrease the quality of food, eliminate jobs, close stores, and offer less choice for consumers (FAC, Paras. 26, 39).

Plaintiffs have alleged that, because of the reduced post-merger competition, the remaining Kroger markets may have less incentive to provide high-quality products and services to Plaintiffs and to consumers and that there may be a reduction in the number of unique products (FAC, Para 136, 139).

The size of the acquisition of Albertson by Kroger substantially lessens competition and tends to create a monopoly not only in the retail business, but also in the wholesale business, and might in effect

give Kroger monopsony buying power over growers, processors, distributers, and suppliers, all of which affect retail prices and products.

Plaintiffs have alleged that both companies have the wherewithal and the ability to continue to profitability compete against each other both actually and potentially.

To enjoin an unlawful merger, private plaintiffs "need only demonstrate a significant threat of injury" from the impending acquisition. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969; (15 U.S.C. § 26). There is no need to show actual present harm. *Id*. A merger will be held unlawful where its "probable future effect" is to lessen competition. *Brown Shoe Co. v. United States*, 370 U.S. 294, 323, 332 (1962).

In this Section 7 case the Plaintiffs have alleged that the merger not only *threatens* them with higher prices, reduced output, but also threatens all consumers, all customers of Albertson and Kroger (FAC, Paras. 26, 29, 80-84, 88, 111, 116-121). The First Amended Complaint alleges that Plaintiffs regularly shop for groceries and other items at stores controlled by Albertsons or Kroger or both (FAC, Paras. 44, 104-107, 113).  As a result, they may suffer "concrete" and "imminent" antitrust injury by the immediate elimination of a competitor who can't be called back, and because it is reasonably foreseeable and that the Plaintiffs will continue to buy groceries at the Defendants multiple stores in the future. The Plaintiffs are consumers of Defendants' grocery products in areas directly and potentially impacted by this acquisition and Plaintiffs have alleged that the merger may impact the Plaintiffs' shopping in any one of the local geographic markets identified in the Amended Complaint, as well as the potential markets that may exist if Kroger competed for potential markets instead of attempting to buy them (FAC, Paras. 43-44, 104-107, 113).

Plaintiffs' current residence locations are alleged at (FAC, Para. 43), but Plaintiffs may travel for business or pleasure. As a result, it is a reasonable inference that Plaintiffs as well as other consumers who travel will shop at Albertsons and Kroger stores throughout the United States.

The Defendants' contention that the Plaintiffs' potential injuries will not be irreparable is without merit and directly contrary to law. In *California v. American Stores*, 492 U.S. 1301 (1989), Justice O'Connor, citing the Ninth Circuit's opinion at 872 F.2d 837, at 844 held that the removal of a substantial competitor is itself irreparable harm: "I agree with both the District Court and the Court of Appeals [for the Ninth Circuit] that appellant has made an adequate showing of irreparable injury. See 872 F.2d, at 844 (lessening of competition "is precisely the kind of irreparable injury that injunctive relief under section 16 of the Clayton Act was intended to prevent") (citations omitted); 697 F.Supp., at 1134." (Emphasis added). Plaintiffs may also suffer myriad other harms from the acquisition that cannot be remedied by money damages: the loss of consumer choice; diminutions in the quality of service; the loss of a major competitor; the loss of potential competition; and losses in innovation, among others. The threat of this harm is well supported by the allegations in the First Amended Complaint. The motion should therefore be denied.

## APPLICABLE LAW

Section 7 of the Clayton Antitrust Act prohibits acquisitions "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition or tend to create a monopoly." (15 U.S.C. § 18). "Section 7 itself creates a relatively expansive definition of antitrust liability. To show that a merger is unlawful, a plaintiff need only prove that its effect '*may be* substantially to lessen competition." *California v. Am. Stores, Inc.*, 495 U.S. 271, 284 (1990) (emphasis in original). By prohibiting acquisitions that *may* substantially lessen competition, Congress "indicate[d] that its concern was with probabilities, not certainties," and courts are to find violations where "the probable future effect of the merger" is to lessen competition. *Brown Shoe*, 370 U.S. at 323.

Section 16 of the Clayton Act authorizes antitrust standing to private plaintiffs to sue for injunctive relief for any "threatened loss or damage" which may result from a violation of the antitrust laws. (15 U.S.C. § 26). Since Section 16 requires only "threatened injury," and injunctive relief to stop

an acquisition is available "even though the plaintiff has not yet suffered actual injury" *Zenith*, 395 U.S. at 130, to obtain an injunction, a private plaintiff "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws." *Id*. (citations omitted). All that is necessary to the threatened injury is that that the injury "flows from that which makes defendants' act unlawful." *Brunswick Corp. v. Pueblo Bowl-O- Mat, Inc.*, 429 U.S. 477, 489 (1977). Among other things, "'antitrust injury' ... means injury from higher prices or lower output, the principal vices proscribed by the antitrust laws." *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1334 (7th Cir. 1986) (citing *Brunswick*, 429 U.S. 477).

In addition, Plaintiffs have shown that they have satisfied all that is required by Article III standing. "To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted). "Imminence is concededly a somewhat elastic concept." *Id.,* quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 n.2 (1992). The purpose of establishing the "imminence" of injury is "to ensure that the alleged injury is not too speculative for Article III purposes." *Id*. "An allegation of future injury" – as in the present case – "will suffice as long as "there is a 'substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) quoting *Clapper*, 568 U.S. at 415 n.5; see also the case of *Warth v. Seldin,* 422 U.S. 490, 498-499 (1975).[1]

Section 7 requires merely the showing that there may be a lessening of competition "in any line of commerce" or "in any activity affecting commerce" anywhere in the country (15 U.S.C. § 18). The Supreme Court has recognized that an unlawful merger or acquisition might affect multiple relevant markets. Courts must consider whether the merger might lessen competition in <u>any one</u> of them; if so,

---

[1] Justice Douglas, in his dissent in *Seldin*, observed that "Standing has become a barrier to access to the federal courts . . . The mounting caseload of federal courts is well known . . . . I would let the case go to trial and have all the facts brought out. Indeed, it would be better practice to decide the question of standing only when the merits have been developed. *Seldin*, at 519

"the merger is proscribed." *Brown Shoe*, 370 U.S. at 325–28. Section 7 ultimately requires merely a "prediction" as to whether competition may be lessened, and "doubts are to be resolved against the transaction." *F.T.C. v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989).

## I. THE ACQUISITION MAY LIKELY INCREASE PRICES, REDUCE OUTPUT AND RESULT IN "CONCRETE" AND "IMMINENT" "ANTITRUST INJURY"

Allegations of concentrated market shares alone are sufficient to establish a plaintiff's prima facie case of a violation of Section 7. *See St. Alphonsus Medical Center v. St. Luke's Health System, Ltd.*, 778 F.3d 775, 785 (9th Cir. 2015). ("prima facie case can be established simply by showing high market share"). In this case, Plaintiffs have alleged the high market share that will result from the merger, both nationally and in local markets.

### A. Plaintiffs' May Be Injured by the Acquisition's Potential Anticompetitive Effects

The acquisition's potential anticompetitive harm may be felt both nationally and in local markets across the nation, threatening Plaintiffs with direct and imminent harm and loss of a significant competitor because Plaintiffs purchase their groceries in areas affected by the acquisition.

Defendants argue that Plaintiffs are not threatened with "concrete" and "imminent" "antitrust harm" from the merger. The First Amended Complaint readily refutes these claims. Plaintiffs need only allege that they are "threatened" with probable harm. In this case, as alleged in the First Amended Complaint, because Plaintiffs shop for groceries in areas that may be drastically impacted, Plaintiffs plainly threatened with potential harm. Plaintiffs have alleged that the merger may likely increase prices by reason of the elimination of a viable competitor. Increased prices and lower output are the "principal vices proscribed by the antitrust laws." *Ball Mem'l Hospital, supra* at 134, citing the Supreme Court's Opinion in *Brunswick*, 429 U.S. 477.

Defendants make the puzzling assertion that Plaintiffs' allegations regarding the likely effect of the merger run afoul of Rule 12 because they are "speculative."[2] This argument makes no sense since Section 7 outlaws mergers that "may" substantially lessen competition. "[T]he very wording of Section 7 requires a prognosis of the probable future effect of the merger." *Brown Shoe*, 370 U.S. at 332. Section 7 aims to prohibit mergers before they occur, and before the trend in concentration[3] raises antitrust concerns. See *Brown Shoe*, 370 U.S. at 323 ("Congress used the words 'may be substantially to lessen competition' ... to indicate that its concern was with probabilities, not certainties.").

### B.    Plaintiffs Have Alleged the Relevant Product and Geographic Markets

The relevant product market is the retail sale of food and other grocery products in supermarket retailers (FAC, Para. 114). Plaintiffs define supermarkets as self-service full-line retail grocery store offering customers substantially all of their weekly food and grocery shopping requirements in a single shopping visit, but that is not a big-box store. (FAC, Para 68). Supermarkets offer fresh food, including meats and fruits and vegetables, as well as packaged grocery items. (FAC, Para. 69). Supermarkets compete with other supermarkets and consumers shopping for food and grocery products at

---

[2] The Courts have recognized the nature of a Section 7 claim maybe "to some extent speculative and uncertain" and that it necessarily deals with the proscription of future anticipated anticompetitive effects, and why they must be stopped at the "incipiency." "Although § 7 deals with probabilities, not ephemeral possibilities, all forms of potential competition involve future events and all of them are, therefore, to some extent speculative and uncertain. Whether future competition will be reduced by a present merger is clearly "not the kind of question which is susceptible of a ready and precise answer in most cases. It requires not merely an appraisal of the immediate impact of the merger upon competition, but a prediction of its impact upon competitive conditions in the future; this is what is meant when it is said that the amended § 7 was intended to arrest anticompetitive tendencies in their 'incipiency.'" *United States v. Philadelphia National Bank*, 374 U.S., at 362.

[3] Representative Celler, one of the authors of the Celler-Kefauver Act amending the Clayton Act, remarked while introducing his bill in the House:  "Small, independent, decentralized business of the kind that built up our country, of the kind that made our country great, first, is fast disappearing, and second, is being made dependent upon monster concentration." 95 Cong. Rec.11486.  Senator Kefauver also expressed the same fear on the Senate floor:  "I think that we are approaching a point where a fundamental decision must be made in regard to this problem of economic concentration. Shall we permit the economy of the country to gravitate into the hands of a few corporations . . . ? Or on the other hand are we going to preserve small business, local operations, and free enterprise?" 96 Cong. Rec. 16450.  References to a number of other similar remarks by other Congressmen are collected in *Brown Shoe Co. v. United States*, 370 U.S. 294, 316, n. 28.

supermarkets are not likely to shop at other types of stores in response to a price increase by supermarkets. (FAC, Paras. 71-72)

Defendants argue that Plaintiffs' product market is too narrow and that it ignores the impact of Walmart, Target, and others. But that is not the way the media always describes Kroger and Albertson as number 1 and number 2 supermarkets, not Walmart or Target.[4]

The relevant geographic markets are both national and local. Supermarkets compete among themselves nationally for suppliers of groceries, goods, and other necessities (FAC, Para. 73). Supermarkets also compete locally where their customers typically do their grocery shopping at stores located close to where they live or work or visit (FAC, Para. 74-75).

## C.     Plaintiffs Have Alleged That the Acquisition May Substantially Lessen Competition

Plaintiffs' Amended Complaint alleges that Albertsons and Kroger are direct horizontal competitors, the largest and second largest grocery chains in the United States (FAC, at Para. 47). Thus, Kroger's acquisition of Albertsons may substantially lessen competition because it will eliminate the direct competition between Albertsons and Kroger, both nationally and in local markets (FAC, Para 93). Under Section 7, the elimination of a significant rival in a nontrivial transaction, especially where there is a trend of concentration are enough. See *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1385 (7th Cir. 1986). (the Supreme Court cases interpreting Section 7 "establish the illegality of any nontrivial acquisition of a competitor, whether or not the acquisition was likely either to bring about or shore up collusive or oligopoly pricing .... None of these

---

[4] The Kroger-Albertsons merger pact, announced in mid-October, would combine the nation's first- and second largest supermarket retailers into a company with annual revenue of about $210 billion and 4,996 stores (excluding divestitures), 66 distribution centers, 52 manufacturing plants, 3972 pharmacies, 2,105 fuel centers and 710,000 workers in 48 states and D.C. Expected by the retailers to close in early 2024, the transaction would mark the largest U.S. supermarket merger ever. https://www.winsightgrocerybusiness.com/kroger/krogers-rodney-mcmullen-sheds-light-albertsons-merger-groceryshop

decisions has been overruled."). "The elimination of a significant rival was thought by itself to infringe the complex of social and economic values conceived by a majority of the Court to inform the statutory words "may ... substantially ... lessen competition." *Id*. As Plaintiffs allege, Albertsons is a significant rival of Kroger. The amount of $24 Billion dollars is not trivial, and that the acquisition is the culmination of decades of acquisitions local, regional, medium, and small grocery stores throughout the United States. Indeed, in this very case, the ultimate irony exists: The Vons stores in the Supreme Court decision were bought by Safeway, which in turn was bought by Albertsons, which in turn maybe bought by Kroger. And, in the Supreme Court's decision in American Stores, which approved the power to divest the acquisition by Lucky stores of the Alpha Beta stores, both were bought by Albertson and Albertson maybe bought by Kroger (FAC, Paras. 4, 9, 16, 19, 66, 141).

Further, Plaintiffs allege the specific market shares of the two rivals. Plaintiffs allege that Albertsons has roughly 12.4% of the national grocery market and Kroger has roughly 23.6%. (FAC, at Paras. 46, 47). The merger of firms with such market shares is also sufficient, without more, to show that the merger may result in illegal market concentration that may substantially lessen competition. See *Phil. Nat 'l Bank*, 374 U.S. at 364, & n.41 ("Without attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat."). Indeed, such facts are sufficient to show "prima facie unlawfulness" under Section 7. *Id*.

In addition, Plaintiffs allege that the grocery supermarket industry has experienced a substantial trend in concentration.[5] (FAC at Paras. 8, 23, 90) This is precisely what Congress

---

[5]  There has been a marked trend toward concentration in American markets over the last 20 years.  A 2019 study in the Review of Finance found that 75% of all American industries have become more concentrated within the last 20 years. The study also highlights that such concentration results in higher markups and price increases. And it notes that average profits for companies within these concentrated sectors increased nearly eightfold during the same period. Other studies point to similar dynamics.

wished to prevent. The Cellar-Kefauver Anti-Merger Act sought to "clamp down with vigor on mergers" and to stop any "trend toward concentration in its incipiency before that trend developed to the point that a market was left in the grip of a few big companies." *Von's Grocery*, 384 U.S. at 276-77 (emphasis added).

In addition, the case law is adamant that the Clayton Act prohibits an acquisition when "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." (15 U.S.C. §18) (purposefully used the phrase "may be" because the Clayton Act was designed to "arrest restraints of trade in their incipiency and before they develop into full-fledged restraints." *Brown Shoe Company*, 370 U.S. at 323, 339. (Emphasis added). Indeed, because Section 7 is in effect "a prediction" of future conduct, the Seventh Circuit has said that all "doubts are to be resolved against the transaction." *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989); see also *American Stores Co.,* 495 U.S. at 282 n.8. The Ninth Circuit also recently held in *St. Alphonsus Medical Center* that "Section 7 does not require certainty of proof that a merger or other acquisition has or will cause higher prices in the affected market. All that is necessary is that the merger create an *appreciable danger* of such consequences in the future." *St. Alphonsus*, 778 F.3d at 1389.

The same is true for the analysis of local markets. Plaintiffs have provided in the First Amended Complaint the HHI analyses for certain of the local markets where Plaintiffs reside as examples of the concentration that may be created locally. (FAC, Para.101,103, 104, 105, 106, 107).

Transactions that result in "undue" concentration in a relevant market are presumed to

---

According to a 2020 report by the American Economic Liberties Project, the concentration of industries in the past two decades has cost the average American family an additional $5,000 annually. Moreover, a 2020 study from the Journal of Human Resources revealed that business concentration results in fewer employment options and an average 17% decrease in wages compared with labor markets with more diverse employment options.

A 2017 report, "Dynamism in Retreat" from the Economic Innovation Group, indicated that new business formation has fallen nearly 50% since the 1970s. The report suggested that larger companies are stifling startups, leading to less job mobility for workers, fewer opportunities for upward mobility and an overall decline in innovation.

be unlawful. *United States v. Phila. Nat'l Bank,* 374 U.S. 321, 363 (1963). "[I]f concentration

is already great, the importance of preventing even slight increases in concentration and so

preserving the possibility of eventual deconcentration is correspondingly great." Id. at 365

n.42.

In enacting and amending §7 of the Clayton Act, "Congress sought to preserve competition

among many small businesses by arresting a trend towards concentration in its incipiency before

that trend developed to the point that a market was left in the grip of a few big companies." *United

States v. Von's Grocery Co.*, 384 U.S. 270, 277 (1966). The line of Supreme Court cases relying

upon this principle of law has never been overruled and has remained in control since 1962. *Brown

Shoe*, 370 U.S. at 297, involved the merger of Brown Shoe Co., the third largest shoe seller and

retailer in the United States, with Kinney, the eighth largest shoe seller and retailer in the United

States. Kinney's market share was less than 2%. The Supreme Court affirmed the lower Court's

order of divestiture, holding that "We cannot avoid the mandate of Congress that tendencies toward

concentration in industry are to be curbed in their incipiency, particularly when those tendencies

are being accelerated through giant steps striding across a hundred cities at a time." *Id.* at 345.

In *Philadelphia National Bank*, cited above, the Defendants proposed to merge the 2nd and

3rd largest banks in a four-county area which would have created the largest bank in the market,

with 36% of all assets. 374 U.S. at 330-31. Here the merger would result in a company controlling

36% of the national market share and locally high percentages of the market in areas where

Plaintiffs shop.  The Supreme Court enjoined the merger, holding that the resultant market share of

the combined firm, as well as the significant increase in concentration in the market, were both so

high as to be presumptively illegal.  374 U.S at 362, n.42.

The issue in the grocery case of *United States vs. Von's Grocery Co.*, 384 U.S. 270 (1966),

involved the acquisition by Von's, a grocery market chain with only a 4.7% market share of

Shopping Bag, another grocery chain with a 4.2% market share. 384 U.S. at 281. The Court,

analyzing the market shares together with the growing number of grocery chains and the shrinking number of independently owned stores, held that "these facts alone are enough to cause us to conclude…that the Von's-Shopping Bag merger did violate §7." *Id.* at 274.

In this case, pre-acquisition, the top four grocery chains represent more than 53% of market share, which itself demonstrates concentration in the industry. Post-acquisition the top four will increase to 60% of market share, emphasize the lack of competition. See Pie Chart, Paragraph 10, p. 5. Such a concentration of market share in four firms is unacceptably high according to the Supreme Court in *United States v. Alcoa*, 377 U.S. 271 (1964). In *Alcoa*, the acquisition of its target-company Rome that controlled only 1.3% of the market was held itself to be "reasonably likely to produce a substantial lessening of competition within the meaning of Section 7." *Id.* at 281.

Similarly, in *United States v. Continental Can Co.*, 378 U.S. 441 (1964), where the second largest competitor, Continental Can, acquired the sixth largest competitor, Hazel-Atlas, Continental Can's post-merger market share only rose from 21.9% to 25%, but the Supreme Court ordered divestiture.

In *United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966), the Court ordered divestiture of a merged entity which had combined the 10th and 18th largest brewers in the United States, but which, when combined, resulted in just the 5th largest brewer with only 4.49% of all domestic beer sales.

In *United States v. Falstaff Brewing Corp.*, 410 U.S. 526 (1973), the Supreme Court reversed the district court where the effect of the proposed acquisition would have been to eliminate a potential competitor which had never even done business in, nor ever professed to have any intention of entering, the target company's market, other than by acquisition. "Entry through merger by such a company . . .. will nevertheless violate Section 7 because the entry eliminates a potential competitor exercising present influence on the market." *Id.* at 532. (Emphasis Added).

- 12 -

The *Falstaff* opinion is especially applicable to this merger as it relates to the Northeastern portion of the United States where Albertsons has 175 stores and Kroger has none.  See Charts, FAC, pps. 19-22. The Court at the hearing on the first Motion to Dismiss was concerned that there would be no anticompetitive effect in a situation where Kroger simply takes over the Albertsons stores in a particular area such as the Northeast and merely changes the name on the marquees because the two companies did not previously compete in the Northeast market area. But this is precisely the conduct that was condemned in *Falstaff*: "in keeping with the spirit of the Celler-Kefauver Amendment, we have also applied § 7 to cases where the acquiring firm is outside the market in which the acquired firm competes." *Falstaff,* 410 U.S. at 558.

Plaintiffs have alleged that Kroger has the wherewithal, experience, financial ability, and expertise to expand on its own into the very markets and areas that it seeks to now gain through acquisition and that if Kroger, instead of combining with Albertsons, were to compete for market share in the Northeast (and elsewhere) rather than buying its way there, it would necessarily increase competition, lower prices, necessitate new jobs, increase consumer choice, invite investment, and otherwise enable Plaintiffs and consumers to enjoy the benefits that competition always provides. (FAC, Paras. 37, 130)

The Supreme Court cases cited above have not been overruled nor even diminished by later opinions and they dictate beyond any doubt that the proposed Kroger-Albertsons combination is unlawful. For example, in *Hospital Corp. of America v. Federal Trade Commission*, 807 F.2d 1381, 1385 (7th Cir. 1986), Judge Posner of the Seventh Circuit, citing *Brown Shoe Co.v. United States*, 370 U.S. 294 (1962), *United States v. Aluminum Co. of America*, 377 U.S.271 (1964, *United States vs. Von's Grocery Co.,* 384 U.S. 270 (1966) and *United States v.Pabst Brewing Co.*, 384 U.S. 546 (1966), acknowledged that the continuous line of Supreme Court precedent, taken together, prohibited "any *nontrivial* acquisition of a competitor." He further observed that "The *elimination of a significant rival* was thought by itself to infringe the complex of social and

- 13 -

economic values conceived by a majority of the Court to inform the statutory words 'may . . . substantially . . . lessen competition'". *Id*.

II.     **PLAINTIFFS' CLAIM IS RIPE BECAUSE THE SUPREME COURT HAS MANDATED THAT THESE ACQUSITIONS BE ENJOINED AT THEIR "INCIPIENCY"**

The Supreme court has consistently states that mergers must be enjoined at their "incipiency," *Brown Shoe, Philadelphia Natl, Vons*. The common definition of incipiency means from the beginning." Section 7 provides Plaintiffs the right to challenge this merger before it goes into effect regardless of any action by the government. *United States v. Borden Co*., 347 U.S. 514, 519 (1954).

Also, Courts have held that all post-merger agreement evidence of divestiture should be disregarded.  Even though as this Court has observed "the contours of the merger have not become apparent" because of the parties' planned divestiture of stores, in *Hospital Corporation of America v. FTC,* 807 F.2d 1381(7th Cir. 1986) Judge Posner ruled that the FTC was entitled to give no weight to the post-merger corrections made by the defendants since they were likely made only to improve their litigation posture.  The purpose of disregarding subsequent corrections was to simplify the adjudication of merger cases generally since otherwise a plaintiff would be required to investigate each instance of potential competition in the hundreds of markets where the divestiture of stores may apply. "Post acquisition evidence that is subject to manipulation by the party seeking to use it is entitled to little or no weight." *Id*. at 1384.

Kroger has executed a binding agreement to acquire Albertsons and has consistently maintained its intention to consummate the merger, now scheduled for February of 2024. As a result, any argument that this controversy is not ripe until the merger is consummated would necessarily turn the statutory scheme on its head since Section 7 is specifically aimed at stopping mergers before they occur. See, e.g., *du Pont de Nemours & Co*., 353 U.S., at 597 (Section 7 seeks "to arrest the creation of trusts, conspiracies, and monopolies in their incipiency and before

consummation). Under Section 7, mergers that "might" substantially lessen competition are unlawful, not just mergers shown to have already lessened competition. 15 U.S.C. § 18.

Similarly, Section 16 provides for a right of action to any Plaintiffs threatened with loss or damage, not just to Plaintiffs who have already suffered harm, 15 U.S.C. § 26, and since Section 7 is meant to curb trends in concentration in their incipiency, *Brown Shoe*, 370 U.S. at 346, there is considerable merit to addressing mergers before they are consummated.

Even as the Court observed, it would require a "superhuman" task to require the investigation and detailed analysis of each and every divestiture prior to consideration of the merits of a merger.  If that were the case, no merger could ever be completely evaluated before the merger is completed since a defendant's continued market manipulation would make the merger a moving target.

## <u>CONCLUSION</u>

For the reasons stated above, Plaintiffs respectfully submit that the Defendants' motions should be denied, and Plaintiffs should be permitted discovery in advance of a hearing on a motion for preliminary injunction and any trial scheduled by the Court.

Dated:  November 9, 2023                Respectfully submitted:

                                By:    */s/ Joseph M. Alioto*_____
                                        Joseph M. Alioto (SBN 42680)
                                        Tatiana V. Wallace (SBN 233939)
                                        ALIOTO LAW FIRM
                                        One Sansome Street, Suite 3500
                                        San Francisco, CA 94104
                                        Telephone: (415) 434-8900
                                        Email: jmalioto@aliotolaw.com

                                        *Attorneys for Plaintiffs*

- 15 -

ADDITIONAL PLAINTIFFS COUNSEL:

Lawrence G. Papale (SBN 67068)
LAW OFFICES OF LAWRENCE G. PAPALE
1308 Main Street, Suite 117
St. Helena, CA 94574
Telephone: (707) 963-1704
Email: lgpapale@papalelaw.com

Josephine Alioto (SNB 282989)
THE VEEN FIRM
20 Haight Street
San Francisco CA 94102
Telephone: (415) 673-4800
Email: jalioto@veenfirm.com