Joseph M. Alioto (SBN 42680)
Tatiana V. Wallace (SBN 233939)
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone: (415) 434-8900
Email:  jmalioto@aliotolaw.com

[Additional Counsel Listed on Last Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Christine Whalen, Katherine Arcell, Jose Brito, Jan Marie Brown, Rosemary D'Augusta, Brenda Davis, Pam Faust, Carolyn Fjord, Don Freeland, Donald Fry, Gabriel Garavanian, Harry Garavanian, Jocelyn Gardner, Valarie Jolly, Michael Malaney, Len Marazzo, Lisa McCarthy, Tim Nieboer, Deborah Pulfer, Bill Rubinsohn, Sondra Russell, Clyde Stensrud, Gary Talewsky, Pam Ward, <br><br> Plaintiffs, <br> v. <br><br> Kroger Co., Albertsons Companies, Inc., and Cerberus Capital Management, L.P., <br><br> Defendants. | Case No.:  23-cv-00459-VC <br><br> **SECOND AMENDED COMPLAINT CHARGING THAT THE KROGER ACQUISITION OF ALBERTSONS IS A VIOLATION OF SECTION 7 OF THE CLAYTON ANTITRUST ACT, 15 U.S.C. §18** <br><br> **Jury Trial Demanded for All Issues at Law** |

PROLOGUE

"The quantity of grocer goods, for example, which can be sold in a particular town, is limited by the demand of that town and its neighbourhood. The capital, therefore, which can be employed in the grocery trade cannot exceed what is sufficient to purchase that quantity.  If this capital is divided between two different grocers, their competition will tend to make both of them sell cheaper, than if it were in the hands of one only; and if it were divided among twenty, their competition would be just so much the greater, and the chance of their combining together, in order to raise the price, just so much the less.  . . .  It can never hurt either the consumer, or the producer; on the contrary, it must tend to make the retailers both sell cheaper and buy dearer, than if the whole trade was monopolized by one or two persons."[1]

Adam Smith, *The Wealth of Nations*, Book II, Chapter V,
University of Chicago Press, ed. Edwin Cannan

INTRODUCTION

1.       This is a private antitrust action brought under the authority of Section 16 of the Clayton Antitrust Act (15 U.S.C. § 26)[2] charging violations of Section 7 of the Clayton Antitrust Act[3] (15 U.S.C. § 18) seeking a permanent injunction to prohibit Kroger Co. from acquiring Albertsons Companies.

2.       Section 16 of the Clayton Act authorizes private Plaintiffs to enjoin a violation of the antitrust laws against "threatened loss or damage". The "threatened loss or damage" to the Plaintiffs and to the public at-large is the potential elimination of Kroger's competitor, Albertsons, and the threat that prices for food and other grocery products may be raised,

---

[1] "Certainly the failure of the Government to prove by an army of expert witnesses what constitutes a relevant 'economic' or 'geographic' market is not an adequate ground on which to dismiss a s 7 case." *U.S. v. Pabst*, 384 U.S. 546, at 549.

[2] "Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against *threatened* loss or damage by a violation of the antitrust laws . . ." (Emphasis Added) 15 U.S. Code Section 26.

[3] Section 7 of the Clayton Antitrust Act provides in pertinent part as follows: "No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital … where in any line of commerce or in any activity affecting commerce *in any section of the country*, the effect of such acquisition *may* be substantially to lessen competition, or tend to create a monopoly." (Emphasis added.)

production may be limited, services may be curtailed, quality may be lessened, and innovations may not be pursued.

3.      Section 7 of the Clayton Act prohibits acquisitions where the effect "*may* be substantially to lessen competition or tend to create a monopoly."  Lessening of competition is irreparable injury.

4.      The proposed acquisition *may* lessen competition and therefore should be enjoined in its *incipiency*.

5.      If it is shown that the "acquisition *may* be substantially to lessen competition or tend to create a monopoly . . . *in any section of the country*", that is sufficient to prove a violation under the law.

6.      The proposed acquisition price is not trivial: $24.6 billion in cash.

7.      There has been a substantial trend of acquisitions in the industry, particularly by Kroger and Albertsons, which have methodically acquired substantial numbers of independent, small, medium and large grocery stores and chains, culminating in this proposed acquisition between the largest grocery store chain and the second largest grocery store chain in the United States amounting to an entity that is three times larger than its next closest competitor by revenue and market share.

8.      The proposed acquisition of Albertsons and Kroger grocery stores is the largest in the US grocery industry in history.  Kroger's acquisition of Albertsons eliminates a significant competitor and rival.

9.      Together, Kroger and Albertsons would form a national company with 4,996 stores, 66 distribution centers, 52 manufacturing plants, 2,015 gas stations and more than 710,000 associates across 48 states and the District of Columbia. The merged entity also would be the fifth-largest retail pharmacy operator by locations, with 3,972 pharmacies.  The

top five retail grocery store chains control 66% of all retail sales in the United States.  The acquisition of Albertsons by Kroger would reduce that number to four.  This market power is hidden in the marketplace because the large corporations hide behind subsidiary "banners".  If you shop at a Ralph's, Food 4 Less, or Smith's Food and Drug, the profits funnel directly into the same company — Kroger.

10.     In furtherance of the acquisition, and as one of the necessary considerations for the acquisition, Kroger and Albertsons agreed that Albertsons would pay $4 billion, the full amount of its profit for the preceding year, to certain shareholders, thereby requiring Albertsons to accept the acquisition by Kroger.

11.     In furtherance of the violation, and as an incentive to secure the cooperation of Albertsons for the acquisition, Kroger agreed to pay Albertsons $318,000,000 if the acquisition is not consummated.

12.     Kroger's plan to acquire rival Albertsons will combine the largest and second-largest supermarket companies in the country by sales, thereby not only substantially lessening competition but also tending to create a monopoly in the sale of grocery goods and to create a monopsony in the purchase of goods from farmers, wholesalers and distributors of grocery products.  The current trend toward concentration, the lessening of competition and the tendency to create a monopoly and monopsony in the grocery industry is unmatched and unparalleled in the history of the industry.

13.     The proposed acquisition is a violation of Section 7 of the Clayton Antitrust Act (15 U.S.C. § 18) because the effect of the elimination of Albertsons may be "substantially to lessen competition or tend to create a monopoly" in the grocery industry by the elimination of a significant competitor in a non-trivial transaction.

14.     Kroger is the largest supermarket operator by revenue, and Albertsons is the second-largest supermarket chain in America after Kroger.  The combination of these two giants will create a supermarket behemoth with a combined market share and control of 36% of the U.S. grocery supermarket operators and with a combined annual sales of more than $200 billion, more than the amount stated by the Supreme Court of the United States that will constitute a violation of Section 7 of the Clayton Act.

15.     According to the SupermarketNews.com, a nationally accepted Commercial Publication and Market Report, the following chart demonstrates not only the significant market shares of the defendants Kroger and Albertsons, but also those of all of the remaining significant, relevant competitors in the national grocery supermarket market.



*Second Amended Complaint for Violation of Section 7 of the Clayton Act*

16.     According to SupermarketNews.com, the following bar charts demonstrate that the acquisition will be almost four times the amount of the next closest competitor and nearly 1.3 times the total sales of the next four competitors combined, showing the enormity and the substantial potential anticompetitive effects of this proposed acquisition.





*Second Amended Complaint for Violation of Section 7 of the Clayton Act*

17.     The proposed acquisition is prohibited nationally, regionally and locally by the binding authority of the Supreme Court of the United States as enunciated in its decisions in *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962), *United States v. Philadelphia National Bank*, 374 U.S. 321 (1963), *United States v. Aluminum Company of America*, 377 U.S. 271 (1964), *United States v. Von's Grocery Co.*, 384 U.S. 270 (1966), *United States v. Pabst Brewing Co*., 384 U.S. 546 (1966), and *United States v. Falstaff Brewing Corporation*, 410 U.S. 526 (1973).

18.     Ironically, two of the grocery supermarket chains involved in two of the controlling decisions by the Supreme Court, *Von's* and *American Stores* (the attempt by the Lucky Stores chain to buy the Alpha Beta chain), were ultimately purchased by Albertsons, which Kroger now seeks to consume by acquiring Albertsons.

19.     This private action is specifically authorized under Section 16 of the Clayton Antitrust Act (15 U.S.C. § 26) which provides that "any person [including members of the public]…shall be entitled to sue and have injunctive relief …against threatened loss or damage by a violation of the antitrust laws."

20.     The remedy afforded to private plaintiffs includes the prohibition of the potential unlawful acquisition at its incipiency.  As was unequivocally stated by the United States Supreme Court in *California v. American Stores Company*, 495 U.S. 271, 283 (1990), "[T]he literal text of Section 16 is plainly sufficient to authorize injunctive relief [in favor of a private Plaintiff], including an order of divestiture, that will prohibit that conduct from causing that harm."  The acquisition is ripe to be enjoined under the authority of the Supreme Court which has stated time and time again that these acquisitions must be enjoined at their "incipiency"; namely, at the very beginning, once the acquisition is announced  *Brown Shoe, supra; Von's, supra*; *Pabst, supra*.

21.     Under Section 7 of the Clayton Act, which provides that a violation may be shown from the lessening of competition in any section of the country, all that is necessary to show is that a lessening of competition may occur "somewhere in the United States – 'in *any* section' of the United States."  The Court stated as follows:

> "We first take up the court's dismissal based on its conclusion that the Government failed to prove either Wisconsin or the three-state area constituted 'a relevant section of the country within the meaning of Section 7.' Apparently the District Court thought that in order to show a violation of s 7 it was essential for the Government to show a 'relevant geographic market' in the same way the corpus delicti must be proved to establish a crime. But when the Government brings an action under s 7 it must, according to the language of the statute, prove no more than that there has been a merger between two corporations engaged in commerce and that the effect of the merger may be substantially to lessen competition or tend to create a monopoly in any line of commerce '*in any section of the country.*' (Emphasis supplied.) The language of this section requires merely that the Government prove the merger may have a substantial anticompetitive effect <u>somewhere</u> in the United States—'in any section' of the United States.  This phrase does not call for the delineation of a 'section of the country' by metes and bounds as a surveyor would lay off a plot of ground. The Government may introduce evidence which shows that as a result of a merger competition may be substantially lessened throughout the country, or on the other hand it may prove that competition may be substantially lessened only in one or more sections of the country. In either event a violation of s 7 would be proved. Certainly the failure of the Government to prove by an army of expert witnesses what constitutes a relevant 'economic' or 'geographic' market is not an adequate ground on which to dismiss a s 7 case. Compare United States v. Continental Can Co., 378 U.S. 441, 458, 84 S.Ct. 1738, 12 L.Ed.2d 953. Congress did not seem to be troubled about the exact spot where competition might be lessened; it simply intended to outlaw mergers which threatened competition in any or all parts of the country. Proof of the section of the country where the anticompetitive effect exists is entirely subsidiary to the crucial question in this and every s 7 case which is whether a merger may substantially lessen competition anywhere in the United States." *U.S. v. Pabst*, 384 U.S. 546, at 549. (Underlining added.)

22.     Private actions to vigorously challenge anticompetitive acquisitions have been encouraged by the Congress and the Supreme Court of the United States in strong and unmistakable language: "The Act's other provisions manifest a clear intent to encourage vigorous private litigation against anticompetitive mergers." *California v. American Stores Company*, 495 U.S. 271, 284 (1990).

23.     Plaintiffs therefore bring this action under the authority of Section 16 of the Clayton Antitrust Act (15 U.S.C. § 26) and allege that the pending elimination of Albertsons by Kroger constitutes a substantial threat of injury and potential damage to these Plaintiffs because this acquisition may have the effect "substantially to lessen competition" and "tend to create a monopoly" in a "line of commerce" in a "section of the country" in violation of Section 7 of the Clayton Antitrust Act (15 U.S.C. § 18).  In addition, the contract to eliminate Albertsons constitutes a non-trivial transaction between significant rivals, neither of which is a failing company, that may eliminate a substantial and growing competitor from the market.

24.     Prior to the proposed acquisition, both Kroger and Albertsons have demonstrated their willingness and intention to expand into markets throughout the United States.  As a result, Kroger and Albertsons directly compete in many sections of the country, including where Plaintiffs live and shop for groceries.  In addition to the actual competition in sections of the country where Kroger and Albertsons are direct competitors, the agreement also eliminates the potential competition of Kroger expanding into markets where Albertsons already is, and Albertsons expanding into markets where Kroger already is.

25.     For example, as part of the acquisition agreement, Kroger would purchase the Albertsons stores in the northeastern United States rather than expanding into that market on its own in competition with the Albertsons stores that are already there.  By acquiring the Albertsons stores in the northeast United States lock, stock and barrel, the potential competition that would otherwise result from Kroger expanding into that market on its own in competition to the Albertsons stores there is eliminated and, in turn, the future potential competition from Albertsons entering markets where Kroger exists would also be eliminated. Kroger's business plan to simply take over the Albertsons stores and substitute its name for

the Albertsons marquee in the northeast has already been found to be unlawful and has been enjoined by the Supreme Court in *Falstaff, supra,* 410 U.S. 526 (1973).

26.     The proposed acquisition substantially affects the interstate and foreign commerce of the United States in that supermarket supplies, food and other consumer items and all the other necessities of the grocery supermarket industry are in the constant flow of the interstate and foreign commerce of the United States.  Because Defendants transact business in this judicial district, venue is proper in this Court pursuant to 15 U.S.C. §§15, 22 and 26, and 28 U.S.C. § 1391.

27.     Plaintiffs seek an Order from this Court prohibiting the proposed acquisition by Kroger of Albertsons that would eliminate Albertsons as a significant actual and potential competitor.

28.     Plaintiffs also seek an order to prohibit the acquisition and to require Kroger to repay the $4 Billion that was paid by Albertsons as part of the consideration for the acquisition.

29.     The relevant product market is the retail sale of food and other grocery products through grocery supermarket chains.  The relevant geographic market is the entire United States, the individual States of the United States, and the regional and local geographic markets within individual states, in "any section of the country".

30.     The grocery supermarket industry is a critical and vital modern necessity to the commercial, social and political well-being of the United States. Competition rather than combination has been and should be enforced in the United States so that these Plaintiffs, and the public at large, may enjoy the benefits of competition, including, *inter alia*, the best possible goods and services at the lowest possible prices.  Vigorous enforcement of the antitrust laws by private persons is an essential part of the Congressional plan to ensure that

competition rather than monopoly is, and remains, the rule of trade in the United States, especially in the grocery supermarket industry.

31.     From 1993 to 2019, the number of grocery stores nationwide declined by roughly 30 percent.  Food industry mergers and acquisitions exceeded 300 in 2019 alone.  The U.S. grocery supermarket industry is moving ineluctably toward complete concentration and monopoly, a fact that is dramatically illustrated by Defendant Kroger's past mergers and acquisitions (see Chart Following) and that is further demonstrated in this Albertsons acquisition.



32.     Similar to Kroger, Albertsons has purchased major grocery store chains, including:

---

4   Source:  Foodandwaterwatch.org *The Economic Cost of Food Monopolies:  The Grocery Cartels. Nov 2021.*

Albertsons

Safeway

Vons

Jewel-Osco

Shaw's

Acme

Tom Thumb

Randall's

United Supermarkets

Pavilions

Star Market

Haggen

Carrs

Kings Food Markets

Balducci's Food Lovers Market

33.     This trend toward concentration was unanimously condemned by Chief Justice Warren in the Supreme Court opinion in *Brown Shoe Co. v. United States, supra,* which made it clear that 1) the Court should and would take steps to curtail *incipient* acquisitions whose effect *may* be to eliminate competition in an industry and 2) that an acquisition is ripe for adjudication at the point of agreement:  "We cannot avoid the mandate of Congress that tendencies toward concentration in industry are to be curbed in their incipiency, particularly when those tendencies are being accelerated through giant steps striding across a hundred cities at a time.  In the light of the trends in this industry we agree with the Government and the court below that this is an appropriate place at which to call a halt."  *Id*. at 346.

34.     If Kroger's proposed acquisition of Albertsons is consummated, the companies' combined power "may" be used to increase prices for groceries, decrease the quality of food and other goods, eliminate jobs, close stores and offer less choice for consumers.

35.     And contrary to the suggestion by the Defendants that there are or will be divestitures of stores before the acquisition, no divestitures have been made to date, nor will they be made until and unless the acquisition of Albertsons by Kroger is consummated. Further, any suggestion or agreement of divestiture should not be considered when weighing the antitrust violation because the divestiture of stores is speculative, and because, even if it were not speculative, subsequent divestiture is not relevant because, as the Supreme Court has stated time and time again, these acquisitions must be judged at their very beginning, or "incipiencies," which in this case was October 13, 2022.

36.     Moreover, post-acquisition agreements have been held to be entitled to little or no weight because these sales are often engineered and "manipulated" for litigation purposes:

> "We agree with the Commission that it was not required to take account of a post-acquisition transaction that may have been made to improve Hospital Corporation's litigating position. . . Post-acquisition evidence that is subject to manipulation by the party seeking to use it is entitled to little or no weight. [Citation Omitted.] The Commission was entitled to give it no weight in this case . . . "[5]

37.     Indeed, four Senators and two Representatives of the United States Congress have publicly noted that so-called "divestitures" consistently fail; do not achieve the purposes of Section 7; "cease to be binding once the term of the agreement ends"; "fail to maintain competitive conditions because . . . companies have an incentive to ensure that the businesses they spin off do not succeed"; and "encourage companies to 'litigate the fix' by proposing

---

[5] *Hospital Corporation of America v. FTC*, 807 F.2d 1381, 1384 (7th Cir. 1986).

remedies during ongoing litigation in order to distract a judge's focus from the original antitrust violations of the merger."[6]

38.     Furthermore,  as the Congressional Leaders pointed out:  1) the Kroger acquisition of Albertsons would result in the five largest food retail companies controlling 55% of all grocery sales in the United States; 2) the resulting entity "may" use its dominance to control and raise consumer prices; 3) the merged company's dominance would be felt most directly at the regional and local levels and "may" result in a Kroger monopsony or a duopoly with Walmart with the two corporations controlling more than 70% of the grocery market in more than 160 cities across the country; [7] 4) on the "buy side", as Adam Smith had predicted, a grocery mega-merger would increase the risk that the merged firm would violate the Robinson-Patman Act, which prohibits price discrimination, by pressuring food suppliers – and especially C&S which will be beholden to Kroger – to provide it with preferred pricing and terms that may not be available to Kroger's smaller competitors;  5) price discrimination impairs independent and smaller grocers' ability to compete on price and even on quality; and 6) the merger will ultimately decrease the smaller grocery suppliers' buying power thereby encouraging those suppliers themselves to consolidate, or collude in violation of the Sherman Act, in order to counter balance the bargaining power of the new Kroger monopsony and/or Kroger/Walmart duopoly.

39.     In addition, the sale of Kroger and Albertson stores to C&S is suspect because (1) the sale was not subject to competitive bidding; (2) it is contingent on the acquisition being approved and, if disapproved, the sale to C&S "may" be annulled and; (3) the sale may

---

[6] Letter dated December 11, 2023 to Honorable Lina Khan, Chair, Federal Trade Commission, from United States Senators Warren, Hirono, Sanders and Booker and U.S. Representatives Lee and Ocasio-Cortez.  Senator Sanders Chairs the Health, Education, Labor and Pensions Committee of the U.S. Senate.
[7] *See* Institute for Local Self-Reliance, "Americans Don't Need Another Mega-Grocer", Stacy Mitchell, October 14, 2022, https://ilsr.org/statement-kroger-albertsons-merger/.

itself be in violation of Section 7 because the sale of the spun-off stores may itself lessen the actual or potential competition of C&S, the recipient of the stores, which would otherwise compete against Defendants by expanding its existing stores against Kroger and Albertsons in those markets where stores are spun off and in other markets. The Defendants are, in effect, buying and selling markets instead of competing for them.

40.     In addition, this attempted "divestiture" may not be a viable sale.  Past supermarket divestitures have struggled within months of being separated and have ultimately failed.  A good example of this eventuality is the Albertsons acquisition of Safeway in 2015 in which the Safeway stores that were divested for the purpose of attempting to pass muster with the FTC eventually struggled and many have failed.  When the Safeway stores were spun off by Albertsons in its acquisition of Safeway, the entity that purchased the spun off stores was unable to meaningfully compete and soon declared bankruptcy.

41.     Unless this acquisition of the first and second largest national competitors in retail sales last year among the U.S. food and grocery supermarket operators is prohibited, the unified company will become the largest supermarket by revenue in the United States with a current national market share of 36%.  And Albertsons, a competitor with a national market share of 12.4%, will be eliminated.

42.     Market concentrations with much lower percentages have in the past been held by the Supreme Court to constitute a violation of Section 7 of the Clayton Act.  *See United States v. Aluminum Company of America*, 377 U.S. 271 (1964) (elimination of Rome Cable with only 1.3% share of national market), and *United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966) (nos. 10 and 18 in the national market becoming no. 5 with 4.9%). (See Chart Following.)

## Key Section 7 Cases
### Market Share and Rankings, Pre-Merger vs. Post-Merger

| Acquiring Company Market Share | Acquired Compan(ies) Market Share | Merged Entity Market Share | Result |
|---|---|---|---|
| **VONS**<br>• 4.7% share<br>• #3 in market | **Shopping Bag**<br>• 4.2% share<br>• #6 in market | • 7.5% share<br>• #2 in market | **ENJOINED** |
| **ALCOA**<br>• 27.8% share<br>• #1 in market | **ROME CABLE.**<br>• 1.3% share<br>• #9 in market | • 29.1% share | **ENJOINED** |
| • 5.48% share tri-state<br>• #10 nationwide<br>• #4 statewide (WI)<br>• #7 tri-state (WI, Ill, Mich) | • 5.84% share tri-state<br>• #18 nationwide<br>• #1 statewide (WI)<br>• #6 tri-state (WI, Ill, Mich) | • 11.32% share tri-state<br>• #5 nationwide<br>• #1 statewide (WI)<br>• 4.49% share nationwide<br>• 23.95% share statewide | **ENJOINED** |
| • 6% manufacturing share<br>• #3 in manufacturing | **Kinney shoes**<br>• .05% manufacturing share<br>• #12 in manufacturing<br>• 2% retail share | • 6% manufacturing share<br>• #3 in manufacturing<br>• 9.5% retail share<br>• #2 in retail market | **ENJOINED** |
| **PNB**<br>• #2 in market | GIRARD TRUST CORN EXCHANGE BANK<br>• #3 in market | • #1 in market<br>• 36% share (of assets) | **ENJOINED** |

14

43.     And in two major cases involving the grocery industry, the Supreme Court condemned the grocery store acquisitions as violations of Section 7 of the Clayton Act.  The

first dealt with a small area of the country, the Los Angeles market, where the combination of the no. 3 and no. 6 groceries becoming the no. 2 grocery with 7.5% of the market in Los Angeles was outright condemned by the Court. *United States v. Von's Grocery Co*, 384 U.S. 270 (1966).

44.     The second was the *American Stores* case in which the Court granted injunctive relief to the private plaintiff, and ultimately ordered the divestiture of the stores under the merger.

45.     Here the combination of Albertsons and Kroger "may" result in the eradication of consumer choice, and "may" have other anticompetitive effects that may, and most probably will, flow from the elimination of Albertsons from the market.  If, however, Kroger, instead of combining with Albertsons, were to compete for market share rather than buying its way there, it would have the wherewithal, the experience, the knowledge, and the ability to expand on its own, all of which would necessarily increase competition, lower prices, necessitate new jobs, increase consumer choice, invite investment, and otherwise enable the consumer to enjoy the benefits that competition always provides.

46.     The United States Supreme Court found it fundamental to free-market economies that "Internal expansion [through competition] is more likely to be the result of increased demand for the company's products and is more likely to provide increased investment in plants, more jobs and greater output. Conversely, expansion through acquisition is more likely to reduce available consumer choice while providing *no increase in industry capacity, jobs or output.* It was for these reasons, among others, Congress expressed its disapproval of successive acquisitions. Section 7 was enacted to prevent even small acquisitions that added to concentration in an industry." *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962), at fn. 72 (emphasis added).

47.     The proposed elimination of Albertsons by Kroger poses a substantial threat to the Plaintiffs, and to the public at large, in that the proposed elimination "may" only serve, as the Supreme Court warned, to "reduce available consumer choice while providing no increase in industry capacity, jobs or output," and may potentially cause loss to the Plaintiffs, and the public at large, in the form of higher prices for food and other consumer goods, the elimination of consumer choice and other potential anticompetitive effects which deprive the Plaintiffs, and the public at large, of the salutary benefits of competition.

48.     The importance of the products that supermarkets sell and the services and innovations that they provide to residents means that any material reduction in a supermarket competitor's ability to compete can harm those residents in ways that are far from hypothetical.  As is customary in these acquisitions, the first casualties "may" be the workers who are fired because they were only needed when the competition existed.  Staffing "may" decrease, leading to worse service for consumers and worse conditions for workers.  Prices "may" go up, and promotions "may" decrease, and that translates directly into the quantity and quality of food that families can put on their tables.

49.     The elimination of Albertsons is manifestly an irreparable harm since the competition from Albertsons would be an irretrievable loss.

50.     Should the proposed elimination of Albertsons go unchallenged, the nation would not only lose the competition of Albertsons, but also the potential competition that Kroger would provide by further building its own national presence the old-fashioned way: by competing for customers instead of buying them.  The proposed elimination of Albertsons, therefore, "may" not only eliminate the stout and particular competition of Albertsons, but "may" also discourage continued vigorous competition from Kroger and "may" ultimately

lessen the economic ideal espoused by Congress and the Supreme Court of more consumer choice made more available through competition.

## THE PARTIES

<u>Plaintiffs</u>

51.     The Plaintiffs named below are individual citizens of the cities and states listed. Each Plaintiff is a consumer and customer of the Defendants, all with an express interest and intent in ensuring that Albertsons stores are preserved as a competitive option for them, now and in the future.  Plaintiffs have made purchases at the Defendants' stores within the last four years.  The actual and potential elimination of Albertsons "may" cause loss and harm to the Plaintiffs, and to the public at large, of the salutary benefits of the competition that Albertsons brings, as well as the opportunity to shop at Albertsons.

> Christine Whalen, New Orleans, LA;
> Gabriel Garavanian, Tyngsboro MA;
> Katherine R. Arcell, New Orleans, LA;
> Jose' M. Brito, Reno, NV;
> Jan-Marie Brown, Carson City, NV;
> Rosemary D'Augusta, Millbrae, CA;
> Brenda K. Davis, Forney, TX;
> Pamela Faust, Loveland, Ohio;
> Carolyn Fjord, Winters, CA;
> Don Freeland, Thousand Palms, CA;
> Don Fry, Tucson, AZ;
> Harry Garavanian, Tyngsboro, MA;
> Yvonne Jocelyn Gardner, Colorado Springs, CO;
> Valarie Ann Jolly, Mabank, TX;
> Michael C. Malaney, Grandville, MI;
> Len Marazzo, Reno, NV;
> Lisa McCarthy, Naples, FL;
> Timothy Nieboer, Clarkston, MI;
> Deborah M. Pulfer, Sidney, OH;
> Bill Rubinsohn, Jenkintown, PA;
> Sondra K. Russell, Waco, TX;
> Clyde D. Stensrud, Kirkland, WA;
> Gary Talewsky, Sharon, MA;
> Pamela S. Ward, Garland, TX.

52.     Plaintiffs are consumers of the Defendants' goods and shop at the Defendants' stores in their local geographic areas.

<u>Defendants</u>

53.     Defendant Kroger Co. (hereinafter "Kroger") is an American retail company that operates supermarkets and multi-department stores throughout the United States. Founded in 1883 in Cincinnati, Ohio, Kroger operates 2,721 retail grocery stores under its various banners and divisions in 35 states and in the District of Columbia, with store formats that include hypermarkets, supermarkets, superstores, department stores, and jewelry stores. Kroger operates 33 food processing or manufacturing facilities, 1,618 supermarket fuel centers, 2,251 pharmacies, and 225 in-store medical clinics.  Kroger's headquarters are located in Cincinnati.

54.     Kroger is the United States' largest supermarket operator by revenue, commanding 23.6% of the market.  It ranked 17th on the 2018 Fortune 500 list of the largest United States corporations by total revenue.  Kroger has expanded by acquisition.  Kroger's family of store banners include Kroger, Ralphs, Dillons, Smith's, King Soopers, Fry's, QFC, City Market, Owen's, Jay C, Pay Less, Bakers, Gerbes, Harris Teeter, Pick N' Save, Metro Market, Mariano's, Fred Meyer, Food 4 Less and Foods Co. (See Charts Following).

## Location of Kroger Stores Nationwide



Source: Kroger Investor Relations

*Second Amended Complaint for Violation of Section 7 of the Clayton Act*

## Location of Kroger Stores by State



Sources: www.thekrogerco.com/newsroom/state-facts, google.com

55.     Defendant Albertsons Companies, Inc. (hereinafter "Albertsons") is an American grocery supermarket operator founded in 1939 and headquartered in Boise, Idaho. With 2,253 stores as of the third quarter of fiscal year 2020 and 270,000 employees as of fiscal year 2019, the company is the second-largest supermarket chain in North America after Kroger, accounting for 12.4 % of the market.  Albertsons ranked 53rd on the 2018 Fortune 500 list of the largest United States corporations by total revenue.  Prior to its January 2015 acquisition of Safeway Inc. for $9.2 billion, it had 1,075 supermarkets located in 29 U.S. states under 12 different banners.  The Safeway acquisition was the largest grocery acquisition in US history at the time. It gave Albertsons a significant presence in the Western United States.

56.     Albertsons' acquisitions have helped the company to expand its reach and become the second-largest grocery retailer in the United States. The company now operates over 2,200 stores in 34 states and the District of Columbia.

57.     Albertsons' store base includes such banners as Albertsons, Safeway, Vons, Jewel-Osco, Shaw's, Acme, Tom Thumb, Randall's, United Supermarkets, Pavilions, Star Market, Haggen, Carrs, Kings Food Markets and Balducci's Food Lovers Market. (See Charts Following).

## Location of Albertsons Stores Nationwide



*Source: Kroger Investor Relations*

*Second Amended Complaint for Violation of Section 7 of the Clayton Act*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Location of Albertsons Stores by State



Source: www.statista.com/statistics/1167508/albertsons-operating-stores-by-state-us

<u>Co-Conspirators</u>

58.     Co-conspirator C&S Wholesale Grocers LLC ("C&S") is a national

wholesale grocery supply company in the United States, based in Keene, New Hampshire. In

2021 it was the eighth largest privately held company in the United States, as listed by Forbes.

C&S owns the Piggly Wiggly grocery brand, which is independently franchised to store

operators, the Grand Union supermarkets brand, as well as several private label brands,

including Best Yet. C&S acted in concert with Defendants in furtherance of the violation of

Section 7 of the Clayton Act.

59.     As of 2021, C&S serviced over 7,700 independent supermarkets, chain stores,

military bases and institutions with over 137,000 different products, including produce, meat,

dairy products, delicatessen products, fresh/frozen bakery items, health and beauty aids, candy, and tobacco.

60.     Services range from wholesale procurement, category management, pricing, marketing, advertising, merchandising, business and accounting, store design, and engineering. C&S customers include Giant-Carlisle, Giant-Landover, Safeway Inc., Southeastern Grocers, Target Corporation, and independent store/supermarket owner/operators.

61.     Over the last 22 years, C&S has bought up or eliminated numerous small independent grocery stores.  The acquisitions began in 2001 when C&S purchased the Grand Union supermarket chain.  In 2005, C&S acquired 104 stores from BI-LO, which operated stores under the BI-LO, Bruno's Supermarkets, Food World, FoodMax and Food Fair brand names.  In October 2014, C&S acquired the operations of Piggly Wiggly Carolina Co.  In 2014, C&S acquired Associated Wholesalers (AWI) which owned the grocery chain Nell's.  In 2019, C&S acquired Olean Wholesale Grocery, which operated in upstate New York and Pennsylvania.

62.     The acquisition by C&S of certain Kroger and Albertsons stores itself substantially threatens injury and harm to grocery shoppers, lessens competition, both horizontally and vertically, substantially threatens discriminatory pricing in favor of Kroger in violation of Section 2(a) of the Robinson Patman Act, and may, in itself, be a violation of Section 7.

63.     Various additional persons, partnerships, firms, and corporations who are members of the consortium of private equity entities which collectively own approximately 75% of Albertsons stock, and other individuals, the identities of whom are presently unknown,

have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the illegal contracts, combinations, and conspiracies.  When the names of these co-conspirators have been identified, Plaintiffs will seek leave to amend this complaint.

64.     On October 13, 2022, Albertsons and Kroger (collectively, "Defendants"), who are the two largest horizontal competitors in the sale of groceries and other consumer goods nationally, entered into an "Agreement and Plan of Merger" ("Agreement").  This Agreement is the final and complete agreement between Defendants to consummate an acquisition that they had contemplated and negotiated since June of 2022.  Kroger agreed to pay $24.6 billion in cash to eliminate Albertsons.  This is not a trivial transaction.

65.     As part of the proposed acquisition, Kroger and Albertsons agreed that Albertsons will pay a "special dividend" of $4 billion, which is more than one-third of Albertsons' total market capitalization of approximately $11 billion.  The funds for this payment would be sourced from $2.5 billion of Albertsons' cash and $1.5 billion in new debt, resulting in a drop from approximately $4 billion to $1.5 billion in Albertsons' cash and cash receivables, and causing its net debt to increase from $4.54 billion to $8.54 billion.

66.     The payment of this Special Dividend "may" leave Albertsons undercapitalized and "may" impede Albertsons' ability to compete with other supermarkets, including Kroger, leaving shoppers to face higher prices, worse services, less innovation, and even closure of Albertsons supermarkets.  Replacing cash with debt "may" inevitably harm Albertsons' credit rating, making borrowing more expensive.  A financially crippled Albertsons "may" have dire consequences for consumers, who depend upon supermarkets near their homes, for such essentials as fresh meat and produce, among other groceries.  If Albertsons is strapped for

cash, it "may" be less able to offer promotions on groceries, less able to offer quality services, and less able to maintain staffing and competitive wages and benefits for workers.

67.     According to data compiled by Statista, Kroger ranked first in U.S. food and grocery supermarket retail sales last year with $138 billion in sales for 2021.  Albertsons was second overall with $72 billion in sales last year.

68.     Collectively, Albertsons and Kroger operate nearly 5,000 stores, employ more than 710,000 associates, run 66 distribution centers,  52 manufacturing plants, nearly 4,000 pharmacies and more than 2,000 fuel centers across 48 states and the District of Columbia.  The companies' combined market share of 36% of U.S. grocery supermarket sales will have a combined annual sales of more than $200 billion.

69.     Supermarkets are already a consolidated industry in the United States.  Albertsons and Kroger are two of its largest players and have been historically fierce competitors in numerous States.  Defendants claim that their transaction will unite "complementary" companies, but even their own map of store locations makes clear the extent of their competitive. (See Charts Following.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Location of Kroger and Albertsons Stores Nationwide



Source: Kroger Investor Relations

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16

## Location of Kroger and Albertsons Stores by State



Sources: www.thekrogerco.com/newsroom/state-facts, google.com, www.statista.com/statistics/1167508/albertsons-operating-stores-by-state-us

17    70.    Defendants currently operate competing banners with strong presences across

18  the United States.  In some markets, Kroger and Albertsons owned supermarkets compete

19  head-to-head for shoppers' dollars.  For example, in California, Kroger owns and operates

20  approximately 214 stores under the Ralphs banner and an additional 19 under Food 4 Less.

21  A majority of these stores are located in Southern California.  The Albertsons Company

22  operates approximately 579 grocery stores in California: 125 stores under the Albertsons

23  banner, along with 26 Pavilion, 243 Safeway, and 185 Vons stores.  In Chicago, Kroger runs

24  the Mariano's chain and Albertsons operates the competing Jewel-Osco stores.  In Seattle,

25  Albertsons owns Albertsons and Safeway while Kroger runs Fred Meyer and QFC.

26
27
28

71.     The proposed elimination of competition between these two Defendants "may" operate to raise prices on groceries and other consumer goods where Kroger and Albertsons once used to compete in a plethora of overlapping markets.  Economic research supports the proposition that increased food retailer concentration increases prices.

## RELEVANT MARKETS

### Relevant Product Market

72.     The relevant product market is the retail sale of food and other grocery products in supermarkets.  Retail supermarket services is a line of commerce or product market under Section 7 of the Clayton Act, 15 U.S.C. § 18.

73.     A "Supermarket" is any self-service full-line retail grocery store offering customers substantially all of their weekly food and grocery shopping requirements in a single shopping visit.  Supermarkets are larger and have a wider selection of goods than smaller convenience grocery stores but are smaller and more limited in the range of merchandise offered for sale than general-retail big-box stores.

74.     Supermarkets offer a wide variety of food, beverages and household products, organized into sections. Supermarkets typically have at least 10,000 square feet of selling space devoted to providing offerings across many product categories, including but not limited to the following: fresh and prepared meats and poultry; fresh fruits and vegetables; refrigerated food and beverage products; frozen food and beverage products; bread and baked goods; dairy products; shelf-stable food and beverage products, including canned, jarred, bottled, boxed, and other types of packaged products; other grocery products, including nonfood items such as soaps, detergents, paper goods, other household products, and health and beauty aids; and pharmaceutical products and pharmacy services (where provided).

75.    Supermarkets provide distinct products and services and offer consumers convenient one-stop shopping for food and grocery products, typically carrying more than 10,000 different items, referred to as stock-keeping units (SKUs).

76.    Supermarkets compete with other supermarkets that provide one-stop shopping opportunities for food and grocery products and base their prices on the prices of food and grocery products sold at nearby competing supermarkets.

77.    Retail stores other than supermarkets, such as convenience stores, specialty food stores, limited assortment stores, discounters, and club stores, may also sell food and grocery products, but these retail stores do not offer a supermarket's distinct set of products and services that provide consumers with the convenience of one-stop shopping for food and grocery products.  Consumers shopping for food and grocery products at supermarkets are not likely to shop at other types of stores in response to a small but significant price increase by supermarkets.

78.    There are significant differences between the markets for general retailers and supermarkets in product scope, target audience, pricing strategy, competition, and market dynamics:

(a)    Product Scope: General Retailers offer a vast array of goods beyond groceries, including clothing, electronics, furniture, home furnishings, toys and more. Supermarkets focus primarily on food and beverage products, including fresh produce, packaged items, dairy, baked goods, and household essentials.

(b)    Target Audience: General Retailers cater to a broader and more diverse demographic. Supermarkets target households seeking groceries and everyday essentials. Their customer base prioritizes factors like price, quality, and variety within the food and beverage category.

(c)     Pricing Strategy:  General Retailers employ a mix of pricing strategies depending on the product category and brand. They often utilize loss leaders, discounts, and bundled deals to attract customers.  Supermarkets generally rely on competitive pricing for national brands and emphasize private label offerings with lower margins. They prioritize value and everyday affordability for groceries.

(d)     Competition:  General Retailers face intense competition from other big-box chains, online retailers, and specialty stores. Supermarkets compete primarily with other supermarket chains in their geographic area, and in limited fashion with convenience stores and discount grocers.

(e)     Market Dynamics:  Supermarkets are more insulated from economic fluctuations as food remains an essential purchase. However, they are sensitive to agricultural commodity prices.

## Relevant Geographic Markets

79.     The entire United States is a relevant geographic market for purposes of this action because supermarket chains, and these Defendants, compete among themselves for groceries, goods and other supplies from national suppliers on a national basis.  Supermarket chains compete for suppliers and products on a national basis.

80.     Although a relevant geographic market is the entire United States, smaller local relevant geographic markets exist within individual states.  Supermarket chains compete for customers in local areas where their consumer customers are concentrated.

81.     Supermarkets offer consumers convenience.  Supermarkets compete locally for customers as consumers typically do their grocery shopping at stores located close to where

they live or work. Consumers are further limited by the distance they travel to shop at a supermarket.

82.     In some areas, many residents lack cars and must travel to grocery stores by walking or through public transit which prevents them from traveling outside the community in which they work or live to shop at alternative grocery stores. As a result, the majority of consumers' grocery shopping occurs at stores located very close to where they live or work.

83.     Relevant geographic submarkets may include areas limited to properly defined neighborhoods or city submarkets, and additional urban, suburban, exurban or rural markets throughout the Unitec States.

84.     Food is one of humanity's few true necessities, making competition in the grocery industry unique. Supermarkets give local residents access to vital grocery products, and supermarkets often compete against each other to provide the best value and service to customers and in offering good jobs to workers.

85.     For many neighborhoods and consumers, the accessibility of supermarkets by foot or by public transit is critical for the communities' health as a whole.

POTENTIAL ANTICOMPETITIVE EFFECTS OF THE ACQUISITION

86.     The proposed acquisition of Albertsons by Kroger "may" eliminate Albertsons as a substantial competitor in the national and local relevant markets and "may" reduce the intensity of price competition both nationally and locally. Although Kroger has stated it "may" pass consolidation savings on to customers, economic studies have shown that post-merger prices do not decrease but rather increase between 3 and 7 percent.

87.     Because of the essential and constant need for food, even a short-term reduction in competition in the urban neighborhoods, especially those where Kroger and

Albertsons compete, can result in higher prices and reductions in quality that can significantly harm consumers' pocketbooks and health.

88.     As a result of this reduced competition, consumers likely "may" pay more for their groceries, and enjoy fewer promotions, worse service, and fewer quality-improving investments and innovation than they would otherwise.

89.     The companies have contended that their newly combined power would not be used to raise prices. Yet Kroger's CFO, Gary Millerchip, told shareholders in October: "We've been very comfortable with our ability to pass on the increases we've seen at this point. And we would expect that to continue to be the case."

90.     Food is among the goods that have seen the highest, most sustained price hikes over the past year.  An average grocery trip costs 13% more than it did a year ago, with the highest jumps impacting supermarket staples (milk and bread are up 15%, chicken is up 17%, and eggs 31%).  Kroger CEO Rodney McMullen has argued that "a little bit of inflation is always good in our business" because "customers don't overly react to that."  At the same time, his counterpart at Albertsons, Vivek Sankaran, has said, "Businesses like ours have done well when in periods where the inflation was 3% to 4%." Last year, he offered this market prediction: "My sense is this inflation will just be passed through" to customers.

91.     This acquisition "may" affect the stores' employees as well as consumer prices. Local residents depend on employment by these companies.  The reduced need for employees and suppressed wages from reduced competition for labor by these employers following the acquisition "may" constitute a significant competitive harm.  Workers "may" experience lower wage growth and worse working conditions than they would otherwise.  Albertsons' current contribution to the prevailing competitive dynamic among supermarkets is, as shown by its market presence and the jobs it provides, critical.

92.     If Albertsons is eliminated, Kroger "may" operate in a highly concentrated market.  As a consequence, the potential for effective collusion among the remaining grocery supermarket chains may substantially increase while food quality and consumer choices may be cut, and prices may rise.

93.     If Albertsons is eliminated, Kroger's actual and potential competition with Albertsons itself is also eliminated and the benefits of that competition are extinguished.

94.     Ultimately, Kroger's proposed elimination of its rival competitor Albertsons may, and probably will, result in significant and irreparable harm and inconvenience to consumers, including the Plaintiffs, by propelling grocery prices higher, reducing consumer choices and decreasing food quality.

95.     Moreover, the payment by Albertsons of the Special Dividend affects Albertsons' ability to compete because the dividend strips Albertsons of nearly all its cash-on-hand during an economic downturn when it "may" be difficult for the company to obtain additional capital.  Without cash, Albertsons cannot advertise, promote, increase services, refurbish, or reorganize stores to make them more attractive to consumers.  As a substitute for credit, it would have to rely on higher prices to raise cash for reinvestment, thereby harming consumers.  It may have to close stores, leaving customers with fewer choices and, as a result, higher prices, inferior selection and quality, or both.

96.     The decrease in the number of major grocery retailers over the past several years reflects a persistent and deliberate pattern of concentration and reduction of competition in the U.S. grocery supermarket industry, a trend which the Supreme Court has said must be arrested in its incipiency.

97.     The elimination of Albertsons by Kroger "may" result in the elimination of a vibrant competitor and the creation of the largest grocery supermarket giant by revenue in the

United States with 36% of all U.S. sales nationally – and higher in local markets -  in an already highly concentrated market.  The resulting concentration of market share both nationally and locally is unacceptably high and "may" ineluctably lead to collusion.

98.     Market concentration is one indicia of the level of competition in a market. The more concentrated a market, and the more an acquisition may increase concentration in a particular market, the more likely it is that that transaction may result in a meaningful lessening in competition.

99.     Kroger and Albertsons currently have extensive overlapping markets.  If Albertsons is eliminated, this acquisition may likely eliminate the actual and potential competition between Kroger and Albertsons in these markets, significantly harming consumers in the process.  In addition, the loss of Albertsons' competition in these markets may increase the likelihood that the remaining grocery retailers "may" coordinate with one another to raise prices, reduce output and diminish the quality of their products, thereby lessening competition in these overlapping markets and potentially creating conflicts with Section 1 of the Sherman Act.

<u>MARKET CONCENTRATION</u>

<u>The Relevant Markets Are Highly Concentrated and the Proposed Elimination of Albertsons</u>

<u>May Result in Presumptively Unlawful Market Concentrations</u>

100.     **The National United States Market**.  The decrease in the number of major supermarkets over the past several years reflects a persistent and deliberate pattern of concentration and reduction of competition in the U.S. grocery industry, a trend which the Supreme Court has said must be arrested in its incipiency.

101.     The elimination of Albertsons by Kroger "may" result in the creation of the largest supermarket chain in the United States with over 36% of the total revenue in the

national grocery market in an already highly concentrated market where the biggest single supermarket share is already nearly 24% by revenue and the top 6 firms command nearly 66% of the market.[8] Such concentration of market share in 6 firms is unacceptably high, ineluctably leading to collusion.

102.    Pre-acquisition, in 2021 Kroger and Albertsons combined accounted for 37.12% of  the total national sales of the top 6 grocery supermarket chains in the United States.[9]

103.    Post-acquisition, a combined Kroger and Albertsons will account for 56.37% of the national sales of the top 6 grocery supermarket chains in the United States, based upon 2021 figures.[10]

104.    And in 2022, according to the European Supermarket Magazine, Kroger had 35.8% and Albertsons had 18.7% of the total national sales of the top 6 grocery supermarkets in the United States.  Together, they accounted for 54.5% of the sales of the top six supermarkets in the United States in 2022.  Of the top four supermarkets in 2022, Kroger accounted for 43.8% and Albertsons accounted for 22.9% and together they accounted for 66.77% of the sales of the top four supermarkets in the United States.

105.    High market share and market concentration is an indication of an anticompetitive market. The more concentrated a market, and the more a transaction may increase concentration in a particular market, the more likely it is that a transaction may result in a meaningful lessening in competition. The Herfindahl-Hirschman Index (HHI) is often widely employed in competition analysis to measure market concentration. HHI is calculated

---

[8] Source: www.supermarketnews.com/retail-financial/top25-supermarket-operators-sales
[9] Source:  Chart, supra, Rankings of Top U.S. Grocery Supermarket Operators, Annual Sales (Pre-Acquisition - 2021)
[10] Source:  Chart, supra, Rankings of Top U.S. Grocery Supermarket Operators, Annual Sales (Post-Acquisition)

*Second Amended Complaint for Violation of Section 7 of the Clayton Act*

by summing the squared market shares of all firms in the given market which "gives proportionately greater weight to the larger market shares."[11]

106.    Analysis of market concentration "consider[s] both the post-merger level of the HHI and the increase in the HHI resulting from the merger."

107.    Markets in which the HHI reaches 2,500 points are considered very highly concentrated. Post-merger increases in HHI of more than 200 points are presumed likely to enhance market power and to be anticompetitive.  Therefore, an acquisition that increases the HHI by more than 200 points will "establish the [Plaintiffs'] prima facie case that a merger is anticompetitive."[12]

108.    The national supermarket grocery provider market is already concentrated. After the acquisition of Kroger and Albertsons, using 2020 sales figures[13], the HHI of the national supermarket grocery provider market would increase by 585 HHI points (almost 3 times the benchmark for an anticompetitive increase) from 1397 to 1,982, a jump in concentration which is "presumed likely to enhance market power."[14]

109.    A Kroger-Albertsons acquisition therefore will result in an increase in national concentration levels that far exceed the upper redline threshold for anticompetitive national market dominance and therefore is presumptively illegal.

110.    **The Local and Regional Markets**.  Defendants have supermarkets that compete head-to-head in several local geographic markets where Plaintiffs shop, including Seattle, WA;  Reno, NV; Tucson, AZ;  Colorado Springs, CO; Snoqualmie, WA; Dallas, TX and Fairbanks, AK.

---

[11] *St. Alphonsus Medical Center vs. St. Luke's Health System Ltd.,* 778 F.3d 775, at 786 (2015).
[12] Id. at 786.
[13] Figures source: Chart, Domestic Market Share of U.S. Grocery Supermarket Operators, *supra*, sourced from www.supermarket news.com/retail-financial/top-25-supermarket-operators-sales.
[14] *St. Alphonsus Medical Center vs. St. Luke's Health System Ltd.,* 778 F.3d 775, at 786 (2015).

*Second Amended Complaint for Violation of Section 7 of the Clayton Act*

111.   The elimination of Albertsons in these local market areas may result in higher prices, less availability of products, and a clear elimination of consumer choice, as well as substantial increases in concentration.

112.   If Albertsons is eliminated, market concentration in at least these local markets, as well as others, may, and most probably will, lead to adverse competitive effects, including increases in prices, reductions in service and loss of choice.

113.   **Seattle, WA Market**.  The following chart shows the distribution of 2023 market share in the Seattle-Tacoma-Bellevue Core Based Statistical Area[15] (CBSA).

| COMPANY | STORE NAME | MARKET SHARE |
|---|---|---|
| **Fred Meyer Stores Inc.** | **Fred Meyer** | **18.35%** |
| **Safeway Inc.** | **Safeway** | **17.31%** |
| Costco Wholesale Corp. | Costco Bus. Center; Costco | 16.10% |
| **The Kroger Co.** | **Quality Food Center** | **14.36%** |
| Walmart Stores Inc. | Walmart; Walmart Supercenter | 8.07% |
| H Mart Northwest | Campeon Mkt etc. | 4.57% |
| Trader Joe's Co. | Trader Joe's | 3.18% |
| WinCo Foods LLC | WinCo Foods | 3.01% |
| Whole Foods Market Inc. | Whole Foods Market | 2.54% |
| PCC Natural Markets | PCC Community Markets | 2.06% |
| Target Corporation | CityTarget; Target; Target PF | 1.82% |
| **Albertsons LLC** | **Albertsons** | **1.78%** |
| Grocery Outlet Holding Co | Grocery Outlet | 1.42% |
| **Metropolitan Market** | **Metropolitan Market** | **0.69%** |
| **Haggen Inc.** | **Haggen Northwest Fresh** | **0.55%** |
| Defense Commissary Ag. | Ft Lewis; McChord AFB | 0.51% |
| Uwajimaya Inc. | Uwajimaya | 0.47% |
| Town & Country Mkt Inc. | Ballard Market etc. | 0.44% |

[15] The Core Based Statistical Area (CBSA) is an area that is based on the major city or cities within that area. CBSAs are generally metropolitan (Metro) or micropolitan (Micro) statistical areas containing a substantial population nucleus, together with adjacent communities that have a high degree of social and economic integration with that core. Metropolitan statistical areas may comprise one or more entire counties.  Market share calculations are based upon the total dollars spent at all supermarkets, mass merchandisers and warehouse clubs within the specified market area during the current identified. Figures for mass merchandisers and warehouse clubs exclude non-grocery sales.
It should be noted that the CBSA figures include the big-box general retail stores of Walmart, Target, Sam's Club and Costco which Plaintiffs contend to be in a separate market.

| Saar's Inc. | Saar's Mkt Place; Super Saver | 0.43% |
| Dollar Tree Stores Inc. | Dollar Tree | 0.41% |
| Others | | 1.93% |

114.    In the Seattle CBSA, the 2023 market data (which also includes the big-box general retail stores of Walmart, Target, Sam's Club and Costco which Plaintiffs contend to be in a separate market), shows Defendant Kroger (Fred Meyer, Metro and QFC stores) with 33.40% market share and Albertsons (Safeway, Haggen) with 19.64%.[16]  The Defendants' post acquisition combined market share would total 53.04%, a local market concentration that is much higher than percentage totals that have been held in the past by the Supreme Court to constitute a violation of Section 7 of the Clayton Act.

115.    In addition, the data shows that the HHI in the Seattle-Tacoma-Bellevue CBSA will exceed the thresholds specified in the U.S. Horizontal Merger Guidelines of the U.S. Department of Justice and "may" be presumptively illegal.  Before the elimination of Albertsons, the HHI index for the Seattle CBSA was 1231.  After Albertsons is eliminated, however, the HHI will increase by 1,967 points to 3,198, an increase and a concentration that is clearly "presumed likely to enhance market power" and is considered highly concentrated under the Department of Justice's Horizontal Merger Guidelines [17] – even including the general retailers Costco and Walmart.

116.    Plaintiff Stensrud who lives in the Seattle area has regularly shopped and "may" continue to shop at the Albertsons owned Safeway stores in this local geographic area, as well as at the Kroger owned QFC and Fred Meyers stores, all of which are within 5 miles of his home and "may" be directly affected by the acquisition should it consummated.  Plaintiff Michael Malaney regularly visits his daughter who lives in Kirkland, WA, a suburb of Seattle,

---

[16] Chain Store Guide, Grocery Industry Market Share Report, 2023.

[17] Calculations based upon figures provided by Chain Store Guide, Grocery Industry Market Share Report, 2023.

three or four times a year and when he is there he shops and "may" continue to shop at the Safeway, Fred Meyer and QFC stores near her, all of which are within 1 to 5 miles of her home.

117.  **Snoqualmie, WA Market**.  Snoqualmie is a small community, a "section of the country", located approximately 30 miles east of Seattle and should be viewed as a sub-market of the Seattle-Tacoma-Bellevue CBSA.  In Snoqualmie there are 6 grocery markets of which 2 are operated by Safeway (Albertsons) and 1 is operated by QFC (Kroger).  The remaining are smaller groceries: Crescent Market, Snoqualmie Market and Dollar Tree.  The purchase of Albertsons by Kroger would give Kroger 50% of the major supermarket locations in Snoqualmie out of the 6 groceries that operate there.

118.  Plaintiff Don Fry regularly shops and "may" continue to shop at the Safeway store in Snoqualmie when he often visits his son there because the store is located within 1 mile of his son's home.  He "may" also occasionally shop at the QFC store in Snoqualmie.

119.  **Dallas, TX Market**.  The market share data for the Dallas-Fort Worth-Arlington CBSA grocery market for 2023 (which also includes the big-box general retail stores of Walmart, Target, Sam's Club and Costco which Plaintiffs contend to be in a separate market), shows Kroger with 16.57% of the market, with 95 stores, and Albertsons (Tom Thumb and Albertsons) with 10.66%, with 94 stores.[18] The combined post-acquisition market share of Kroger and Albertsons would total 27.23%.  A local market concentration in this amount is much higher than percentages that have been held in the past by the Supreme Court to constitute a violation of Section 7 of the Clayton Act.

120.  In addition, the data shows that the HHI in the Dallas-Fort Worth-Arlington CBSA will exceed the thresholds specified in the U.S. Horizontal Merger Guidelines of the

---

[18] Source:  Chain Store Guide, grocery sales only - pharmacy and general merchandise sales excluded.

U.S. Department of Justice and "may" be presumptively illegal.  Before the elimination of

Albertsons, the HHI index for the Dallas-Fort Worth-Arlington CBSA was 1300.  After

Albertsons is eliminated, however, the HHI will increase by 403 points to 1703, an increase

that is double the increase that is "presumed likely to enhance market power" and is

considered concentrated under the Department of Justice's Horizontal Merger Guidelines[19] –

even though it also includes the general retailers Target, Costco, Sam's Club and Walmart.

121.    Plaintiff Valarie Jolly regularly shops and "may" continue to shop at the

Albertsons and the Kroger stores where she works near the Dallas Fort Worth Airport in the

Dallas-Fort Worth-Arlington CBSA and "may" be directly affected by the acquisition should

it consummated.

122.    **Colorado Springs, CO Market**.  The 2023 supermarket grocery store market

share data for the Colorado Springs, CO, Core Based Statistical Area (CBSA) (which also

includes the big-box general retail stores of Walmart, Target, Sam's Club and Costco which

Plaintiffs contend to be in a separate market), shows Defendant Kroger (City Market; King

Soopers; King Soopers Marketplace) with 20.9% and Albertsons (Safeway) with 18.15%.[20]

The Defendants' post acquisition combined market share would total 39.05%, a local market

concentration that is much higher than percentage totals that have been held in the past by the

Supreme Court to constitute a violation of Section 7 of the Clayton Act.

123.    In addition, the data shows that the HHI in the Colorado Springs, CO, CBSA

will exceed the thresholds specified in the U.S. Horizontal Merger Guidelines of the U.S.

Department of Justice and "may" be presumptively illegal.  Before the elimination of

Albertsons, the HHI index for the Colorado Springs, CO, CBSA was 1616.  After Albertsons

is eliminated, however, the HHI will increase by 759 points to 2375, an increase that is almost

---

[19] Calculations based upon figures provided by Chain Store Guide, Grocery Industry Market Share Report, 2023.
[20] Chain Store Guide, Grocery Industry Market Share Report, 2023.

*Second Amended Complaint for Violation of Section 7 of the Clayton Act*

quadruple the increase that is "presumed likely to enhance market power" and is considered concentrated under the Department of Justice's Horizontal Merger Guidelines[21] – even though it also includes the general retailers Target, Costco, Sam's Club and Walmart.

124.   Plaintiff Gardner lives within 10 miles of the nearest King Soopers (Kroger) where she regularly shops and "may" continue to shop.

125.   **Fairbanks, AK Market**.  In the State of Alaska, Kroger and Albertsons (Safeway and Carrs stores) are the primary competitors selling groceries and household goods and are the state's third and fourth largest employers measured by number of employees. Other smaller groceries lack sufficient scale to compete with Kroger and Albertsons.  Alaska State Representatives Spohnholz and Fields have written that  "The short-term benefits – to a tiny number of executives and the largest corporate shareholders – from consolidation of the nation's leading grocers do not outweigh the massive costs to consumers and front-line workers."[22]

126.   Safeway and Fred Meyer are the only major grocery supermarkets in Fairbanks.

127.   The 2023 supermarket grocery store market share data for the Fairbanks, AK Core Based Statistical Area (CBSA) (which also includes the big-box general retail stores of Walmart and Costco and the Fort Lee and Eielson Commissaries which Plaintiffs contend to be in a separate market), shows Defendant Kroger (Fred Meyer) with 30.1% and Albertsons (Safeway) with 17.62%.[23]  The Defendants' post acquisition combined market share would total 47.72%, a local market concentration that is well in excess of percentage totals that have

---

[21] Calculations based upon figures provided by Chain Store Guide, Grocery Industry Market Share Report, 2023.
[22] Letter from Alaska State Representatives, Spohnholz and Fields, to Chairwoman Lina Kahn, Federal Trade Commission, dated October 21, 2022.
[23] Chain Store Guide, Grocery Industry Market Share Report, 2023.

*Second Amended Complaint for Violation of Section 7 of the Clayton Act*

been held by the Supreme Court in the past to constitute a violation of Section 7 of the Clayton Act.[24]

128.    In addition, the data shows that the HHI in the Fairbanks, AK, CBSA will exceed the thresholds specified in the U.S. Horizontal Merger Guidelines of the U.S. Department of Justice and "may" be presumptively illegal.  Before the elimination of Albertsons, the HHI index for the Fairbanks, AK, CBSA was 2193.  After Albertsons is eliminated, however, the HHI will increase by 1061 points to 3254, an increase that is more than five times the increase that is "presumed likely to enhance market power" and is considered extremely concentrated under the Department of Justice's Horizontal Merger Guidelines  – even though it also includes the general retailers Costco and Walmart and military commissaries.

129.    Plaintiff Pamela Ward regularly shops and "may" continue to shop at both the Safeway and the Fred Meyer stores in Fairbanks when she regularly travels there to visit her family.

130.    According to Alaska State Representatives Spohnholz and Fields:  "This merger would reduce market competition and result in further price inflation in food and household necessities."[25]

131.    **Tucson, AZ Market**.  Albertsons operates 134 stores in Arizona, compared with 124 for Kroger.  The combined companies would command a 44% market share of the Arizona grocery market according to a 2019 analysis by Chain Store Guide.

132.    In the Tucson Core Based Statistical Area (CBSA) (which also includes the big-box general retail stores of Walmart, Costco, Target, and Sam's Club which Plaintiffs

---

[24] Calculations based upon figures provided by Chain Store Guide, Grocery Industry Market Share Report, 2023.
[25] Letter from Alaska State Representatives, Spohnholz and Fields, to Chairwoman Lina Kahn, Federal Trade Commission, dated October 21, 2022.

contend to be in a separate market), Albertsons operates 6 Albertsons supermarkets and 18 Safeway supermarkets.  Kroger operates 18 Fry's supermarkets in Tucson.  The next biggest dedicated grocery chain operator in Tucson is Basha's with 14 stores. The purchase of Albertsons by Kroger would give Kroger 42 supermarket locations in Tucson.

133.    The 2023 supermarket grocery store market share data for the Tucson, AZ, CBSA shows Defendant Kroger's stores with 21.71% and Albertsons (Safeway and Albertsons) stores with 18.83%.[26]  The Defendants' post acquisition combined market share would total 40.54%, a local market concentration that is well in excess of percentage totals that have been held by the Supreme Court in the past to constitute a violation of Section 7 of the Clayton Act.

134.    In addition, the data shows that the HHI in the Tucson, AZ, CBSA will exceed the thresholds specified in the U.S. Horizontal Merger Guidelines of the U.S. Department of Justice and "may" be presumptively illegal.  Before the elimination of Albertsons, the HHI index for the Fairbanks, AK, CBSA was 1338.  After Albertsons is eliminated, however, the HHI will increase by 951 points to 2289, an increase that is almost five times the increase that is "presumed likely to enhance market power" and is considered concentrated under the Department of Justice's Horizontal Merger Guidelines[27] – even though it also includes the general retailers Costco and Walmart and military commissaries.

135.    Plaintiff Don Fry lives in Tucson and has shopped and "may" continue to shop at the Kroger and Albertsons owned stores in this local geographic area.

136.    **Reno, NV Market**.  The 2023 supermarket grocery store market share data for Reno, NV, Core Based Statistical Area (CBSA) (which also includes the big-box general retail stores of Walmart, Costco, Target, and Sam's Club which Plaintiffs contend are in a separate

---

[26] Chain Store Guide, Grocery Industry Market Share Report, 2023.

[27] Calculations based upon figures provided by Chain Store Guide, Grocery Industry Market Share Report, 2023.

market), shows Defendant Kroger (Smith's) stores with 8.15% and Albertsons (Safeway) stores with 7.08%.[28]  The Defendants' post acquisition combined market share would total 15.23%, a local market concentration that is in excess of percentage totals that have been held by the Supreme Court in the past to constitute a violation of Section 7 of the Clayton Act.

137.   Both Plaintiffs Len Marazzo and Jose Brito live in Reno and regularly shop at the Defendants' stores.  Both "may" continue to shop at the Defendants' Safeway and Smith's stores.

138.   **The Northeastern United States Market**.  According to the heatmap demographic analysis made by Maptitude Mapping Software[29], Defendant Kroger's stores are generally located in areas with a lower measure of expenditure on groceries. Generally, across the U.S., the average expenditure for groceries around Kroger-owned locations is $6,755.46 while the average expenditure for groceries around Albertsons-owned locations is $7,028.07. A conclusion to be drawn is that people who live close to Albertsons locations spend more on groceries than people who live close to Kroger locations, but, according to Maptitude, it is also true that spending on groceries near Albertsons and Kroger locations is somewhat higher than the national average.

139.   Apparently in response to these demographics, Kroger has proposed to acquire the Albertsons stores located in markets where Kroger does not currently compete with Albertsons and has NO stores.  One such market area is the Northeastern United States where Albertsons owns and operates 225 stores in Maine, New Hampshire, Vermont, New York, Massachusetts, Connecticut, Rhode Island and Pennsylvania.  This whole-cloth purchase of 225 stores in a market where Kroger has not previously competed is further evidence of anticompetitive conduct in violation of Section 7 which values entry into a market  by

---

[28] Chain Store Guide, Grocery Industry Market Share Report, 2023.
[29] https://www.caliper.com/maptitude/blog/albertsons-and-kroger-geographic-market-analysis/default.htm

competition rather than by acquisition.  The Defendants are, in effect, buying and selling

markets instead of competing for them.  See *Falstaff, supra.*

140.    Plaintiffs Gary Talewsky, Harry Garavanian, Gabe Garavanian and Bill

Rubinsohn live in the Northeast United States where Kroger has proposed its wholesale

purchase of Albertsons stores.  Harry Garavanian lives in Nashua, New Hampshire and

regularly shops and "may" continue to shop at the Shaw's store (Albertsons) there.  Plaintiff

Bill Rubinsohn lives in Philadelphia, Pennsylvania and regularly shops at the Acme

(Albertsons) supermarket that is .5 miles from his home and at the Acme that is 3 miles from

his home.  He plans to continue to shop at these stores.   Plaintiff Gabriel Garavanian lives in

Tyngsboro, Massachusetts and regularly shops and "may" continue to shop at the Shaw's

market (Albertsons) in close-by Nashua, NH.  And Plaintiff Gary Talewsky lives in Foxboro,

Massachusetts during the summer months and regularly shops and "may" continue to shop at

the Shaw's store (Albertsons) when he is there.  Shaw's controls 60% of the market there.

<u>STANDING</u>

141.    Plaintiffs have standing to bring this action under Section 7 of the Clayton Act.

142.    For standing in a Section 7 case a plaintiff need only show that the effect of the

acquisition "may be substantially to lessen competition … in any line of commerce … *in any*

*section of the country.*" [30]

143.    By prohibiting acquisitions that may substantially lessen competition, Congress

"indicate[d] that its concern was with probabilities, not certainties," and courts are to find

violations where "the probable future effect of the merger" is to lessen competition[31]  and

Section 16 of the Clayton Act authorizes private plaintiffs to obtain injunctive relief for any

---

[30] 15 U.S.C. § 18.
[31] *Brown Shoe, supra* at 370 U.S. at 323.

"threatened loss or damage" resulting from a violation of the antitrust laws[32] "even though the plaintiff has not yet suffered actual injury."[33]   A private plaintiff "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws."[34]

144.    The threatened injury to Plaintiffs and all grocery store consumers throughout the United States in this case is that prices "may" increase to Plaintiffs and consumers if this acquisition is consummated.  Studies have shown that prices after mergers normally increase by 12-13% and the quality of services is diminished. This is the very "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful"[35] since "'antitrust injury' … means injury from higher prices or lower output, the principal vices proscribed by the antitrust laws."[36]

145.    In addition, Plaintiffs in this case seek to serve "the high purpose of enforcing the antitrust laws"[37] since Section 16 was intended to "encourage vigorous private litigation against anticompetitive mergers;" "was an integral part of the congressional plan for protecting competition;" and "fits well in a statutory scheme that … subjects mergers to searching scrutiny".[38]

146.    The effect on Plaintiffs is in this case probable, not speculative. Since Plaintiffs are direct consumers of Defendants' supermarket services and since Plaintiffs purchase the goods sold by Defendants at their supermarkets, Plaintiffs allege that competition might substantially be lessened for these Plaintiffs and other consumers in the local markets where Plaintiffs shop.  The potential injury to Plaintiffs in this case, the lessening of competition, is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and

---

[32] 15 U.S.C. § 26.
[33] *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100 (1969), at 130.
[34] *Id.*
[35] *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977).
[36] *Ball Memorial Hosp., Inc. v. Mut. Hosp. Ins., Inc.,* 784 F.2d 1325, 1334 (7th Cir. 1986).
[37] *Zenith*, *supra at* 395 U.S. at 130.
[38] *California v. American Stores*, 495 U.S 271 (1990), at 284-85

redressable by a favorable ruling.'"[39]  The injury is imminent and "there is a 'substantial risk'
that the harm will occur"[40] if the acquisition is permitted to go forward since this acquisition
"may" eliminate a viable competitor from the marketplace where Plaintiffs are consumers of
the Defendants' goods.

147.  Plaintiff Michael Malaney:  Plaintiff Malaney lives in Grandville, Michigan.
There are no Kroger or Albertsons stores in the Grandville area, but he regularly visits his
daughter who lives in Kirkland, WA, a suburb of Seattle, three or four times a year and when
he is there he shops and may continue to shop at the Safeway, Fred Meyer and QFC stores
near her, all of which are within 1 to 5 miles of her home.

148.  Plaintiff Timothy Nieboer:  Plaintiff Nieboer lives in Clarkston, Michigan,
which is a near suburb of Detroit.  He regularly shops and "may" continue to shop at the
Kroger supermarkets near his home.  There are four Kroger supermarkets within six miles of
his home.  The other supermarkets nearby are Neiman's Family Market (2.5 miles), Aldi (6.7
miles), Meijer (7.2 miles), Bueches Food World (7.3 miles) and Kroger Marketplace (8.8
miles).  These stores are not options for him because Neiman's is very expensive and because
Aldi and Meijer, though less expensive, are farther away and inconvenient during rush hours.

149.  Plaintiff Jose Brito:  Plaintiff Brito lives in Reno, Nevada.  He regularly shops
and "may" continue to shop at the Safeway (Albertsons) and Smith's (Kroger) supermarkets
near his home.  The other supermarkets nearby are Raley's and Save Mart; however, Raley's
is not an option because it is too expensive.

150.  Plaintiff Len Marazzo:  Plaintiff Marazzo lives in Reno, Nevada.  He regularly
shops and "may" continue to shop at the Safeway (Albertsons) and Smith's (Kroger)

---

[39] *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)
[40] *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) quoting *Clapper*, *supra* at 568 U.S. at 415 n.5.

*Second Amended Complaint for Violation of Section 7 of the Clayton Act*

supermarkets near his home.  The other option is Sak n' Save, but it is not as good an option since it is four miles away.

151.    Plaintiff Don Freeland:  Plaintiff Freeland lives in Thousand Palms, California. He regularly shops and "may" continue to shop at Albertsons, Vons (Albertsons), Ralph's (Kroger) and Food 4 Less (Kroger).  Other local stores are Stater Bros. Supermarket and certain smaller stores and Mexican oriented chains that are not realistic options.

152.    Plaintiff Christine Whalen:  Plaintiff Whalen lives in New Orleans, Louisiana. There are no Kroger or Albertsons supermarkets in her area in New Orleans, however she "may" occasionally shop at the Albertsons supermarket in Baton rouge when she is there to visit.

153.    Plaintiff Kathy Arcell:  Plaintiff Arcell used to shop at the Albertsons store in New Orleans, but it was closed many years ago. She now shops at Winn Dixie and Rouses. Plaintiff shops at Kroger in Atlanta when she visits family there.

154.    Plaintiff Carolyn Fjord:  Plaintiff Fjord lives in Winters, California and owns a vacation home in Port Huron, Michigan.  She shops and "may" continue to shop at Albertsons' Safeways in Vacaville and in Davis once or twice a week.  She and her husband travel to Port Huron most every summer and when there regularly shop at the Kroger supermarket there.  She has regularly shopped at Kroger in Port Huron for over 30 years.  She "may" continue to shop at Kroger when she travels to Port Huron during summer vacations. She also regularly shops and "may" continue to shop at Kroger's King Super in Loveland, Colorado when she regularly visits her son there.

155.    Plaintiff Rosemary D'Augusta:  Plaintiff D'Augusta lives in Millbrae, California and regularly shops and "may" continue to shop at the Safeway (Albertsons) in Millbrae.  Safeway is the  major supermarket in her area and is within one mile of her home.

There are also Trader Joe's (within 1 mile) and Lunardi's (2 miles) from her home.  Lunardi's is not a reasonable option because it is not a major supermarket.  It offers some products that you would find in Safeway but at higher prices.  Trader Joe's is not a major supermarket and has only a limited supply of food offerings to the public.  Plaintiff shops at Safeway regularly, almost daily. It is convenient, and provides full service, one-stop shopping at reasonable prices.  The Lucky supermarket in her area recently closed.

156.    Plaintiff Deborah Pulfer:  Plaintiff Pulfer lives in Sidney, Ohio.  Plaintiff regularly shops and "may" continue to shop at the Kroger supermarket that is 4 miles from her home in Sidney.  The other options are the Walmart store which is 4.5 miles from her home or the Sidney Foodtown which is 2.8 miles from her home.  Although the Foodtown in closer than the Kroger supermarket, it is not a reasonable option because its prices are higher, and it is smaller and does not offer the selection of products that the Kroger offers.  Plaintiff also regularly shops at the Safeway (Albertsons) in Estes Park, Colorado where she vacations for two months every summer.   Estes Park is a small community of 5-6 thousand year-round residents, and there is not another major grocery nearby.  The closest would be in Loveland, Colorado, 30 miles away.  There are no reasonable options when in Estes Park for the summer.

157.    Plaintiff Bill Rubinsohn:  Plaintiff Rubinsohn lives in Philadelphia, Pennsylvania and regularly shops at the Acme (Albertsons) supermarket that is .5 miles from his home and at the Acme that is 3 miles from his home.  He plans to continue to shop at these stores.  Other stores close by his home in Philadelphia are Shoprite, Whole Foods, Shop and Bag and Giant, all within 3 miles.  Plaintiff also regularly shops at the Kroger store in Lansing, Michigan and at the Kroger store in Holt, Michigan when he travels to Michigan four to five times a year.

158.     Plaintiff Jocelyn Gardner:  Plaintiff Gardner lives in Colorado Springs, Colorado and lives 10 miles from the nearest King Soopers (Kroger) where she regularly shops and "may" continue to shop.  There are King Soopers in town, as well as Safeway stores (Albertsons), Sprouts Farmers Market, Whole Foods, Natural Grocers, Trader Joe's and Save A Lot. The Safeway stores are not a reasonable option because the Safeway stores are more expensive than the King Soopers; but if Kroger is permitted to purchase the Safeway stores in the area, the King Soopers prices may rise to the level of the Safeway stores' pricing.

159.     Plaintiff Jan Marie Brown:  Plaintiff Brown lives in Carson City, Nevada, and regularly shops and "may" continue to shop at the Smith's (Kroger) supermarket there that is close to her house approximately one mile away.  Other grocery stores in Carson City are Save Mart, Food Maxx, Trader Joe's, and Raley's.  These stores are not an option because they are farther away. There is a Walmart close by, but its grocery department is poorly managed and is inferior in quality to the Smith's.  In addition, Plaintiff's husband commutes to Truckee, California, five days a week and occasionally shops at the Safeway (Albertsons) there.  In Truckee there is also a Grocery Outlet and a Save Mart.

160.     Plaintiff Don Fry:  Plaintiff Fry lives in Tucson, Arizona and regularly shops and "may" continue to shop at Safeway (Albertsons), which is within 4 miles of his home, and he sometimes shops at the Fry's market (Kroger) that is 6 miles away.  There are two more Safeway stores within 6 miles of his home in either direction.  There are also 2 additional Fry's (Kroger) markets within 6 to 8 miles and there are 2 Albertsons within 6 miles of his home.  In addition, Plaintiff often visits his son in Snoqualmie, Washington.  When visiting his son, he regularly uses the Safeway (Albertsons) located within 1 mile of his son's home and occasionally "may" shop at the Fred Meyer (Kroger) store located there as well, but farther away.

161.    Plaintiff Clyde Stensrud:  Plaintiff Stensrud lives in Kirkland, Washington and regularly shops and "may" continue to shop at the Safeway (Albertsons), the QFC (Kroger) and the Fred Meyer (Kroger) stores in the area.  All of these stores at within 5 miles of his home.  There are no adequate substitutes in his mind to these supermarkets.

162.    Plaintiff Pamela Faust:  Plaintiff Faust lives in Loveland, Ohio and regularly shops and "may" continue to shop at the Kroger store located within 2 miles from her home. A potential option is the Meijer store, but it is located over 5 miles from her home and so is not as convenient.  There is also an Aldi market in Loveland which is 6 miles from her home but where she would only shop if she were in the area.  Plaintiff regularly vacations in Salt Lake City and when there regularly shops at Smith's (Kroger) which is located 5 miles from where she stays.  She "may" continue to shop at Smith's when in Salt Lake City.

163.    Plaintiff Pamela Ward:  Plaintiff Ward lives in Holmes Beach, Florida, where there are currently no Albertsons or Kroger stores.  However, Plaintiff regularly visits family in Fairbanks, Alaska.  There are Safeway stores (Albertsons) and Fred Meyer stores (Kroger) in Fairbanks.  When there Plaintiff regularly shops at both the Safeway and the Fred Meyer stores.  If these stores were to merge, it would eliminate all of the competition there and would be catastrophic.  Plaintiff also travels to Dallas, TX to visit her son who lives there and when she is in Dallas she shops at Tom Thumb, Albertsons and the Kroger there.

164.    Plaintiff Sandy Russell:  Plaintiff Russell lives in Waco, Texas. It is a rural area that has no Albertsons or Kroger.  The closest Albertsons is 30 miles away where she "may" shop occasionally.  There is a United Super (Albertsons) 25 miles away where I may shop in the future when I am in that area.  I do often shop at Albertsons and Tom Thumb when I regularly vacation in Gainesville.

165.     Plaintiff Valarie Jolly:  Plaintiff Jolly lives in Mabank, Texas, but since there are no good shopping opportunities near her home she shops where she works, near the Dallas/Fort Worth airport, where there is an Albertsons, a Kroger, Tom Thumb, Target, Central Market, Market Street and other Big Box stores.  Plaintiff regularly shops and "may" continue to shop at the Albertsons and the Kroger stores near the Dallas Fort Worth Airport.

166.     Plaintiff Brenda Davis:  Plaintiff Davis lives in Forney, Texas and regularly shops and "may" continue to shop at the Kroger store located at 500 Marketplace Drive in Forney, Texas.   Forney is a relatively small city located in Kaufman County, approximately 21 miles east of Dallas and is one of the fastest growing communities in Texas.  The Kroger store where she shops is approximately 3.5 miles from her home. Although there is a Walmart store in Forney, it is not an option because Plaintiff prefers the produce and meats at the Kroger market and enjoys the weekly specials at the Kroger store and it takes too long to shop at the crowded Walmart store.  The Aldi and Brookshires stores also located in Forney are not an option because they have less selection and product.

167.     Plaintiff Gabriel Garavanian:  Plaintiff Garavanian lives in Tyngsboro, Massachusetts and regularly shops and "may" continue to shop at the Shaw's market (Albertsons) in close-by Nashua, NH which is 3 miles from his home.  Plaintiff also lives part of the year in Myrtle Beach, South Carolina and regularly shops and "may" continue to shop at the Kroger store there.

168.     Plaintiff Harry Garavanian:  Plaintiff Garavanian lives in Nashua, New Hampshire and regularly shops and "may" continue to shop at the Shaw's store (Albertsons) there.

169.     Plaintiff Gary Talewsky:  Plaintiff Talewsky lives in Foxboro, Massachusetts for 3 to 4 months during the summer and regularly shops and "may" continue to shop at the

Shaw's store (Albertsons) when he is there.  There are several Shaw's stores in and around Foxboro and Shaw's controls 60% of the market there.  Other stores that carry some grocery items include Stop & Shop and the big box store, Costco, but neither are viable options to the selection and quality of the Shaw's stores.

170.    Plaintiff Lisa McCarthy:  Plaintiff McCarthy lives in Naples, Florida and regularly shops there.  Plaintiff formerly shopped at Albertsons, but the stores were closed there.  There are currently no Kroger or Albertsons stores in Naples or Collier County.  She primarily shops at Publix which is 3 miles from her home.  She also shops at The Fresh Market, Wynn's and Trader Joe's.

171.    The relevant product market in this case is the retail sale of food and other grocery products in supermarkets. Plaintiffs buy food and other products from Defendants stores. As a result, Plaintiffs participate directly in the market for retail sales in supermarkets. Defendants seek to attract the business of Plaintiffs for their supermarket sales.

172.    Defendants make their money from the sales they make to Plaintiffs and other consumers of grocery products. Defendants' dominance in the grocery sales market gives them the power to control the price goods that they "may" charge to Plaintiffs and other consumers  The revenue Defendants generate comes from the sale of groceries and other products to Plaintiffs and other consumers.

173.    Prices to Plaintiffs and consumers may rise and the quality of services may decrease if competition for grocery sales is eliminated by this acquisition.  This fact is borne out by both the authorities and experience.

174.    For example, the US Department of Justice's (DOJ) Antitrust Division has stated that "mergers can lead to higher prices and reduced innovation." The DOJ also notes that "mergers that eliminate significant competition are more likely to harm consumers."

175.    The Federal Trade Commission (FTC) also has a number of concerns about mergers, including their potential for higher prices. The FTC has stated that "mergers can reduce competition and lead to higher prices, less innovation, and lower quality goods and services."

176.    In addition to the DOJ and FTC, the European Commission has stated that "mergers can lead to higher prices for consumers, less innovation, and lower quality goods and services."

177.    There is a significant body of economic research that supports the view that acquisitions or mergers may lead to higher prices. For example, a study by the American Economic Association found that "mergers between two firms in the same industry lead to an average price increase of 4%."

178.    Overall, there is a strong consensus among authorities and economists that acquisitions and mergers can lead to higher prices. This is because acquisitions and mergers reduce the number of competitors in a market, which gives firms more market power and allows them to raise prices.

179.    In addition, there are specific examples of mergers that have led to higher prices:

    (a)    The merger of Anheuser-Busch and InBev in 2008 led to higher beer prices in the United States.

    (b)    The merger of Dow Chemical and DuPont in 2017 led to higher prices for pesticides and other agricultural chemicals.

    (c)    The merger of AT&T and Time Warner in 2018 led to higher prices for cable TV and broadband services.

180. The Plaintiffs' threatened injury is therefore both particularized and concrete and imminent. Plaintiffs have been threatened with injury by reason of the proposed acquisition which would eliminate the competition of a viable competitor in the market, and which may result in higher prices, less quality of goods and services and less variety and innovation in the grocery market.

<u>IRREPARABLE INJURY</u>

181. The lessening of competition constitutes irreparable harm as Justice O'Connor explicitly and unequivocally stated: ". . . lessening of competition 'is precisely the kind of irreparable injury that injunctive relief under Section 16 of the Clayton Act was intended to prevent'". *California v. American Stores,* Justice O'Connor, 492 U.S. 1301, 1304 (1989).[41]

182. In addition, Kroger's elimination of Albertsons will be virtually certain to cause substantial irreparable injury to Plaintiffs and to all consumers for grocery and other retail products in the relevant geographic and product markets in that, among other reasons, Albertsons, and the consumer choices that go with it, "may" be gone, and once gone, cannot be reconstituted.

183. Plaintiffs and customers are threatened with the loss of (1) the distinctive services offered by Albertsons; (2) a reduction in customer choice; and (3) a reduction and curtailment of competition, and the loss of a vibrant, vigorous and innovative competitor, thereby creating higher prices and potential inconvenience to consumers. The elimination of Albertsons "may" certainly reduce the number of competing supermarkets servicing the areas where Albertsons and Kroger formerly competed and in doing so, substantially threatens to harm plaintiffs and customers through increases in the price of groceries, potentially translating to billions of dollars of harm to consumers annually, and further threatens to

---

[41] The *American Stores* case included the acquisitions of the Lucky Store and Alfa Beta chains.

deprive customers of the unique style, affordability, service and experience offered by Albertsons' grocery stores.

184.   If Albertsons is eliminated, Plaintiffs and consumers "may" sustain irreparable harm for which damages will be inadequate to compensate Plaintiffs in that the competition from a rival competitor "may" be extirpated and customer choice for grocery options eradicated.  The imagination and initiative of Albertsons "may" be snuffed-out; expansion plans "may" be jettisoned; customer convenience and satisfaction "may" be disregarded. Albertsons services and competition, once lost, cannot be restored.

185.   In addition, Kroger's acquisition (1) threatens to derail any proposed expansion into other market by Albertsons, with a concomitant loss of jobs that would have otherwise been created there; (2) threatens to derail any planned expansion of stores by Albertsons, thereby lessening the overall capacity of grocery supply in the relevant markets; and (3) threatens to substantially reduce the work force of the two grocery companies through employee layoffs due to the elimination of competition.

186.   Since the prospect of "start-up" the grocery market is unlikely, there "may" be no entry of new competitors into the marketplace to mitigate the anticompetitive effects that may result from Kroger's proposed acquisition.  Significant barriers to entry in the grocery market include the time and costs associated with conducting market research, selecting an appropriate location for a supermarket, obtaining the necessary permits and approvals, and constructing the new supermarket facilities.

187.   Kroger as an existing supermarket business chain, however, has the wherewithal, experience, financial ability, intent, and expertise to enter into the very same markets and areas that it seeks to gain by its elimination of Albertsons. Such an entry by Kroger into new markets would increase competition, create new jobs, increase capacity,

increase availability, and enhance consumer choice. The elimination of Albertsons would do exactly the opposite.

188.    Indeed, if there is to be any restoration of competition in the grocery industry as a result of its relentless drive toward consolidation, Albertsons is the company that can do it.

189.    Accordingly, Plaintiffs bring this action for both preliminary and permanent injunctive relief against Defendants' proposed elimination of Albertsons and seek an order prohibiting Kroger from acquiring Albertsons.

## VIOLATIONS ALLEGED

### Count One

Clayton Act, Section 7, 15 U.S.C. § 18

190.    Plaintiffs hereby incorporate the allegations of paragraphs 1 through 189 above as if fully set forth herein.

191.    The effect of the proposed acquisition may be substantially to lessen competition, or tend to create a monopoly, in interstate trade and commerce in the relevant markets in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

192.    Unless enjoined, the proposed acquisition may, and most probably would, have the following potential effects in the relevant markets, among others:

(a) actual and potential competition between Kroger and Albertsons may be eliminated;

(b) the elimination of Albertsons, a significant competitor in a non-trivial transaction, may substantially lessen competition, or tend to create a monopoly     in the grocery supermarket industry;

(c) competition in general among other grocers may be lessened substantially;

(d) grocery prices may be higher than they otherwise would be;

(e) consumer choices may be lower than they otherwise would be; and

(f) food quality may be lessened.

193.    The acquisition "may" have the following negative impacts in the national and local markets for supermarket sales:

(a)    Impact on consumers and on Plaintiffs:

i.    <u>Higher food prices</u>. The acquisition would reduce competition in the grocery industry, which would lead to higher food prices for consumers and Plaintiffs.  This is especially concerning given the current high inflation environment.

ii.    <u>Fewer choices</u>.  The acquisition would also reduce the number of grocery chains that consumers and Plaintiffs can choose from.  This would lead to less variety and innovation in the grocery market.

iii.    <u>Lower quality products and services and availability</u>.  With the reduced competition, the Kroger markets may have less incentive to provide high-quality products and services to consumers and Plaintiffs and make them available to Plaintiffs and consumers on a timely basis.  There would be a reduction in the number of unique products available for purchase.

(b)    Impact on workers:

i.    <u>Job losses</u>.  The acquisition is expected to lead to job losses, as the combined company consolidates operations and eliminated duplicate positions.  Thousands of workers and employees would be laid off or let go, which could have a severe economic impact on the communities.  This loss of jobs would not only affect the employees, but also local businesses, as people would have less disposable income to spend on their goods and services.

ii.   Lower wages.  The acquisition could also lead to lower wages for grocery store workers, as the combined company would have more bargaining power in labor negotiations.

(c)   Impact on suppliers:

i.   Lower prices.  The merged company would have more buying power than either Kroger or Albertsons alone.  This would lead to lower prices for the merged company's suppliers, including farmers and food manufacturers.

ii.   Reduced access to market.  The acquisition would also make it more difficult for smaller suppliers to get their products onto the shelves of the merged company.

194.   Overall, the proposed acquisition of Albertsons and Kroger has the potential to have a negative impact on Plaintiffs, consumers, workers and suppliers.

195.   In addition, the acquisition would have a negative impact on innovation in the grocery industry.  With less competition, the Kroger would be less likely to invest in new products and services.  This could lead to a less dynamic and innovative grocery market.

196.   By reason of this violation, the Plaintiffs and all consumers are threatened with loss or damage in the form of potentially higher grocery prices, diminished consumer choices, the potential elimination of a favored supermarket, as well as additional irreparable harm for which damages will be inadequate to compensate Plaintiffs.   Plaintiffs are entitled to bring suit under Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26, to obtain preliminary and permanent injunctive relief against this proposed acquisition, and to recover their costs of suit, including a reasonable attorney's fee.

SPECIAL PAYMENT

IN FURTHERANCE OF SECTION 7 VIOLATION

197.    Albertsons is a publicly traded company. It is effectively controlled by a consortium of private equity entities, which collectively own approximately 75% of Albertsons stock.

198.    On October 14, 2022, Kroger and Albertsons announced that they had "entered into an Agreement" whereby  Kroger would acquire Albertsons, its significant rival, for $24.6 billion.  The Albertsons and Kroger acquisition agreement is memorialized in the "Agreement and Plan of Merger" document dated October 13, 2022.

199.    As part of the acquisition transaction**,** Albertsons agreed to pay a special cash dividend of up to $4 billion to the investor consortium of private equity entities and other shareholders**.**  That special payment, which did not exist prior to the proposed acquisition, has now in fact been paid pursuant to the acquisition agreement.  This special dividend would never have been paid, but for the acquisition, since the special dividend was part of, and inextricably tied to, the acquisition.  If the acquisition is enjoined, this payment must be repaid to Albertsons by Kroger.

200.    One of the purposes envisioned by Kroger for the special payment to the Albertsons shareholders was to hamper and cripple Albertsons as the number two supermarket competitor to Kroger in the United States in order to be able to compel Albertsons to accede to the acquisition by Kroger.

201.    The scheme, which was intended to be and was in fact made in derogation of Albertsons' minority shareholders and also in derogation of the integrity of Albertsons as an ongoing entity, was made and implemented in furtherance of defendants' violation of Section

7 of the Clayton Antitrust Act which otherwise would prohibit Kroger from acquiring Albertsons.

202.    The issuance of the special payment to shareholders does not have any procompetitive purpose and any arguable benefits of the special payment are outweighed by their actual and likely anticompetitive effects.

203.    One of the purposes of the special payment was to enrich the majority special interest shareholders of Albertsons who are the primary beneficiaries of the agreed-upon $4 billion special payment.

204.    Another purpose of this scheme is to falsely create the supposed defense that Albertsons is a failing company by sucking the lifeblood from a viable company.

205.    Another purpose of this scheme is to eliminate Albertsons' cash-on-hand and to nearly double its debt, putting Albertsons in a weakened competitive position relative to Kroger, and thereby harming grocery consumers and workers throughout United States.

206.    These Plaintiffs and all consumers are directly injured by reason of this special payment because the ability of Albertsons to remain a viable company after the payment has been compromised and Albertsons is no longer able to compete.  Many of the Plaintiffs and many consumers depend upon Albertsons for their everyday grocery needs.  If Albertsons is no longer able to provide these services, Plaintiffs and consumers are injured.

207.    Moreover, many individuals depend on employment by these Albertson stores. The reduced need for employees and suppressed wages for labor necessitated by reason of the special dividend payment constitutes a significant competitive harm.  This special dividend has made it more difficult for Albertsons to compete for labor by reducing Albertsons' ability to offer wage increases, pensions, or store improvements.

208.    Albertsons plans to fund the special dividend by using $2.5 billion in cash

and by taking on $1.5 billion in new debt.  This payment would eliminate more than half of Albertsons' cash and its available liquidity will be reduced to less than one billion after the special payment. The special dividend payment would increase Albertson's net debt by $4 billion to $8.54 billion.  This lack of cash may hamper Albertsons' ability to continue to compete in the short term and Albertsons may be unable to respond effectively to shifts in the market through promotions and advertising and, more generally, Albertsons may have less available cash to pay employee wages and benefits to retain staffing and may be unable to make necessary investments in its stores.

209.    Albertsons' lack of cash and deteriorating bond ratings may make access to capital harder for Albertsons and may serve to curtail Albertsons' ability to compete on price, services, quality, and innovation. The reduction in Albertsons' competitiveness may reduce the intensity of price competition market-wide and, as a result, Plaintiffs and consumers "may" likely pay more for their groceries, and enjoy fewer promotions, worse service, and fewer quality-improving investments than they would but for Defendants' agreement to pay the special dividend.

210.    In addition, Albertsons' inability to invest in its stores and its workforce "may" also likely harm workers who "may" experience lower wage growth and worse working conditions than they would but for Defendants' agreement to pay the Special Dividend, which "may" in turn affect Plaintiffs' and consumers' experiences while shopping at Albertsons' stores.

211.    It is probable that the $4 billion special dividend, had it not been paid, could have enabled Albertsons to lower prices, increase quality, hire employees, expand stores and increase innovation in products and services – all of the beneficial effects of competition and

ensuing consumer welfare – and all of which could be attested to by the chief executive officer of Albertsons upon examination.

212.    This special dividend would never have taken place in the absence of the agreement to be purchased by Kroger.  Kroger agreed to the special dividend payment because it knew that the special dividend would hamper any potential future competition from Albertsons and would solidify their attempt to acquire Albertsons.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs request the following relief from this Honorable Court:

A.    Declaring, finding, adjudging, and decreeing that the agreement of Kroger to acquire Albertsons violates Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18, and is permanently enjoined.

B.    Permanently enjoining Kroger from consummating the acquisition of Albertsons;

C.    Prohibiting any payment by Kroger to Albertson of any termination fee by reason of this permanent injunction;

D.    Ordering repayment and disgorgement of any of the $4 billion in payments made to the consortium of private equity entities and shareholders;

E.    Permanently enjoining Albertsons from making any further Special Dividend payments to any consortium of private equity entities as an act in furtherance of the Defendants' violation of Section 7 of the Clayton Act.

F.    Declaring void any agreement to pay the consortium of private equity entities any amount by reason of the failure of the Albertsons acquisition as an act in furtherance of the violations alleged;

G.    Declaring the acquisition contract between the Defendants to be null and void;

H.     Awarding to Plaintiffs their costs of suit, including a reasonable attorney's fee, as provided by Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26; and

I.     Granting to Plaintiffs such other and further relief to which they may be entitled and which the Court finds to be just and proper.

DATED:  January 10, 2024          By:  /s/ Joseph M. Alioto
                                       Joseph M. Alioto, Esq. (SBN 42680)
                                       Tatiana V. Wallace, Esq. (SBN 233939)
                                       ALIOTO LAW FIRM
                                       One Sansome Street, Suite 3500
                                       San Francisco, CA 94104
                                       Telephone: (415) 434-8900
                                       Email: jmalioto@aliotolaw.com


JURY DEMAND

Plaintiffs demand a trial by jury as their right under the Seventh Amendment to the Constitution of the United States or as given by statute for all issues considered at law and not in equity. Fed. R. Civ. P. 38.


ADDITIONAL PLAINTIFFS COUNSEL:

Lawrence G. Papale (SBN 67068)
LAW OFFICES OF LAWRENCE G. PAPALE
1308 Main Street, Suite 117
St. Helena, CA 94574
Telephone: (707) 963-1704
Email: lgpapale@papalelaw.com

Josephine Alioto (SNB 282989)
THE VEEN FIRM
20 Haight Street
San Francisco CA 94102
Telephone: (415) 673-4800
Email: jalioto@veenfirm.com