Joseph M. Alioto (SBN 42680)
Tatiana V. Wallace (SBN 233939)
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone: (415) 434-8900
Email:  jmalioto@aliotolaw.com

[Additional Counsel Listed on Last Page]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

Christine Whalen, et al.,

               Plaintiffs,

     v.

Kroger Co., Albertsons Companies, Inc., and Cerberus Capital Management, L.P.,

              Defendants.

Case No.:  23-cv-00459-VC

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTIONS OF KROGER AND ALBERTSONS TO DISMISS THE SECOND AMENDED COMPLAINT**

Hearing Date:  March 7, 2024
Time:              10:00 AM
Place:             Courtroom 4, 17th Floor
Judge:            Honorable Vince Chhabria

# TABLE OF CONTENTS

ARGUMENT…………………………………………………………………… 1

    A.    Standard of Review …………………………………………... 1

    B.    Plaintiffs Have Remedied the Court's Concerns ……………………… 2

    C.    Plaintiffs Have Alleged Shopping at Albertsons or Kroger Stores or Both ……. 2

    D.    Plaintiffs Have Alleged That They Are Threatened With

        Loss or Damage from the Merger ……………………………………… 6

    E.    Plaintiffs Have Alleged Detailed Market Share Percentages Among

        Identified Competitors And Have Provided HHI Numbers

        Demonstrating a Prima Facie Case for Unlawful Concentration and

        Impact …………………………...........………………………… 10

    F.    Undue Concentration in Any Market Is a Violation of Section 7 ………… 13

    G.    Kroger's "Divestiture" Is Speculative And May Not Be Considered …….. 14

    H.    This Case Is Not "Unripe" ……………………………………… 15

    I.    The Dividend Payment by Albertsons Compelled the Merger …………… 15

CONCLUSION ………………………………………………………………... 15

PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS SECOND AMENDED COMPLAINT

**TABLE OF AUTHORITIES**

**Cases**

*Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1334 (7th Cir. 1986) ........... 7

*Bell Atlantic v. Twombly,* 550 U.S. 544, 555 (2007) ................................................. 1

*Brown Shoe Co. Inc. v. United States*, 370 U.S. 294, 323 (1962) ......................................... 12

*California v. American Stores*, 495 U.S. 217, 284-285 (1990) ............................... 1,8,9,10,11

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) ........................................ 8

*FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26, 60 (D.D.C. 2009) ................................ 17

*FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989) ................................. 7

*FTC v. Sysco Corp.*, *supra* at 48; *see also U.S. v. Pabst*, 384 U.S. 546, at 549 (1966).... 13,15

*Hospital Corporation of America v. FTC*, 807 F.2d 1381, at 1384 (7th Cir. 1986) ............... 15

*Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116, 1123 (9th Cir. 2008) ....................... 2

*Phillips v. County of Allegheny*, 515 F.3d 224, 230-32 (3d Cir. 2008) ................................. 2

*ProMedica Health v. FTC*, 749 F.3d 559, 568-70 (6th Cir. 2014) ......................................... 13

*Safe Air v. Meyer*, 373 F.3d 1035, 1040 (9th Cir. 2004.) ........................................ 2

*St. Alphonsus Medical Center v. St. Luke's Health*, 778 F.3d 775, 785 (9th Cir. 2015) ....... 7,9

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014 ................................. 9

*United States v. Borden Co.*, 347 U.S. 514, 515 (1954) ........................................ 16

*United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 49 (D.D.C. 2011) ........................ 13

*United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 363 (1963) ................................. 13

*United States v. Von's Grocery Co.*, 384 U.S. 270  (1966) ……………………………..9, 13

PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS SECOND AMENDED COMPLAINT

## ARGUMENT

"The [Clayton Act] . . . manifest[s] a clear intent to *encourage* vigorous *private* litigation against anti-competitive mergers. Section 7 itself creates a relatively expansive definition of antitrust liability: To show that a merger is unlawful, a plaintiff need only prove that its effect 'may be substantially to lessen competition.'" Justice Stevens' Opinion, *California v. American Stores*, 495 U.S. 217, 284-285 (1990)

"[T]he purpose of giving private parties ... injunctive remedies was not merely to provide private relief, but was to serve as well the high purpose of enforcing the antitrust laws." *Zenith*, 395 U.S. at 130. Section 16 "should be construed and applied with this purpose in mind." *Id*. at 131.  Section 16 "was an integral part of the congressional plan for protecting competition;" and "fits well in a statutory scheme that ... subjects mergers to searching scrutiny"; and private Plaintiffs are considered by the Courts as tantamount to "private attorney generals" serving the public interest.[1] *Am. Stores Co.*, *supra* at 284-85.

### A.    Standard of Review

Plaintiffs are entitled to all inferences that may fairly be drawn from the factual allegations.  In *Bell Atlantic v. Twombly,* 550 U.S. 544, 555 (2007), the Supreme Court simply required plaintiffs to provide factual allegations that "raise a right to relief above the speculative level" and that offer more than just "a formulaic recitation of the elements of a cause of action." *Id.* at 555 (2007). This, Plaintiffs have done. The Supreme Court made clear that complaints do "not need detailed factual allegations," and it did not "require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id*. at 555, 570. The Court did not intend for its "plausibility" requirement to expand into a "probability" hurdle, and it allowed a complaint to proceed "even if it strikes a savvy judge that actual proof of these facts is improbable." *Id*. at 556.

---

[1] See also *Cargill, Inc. v. Monfort*, 479 U.S. 104 at 129 (1986): "Effective enforcement of the antitrust laws has always depended largely on the work of private attorney generals, for whom Congress made special provision in the Clayton Act itself. As recently as 1976, Congress specifically indicated its intent to encourage private enforcement of § 16 . . ."

"Rule 8 requires only a short and plain statement of the claim and its grounds." *Phillips v. County of Allegheny*, 515 F.3d 224, 230-32 (3d Cir. 2008).

That standard applies here.  "[V]iewing the totality of the alleged circumstances in the light most favorable to [plaintiff], the complaint puts forth 'enough facts to state a claim for relief that is plausible on its face.' Our notice pleading requirements do not require more." *Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116, 1123 (9th Cir. 2008). The case that Defendants cite to the contrary is no support since the standard there was summary judgment, not dismissal.  *Safe Air v. Meyer*, 373 F.3d 1035, 1040 (9th Cir. 2004.)

### B.      Plaintiffs Have Remedied the Court's Concerns

On December 20, 2023, this Court issued its Order and stated its concerns. (ECF 120) Plaintiffs have remedied these concerns in their Second Amended Complaint ("SAC", ECF 121). The Plaintiffs have now alleged in greater detail whether they have shopped at Albertsons stores or Kroger stores or both, and whether they are likely to, or have plans to, shop at these stores in the future.  In addition, Plaintiffs have alleged whether they shop at Defendants' stores "occasionally or regularly" and whether there are "other reasonable options equally accessible to them".

### C.      Plaintiffs Have Alleged Shopping at Albertsons or Kroger Stores or Both

For purposes of standing, Plaintiffs have alleged generally that many of the "Plaintiffs are direct consumers of Defendants' supermarket services" (SAC, ¶ 146)

More particularly, Plaintiffs have detailed each Plaintiff's shopping habits and identified where each Plaintiff shops when at home or when regularly traveling to vacation destinations or to second homes or to visit friends and relatives.  Plaintiffs have detailed whether a Plaintiff intends to continue to shop at Defendants' identified markets.  And Plaintiffs have detailed whether there are alternative supermarket shopping options available to them in their local area. (See ¶¶ 116, 118, 121, 124, 129, 135, 137, 140, 147 – 170).  The following are examples of local

2

markets where the Defendants presently compete head-to-head and where Plaintiffs currently shop because they either live there, work there or regularly travel there on vacation.

In the Seattle market, Plaintiff Stensrud, who lives in the area, has regularly shopped and will continue to shop at the Albertsons owned Safeway stores and at the Kroger owned QFC and Fred Meyers stores in his local neighborhood, all of which are within 5 miles of his home. (SAC, ¶ 116) He is directly affected by the acquisition because there are no adequate substitutes in his mind to the supermarkets where he currently shops. (SAC, ¶161) In addition, Plaintiff Michael Malaney, although he does not live in Seattle, regularly visits there three or four times every year to be with his daughter who lives in Kirkland, WA, a suburb within the Seattle market. When he is there, he shops at the Safeway (Albertsons), Fred Meyer (Kroger) and QFC (Kroger) stores located near his daughter, all of which are within 1 to 5 miles of her home. (SAC, ¶116, 147)

In Snoqualmie, WA, a small submarket 30 miles east of Seattle, there are six grocery stores, two of which are supermarkets operated by Albertsons and one of which is a supermarket operated by Kroger. The remaining stores are smaller groceries. Although Plaintiff Don Fry does not live in Snoqualmie, he shops at the Safeway there, and sometimes at the Kroger store there, when he regularly visits his son who lives in Snoqualmie. (SAC, ¶ 117-118) The Safeway (Albertsons) is located within 1 mile of his son's home, but the Fred Meyer (Kroger) store is located farther away and therefore not a good option. (SAC, ¶ 160)

In Dallas, Plaintiff Valarie Jolly regularly shops at the Albertsons and at the Kroger stores where she works near the Dallas-Fort Worth Airport. There are also a Tom Thumb (Albertsons), Target, Central Market, Market Street and other Big Box stores nearby her work. She intends to continue to shop at the Albertsons and the Kroger near where she works since in Mabank, TX, where she lives, there are no good shopping opportunities. She believes she will be directly affected by the merger should it consummated. (SAC, ¶ 121,

165)  Plaintiff Pamela Ward shops in Dallas when she visits her son who lives there.  When there, she shops at the Albertsons, the Tom Thumb (Albertsons), and the Kroger stores. (SAC, ¶ 163)

In Colorado Springs, CO, there are both Albertsons and Kroger stores where Plaintiff Jocelyn Gardner lives and regularly shops.  Plaintiff Gardner lives within 10 miles from the nearest King Soopers (Kroger) where she regularly shops and intends to continue to shop. Besides the King Soopers in Colorado Springs, there are Safeway stores (Albertsons), Sprouts Farmers Market, Whole Foods, Natural Grocers, Trader Joe's and Save A Lot. The Safeway stores are not a reasonable option because the Safeway stores are more expensive than the King Soopers.  Plaintiff is concerned that if Kroger is permitted to purchase the Safeway stores in her area, the King Soopers prices will rise to the level of the Safeway stores' pricing.  (SAC, ¶158)

Plaintiffs Len Marazzo and Jose Brito both live in Reno, NV, and both regularly shop at the Defendants' stores there.  Both intend to continue to shop at the Defendants' Safeway (Albertsons) and Smith's (Kroger) stores in their area.  (SAC, ¶ 136-137)  The other supermarkets nearby are Raley's and Save Mart. Raley's is not an option for Plaintiff Brito, however, because it is too expensive. (SAC, ¶149)  For Marazzo, another option is Sak n' Save, but it is not as good since it is four miles away from where he lives. (SAC, ¶150)

Plaintiff Don Fry lives in Tucson, AZ, and has shopped and intends to continue to shop at the Kroger and Albertsons owned stores there.  (SAC, ¶ 135)  The Albertsons store where he shops is located within 4 miles of his home, and the Fry's (Kroger) market is 6 miles away.  There are two other Albertsons Safeway stores within 6 miles of his home in either direction.  There are also 2 additional Kroger markets within 6 to 8 miles of his home. (SAC, ¶ 160)

PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS SECOND AMENDED COMPLAINT

In Fairbanks, Alaska, Plaintiff Pamela Ward regularly shops and intends to continue to shop at both the Albertsons and the Kroger stores there.  Although Plaintiff lives in Holmes Beach, Florida, where there are currently no Albertsons or Kroger stores,  she regularly visits her family in Fairbanks, Alaska, where there are Safeway stores (Albertsons) and Fred Meyer stores (Kroger).  If these stores were to merge, it would be catastrophic to competition there.  (SAC, ¶163)   According to Alaska State Representatives Spohnholz and Fields:  "This merger would reduce market competition and *result in further price inflation* in food and household necessities."  (Emphasis added, SAC, ¶ 130)

In addition to the markets set out above, there are geographic markets where Plaintiffs shop at Defendants' stores but where Defendants do not currently compete head-to-head.  (SAC, ¶ 138-140)

Albertsons currently owns and operates 225 stores in Maine, New Hampshire, Vermont, New York, Massachusetts, Connecticut, Rhode Island and Pennsylvania without competition from Kroger.  (SAC, ¶ 139)  Kroger now proposes to buy these markets outright instead of competing against them.  Kroger's business plan to simply take over the Albertsons stores and substitute its name for the Albertsons marquee in the northeastern United States has previously been found to be unlawful and has been enjoined by the Supreme Court in *United States v. Falstaff Brewing Corporation*, 410 U.S. 526 (1973).

Plaintiffs Gary Talewsky, Harry Garavanian, Gabe Garavanian and Bill Rubinsohn all live in the Northeast United States where there are currently no Kroger stores but where Kroger has proposed a wholesale purchase of the Albertsons stores there.  Harry Garavanian lives in Nashua, NH, and regularly shops at the Shaw's (Albertsons ) store there.  Plaintiff Bill Rubinsohn lives in Philadelphia, and regularly shops at both the Albertsons Acme supermarket located .5 miles from his home and at the Acme store 3 miles from his home. He plans to continue to shop at both stores.   Plaintiff Gabriel Garavanian lives in

Tyngsboro, Massachusetts and regularly shops and will continue to shop at the Albertsons

Shaw's market in close-by Nashua, NH.  And Plaintiff Gary Talewsky lives in Foxboro,

Massachusetts during the summer months and regularly shops and will continue to shop at

the Albertsons Shaw's store when he is there.  Shaw's controls 60% of the grocery market in

Foxboro.  (SAC, ¶ 140)

      **D.**       **Plaintiffs Have Alleged That They Are Threatened With Loss or Damage**
              **From the Merger**

      Section 16 of the Clayton Act authorizes private plaintiffs to obtain injunctive relief

for any "threatened loss or damage" resulting from a violation of the antitrust laws. 15

U.S.C. § 26. There is no requirement of "injury in fact" as Defendants insist on blindly

asserting.  Section 16 requires only "'threatened' injury," and injunctive relief is available

"even though the plaintiff has not yet suffered actual injury." *Zenith*, 395 U.S. at 130. A

private plaintiff "need only demonstrate a significant threat of injury from an impending

violation of the antitrust laws." *Id*.  Indeed, because Section 7 is in effect "a prediction" of

future conduct, the Seventh Circuit has said that all "doubts are to be resolved against the

transaction." *FTC v. Elders Grain, Inc*., 868 F.2d 901, 906 (7th Cir. 1989)  Among other

things, "'antitrust injury' ... means injury from higher prices or lower output, the principal

vices proscribed by the antitrust laws." *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784

F.2d 1325, 1334 (7th Cir. 1986) (citing *Brunswick*, 429 U.S. 477).[2]  The Ninth Circuit also

recently held in *St. Alphonsus Medical Center* that "Section 7 does not require certainty of

proof that a merger or other acquisition has or will cause higher prices in the affected

market. All that is necessary is that the merger create an *appreciable danger* of such

consequences in the future." *St. Alphonsus*, 778 F.3d at 1389.

---

[2] Defendants misguidedly argue against standing that some Plaintiffs do not purchase groceries from either
Defendant.  This ignores the many Plaintiffs who do. As the District Court in Boston recently said in denying
summary judgment against private plaintiffs in *Garavanian v. JetBlue*: "He only needs 1 [plaintiff]."  (ECF 99)

Plaintiffs have alleged that prices may rise if the merger is consummated:

- Economic studies have shown that post-merger prices do not decrease but rather increase between 3 and 7 percent.  (SAC, ¶ 86)

- Even a short-term reduction in competition in the urban neighborhoods can result in higher prices and reductions in quality. (SAC, ¶ 87)  As a result of reduced competition, consumers are likely to and may pay more for their groceries and enjoy worse service.  (SAC, ¶ 88)

- Kroger's CEO admitted in October, 2022 that  "We've been very comfortable with our ability to pass on the increases [from inflation] we've seen at this point. And we would expect that to continue to be the case."  (SAC, ¶ 89)

- Studies have shown that prices after mergers normally increase by 12-13% and the quality of services diminishes.  (SAC, ¶ 144)  A study by the American Economic Association found that "mergers between two firms in the same industry lead to an average price increase of 4%."  (SAC, ¶ 177)

- The DOJ has stated that "mergers can lead to higher prices and reduced innovation" and that "mergers that eliminate significant competition are more likely to harm consumers." (SAC, ¶ 174)  The FTC has stated that "mergers can reduce competition and lead to higher prices, less innovation, and lower quality goods and services."  (SAC, ¶ 175)

- The European Commission has stated that "mergers can lead to higher prices for consumers, less innovation, and lower quality goods and services."  (SAC, ¶ 176)

- The 2008 merger of Anheuser-Busch and InBev led to higher beer prices in the United States. (SAC, ¶ 179)  The 2017 merger of Dow Chemical and DuPont led to higher prices for pesticides and chemicals. (SAC, ¶ 179)  The 2018 merger of AT&T and Time Warner led to higher prices for cable TV and broadband services. (SAC, ¶ 179)

PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS SECOND AMENDED COMPLAINT

- According to the letter of Alaska State Reps Spohnholz and Fields to FTC Chair Lina Kahn dated October 21, 2022, "This merger would reduce market competition and result in further price inflation in food and household necessities." (SAC, ¶ 130)

"To establish Article III standing, an injury must be . . . 'fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted). In this case the harm will clearly occur if the merger is consummated. There is an "appreciable danger" of loss or damage in the future. *St. Alphonsus*, at 778. It is traceable to the merger. And it is redressable by a permanent injunction.

In most merger cases, the Plaintiff relies on indirect evidence of concentrated market shares, which alone has been held to be sufficient to establish a Plaintiff's prima facie case of a violation of Section 7. *See St. Alphonsus Medical Center v. St. Luke's Health System, Ltd.*, 778 F.3d 775, 785 (9th Cir. 2015) ("prima facie case can be established simply by showing high market share"). In the District Court Opinion in *California v. American Stores*, 697 F.Supp. 1125 (C.D. CA 1988) which GRANTED a preliminary injunction against the merger of Alpha Beta and Lucky Stores, the court set out guidelines for determining whether the effect of a proposed "acquisition may be substantially to lessen competition or tend to create a monopoly . . . in any section of the country" in violation of the Clayton Act:

> [A] merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects. *Id*. at 1128.

The irony of the District Court's injunction prohibiting the merger of Alpha Beta and Lucky Stores is that both are now owned by Albertsons and that Albertsons is about to be swallowed by Kroger, clearly demonstrating the ineluctable trend toward concentration in

the grocery industry. Indeed, and in addition, the Supreme Court had previously enjoined the merger of Von's Grocery which is now owned by Albertsons.[3]

Contrary to Defendants mistaken assertion that no private action has ever resulted in enjoining a merger, *American Stores* was in fact a *private action* where the state was acting as a private plaintiff. The district court there sets out a comprehensive analysis of Section 7 liability. (See *American Stores*, *Id*. at pp.1128-1132.) And the court used the defendants' own version of an expanded Metropolitan Statistical Area (MSA) (similar to our CBSA) as its geographic market to support liability in that case[4]. In this case, the merger's anticompetitive harms may be felt in hundreds of communities across the nation, threatening consumers and these Plaintiffs with direct and imminent threat of harm because they routinely shop in markets impacted by the merger.

As is graphically demonstrated by Plaintiffs' charts showing the location of Kroger and Albertsons Stores national and by State Region and Local Community (SAC, ¶ 68-70), the proposed merger may lessen competition in at least 22 states across the nation where the Defendants currently compete, and "potential competition" may be harmed in many more. *All twenty-four* Plaintiffs are threatened with impending antitrust injury because they are grocery consumers in these impacted markets.

---

[3] The issue in the grocery case of *United States vs. Von's Grocery Co*., 384 U.S. 270 (1966), involved the acquisition by Von's, a grocery market chain with only a 4.7% market share of Shopping Bag, another grocery chain with a 4.2% market share. 384 U.S. at 281. The Court, analyzing the market shares together with the growing number of grocery chains and the shrinking number of independently owned stores, held that "these facts alone are enough to cause us to conclude...that the Von's-Shopping Bag merger did violate §7." *Id*. at 274.

[4] And there have been many other private cases granting injunctions against mergers as well. See, e.g., to name of few, *Christian Schmidt Brewing Co. v. G. Heilman Brewing Co., Inc.,* 600 F.Supp. 1326 (E.D.Mich.), *aff'd,* 753 F.2d 1354 (6th Cir.1985) (proposed merger found to substantially lessen competition based on statistical evidence of post-merger market share of 31%, four-firm concentration increase from 78% to 89%, HHI increase from 1746 to 2120, and general trend toward concentration); and *Marathon Oil Co. v. Mobil Corp*., 530 F.Supp. 315 (N.D.Ohio), *aff'd,* 669 F.2d 378 (6th Cir.1981) (acquisition enjoined based on post-merger combined market share of 10-20% in relevant markets, four-firm concentration increase from 48% to 53% on average, and general trend toward concentration.)

PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS SECOND AMENDED COMPLAINT

**E.** **Plaintiffs Have Alleged Detailed Market Share Percentages Among Identified Competitors And Have Provided HHI Numbers Demonstrating a Prima Facie Case for Unlawful Concentration and Impact**

In the overlapping markets in which Albertsons and Kroger compete head-to-head Plaintiffs have alleged that the merger may lessen actual competition and may cause loss or damage to consumers, including the Plaintiffs, by eliminating a potential competitor, increasing concentration, raising prices, reducing capacity, and limiting consumer choice. (SAC, ¶ 99)

In the Ninth Circuit's opinion in *St. Alphonsus Med. Center v. St. Luke's Health System*, 778 F.3d 775 (9th Cir. 2015), the Ninth Circuit held that an "extremely high HHI on its own establishes the prima facie case" and that, quoting *Hospital Corp of America*, "Section 7 does not require proof that a merger or other acquisition has caused higher prices in the affected market.  All that is required is an appreciable *danger* of such consequences in the future."  *St. Alphonsus, supra* at page 778.  The Court went on to say that other factors, such as a "history of cooperation" and "high entry barriers" contribute to the violation, *Id*. at 778, and cited other cases where high HHI, high market concentration and high entry barriers resulted in the establishment of prima facie violations of Section 7.  (*See Chi. Bridge & Iron*, 534 F.3d at 431-432;  *Lucas Auto Eng'g, Inc. v. Bridgestone/Firestone, Inc.,* 140 F.3d 1228, 1236-37 (9th Cir. 1998), *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1219-20, n. 27 (11th Cir. 1991) and *American Stores*, 872 F.2d 837, at 842-43 (9th Cir. 1989), all cited in *Alphonsus* at 788.)

Plaintiffs have alleged a history of cooperation in the industry through food industry acquisitions, the trend toward concentration in the industry, and the substantial barriers to entry into these grocery markets. (SAC, ¶¶ 31-33, 56)

Plaintiffs have also alleged the high market shares of Defendants in markets where they compete and where Plaintiffs patronize their stores and Plaintiffs have provided detailed numbers and analysis supporting these before-and-after market calculations.

For example, Plaintiff Clyde Stensrud lives and works in the Seattle area. Not only is Seattle a market that may be harmed, but, if the merger proceeds, Kroger will have a complete and unchallenged *monopoly* in that area, rendering the merger facially unlawful and essentially un-rebuttable under the law.  Plaintiffs have identified the supermarkets and groceries in the market. (SAC, ¶¶ 113) Plaintiffs have alleged that the Kroger market share would rise from 33.4% to 53.04%.  (SAC, ¶¶ 114)  And the merger will cause the market concentration index (known as the "HHI") in that market area to increase by 1,967(!) points to 3,198 – dramatically above the 2,500 post-merger and 200-point increase thresholds that establish the merger's presumptive illegality under the law. (SAC, ¶¶ 113-116) (*See St. Alphonsus*, 778 F.3d at 786 ("[m]ergers that increase the HHI more than 200 points and result in highly concentrated markets [*i.e.* 2,500 HHI or higher]" are presumptively anticompetitive).  Plaintiffs' figures supporting these market share calculations are derived from the industry standard 2023 Grocery Industry Market Share Report, prepared by Chain Store Guide.  (SAC, ¶¶ 115, fn.17)

Plaintiff Jocelyn Gardner lives in Colorado Springs, CO.  This area also may be harmed by the merger and once again Kroger will have a complete monopoly there post-acquisition. The Kroger market share would rise from 20.9% to 39.05%.  (SAC, ¶ 122)  And the merger will cause the HHI in that market area to increase by 759 points to 2,375, three times the benchmark increase recognized by the courts.  (SAC, ¶¶ 123-24)

In Fairbanks, Alaska, Plaintiff Pamela Ward is confronted with a pending monopoly if the acquisition is permitted.  In Fairbanks, the Kroger market share would rise from 30.1% to 47.72%.  (SAC, ¶¶ 127)  And the merger will cause the HHI in that market area to

PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS SECOND AMENDED COMPLAINT

increase by 1061 points from 2,193 to 3,254, four times the benchmark increase recognized by the courts.  (SAC, ¶¶ 128)

Plaintiffs have alleged similar dramatic market share increases for Kroger in the additional markets of Snoqualmie, WA (from 1 to 3 out of 6 grocery markets) (SAC, ¶¶ 117-118); Dallas, TX (16.57% to 27.23% market share; 403 increased HHI) (SAC, ¶¶ 119-121); Tucson, AZ (pre-acquisition market share of 21.71%, with a post-acquisition market share totaling 40.54%; increased HHI of 951 points from 1338 to 2289) (SAC, ¶¶ 131-135); and Reno, NV (8.15% increase in market share to 15.23%) (SAC, ¶¶ 136-137) where Plaintiffs Don Fry, Valarie Jolly, Len Marazzo and Jose Brito live, work, or regularly vacation or visit with relatives.

In merger cases, "[Congress's] concern was with *probabilities*, not *certainties*," *Brown Shoe Co. Inc. v. United States*, 370 U.S. 294, 323 (1962). Accordingly, a merger violates the law if it is "reasonably likely to cause anticompetitive effects." *United States v. H & R Block, Inc*., 833 F. Supp. 2d 36, 49 (D.D.C. 2011). The law "does not require proof that a merger or other acquisition has caused higher prices in the affected market. All that is necessary is that the merger create an appreciable danger of such consequences in the future." *Id*., citing *Hospital Corp*. Some mergers are *presumptively* illegal because they are "so inherently likely to lessen competition substantially that [they] must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 363 (1963).  The proposed acquisition need only result in markets exceeding *either* the 30% market share with the significant increase in the concentration threshold set forth in *Philadelphia National Bank, or* the HHI and delta HHI thresholds set forth in the Merger Guidelines, to be presumptively unlawful. Merger Guidelines § 2.1; *see also FTC v. IQVIA Holdings Inc.*, No. 23 CIV. 06188 (ER), 2024 WL 81232, at *33 (S.D.N.Y. Jan. 8, 2024).

Once the presumption of illegality is established, the burden shifts to Defendants to rebut that presumption. *ProMedica Health v. FTC*, 749 F.3d 559, 568-70 (6th Cir. 2014).

### F.     <u>Undue Concentration in *Any* Market Is a Violation of Section 7</u>

A "relevant market" for purposes of Section 7 was recently defined in *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 24 (D.D.C. 2015) as comprised of both a "relevant product market" describing "the product and services with which the defendants' products compete," and a "relevant geographic market" which "identifies the geographic area in which the defendant competes in marketing its products or service." *Id*. at 24.

Importantly, proof that a merger may substantially lessen competition in *any* market—no matter its size—and no matter that it is only one of a number of markets in which Defendants do business—suffices to show that the merger violates the antitrust laws. *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 193  (D.D.C. 2017).  This is in accordance with the statute's direct statement that the acquisition is to be scrutinized "in *any section* of the country".  15 U.S.C. 18.

For its product market, Plaintiffs have alleged that supermarkets compete primarily with other supermarkets that provide one-stop shopping opportunities for food and grocery products. In public statements Defendants have readily admitted that the relevant product market is the retail sale of food and other grocery products in supermarkets.[5]  (SAC, ¶¶ 72-77)  Plaintiffs have alleged the product scope, the target audience, the pricing strategy, the competition and the dynamics of the supermarket product market that distinguishes supermarkets from big box general retail stores and that supports Plaintiffs' allegations that general retail stores should be excluded from the product market.  (SAC, ¶78)[6]

---

[5] Kroger's CEO has stated that Kroger is the largest retail grocery store in the U.S. and that Albertsons is the second largest.  Article, *Making Things Easier for Customers is Kroger's Goal*, Grocery Business Newsletter, Jan. 17, 2023, at file:///Users/LGP/Desktop/Making%20things%20easier%20for%20customers%20 is%20Kroger's%20goal,%20CEO%20Rod ney%20McMullen%20says.webarchive

[6] Only supermarkets were the product market in *California Stores* and in *Von's* and only supermarkets have been alleged as the product market in the recent Washington State suit recently filed against this merger. *State of Washington v. The Kroger Co*., *et al.,* Case No. 24-2-00977-9 SEA, January 16, 2024, ECF 124-1.

PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS SECOND AMENDED COMPLAINT

With regard to the appropriate geographic markets, Plaintiffs have alleged markets including the entire United States (SAC, ¶ 79), as well as "smaller local relevant geographic markets . . . within individual states. . . .where their consumer customers are concentrated." (SAC, ¶ 80)  As the Supreme Court has noted, a plaintiff need not "delineat[e] . . . [each geographic market] by metes and bounds as a surveyor would lay off a plot of ground." *United States v. Pabst Brewing Co.*, 384 U.S. 546, 549 (1966). This is because the "Supreme Court has recognized that an element of fuzziness would seem inherent in any attempt to delineate the  relevant geographic market." *FTC v. Sysco Corp.*, *supra* at 48; *see also U.S. v. Pabst*, 384 U.S. 546, at 549 (1966).  Discovery will permit Plaintiffs to fully refine the metes and bounds of relevant macro and micro geographic markets in this case, from national to regional to state to metro area to even smaller relevant micro geographic markets that may exist within each of the alleged CBSAs and that involve Plaintiffs directly.

## G.     Kroger's "Divestiture" Is Speculative And May Not Be Considered

The fact that Defendants are considering divestiture is tantamount to an admission that the merger will lessen competition.  Moreover, Defendants' so-called "divestiture" of stores is completely speculative.  First, there has been no divestiture to date and, if this Court prohibits the merger, there will be no divestiture.  Second, the so-called "divestiture" appears to be contingent upon FTC approval of the merger.  If the FTC does not agree to the divestiture proposal in connection with approving the merger, there will be no sale of stores.  In that case, Defendants' divestiture argument becomes completely irrelevant.[7]  In addition, there are other valid reasons why the "divestiture" argument should be rejected by the Court, all of which are set out in the SAC at ¶¶ 35-40 as well as in Judge Posner's opinion in *Hospital Corporation of America v. FTC*, 807 F.2d 1381, at 1384 (7th Cir. 1986) and in the Letter dated December 11, 2023 from the

---

[7] If the Court is inclined to consider facts offered by Defendants regarding divesture from outside the SAC, Plaintiffs should be permitted discovery pursuant to Rule 12(d).

U.S. Senators and Congresspersons to FTC Chair Kahn in which they observe that proposals for divestitures historically have not worked, are anticompetitive in themselves and only serve to "encourage companies to 'litigate the fix' by proposing remedies during ongoing litigation in order to distract a judge's focus from the original antitrust violations of the merger."  (See SAC, ¶37)  In addition, many markets including Reno and Snoqualmie and Fairbanks where Plaintiffs buy groceries do not appear to be affected by the proposed divestiture and themselves remain presumptively anticompetitive.  Finally, the issue of divestiture should be an affirmative defense and not a bar to the prima facie case made by these Plaintiffs.  See *St. Alphonsus*, *supra* at 788-89.

### H.        This Case Is Not "Unripe"

For the reasons stated in prior memoranda, this case is not unripe, and the Supreme Court has not held otherwise. *United States v. Borden Co.*, 347 U.S. 514, 515 (1954) ("private and public actions *may proceed simultaneously or in disregard of each other.*")

### I.        The Dividend Payment by Albertsons Compelled the Merger

Plaintiffs have alleged that the $4 Billion dividend paid by Albertsons was engineered by Kroger to force Albertsons either to merge or to seek expensive financing in the equity markets, thereby crippling Albertsons' ability to compete. (SAC, ¶¶ 197-212) These allegations illustrate another anticompetitive effect of the merger.

### CONCLUSION

"Merger law rests upon the theory that, where rivals are few, firms will be able to coordinate their behavior, either by overt collusion or implicit understanding in order to restrict output and achieve profits above competitive levels." *FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26, 60 (D.D.C. 2009).  By removing Albertsons from the market, this acquisition will increase the likelihood that, instead of competing fiercely, the remaining grocery competitors will be incentivized to coordinate to raise prices.

Dated:  February 14, 2024,                    Respectfully submitted:


                                    By:      /s/ Joseph M. Alioto
                                             Joseph M. Alioto (SBN 42680)
                                             Tatiana V. Wallace (SBN 233939)
                                             ALIOTO LAW FIRM
                                             One Sansome Street, Suite 3500
                                             San Francisco, CA 94104
                                             Telephone: (415) 434-8900
                                             Email: jmalioto@aliotolaw.com

                                             *Attorneys for Plaintiffs*

ADDITIONAL PLAINTIFFS COUNSEL:

Lawrence G. Papale (SBN 67068)
LAW OFFICES OF LAWRENCE G. PAPALE
1308 Main Street, Suite 117
St. Helena, CA 94574
Telephone: (707) 963-1704
Email: lgpapale@papalelaw.com

Josephine Alioto (SNB 282989)
THE VEEN FIRM
20 Haight Street
San Francisco CA 94102
Telephone: (415) 673-4800
Email: jalioto@veenfirm.com

Christopher A Nedeau (SBN 81297)
NEDEAU LAW PC
154 Baker Street
San Francisco, CA 94117-2111
Telephone: (415) 516-4010
Email: cnedeau@nedeaulaw.net

PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS SECOND AMENDED COMPLAINT