# EXHIBIT F

EFiled: Dec 14 2024 04:34PM EST
Transaction ID 75228023
Case No. 2024-1276-LWW

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| ALBERTSONS COMPANIES, INC., | |
| Plaintiff, | C.A. No. 2024-1276-LWW |
| v. | **Redacted Public Version** |
| THE KROGER COMPANY, | **Filed: December 14, 2024** |
| Defendant. | |

## VERIFIED COMPLAINT

Plaintiff Albertsons Companies, Inc. ("Albertsons"), by and through its attorneys, for its Verified Complaint against The Kroger Company ("Kroger," and in conjunction with Albertsons, the "Parties") alleges as follows:

## PRELIMINARY STATEMENT

1.     For many Americans, the local supermarket is a trusted brand and an iconic feature of the community.  It is a place where American families spend, on average, nearly six percent of their disposable income and where they depend on access to affordable nutrition.  On October 14, 2022, Albertsons and Kroger, who collectively own and operate more than 30 of America's trusted grocery brands, announced that they had agreed to merge after signing an agreement (the "Merger Agreement")[1] by which Kroger would acquire Albertsons in a transaction valued at

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Merger Agreement.

almost $25 billion (the "Merger").    The transaction was not just a boon to Albertsons' stockholders—after the announcement, Albertsons' stock price closed at a 32.8% premium to the unaffected stock price—it also would have benefitted American consumers by creating a combined company with the necessary scale to drive down prices, invest in higher quality products, promote and protect consumer choice in the face of expanding industry behemoths (such as Walmart, Costco, Target, and Amazon), and protect union jobs.    For many American communities, this transaction represented hope for the continued viability of the local grocery stores that have sustained their communities for generations.

2.    But Kroger derailed the merger after suffering a classic case of buyer's remorse.    At first, Kroger was eager to acquire Albertsons, and it willingly assumed stringent obligations in the Merger Agreement to do everything necessary to close the Merger as quickly as possible.    Obtaining the necessary antitrust clearances was at the top of the list.    As both Albertsons and Kroger knew when negotiating the Merger Agreement, the ability to close the Merger depended on obtaining approval from the Federal Trade Commission ("FTC") and relevant state regulators, which in turn would require Kroger, as the surviving company, to divest a substantial number of supermarkets and other assets to ensure that the Merger would comply with antitrust law and achieve its aim of promoting competition in communities across

2

the country.  Accordingly, the Parties agreed to a specific series of escalating obligations on the part of Kroger, first to exercise "best efforts" and then, in the face of any threatened regulatory action to block the Merger, to take "any and all actions" necessary to "eliminate each and every impediment" to closing the Merger.

3.     But Kroger later had second thoughts after a negative market reaction to the Merger and falling post-pandemic profits, and it decided it would go through with the deal, if at all, only on terms far more advantageous to Kroger than those for which it had bargained.  Immediately after the Merger was announced, Kroger received sharp criticism from rating agencies, saw its stock price decline, and faced pushback from politicians.  The day after the Merger announcement, Kroger's stock dropped by 7.3%.  S&P Global Ratings ("S&P"), Moody's Investor Service ("Moody's"), and DBRS Morningstar ("Morningstar") all published negative reports.  Both Moody's and S&P highlighted the stress the Merger would put on Kroger's debt levels and questioned whether Kroger would be able to maintain its commercial-grade credit rating.   Kroger also faced highly public political opposition—including having its and Albertsons' executives called before a U.S. Senate Subcommittee to be grilled on the Merger the month after the deal was signed.  At the same time, net profits for Kroger and Albertsons fell as purchasing trends abated after COVID: whereas during the pandemic, customers had shifted

3

their food purchasing to grocery stores and away from restaurants and had consolidated their shopping in a fewer number of stores, those trends reversed.

4.      In the face of these headwinds, rather than take the steps it knew would give the Merger the best chance to succeed, and which it had agreed to take, Kroger put itself first.  Despite knowing better, Kroger squandered its credibility with regulators from the outset by proposing a plainly indefensible divestiture package that elevated Kroger's bottom line over its contractual obligations to Albertsons to put forward a tenable divestiture proposal.  Kroger then deepened that rift with regulators by refusing to adjust its proposed divestiture package in response to regulators' predictable and readily addressable feedback.

5.      Kroger compounded these breaches by turning away divestiture buyers with long track records of successfully running large-scale retail grocery businesses and instead selecting a bidder whose primary experience was as a wholesaler.  And, although obligated by contract to work with Albertsons in good faith, Kroger kept Albertsons in the dark about regulatory strategy and ignored Albertsons' suggestions for how to get the Merger approved.

6.      Instead of complying with its contractual obligations to exercise "best efforts" and to take "any and all actions" to get the Merger approved, Kroger

4

prioritized its own financial self-interest and refused to do what was required to close the deal.  It therefore breached the Merger Agreement at least by:

> a. Failing to divest an adequate package of up to 650 stores to satisfy regulators' concerns;
>
> b. Failing to divest an adequate package of non-store assets (like banners, technology, and private label brands) to satisfy regulators' concerns;
>
> c. Delaying its engagement with regulators and failing to respond adequately to regulators' questions and concerns;
>
> d. Mismanaging the process of identifying a divestiture buyer; and
>
> e. Failing to cooperate with Albertsons in good faith.

7.     Ultimately, the FTC (joined by several states) and the states of Washington and Colorado each filed a separate lawsuit to enjoin the Merger.

8.     On December 10, 2024, and as a direct result of Kroger's malfeasance, the United States District Court for the District of Oregon and the King County Superior Court in the State of Washington issued injunctions blocking the Merger on antitrust grounds.  The Merger's failure has significant consequences for Albertsons and its stockholders, who endured more than two years of uncertainty,

spent hundreds of millions of dollars preparing for the Merger, and now will lose the significant premium on their shares Kroger committed to pay.

9.    As a direct result of Kroger's willful breaches, Albertsons' stockholders suffered billions of dollars in damages, and the American public suffered the loss of a supermarket option offering lower prices and increased choice. This action seeks to hold Kroger responsible for the harm it caused.

## SUMMARY OF ALLEGATIONS

10.    The impact of Kroger's breaches and the resulting failure of the Merger are particularly significant given the state of the grocery industry, which in recent years, has undergone a fundamental shift. Retail giants like Walmart, Costco, Amazon, and Target increasingly have focused on selling food as part of their diverse product offerings. Because of their massive scale, those retailers can sell groceries at rock-bottom prices—often lower than Albertsons' prices. At the same time, consumers are spreading their shopping trips across several different retailers, searching for value wherever they can find it. Together, these dynamics pose an existential threat to Albertsons and Kroger, and to their ability to serve their customers.

11.    The Merger was an ideal solution to this problem. The combined company would have been more competitive with the behemoths, benefitting from

6

improved economies of scale by allowing it to expand in new locations at lower costs, to operate with more efficient overhead, and to take advantage of a national supply chain, an enhanced distribution infrastructure, and the ability to borrow at a lower cost of capital. From these synergies and others, Albertsons and Kroger expected that the combined company would deliver a more diverse and lower-cost product offering to consumers, while still providing fair-paying union jobs. The combined company also could invest in new projects related to advertising and digital sales, leveraging Albertsons' and Kroger's larger combined set of consumers and consumer data to provide added value to customers nationwide. All of that would have allowed the combined company to better compete with retail giants Walmart, Costco, Amazon, and Target, and other grocery competitors.

12.     Kroger and Albertsons understood from the beginning that their ability to close the Merger was dependent upon obtaining FTC and state regulatory approval. And despite all the benefits that would flow from the Merger, both Parties expected that the Merger would face scrutiny by antitrust regulators due to the overall size of the transaction and the fact that Kroger and Albertsons operate in a limited number of overlapping geographic areas.

13.     To address those concerns, as is typical in large retail mergers, Albertsons and Kroger contemplated that the FTC and state regulators would require

7

Kroger to divest certain assets. Thus, from early on in their negotiations, the Parties understood that antitrust regulatory approval was likely to require (1) a large divestiture; (2) careful selection of the stores to be divested based on sound economic modeling and neutral, objective criteria; and (3) the inclusion of other assets regulators deemed essential to the successful operation of the divested business, like "banners" (the stores' trade names), private label brands, distribution centers, supply chain agreements, and information technology assets.

14.    Albertsons knew from the start that regulatory approval in general and a robust divestiture in particular would be critical to the Merger's ability to close. As a result, Albertsons began negotiations by insisting on significant assurances that Kroger would take all necessary steps to secure regulatory approval and close the Merger. Albertsons raised the need for these assurances at the outset of the Parties' negotiations. They were in the initial draft of the Merger Agreement, which was exchanged in August 2022. And those provisions remained largely unchanged in the final Merger Agreement that the Parties signed two months later, on October 13, 2022.

15.    The core assurances Albertsons insisted on during negotiations were embodied in three provisions. Those provisions impose on Kroger a series of escalating obligations around its efforts to obtain regulatory approval:

8

a.  *First*, Kroger generally agreed to use "reasonable best efforts" to satisfy all closing conditions "as promptly as reasonably practicable."

b.  *Second*, Kroger assumed a more stringent obligation to use its "best efforts"—not limited by any standard of reasonableness— "to avoid, eliminate, and resolve any and all impediments under any Antitrust Law . . . so as to enable the Closing to occur as promptly as practicable." That "best efforts" provision explicitly required Kroger to divest any assets and make any changes to its operations that were necessary to obtain antitrust approval.

c.  *Third*, if a regulator threatened or instituted an antitrust challenge, Kroger committed to take "any and all actions" necessary to "eliminate each and every impediment under any Antitrust Law" to closing the Merger. This "any and all actions" obligation is an exceptionally high standard: Kroger had to resolve antitrust concerns, as Delaware courts have put it, "come hell or high water."

16.   There was only one caveat to Kroger's "best efforts" and "any and all actions" obligations: those commitments did not require Kroger to divest more than

9

650 physical stores. Albertsons bargained hard for this 650-store threshold, rejecting Kroger's repeated proposals for a lower cutoff. Indeed, Albertsons withheld its consent to the Merger until Kroger's CEO personally committed to divest 650 stores and shook hands on that term with the CEO of Albertsons' largest stockholder.

17. The Merger Agreement contained no other limitations on what Kroger was required to do to facilitate the close of the Merger. For example, nothing in the Merger Agreement limited *which stores* Kroger had to divest. In other words, to satisfy its "best efforts" and "any and all actions" obligations, Kroger was required to divest *any* combination of up to 650 stores that would satisfy regulators. It could not (as it later tried to do) select plum stores to retain and offer up largely unprofitable stores for divestiture. Similarly, the Merger Agreement did not in any way limit Kroger's obligation to part with assets other than stores themselves. For example, Kroger had an unlimited obligation to sell any non-store assets such as store banners, private label food brands, distribution centers, and IT systems, if doing so would resolve regulators' antitrust concerns.

18. As a result of the procompetitive aspects of the Merger and the Parties' clear commitment—at least on the face of the Merger Agreement—to offer a robust divestiture, the transaction should have been able to close. So long as Kroger fulfilled its obligations to provide necessary non-store assets and divest a reasonable

10

set of stores, regulatory approval could have been achieved.  Nonetheless, Kroger owed Albertsons yet further obligations, to help ensure that the Parties' incentives remained aligned and Kroger would work diligently to ensure the Merger closed.

19.    First, because of Kroger's "best efforts" and "any and all actions" promises, Albertsons agreed that Kroger would have the principal responsibility for devising and implementing a strategy to obtain antitrust approval.  But Kroger committed to "cooperate" with Albertsons in the antitrust clearance process; consult with Albertsons before meeting or communicating with regulators; give Albertsons the opportunity to attend and participate in such meetings; consider Albertsons' strategic views; and "work together in good faith to resolve [any] disagreement." Thus, Kroger was required to actively include and engage with Albertsons throughout the regulatory review process, even though the final call on decisions if the Parties disagreed on a particular strategy was Kroger's to make.

20.    Second, the Parties agreed that Kroger would pay Albertsons a $600 million termination fee if the Merger failed to close by the outside date set in the Merger Agreement.  The Parties knew that this termination fee, totaling less than 2.5% of the total merger consideration, was lower than other mergers of comparable size and complexity.  Albertsons was willing to accept this smaller termination fee because Kroger was contractually obligated to use its "best efforts" and to take "any

11

and all actions" to make sure the Merger would close.  As further protection to ensure Kroger's full commitment to the Merger, Albertsons expressly negotiated for an additional independent right, beyond the $600 million termination fee: in the event the Merger failed, Albertsons could seek all legally available damages for any "Willful Breach" of the Merger Agreement by Kroger.

21.     Yet, despite all its obligations in the Merger Agreement, Kroger did not hold up its end of the bargain.  Kroger failed to act promptly to secure regulatory approval, and it repeatedly delayed its responses to and its interactions with federal and state regulators.  When it did engage, Kroger took untenable positions and failed to answer routine questions about its assumptions and data for proposed divestitures. Kroger also failed to adjust its positions in response to regulators' feedback.  And Kroger ignored Albertsons' recommended strategy and general best practices to obtain regulatory approval at every step.  Kroger's conduct created frustration and distrust among regulators, who repeatedly informed Kroger that it had failed to address their concerns, and ultimately caused an unprecedented litigation onslaught where the Parties were sued contemporaneously in three separate jurisdictions.

22.     Indeed, Kroger willfully squandered every opportunity to obtain antitrust approval through a divestiture.  As Albertsons repeatedly told Kroger, and as Kroger should have known from its own previous merger clearance experience,

the Merger would have the best chance of obtaining FTC approval if Kroger proposed a robust divestiture package within the first thirty days after signing the Merger Agreement.  Such a package would (at a minimum) include a set of stores designed to allay regulators' local concentration concerns, based upon thorough economic analysis.  Putting a serious divestiture offer on the table right from the start would make FTC staff reluctant to recommend that the agency block the Merger and would provide a solid platform from which to negotiate a solution.  Kroger chose not to do this.

23.    Instead, Kroger proposed an initial divestiture package that was facially deficient.  When Kroger first met with the FTC in December 2022, Kroger proposed to divest only 238 stores—just over one third of the 650-store ceiling in the Merger Agreement and nearly half of the 440 stores that Kroger's own expert's economic analysis demonstrated would be needed to offer to close the deal.  It quickly became clear that Kroger had not used any supportable basis to select these stores: in meetings with the FTC, Kroger could not even answer basic questions about the economic analysis underlying its proposal or the principles underlying the selection of the stores to be divested.  That, of course, was because the proposal reflected *no* objective economic analysis: Kroger cherry-picked the Kroger stores included in the

13

238-store set based on their poor financial performance, not because their divestiture would alleviate the FTC's concerns about localized concentration of stores.

24.    Days after the initial December 2022 meeting, the FTC issued a second request (the "Second Request") to both Parties.  A second request is universally understood by antitrust practitioners as putting the Merger at risk for future litigation and requiring an extensive series of document productions and engagements with the FTC regarding the competitive effects of the Merger.

25.    The FTC's issuance of a Second Request triggered Kroger's obligation to take "any and all actions" to remove antitrust impediments, requiring Kroger to address each and any concern raised by regulators during the Parties' negotiations with the FTC.

26.    Around the same time, the Attorneys General of multiple states, including Washington, which sent Albertsons and Kroger a Civil Investigative Demand on January 6, 2023, initiated investigations into the Merger, further heightening the risk of enforcement action and the need for Kroger to take "any and all actions" to either avoid or win any litigation challenging the Merger.  Throughout their investigations, the states and the FTC coordinated their actions closely, sharing all material information they obtained from the Parties and frequently joining the same meetings with the Parties.

14

27.     Any buyer that was serious about making "best efforts," let alone taking "any and all actions" to obtain antitrust approval, would have responded to the initial FTC meeting, the FTC's issuance of the Second Request, and the initiation of multiple state Attorney General investigations by immediately proposing a new divestiture package based on rigorous economic analysis.

28.     Not Kroger.  Instead, Kroger stalled, resisting any effort to improve its divestiture proposal for months. Rather than address the FTC's concerns when next meeting with the FTC in March 2023, Kroger presented *the same* indefensible proposal to divest 238 cherry-picked stores, with a buyer to be named later.  This willfully obstructive and high-risk tactic was inexplicable, except as a decision by Kroger to press its own independent economic best interests over meaningful engagement with the FTC about resolving the agency's concerns.

29.     Kroger's initial shirking of its obligations under the Merger Agreement escalated to outright repudiation of its obligations as the Parties discussed identifying a divestiture buyer.  Kroger waited for months after signing the Merger Agreement before even starting to court potential divestiture buyers.  When Kroger finally began that process, it received ample interest: approximately 60 potential bidders signed non-disclosure agreements to initiate talks with Kroger in the first half of 2023, including established, large-scale grocery retail competitors like ■■■

These companies were strong candidates: they had the experience, resources, and scale to acquire stores and operate them as strong competitors from Day One, thus allaying concerns about grocery competition in the vicinities of those stores.

30.     Kroger kept Albertsons largely in the dark about the identities of these potential buyers and Kroger's negotiations with them, rejecting Albertsons' pleas to be included in the process.  Kroger waited until August 2023, and then only told Albertsons that it had shortlisted three bidders—C&S Wholesale Grocers ("C&S"), ███████ and ████████—while concealing from Albertsons that it had eliminated ████ and other qualified buyers from consideration.

31.     On September 8, 2023—nearly a year after the Merger Agreement was signed, and nine months after the FTC made its Second Request—Kroger finally entered into an Asset Purchase Agreement with C&S (the "APA").  Kroger's choice of C&S as the divestiture buyer came with obvious risks.  C&S was primarily a grocery wholesaler and operated only 23 retail grocery locations at the time it was selected.  Lacking a large-scale grocery retail business of its own, C&S would need significant management and transition resources from Kroger and Albertsons to operate the divested stores effectively.  C&S was subject to heightened scrutiny by the FTC because it previously had sold numerous retail locations in the early 2000s and 2010s just a few years after purchasing them, which would predictably cause the

16

FTC to be concerned that C&S might attempt another quick sale with divested assets. Moreover, C&S would need significant new financing to purchase up to 650 stores. These attributes of C&S were bound to draw scrutiny from antitrust regulators, given that any plan to divest stores to C&S would necessarily be premised on C&S's ability to operate those stores as strong local competitors. Selecting C&S as a divestiture buyer was thus highly risky and inconsistent with Kroger's obligations to make its "best efforts" and take "any and all actions" when buyers such as ████ were available. Yet, Kroger made this selection without informing Albertsons of the other potentially stronger bidders.

32.    Once it selected C&S, it was incumbent on Kroger to demonstrate to the FTC that Kroger would divest the assets C&S would need to thrive as a competitor. Kroger failed on this front too. Kroger's initial APA with C&S was also grossly deficient. It provided for the divestiture of just 413 stores, many of which still were chosen based on Kroger's financial interests rather than the required objective and neutral economic analysis. The APA also failed to include the non-store assets that Kroger knew any potential buyer, as well as the FTC, would regard as essential to making the divested stores competitive, such as key IT infrastructure and private label food products.

17

33.    Over a number of months, both Albertsons and C&S urged Kroger to address these deficiencies by divesting a cohesive selection of 650 stores and non-store assets that would meaningfully address competitive concerns.  Kroger ignored these entreaties and focused on its own economic interests, to the detriment of its credibility with regulators and its ultimate ability to negotiate a solution that would avoid litigation.    Demonstrating the seriousness of Kroger's blunders, the Washington Attorney General highlighted in its opening statement at trial an example of a store that Kroger's management had suggested be included in the divestiture package, but which was vetoed by Kroger's CEO Rodney McMullen because "this store has real estate that is worth a lot."  In its opinion enjoining the Merger, the Washington Court ultimately concluded—citing that very example—that "Kroger kept the best performing assets for itself."  As the Washington Court put it:  "Where it could, Kroger followed a simple rule:  if a store was a 'good EBITDA producer, . . . we wouldn't want to divest.'"

34.    Similar self-serving conduct by Kroger occurred throughout its negotiations with the FTC and other regulators.

35.    In addition to deficient interactions with the regulators and proposed divestiture buyers, Kroger failed to adequately inform and cooperate with Albertsons, as the Merger Agreement required.  Throughout the Parties' interactions

18

with regulators from October 2022 through February 2024, Kroger failed to meaningfully include Albertsons in strategy sessions with its legal team and experts, provide updates to Albertsons about the bases for its divestiture proposal, explain its methodologies for analyzing local competition effects, or consider feedback from Albertsons about the proper process and substance for engaging with regulators. At each turn, Kroger failed to meaningfully engage and respond to Albertsons' feedback. Instead, Kroger acted consistent with what it perceived to be in its financial interest, spending months delaying responses to regulators and then providing half-baked proposals that were objectively destined to fail.

36.    Kroger's recalcitrance toward cooperating with Albertsons was the opposite of Albertsons' approach for working with Kroger. Albertsons offered to meet with Kroger's experts and repeatedly provided Kroger with economic analyses and models from its own experts reflecting a divestiture proposal to remedy the shortcomings of Kroger's proposals and to fully address the stated concerns of the FTC and state regulators. In numerous instances, Albertsons pushed Kroger to add more stores and assets to its proposed divestitures, engage more quickly with agency officials, and provide comprehensive, economic-based rationales for its offers. And Albertsons pleaded with Kroger to offer a divestiture closer to the 650-store threshold, selected through rigorous economic analysis, and buttressed by key non-

19

store assets that would allow a divestiture buyer to become a viable competitor. Kroger brushed this input aside and omitted it from submissions to the FTC, eschewing its duty of cooperation under the Merger Agreement.

37.    Finally, Kroger failed to make a best and final offer to the FTC with the terms and on a timing that could allow the deal to close, dooming the Merger.  As a result of Kroger's conduct, the Parties lost out not only on their opportunity for a pre-litigation settlement but also compromised their defense in the eventual litigation.

38.    On September 13, 2023, Kroger met with the FTC to discuss its new proposal to sell 413 stores to C&S.  The FTC reiterated the same concerns from nearly a year prior regarding how Kroger was selecting stores to divest.  The FTC thereafter met or communicated with Kroger multiple times in October 2023, seeking additional information about Kroger's proposal, which Kroger did not provide.  Nearly a year after Kroger first engaged with the FTC, on November 22, 2023, the FTC informed Kroger that its 413-store offer remained woefully inadequate.  Kroger still had not addressed the FTC's questions about the economic methodology for its divestiture offer, nor had it addressed the FTC's prior concerns with how Kroger was defining a relevant product market.  As a result, the FTC wrote that Kroger's proposed divestiture failed to address "dozens, if not hundreds, of

'markets' where the [M]erger would be presumed likely to enhance market power."
And yet, between November 2023 and January 2024, Kroger made just small
adjustments to the number of stores it was willing to divest, first offering 510 stores
and then 541 stores, but still failing to provide any additional explanation for how it
was selecting those stores.  When two of the FTC Commissioners convened "last
rites" meetings on February 22, 2024, with litigation imminent, Kroger still refused
to address the FTC's longstanding concerns, even though these were the same
concerns Albertsons and C&S had been pressing for Kroger to address for months.

39.     In early 2024, as a direct result of Kroger's failure to take "any and all
actions" to remove antitrust impediments, the FTC (joined by several states) and the
states of Washington and Colorado each filed a separate lawsuit to enjoin the
Merger.  While Albertsons and Kroger entered those lawsuits at a disadvantage
because of Kroger's willful blunders in the pre-litigation regulatory process, Kroger
had a final opportunity to save the Merger by pivoting to a 650-store divestiture
package proposed by C&S that was both responsive to the FTC's competitive
concerns and within Kroger's obligations under the Merger Agreement.  Instead,
Kroger proposed a more limited 579-store package, knowing that it would be subject
to more criticisms by the FTC and had a lower probability of passing muster with a
court.  That 579-store package remained highly vulnerable to attack by antitrust

21

regulators. Indeed, even Kroger's own economics expert could not fully justify the package and was forced to concede at trial in the FTC's enforcement action that the Merger was presumptively anticompetitive in nearly two dozen markets, taking the divestiture package into account.

40.     On December 10, 2024, the District of Oregon granted the FTC's motion for a preliminary injunction, dooming the transaction. The judge highlighted Kroger's hand-picked economics expert's concession that at least 22 markets were presumptively unlawful, holding: "This evidence on its own is sufficient to find that the divestiture will not mitigate the merger's anticompetitive effect such that it is no longer likely to substantially lessen competition." The Oregon Court also repeatedly highlighted the glaring deficiencies in Kroger's divestiture package, particularly in light of C&S's inexperience as a retail operator.

41.     Had Kroger lived up to its contractual obligations, this Merger would have succeeded. Instead, Kroger flagrantly violated its obligations to take "any and all actions" to remove antitrust impediments; to "cooperate" with Albertsons; to use "best efforts" to obtain antitrust approval; and to use "reasonable best efforts" to satisfy closing conditions generally. As a result, Albertsons has endured more than two years of limbo, during which time it has been blocked from taking on new projects, making new investments, or exploring alternative transactions it would

22

otherwise pursue.  Further, Albertsons' stockholders have been denied the multi-billion-dollar premium Kroger agreed to pay for Albertsons' shares and suffered from a decrease in stockholder value.  Meanwhile, American consumers who value fresh, high-quality food have been deprived of an opportunity for lower prices and greater choice and competition in the relevant market(s).

## PARTIES

42.    Albertsons is a Delaware corporation headquartered in Boise, Idaho.  It is one of the largest food and drug retailers in the United States.  As of September 7, 2024, Albertsons operated 2,267 stores and 1,726 pharmacies across 34 states and the District of Columbia.  Albertsons serves 36.8 million customers per week and, as of September 7, 2024, employed approximately 285,000 associates.

43.    Kroger is an Ohio corporation headquartered in Cincinnati, Ohio.  As of February 3, 2024, Kroger operated 2,722 supermarkets, of which 2,257 had pharmacies and 1,665 had fuel centers, across 35 states and the District of Columbia. As of February 3, 2024, Kroger employed approximately 414,000 associates.

## JURISDICTION

44.    Subject matter jurisdiction is proper in this Court pursuant to 8 *Del. C.* § 111(a), which confers jurisdiction over "[a]ny civil action to interpret, apply,

enforce or determine the validity of . . . [a]ny agreement, certificate of merger or consolidation," under 8 *Del. C.* § 251, which governs the Merger.

## FACTUAL ALLEGATIONS

### I.    Albertsons and Kroger Face Fierce Competition, Increasingly Dominated by Walmart, Amazon, and Other Diversified Behemoths

45.    Albertsons and Kroger have operated retail grocery stores since 1939 and 1883, respectively.  Unlike many of their competitors, Kroger and Albertsons have majority-union workforces.

46.    The grocery business has become increasingly competitive over the last few decades.  While thirty or forty years ago, customers commonly would choose one store at which to do their primary grocery shopping for the week, customers now typically split their grocery shopping across multiple trips and multiple formats, including online.

47.    At the same time, Walmart, Costco, Amazon, and Target have emerged as significant grocery competitors.  These competitors have immense scale and diversified businesses, including between grocery and non-grocery products.  Their workforces are mostly non-union, resulting in lower labor costs.  These factors, among others, enable them to consistently offer low prices to their customers.

48.    Other new competitive threats also have emerged.  Foreign-owned grocery companies like Ahold Delhaize, Aldi, and Lidl are rapidly expanding in the

24

U.S. market.  Other historically non-food retailers like Dollar General have recognized an opportunity for growth in grocery and have invested aggressively in the space.  Once-niche natural food and organic grocers like Whole Foods, Sprouts, and Trader Joe's have expanded and diversified their offerings.  And ethnically-focused sellers like H Mart, Patel Brothers, Fiesta Mart, and 99 Ranch Market have expanded from localized chains to regional competitors, operating between 50 and nearly 100 locations each.

49.    As a result, so-called "traditional grocery stores" like Albertsons and Kroger have faced increased pressure on price, quality, and diversity of their offerings and have been losing market share to both global giants and agile new entrants.

50.    During the COVID-19 pandemic, Albertsons and Kroger both enjoyed a short period of outsized profitability; overall grocery revenue rose as customers shifted from restaurants to grocery stores and consolidated their weekly trips.  As a result, grocers like Albertsons were able to hire new employees and invest in long-term projects like increasing digital sales.  In recent years, however, that trend has reversed, and competition in grocery retail has grown even more fierce.

51.    To address this increasing competition, Albertsons has implemented various initiatives to leverage its existing scale and reduce its costs, for example,

25

Case 3:23-cv-00459-VC    Document 148-7    Filed 12/24/24    Page 27 of 141

increasing its digital sales and improving overall productivity in its stores. Those changes have allowed Albertsons to offset a certain amount of food-based inflation and some of its rising labor costs. But these measures alone did not and could not do enough to allow Albertsons to lower its product prices to compete effectively with Walmart, Costco, Amazon, Target, and the other competitors.

52.    If dedicated grocery stores like those operated by Albertsons were forced to close due to their inability to match the prices of their superstore competitors, consumers would suffer. Through vigorous competition, Albertsons has cultivated many customers who choose to shop at its stores—either instead of or in addition to other grocery options. These consumers would lose a desirable alternative if they were forced to shop for groceries only at Walmart, Costco, and their ilk.

## II.    Kroger Approaches Albertsons, Proposing a Merger

53.    Beginning in 2021, the Albertsons board of directors engaged in a strategic review of the ways in which it could maximize stockholder value in the face of increasing pressure from larger-scale competitors. One of the options that the board explored was a potential transaction by which Albertsons might be acquired. From these discussions, and after engaging in a process to identify potential buyers, Albertsons entered negotiations with another company

26

("Company A") regarding Company A's interest in acquiring Albertsons.  After Albertsons expended significant effort on the potential sale, including engaging in due diligence, Company A informed Albertsons in February 2022 that it did not wish to pursue a transaction at that time.

54.    Shortly thereafter, Albertsons publicly announced on February 28, 2022 that it had commenced a Board-led review of potential strategic alternatives aimed at enhancing the Company's growth and maximizing stockholder value, and weeks later, in April 2022, representatives of Kroger approached Albertsons' outside financial advisor to discuss the possibility of Kroger acquiring Albertsons. Albertsons considered an acquisition by Kroger to be an attractive opportunity.  The deal would result in a company of considerable scale: together, Kroger and Albertsons own and operate approximately 5,000 retail stores and 4,000 retail pharmacies.  They also employ approximately 700,000 employees, many of whom are union members, across 48 states.  This expanded scale would enable the surviving company to obtain more favorable terms from suppliers, improve its long-term supply chain management, and centralize administrative functions.  In turn, the newly-merged company would use the cost savings generated by these efficiencies to deliver lower prices and expanded product offerings to customers.  The surviving

company would also be better situated to invest in capital improvements, online shopping operations, and non-grocery business segments, including pharmacies.

55.    Critically, the combined company would be more competitive against retail giants like Walmart, Costco, Amazon, and Target, benefiting consumers. Joining forces would allow the combined entity to offer more competitive prices without compromising their fundamental business model.

56.    A merger between Kroger and Albertsons would also allow the companies to build a more valuable retail media platform than either company could build on its own.  Like other grocery retailers, Kroger and Albertsons earn revenue by selling digital and physical media space for advertisements of consumer-packaged goods, and by providing advertisers with insights on consumer purchases in response to advertisements.  This non-grocery revenue can enable a virtuous cycle: profits from retail media allow the companies to invest more in lowering grocery prices; lower prices attract more shoppers; increasing customer traffic raises the value of the advertising space the companies are able to sell; and greater future media revenue enables further grocery price reductions.  However, today, Kroger and Albertsons lack the scale and resulting network effects of superstores like Walmart, which generate much greater retail media revenues.  Building a single, nationwide retail media platform for Albertsons and Kroger, instead of two separate

platforms with only regional coverage, would also generate cost savings that could be passed on to consumers.

57.     Moreover, while there are certain geographic markets in which Albertsons and Kroger both operate, the two companies have different overall geographic footprints.  Albertsons stores are predominantly located in the Northeast and on the West Coast; Kroger has no presence in the Northeast.  Kroger stores are predominantly located in the Midwest, Southeast, and West; Albertsons has no presence in the Midwest or Southeast.  A merger between Albertsons and Kroger would thus create a grocery chain with broader geographic scope across the country, improving and streamlining supply chain and distribution resources, as well as unlocking new value from existing resources like consumer data.

58.     While Albertsons saw great upside in a potential deal with Kroger from Kroger's initial outreach, it needed to receive assurances from Kroger that it would do all that was necessary to close the deal.  During the time from negotiations to execution of a merger agreement, to obtaining antitrust clearance, to closing, Albertsons would have to bear significant transaction costs, including fees for attorneys and financial advisors, as well as significant costs and employee time for integration planning.

59.    Albertsons also knew any agreement to merge would also create a period of strategic limbo for it between signing and closing.  The Merger Agreement, for example, required Albertsons to commit to significant limitations on its ability to enter contracts, including leases, above a threshold of $10,000,000.    And Albertsons had to forgo other strategic alternatives at a time of significant and rapid market evolution.

60.    If the Merger never closed, Albertsons' investment of resources and effort would go to waste—a risk that was front of mind for Albertsons in the wake of its recent failed negotiations with Company A.

61.    It also was clear to both Kroger and Albertsons that their potential merger would not achieve its procompetitive aspirations and would face a substantial risk of being blocked on antitrust grounds unless the Parties pursued a principled and robust regulatory strategy, including by making divestitures in limited local geographic areas where Kroger and Albertsons both operated stores.

62.    Because the antitrust aspects of any prospective deal between Kroger and Albertsons were critical, both Parties involved antitrust counsel almost immediately after Kroger's initial outreach to Albertsons.  Kroger engaged a team of accomplished, sophisticated antitrust lawyers at Arnold & Porter Kaye Scholer LLP ("A&P"), including a former Deputy Assistant Attorney General in the

Antitrust Division of the U.S. Department of Justice, who had had a front-row seat for four years to both the Trump and Biden Administrations' enforcement of antitrust laws. The A&P antitrust practice group was led by the former Director of the FTC's Bureau of Competition from 2013 to 2017. These attorneys and their colleagues were intimately familiar with what antitrust regulators would require from Kroger to get the deal done and how the agency's views could be affected by changes in the political climate.

63.    Through their respective competition attorneys, the Parties discussed antitrust issues extensively at the very outset of their negotiations, even before negotiating pricing and other material terms. On May 5, 2022, Kroger's and Albertsons' outside antitrust counsel discussed the geographic overlap of their stores in select areas and the intense competition that their stores face from a variety of retailers. The same outside counsel spoke about these topics again on May 11, 2022. On May 19, 2022, Albertsons CEO Vivek Sankaran met with Kroger CEO Rodney McMullen to discuss the potential deal, including the importance of developing a plan to achieve regulatory clearance by divesting specific stores to a qualified third party.

64.    As these deal discussions were ongoing, Albertsons retained Charles River Associates ("CRA"), an economic consulting firm, to conduct a preliminary

31

economic analysis of the proposed deal.  CRA adopted a fulsome approach and considered each of the 83 metropolitan areas where both Parties operated stores as part of its analysis.  From this analysis, Albertsons formed the view that a substantial number of divestitures would be required to address competitive issues in many communities and that a realistic store divestiture figure would be approximately 600 to 650 stores.

65.    Kroger engaged CompassLexecon, another economic consulting firm with significant experience in competition analysis.  To Albertsons' surprise, Kroger's consulting economists concluded that only 400 to 500 stores would need to be divested in a potential merger.  Albertsons immediately flagged flaws with this analysis, including that CompassLexecon had only evaluated competitive effects in 24 metropolitan areas, not all metropolitan areas where both Parties operated stores. When Albertsons attempted to re-create Kroger's analysis using similar assumptions but expanding results to 83 metropolitan areas, it identified hundreds more stores that presented concentration concerns and thus would likely need to be included in a divestiture package.  Kroger also did not consider either a uniform threshold of market concentration or specific radius around Kroger and Albertsons stores to determine overlaps.  Nor did it apply a market definition that the FTC was likely to use in its own analysis.  For example, Kroger included club stores like Costco,

32

natural foods stores, and ethnically-focused sellers in its early estimates even though the FTC had rejected including those stores in prior merger clearance reviews. Kroger's approach had the overall effect of significantly undercounting the number of stores it would likely need to divest.

66.    It was also clear from the outset that a successful divestiture package would require more than merely divesting a certain number of stores.  From the Parties' initial estimation exercises, there were a large number of overlapping stores in Los Angeles, San Diego, Chicago, Dallas, Las Vegas, Phoenix/Tuscon, and Washington, D.C.  As a result, the Parties would need to select stores for divestiture that would alleviate regulatory concerns related to those specific, limited set of local markets.  In effect, Kroger would need to select the "right" stores and accompany those with key non-store assets, including banners, distribution centers, manufacturing facilities, and private label brands and products that supported those stores, so that the regulators would be persuaded that a divestiture buyer would be able to establish a competitive operation.  In short, while the number of stores was important, divesting other assets would be key to resolving regulatory competition concerns.

67.    Thereafter, the Parties continued to analyze the extent of necessary divestitures while further negotiating other material terms of a deal.

**III.    Albertsons Bargains for Stringent Requirements for Kroger in Seeking Antitrust Approval**

68.    Given the importance of a strong antitrust strategy, coupled with the risk of immense costs to Albertsons if it became entangled in a deal that never closed, Albertsons was unwilling to proceed with even drafting a merger agreement—let alone signing one—unless Kroger committed to make extraordinary efforts to close the deal, minimizing the risk of transaction failure.

69.    On June 25, 2022, Kroger, through its outside financial advisor, provided Albertsons with a nonbinding indication of interest that described terms and conditions to be further discussed, including a cap on the number of stores to be divested to obtain regulatory clearance, the time period for obtaining regulatory clearance, and the termination fee each Party might have to pay if the transaction failed to close.

70.    During the several weeks following Kroger's June 25, 2022 opening proposal, the Parties—through their senior executives, outside counsel, and outside financial advisors—discussed certain material terms that would need to be included in any merger agreement, although no draft contract had yet been shared between the Parties.

71.    To proceed with the negotiations, Albertsons demanded assurances that Kroger was willing to agree to stringent protections.  Kroger provided this assurance

34

by indicating early in the Parties' discussions that it would accept eight key deal points to mitigate the risk that the Merger would fail. Albertsons incorporated each of these protections into the first draft of the Merger Agreement, which it sent to Kroger on August 12, 2022. These protections remained materially unchanged in all subsequent drafts and were included in the final Merger Agreement, which was executed on October 13, 2022.

72. *First*, Kroger and Albertsons both agreed to use "reasonable best efforts" to satisfy all conditions to closing of the Merger, including but not limited to antitrust approval, "as promptly as reasonably practicable." This provision ultimately appeared in Section 6.3(a) of the final Merger Agreement.

73. *Second*, in addition to the mutual obligation to use "reasonable best efforts" to satisfy all closing conditions, Kroger agreed to a separate and higher standard for its antitrust strategy: Kroger alone would be obligated to use its "**best efforts**"—not limited by any standard of reasonableness—"to take . . . **any and all actions necessary** to avoid, eliminate, and resolve any and all impediments under any Antitrust Law . . . so as to enable the Closing to occur **as promptly as practicable**." The "actions" Kroger was required to take included (but were not limited to) (1) divesting "assets, properties, or businesses"; (2) entering any "arrangements" needed "to effect the dissolution of any injunction, temporary

35

restraining order or other order in any suit or proceeding" that would otherwise block the Merger; (3) "changing or modifying any course of conduct regarding [Kroger's] future operations"; and (4) taking "any other action that would limit [Kroger] or its Subsidiaries or Affiliates' freedom of action with respect to, or their ability to retain," any "operations, divisions, businesses, product lines, customers, assets or rights or interests, or their freedom of action with respect to the assets, properties, or businesses to be acquired" from Albertsons.  This provision ultimately appeared in Section 6.3(d) of the final Merger Agreement.

74.    *Third*, if any proceeding was "instituted (or threatened) challenging the Merger as violating any Antitrust Law," Kroger committed to take "**any and all actions** . . . **to eliminate each and every impediment** under Antitrust Law to close the [Merger] prior to the Outside Date" (a contractually specified date that could be extended to no later than approximately two years after signing of the contract).  This "any and all actions" obligation was even more demanding than the "reasonable best efforts" standard under Section 6.3(a): Kroger was agreeing to remove antitrust impediments "come hell or high water."  This provision appeared in Section 6.3(e) of the final Merger Agreement.

75.    *Fourth*, as a further protection for Albertsons' interest in accelerating antitrust approval and closing  the Merger, the Parties agreed that, unless both Parties

36

consented, neither Party would "enter into any agreement with any Governmental Entity to delay" the Merger or withdraw its regulatory filing seeking clearance for the Merger under the Hart-Scott-Rodino Antitrust Improvements Act ("HSR Act"). This protection would be particularly important once the Parties substantially complied with a potential second request. At that point, the FTC would have 30 days to either sue to block the Merger or permit the Merger to close—and Albertsons could insist on holding the FTC to this timeframe, even if Kroger wanted to allow an extension. By vetoing any proposed timing agreement with the FTC, Albertsons could ensure that if litigation with the FTC was necessary, it would begin promptly so Albertsons and Kroger would have time to defend themselves fully, including through any appeals. This provision appeared in Section 6.3(c) of the final Merger Agreement.

76. *Fifth*, Albertsons and Kroger agreed that the *sole* limit on Kroger's obligations to make its "best efforts" and take "any and all actions" in addressing antitrust issues would be a cap on the total number of stores Kroger could be required to divest if necessary to address regulators' antitrust concerns. There was no limit on Kroger's obligation to sell any *non-store assets* such as store banners and intellectual property to obtain regulatory approval. And there was no limit on the *specific* stores Kroger was required to divest. Kroger, in other words, could not

37

simply offer to divest its most unprofitable or otherwise unattractive stores, even if it offered enough of them to meet the contractual cap on required store divestitures. This deal point was memorialized in Sections 1.1 and 6.3(d) of the final Merger Agreement, which respectively (1) defined "Material Divestment Event" as the divestment of over 650 stores, and (2) provided that the sole limit on Kroger's "best efforts" and "any and all actions" obligation was that no Material Divestment Event would be required.

77.     *Sixth*, the Parties agreed that neither could be cut out of the antitrust approval process.  They agreed to (1) "cooperate in all respects" on regulatory submissions and documents filed in any litigation or other proceeding; (2) promptly inform each other of any communication from the government or any communication regarding a proceeding; (3) allow each other "to review in advance and incorporate their reasonable comments in any communication" to the government; and (4) "to the extent practicable," consult with each other before "any material meeting, written communications or teleconference" regarding regulatory approval or any proceeding, and give each other "the opportunity to attend and participate in such meetings and teleconferences."  These obligations were included in Section 6.3(b) of the final Merger Agreement.

38

78.    *Seventh*, the Parties agreed that if the Merger failed to close, Kroger would pay Albertsons a termination fee.  This obligation appeared in the August 12, 2022 Merger Agreement draft, with the amount of the termination fee provisionally left blank.  The Parties later agreed to a $600 million termination fee.

79.    *Eighth*, the Parties agreed that, even if the Merger Agreement was terminated and the $600 million termination fee was paid, the termination would not release any Party from liability for any "Willful Breach" of the Merger Agreement— *i.e.*, a "material breach … that is the consequence of an act or omission by the breaching [P]arty with the actual knowledge that the taking of such act (or, in the case of an omission, failure to take such act) would cause or constitute such material breach, regardless of whether breaching was the object of the act or failure to act." In the case of a Willful Breach, the aggrieved Party would be "entitled to all rights and remedies available at law or in equity," such as "benefit of the bargain" damages suffered by Albertsons' stockholders from the loss of the premium that they would have received had the Merger closed.  Thus, if Kroger willfully breached any of its obligations under Merger Agreement—including its obligations regarding antitrust matters under Section 6.3—Albertsons could seek damages for the breach, which would not be limited by the $600 million termination fee.  The final Merger

39

Agreement memorialized this point in Sections 8.3 and 9.5 and in the definition of "Willful Breach" in Section 1.1.

80.    Thus, as of August 12, 2022, when Albertsons shared the initial draft Merger Agreement with Kroger, the basic framework protecting Albertsons from the risk of Kroger failing to obtain antitrust regulatory approval already was in place. The only open issues for further negotiation on this topic included (1) the cap on how many stores Kroger could be required to divest, (2) the amount of the termination fee Albertsons would receive if the deal failed, and (3) the extent of control Kroger would exercise over the process of seeking antitrust regulatory approval, notwithstanding Albertsons' agreed-upon right to participate in that process.

81.    On August 19, 2022, Kroger sent Albertsons proposed revisions to the initial draft Merger Agreement.  Some of Kroger's edits focused on the issue of control over the regulatory process.  While accepting Albertsons' proposed language requiring cooperation, Kroger rejected Albertsons' proposal that the Parties resolve any disagreements about any regulatory "communication, strategy or process" by "work[ing] together in good faith to resolve the disagreement and endeavor[ing] to implement such communication, strategy or process in a mutually acceptable manner."  Kroger instead proposed language stating that Kroger "shall have the

principal responsibility for devising and implementing" the antitrust strategy "and shall lead and direct all submissions" in the antitrust regulatory process and any litigation.

82.    That proposed transfer of control to Kroger was not acceptable to Albertsons—unless Kroger committed to a divestiture package sufficiently large and robust to give Albertsons confidence that the Merger would receive antitrust approval.  On August 26, 2022, Albertsons sent Kroger a draft Merger Agreement that reversed Kroger's edits on the issue of control but added, in a footnote: "Control of strategy to be discussed after [Albertsons'] review of [Kroger's] proposed divestment package."

83.    Accordingly, for the next several weeks, the Parties temporarily tabled the question of control over post-signing antitrust strategy, instead focusing their negotiations largely on the cap on the number of stores that Kroger would be contractually required to divest and the size of the termination fee Kroger would be contractually obligated to pay if the deal failed.

84.    Kroger's incentive was to bargain for the lowest possible cap on the number of stores it would potentially need to divest because, other things being equal, divesting more stores would mean Kroger was giving up more value.  But

41

Albertsons was unwilling to enter into a Merger Agreement that did not require a divestiture level that Albertsons could be confident would secure antitrust approval.

85.    On September 2, 2022, Kroger proposed a 600-store cap on Kroger's obligation to divest stores to obtain regulatory approval.

86.    Albertsons was not satisfied.  The next day, the Parties' respective antitrust attorneys discussed Kroger's proposal and the importance of Kroger proposing a viable divestiture package to antitrust regulators.

87.    On September 5, 2022, Albertsons communicated a counterproposal in which the cap for Kroger's divestiture obligation would be increased to 650 stores, and the termination fee payable by Kroger to Albertsons would be $800 million.

88.    Kroger countered the next day, proposing a 600-store divestiture cap and a $600 million termination fee.  Albertsons rejected that proposal.  On September 22, 2022, it communicated to Kroger that it would agree to a $600 million termination fee, but only on the condition that the divestiture cap was raised to 725 stores.

89.    Kroger initially balked at raising the divestiture cap above 600 stores. But after discussions between the Parties' financial advisors and attorneys on September 27 and 28, 2022, Kroger made a September 29, 2022, counteroffer that included a 650-store divestiture cap and a $600 million termination fee.

42

90.    The same day, Albertsons communicated to Kroger that it was prepared to accept Kroger's economic terms, subject to a few final demands including increasing the divestiture cap to 725 stores.

91.    Finally, in discussions between September 30 and October 1, 2022, Albertsons and Kroger reached an agreement in principle on the termination fee and divestiture cap.  Kroger would agree to set the cap for required divestiture at 650 stores, despite having insisted repeatedly that it should be no higher than 600 stores. While lower than the 725-store threshold Albertsons had proposed, this 650-store threshold was still conservative and thus protective of Albertsons; the Parties understood that if Kroger met its stringent obligations to make "best efforts" and take "any and all actions" to secure antitrust approval, it would be readily achievable to construct a divestiture package that would fully address any antitrust concerns without needing to divest more than 650 stores.  In return for Kroger's agreement to the 650-store threshold, Albertsons would accept Kroger's proposal for a $600 million termination fee.  While the termination fee was below market expectations for a merger of similar size and complexity, Albertsons was willing to accept the lower termination fee because of the strong protections designed to minimize the risk of transaction failure as a result of Kroger accepting the 650-store cap, and because Albertsons had preserved the right to seek damages beyond the termination

43

fee for any Willful Breach by Kroger.  Ultimately, the final Merger Agreement reflected the Parties' agreement on a 650-store divestiture cap and provided for the $600 million termination fee.

92.    That left the issue of control over antitrust strategy to be negotiated.  In a markup of the Merger Agreement on October 7, 2022, Kroger proposed a compromise: Kroger would agree to Albertsons' proposed language requiring "good faith" efforts to resolve disagreements, in exchange for Albertsons agreeing that, "following such good faith efforts" to resolve disagreements, Kroger "shall have the principal responsibility for devising and implementing the strategy for obtaining any necessary antitrust consents or approvals."  Albertsons agreed.  Whereas Albertsons could not unliterally approach the FTC to provide updates on the Merger or proposed divestiture package, it could rely on the strong contractual protections that mitigated the risk of Kroger abusing its asymmetric control over the antitrust process.  Section 6.3(b) of the final Merger Agreement reflected this compromise.

93.    Before Albertsons made its final decision to accept Kroger's terms, Kroger CEO Rodney McMullen met face-to-face with Stephen A. Feinberg, the CEO of Albertsons' then-largest stockholder, Cerberus Capital Management.  McMullen explicitly committed to Feinberg that Kroger would divest 650 stores to get the Merger done, and shook hands with Feinberg on that point.  This personal

44

commitment from the highest level of Kroger's management gave Albertsons the added assurance to feel comfortable selling the business to Kroger.

## IV.    Albertsons and Kroger Agree to Merge

94.    On October 13, 2022, Albertsons and Kroger entered into the Merger Agreement.  A true and correct copy of the Merger Agreement is annexed to this Complaint as Exhibit 1.

95.    In the Merger Agreement, Kroger and Albertsons agreed to merge Kroger's subsidiary, Kettle Merger Sub Inc., into Albertsons, in a transaction that valued Albertsons at approximately $24.6 billion and would provide $34.10 per share in consideration to Albertsons' stockholders, representing a 32.8% premium over Albertsons' closing stock price of $25.67 on October 12, 2022, the day before news of the Merger became public.  The premium alone was valued at approximately $6 billion.

96.    The executed Merger Agreement imposed on Kroger all the stringent obligations regarding its pursuit of regulatory approval for which Albertsons had bargained, and that Albertsons had insisted on maintaining throughout negotiations. *See supra* Section III.

97.     Section 8.1(e) of the Merger Agreement set the "Outside Date"—the date on which either Party could terminate the Merger Agreement if the deal had not closed—as January 13, 2024.

98.     That same subsection provides that if regulatory approval was still pending, either Party could unilaterally extend the Outside Date in increments of 30 days, for up to 270 days total, *i.e.*, until October 9, 2024.  If either Albertsons or Kroger was in breach of the Merger Agreement, however, that Party was not permitted to extend the Outside Date.  Albertsons later exercised its rights under Section 8.1(e) of the Merger Agreement to extend the Outside Date nine times in one-month increments from January 13, 2024 through October 9, 2024 in an effort to salvage the Merger despite Kroger's breaches of its obligations.

99.     Under Section 8.4(c), if the Merger Agreement was terminated by either Party (i) following the passage of the Outside Date if the Merger had not received regulatory approval or an antitrust injunction remained pending or (ii) following the issuance of a final non-appealable order enjoining the Merger on antitrust grounds, then Kroger would be required to pay Albertsons the $600 million termination fee.  Kroger also would be obligated to pay the $600 million termination fee if Albertsons terminated because the transaction was otherwise ready to close but Kroger refused to close.

46

100.   Further, in the event of a "Willful Breach" of the Merger Agreement by Kroger, Section 8.3 allows Albertsons to recover its damages over and above the $600 million reverse termination fee, providing that Albertsons "shall be entitled to all rights and remedies available at law or in equity."

101.   Finally, Section 9.5 of the Merger Agreement expressly contemplates that the damages Albertsons may seek for a Willful Breach include "benefit of the bargain" damages, which Albertsons may "pursue[] on behalf of the holders of [Albertsons] Common Stock."  These "benefit of the bargain" damages include the premium that Albertsons' stockholders would have received if the Merger had closed.

## V.   Kroger Immediately Receives Negative Market Feedback After the Merger Is Announced

102.   When Albertsons and Kroger agreed to merge, both companies believed the transaction was in their economic interest.  But the ink on the Merger Agreement was barely dry before Kroger began to develop buyer's remorse. Multiple factors—including negative market feedback on the deal and its impact on Kroger's debt burden; and ominous economic signals for the grocery sector— combined to change Kroger's financial assumptions, creating a disincentive for Kroger to go as far in seeking antitrust approval (including the divestiture process)

47

as might be necessary to close the deal on the terms it had agreed to, despite its contractual obligations.

103.  *First*, Kroger received near-instant feedback from the market indicating that investors and analysts viewed its acquisition of Albertsons negatively.

104.  News of the likely merger became public on October 13, 2022, preceding the formal announcement the next day.  Following the initial news reports and continuing after the formal announcement, there was a significant sell-off of Kroger's stock, causing a 7.3% decrease in share price that day—the stock's largest single-day decline in the second half of 2022.

105.  After the public announcement on October 14, 2022, well-known investment ratings companies, including S&P, Moody's, and Morningstar, all published reports on Kroger.  These analyses recognized that Albertsons was an attractive acquisition target for Kroger, and none suggested that the deal overvalued Albertsons.  S&P, for example, noted that both companies had "performed well recently" and that "[t]he combined enterprise will have a more balanced footprint across the U.S. with the benefit of [Albertsons'] solid western U.S. presence and should present the organization with significant synergy opportunities."  Nevertheless, S&P, Moody's, and Morningstar each concluded that the Merger's overall effect on their outlook for Kroger was "negative."  In addition to recognizing

48

that obtaining antitrust clearance would likely require a large divestiture package, analysts were concerned about potential increases in debt levels at the post-merger company, as well as potential integration risks in an uncertain time for grocery retailers.

106.    Kroger's post-merger debt load was an especially significant concern to third-party analysts.    Morningstar, for example, emphasized that Kroger's additional leverage as a result of the Albertsons acquisition could result in a debt-to-adjusted-EBITDA ratio of well over 3.00x, which could lead to challenges in achieving future revenue growth.    Analysts at S&P and Moody's were similarly concerned that high leverage might hinder future growth for Kroger and ultimately affect its ability to maintain a commercial-grade credit rating.

107.    Analysts also expressed concern that a general cooldown in grocery sales, following record high performance during the COVID-19 pandemic, might create integration risks.    S&P, for example, explained that in an industry that "continue[d] to evolve rapidly to meet customer expectations," there might be unforeseen execution risks in the management of the combined entity.    Moody's warned that these risks could even lead to potential operational shortfalls, endangering the short-term financial well-being of the new company.

49

108.    These negative reactions from influential ratings agencies—and the implicit risk of a near-term credit downgrade, which could make borrowing for Kroger more expensive going forward—soured investors' opinion of Kroger.  That, in turn, created a powerful incentive for Kroger to revise its approach to the deal.

109.    *Second*, concerns emerged about the risk of deflation in the U.S. economy following years of inflation, which could have undermined Kroger's assumptions related to the value it expected to capture from the deal.  During the Merger negotiations, post-pandemic inflation was high—but as pandemic-era stimulus programs began to wind down, and global monetary policy tightened, some economists predicted lower inflation or even deflation, pushing down the prices of groceries and other consumer goods.  Analysts warned that, based on historical data, a period of deflation would depress grocery companies' earnings.

110.    *Third*, over the two years following the Merger Agreement, both Albertsons and Kroger experienced financial results that fell short of expectations in some respects.  Albertsons, for example, had forecasted around the time of the Merger Agreement that its adjusted EBITDA for fiscal year 2023 would be approximately $4.7 billion, but it ultimately reported adjusted EBITDA of approximately $4.3 billion for that fiscal year.  The headwinds reflected in these results were also felt by other grocery retailers, as overall consumer spending at

50

grocery stores trended downward.  These financial realities made the Merger less accretive to Kroger, other things being equal.

111.   These post-signing market developments were no excuse for Kroger to walk back from its contractual obligations in the Merger Agreement.  After a deal announcement, it is not unusual for the buyer to receive negative market feedback and to experience economic headwinds that partially erode the deal's value.  Kroger bore this risk under the Merger Agreement, and it was Kroger's responsibility to consider this possibility before it irrevocably committed to acquire Albertsons and to use "best efforts" and take "any and all actions" to secure antitrust approval.  Despite its contractual obligations, however, economic factors after the signing of the Merger Agreement gave Kroger an incentive to breach the contract by approaching the regulatory process in a way that prioritized preserving value for Kroger at the expense of antitrust approval risk.

## VI.    Kroger Faces Political and Labor Pushback to the Merger, Which It Refuses to Take Reasonable Measures to Mitigate

112.   From the Merger's announcement, Kroger also faced significant political and labor group pushback.  Albertsons proposed a proactive advocacy and public relations strategy to Kroger, but Kroger ignored its advice.  These political and labor pressures increased the scrutiny on antitrust approval of the Merger and

51

ultimately added fodder to the FTC's concern that the Merger could be problematic for labor market competition.

113.   Organized labor groups representing grocery store employees voiced opposition to the Merger.  For example, on November 29, 2022, the Local United Food and Commercial Workers Unions, which represented over 100,000 Kroger and Albertsons employees in twelve states, held a press conference opposing the Merger. Only one labor group representing employees from either company subsequently supported the Merger, and it later retracted its support.  Opposition from labor groups further inflamed the political pressure that Kroger faced.

114.   Albertsons proposed ways for Kroger to allay political and labor concerns.  In or around June of 2023, Albertsons encouraged Kroger to develop a grassroots communications and advocacy strategy.  Albertsons urged Kroger to proactively reach out to and meet with members of Congress to discuss the Merger and its procompetitive benefits.  Kroger did not do so.

115.   Albertsons also advised Kroger to seek negotiations with pertinent unions.  The Parties knew that FTC Chair Lina Khan had indicated that labor issues were among the FTC's considerations when evaluating a potential merger.  Thus, proactively engaging with labor interests would help get the deal done.  Albertsons

52

believed that at least one national union would favor the deal if the Parties provided meaningful incentives.  Kroger CEO Rodney McMullen refused to engage.

116.   Union opposition was far from inevitable.  In fact, unions had powerful incentives to support the Merger.  Unionized grocers' jobs fell from about 50% to 14% among the top 15 grocers in the last 20 years.   Against that backdrop, the Merger would preserve union jobs by helping Albertsons and Kroger keep stores in business.  Unions would thus be natural allies of the Merger, but only if Kroger successfully addressed their concerns.

117.   Those concerns were readily solvable.  One of the United Food and Commercial Workers International Union's main complaints about the Merger was "lack of transparency."  Another was that Kroger was not pro-union.  Had Kroger engaged with the unions, demonstrated transparency, and explained the Merger's benefits to labor, the Merger would have likely found some union support.  That support would have helped to blunt public opposition to the Merger and promote a favorable regulatory review.

118.   Kroger let these manageable headwinds turn into large roadblocks through its refusal to heed Albertsons' advice and failure to take steps from early 2023 onwards to educate key constituencies about the benefits of the Merger.

53

119.   None of these developments changed Kroger's obligations under the Merger Agreement.  And despite political and labor concerns about the Merger, the path to FTC approval was still attainable.   Large, complex deals often face considerable public scrutiny and political controversy, and many such transactions clear agency review without litigation.   Kroger, however, flouted its contractual obligations, insisting on the Merger going forward on its own terms or not at all.

## VII.  The Merger Has a Viable Path to Antitrust Approval, Provided Kroger Complies with its Contractual Obligations

120.   As discussed above, the Merger Agreement specifies that Kroger was responsible for shepherding the Merger through the regulatory-approval process. This task was entirely achievable, so long as Kroger performed as required under the Merger Agreement.

121.   In evaluating proposed mergers, antitrust regulators and courts consider not only whether the merger could cause competitive concerns, but also whether it would have procompetitive benefits.  In this case, the Merger would have provided significant procompetitive benefits to the customers that Albertsons and Kroger serve.

122.   The path to obtaining antitrust clearance of mergers between large supermarket companies is well-trodden.  For example, in 2016, the FTC settled a $28 billion merger between Koninklijke Ahold ("Ahold") and Delhaize Group,

which together owned grocery chains such as Giant, Martin's, Stop & Shop, Food Lion and Hannaford, after the two companies agreed to divest 81 stores. As the Ahold-Delhaize merger illustrated, two large companies can assuage FTC concerns if they take appropriate steps to address those concerns, including by presenting defensible and timely divestiture proposals.

123.    After a merger is first presented to the FTC pursuant to the HSR Act, the FTC has a certain amount of time to issue additional requests for documents and information—referred to as second requests—seeking additional information about the transaction. Statutory waiting periods differ depending on the type of transaction at issue. The operative waiting period for the Merger was 30 days. If the FTC does not issue a second request during the waiting period, the transaction can close. If, however, the FTC issues second requests within the waiting period, the Parties must work with the FTC to address its additional inquiries. When the Parties have substantially complied with the FTC's requests, absent a timing agreement with the Parties stating otherwise, the FTC then has 30 days to either (1) sue to enjoin the transaction or (2) reach a negotiated agreement to allow the transaction to close without the need for litigation. Each of these steps must occur before the Parties' agreed-upon outside date, *i.e.*, the final deadline for closing the deal, after which the Parties can walk away.

124.   Under Section 8.1(e) of the Merger Agreement, either Albertsons or Kroger could walk away from the transaction "if the Closing d[id] not occur on or before" January 13, 2024—the Outside Date.  That date could thereafter be extended by one of the Parties to October 9, 2024, with certain limitations.

125.   Given this timeline, a party intent on seeing the Merger close before the Outside Date—as was Kroger's obligation—would have and should have taken a proactive approach on appealing to and working with the FTC from the moment the Merger was first presented to the agency.  That would mean presenting to the FTC, as an initial offer, a sizeable divestiture package that was supported by detailed economic analysis and that contained stores selected by objective, neutral criteria.  Such a package would be structured to address local concentration concerns and thereafter, be updated to timely respond to the FTC's feedback in subsequent divestiture package proposals.

## VIII.  Kroger Proposes a Woefully Inadequate Initial Divestiture Package

126.   Given the timing pressures the Merger faced and the importance of establishing credibility before the FTC, it was imperative that Kroger propose workable solutions to the FTC early on in its negotiations with the agency.  Kroger instead proposed a facially deficient divestiture package of only 238 stores.  That

56

was inadequate under Kroger's own experts' economic analyses, and well below the 650-store threshold in the Merger Agreement.

127.   The inadequacy of Kroger's proposal was especially surprising, since as described in Section II, Kroger was being advised by sophisticated legal counsel with extensive experience in antitrust matters, including government leadership experience.  Those lawyers understood what it would take for the Merger to close: a meaningful divestiture package and serious and efficient cooperation with the regulatory agency.

128.  In particular, a well-reasoned divestiture package would have considered and been drafted in light of the FTC's well-known methodology for assessing competitive effects in merger analysis.   As part of any merger investigation, the FTC examines the merger's impact on market concentration in relevant product and geographic markets, which can and may include multiple sub-markets in localized areas of competition.  Especially when evaluating merging grocery sellers, the FTC has a long history of evaluating hyper-local areas of competition, for example, competition within a 3 or 5-mile radius.  Knowing the likely approach the FTC would take in analyzing the competitive effects of the merger, Kroger should have created a highly detailed initial divestiture proposal

focused on areas of local competition that could be affected by the Merger. It did not.

129. Instead, Kroger's initial proposed package ignored settled economic principles and methods and cherry-picked its low-performing, unattractive stores, in a hodgepodge of localities. Other localities with areas of overlap between Kroger and Albertsons but with high-performing Kroger stores were not prioritized for divestitures. This clearly was an indefensible approach designed only to benefit Kroger's balance sheet at the expense of time and credibility before the FTC, and ultimately, to the detriment of consumers and Albertsons.

### A.    Kroger Presents an Initial Divestiture Package of Just 238 Stores

130. On October 14, 2022, the day the Merger was made public, the Parties had an initial call with the FTC. Kroger explained the rationale for the deal and that the Parties expected considerable synergies. Kroger expressed its willingness to present a divestiture package that would get the deal done.

131. On December 1, 2022, Kroger and Albertsons had their first formal meeting with FTC staff. At that meeting, Kroger presented its initial divestiture proposal of 238 stores. Kroger had developed this proposal unilaterally, rejecting Albertsons' advice and warnings that a low initial divestiture number would be problematic for the FTC; ignoring Albertsons' recommendations about which stores

should and should not be included on the list; and ultimately refusing to share with the FTC how it had arrived at the 238 stores. The package contained approximately a third of the 650 stores contemplated by the Merger Agreement and approximately half of the stores that Kroger had told Albertsons that its economic experts had modeled that it would likely need to divest.

132. Following receipt of Kroger's initial proposal, the FTC issued second requests (the "Second Request") on December 5, 2022, to Kroger and Albertsons requiring them to assemble massive document productions in support of the Merger. The FTC's Second Request to Albertsons contained 91 separate requests for narrative responses and/or documents, many of which had several sub-parts, touching all aspects of Albertsons' businesses. The Parties ultimately produced many million documents to the FTC over a period of several months, at a considerable expense.

133. Nonetheless, despite the seriousness of having received a Second Request, indicating the Merger stood a good chance of ultimately being litigated, between December 2022 and March 2023, Kroger dragged its feet and failed to address adequately the FTC's concerns.

134. In the initial December 1, 2022 meeting with regulators, for example, the FTC had raised questions regarding local concentrations of stores in specified

geographies.  Kroger took months to respond.  This laggard approach colored its later interactions with regulators as well.

### B. Kroger Doubles Down on Its Inadequate Divestiture Package of 238 Stores

135.   On March 17, 2023, after months of little to no contact about Kroger's divestiture proposal, the Parties met with the FTC again.  Kroger presented a slide deck about the merger and about its divestiture proposal, which remained the same 238-store proposal from December 1, 2022.

136.   Kroger's presentation on the divestiture proposal provided more detail about how its 238 stores were selected; those details only revealed that Kroger had failed to use uniform, neutral criteria for selecting stores.  Kroger did not, as the FTC would have expected, evaluate stores using a uniform metric like radius around existing Kroger and Albertsons stores.  Nor did it evaluate market shares with a recognized 30% threshold or evaluate whether there were four or fewer remaining competitors in the relevant geographic area that it defined.  Whereas Kroger stated it was evaluating a "localized, store-by-store competition analysis," this appeared to be a non-rigorous, cherry-picking approach.  As later analysis confirmed, out of the 238 stores that Kroger proposed to divest, those belonging to Kroger were largely unprofitable stores, and divesting them would protect Kroger's bottom line. Kroger's failure to use an objective, neutral approach to select stores was a

60

purposeful one aligned with Kroger's self-interest, rather than one aimed at alleviating local concentration concerns.

137.   Kroger's presentation to the FTC also failed to evaluate local competition in the "traditional supermarket and supercenter" market that the FTC had used in prior successful mergers.  Kroger should have known, based on the FTC's approach to prior grocery mergers, that the FTC was likely to rely on this kind of "traditional supermarket and supercenter" definition and Kroger thus should have tailored its presentation and analyses accordingly to address that approach.  It did not.

138.   Unsurprisingly, Kroger's presentation was not well received by the FTC.  The FTC made clear that the number of stores Kroger was proposing to divest was inadequate, and it was not clear how stores were being selected or why certain local geographies with concentration issues were not addressed.

## IX.   Kroger Mismanages the Process of Identifying a Divestiture Buyer, Culminating in the Selection of Wholesale-Focused C&S

139.   Kroger also failed to live up to its obligations under the Merger Agreement in identifying a buyer for the divested stores.

140.   The selection of an appropriate divestiture buyer, or group of buyers, is a critical part of any antitrust regulatory process that involves a potential divestiture. In assessing whether a divestiture plan would sufficiently address any competitive

concerns otherwise posed by a merger, the FTC and other antitrust regulators assess not only the scope of assets to be divested, but whether the buyer has the skills, resources, and motivation to operate those assets in a way that preserves competition.

141.   Kroger's search for a divestiture buyer was disorganized, protracted, and contributed to the ultimate failure of the Merger.  Kroger passed up highly qualified divestiture buyers—including a buyer that its own executives characterized in their internal communications revealed at trial as a "no brainer"—in favor of a divestiture buyer whose primary business was wholesale distribution with a limited record of running retail stores.  Kroger's selection of a divestiture buyer introduced new obstacles for the Parties throughout trial and ultimately contributed significantly to the Oregon and Washington Courts' decisions to enjoin the merger.

142.   As an initial matter, Kroger dragged its feet.  Kroger failed to sign a single nondisclosure agreement ("NDA") with a prospective buyer until February 2023, months after it signed the Merger Agreement.

143.   Once it finally began its search for a buyer, Kroger received substantial interest from the market.   During the course of the solicitation process, approximately 90 potential buyers were contacted about the transaction, and about 60 indicated their interest in exploring the divestiture transaction by signing NDAs. Unbeknownst to Albertsons at the time, some of these prospective buyers were

experienced, large-scale grocery retailers including ██████ who should have been front runners and would have been strong competitors to Kroger. Instead, Kroger turned them away.

144. ██████ for example, ██████████████████████████ ██████████████ when it was ████████████████████████████ ██████ expressed specific interest in ████████████████████████ an area that was flagged by regulators as having specific local concentration concerns. ██████ was an ideal candidate to purchase divested stores: it had a strong track record of operating retail supermarkets ██████████████, which would quell any doubts about its ability to operate the divested stores, and had ████████████████ ████████████████████████████████████████████████████. ████████████████████████████████████████████, later stated that ██████ would have been a better buyer than C&S because it "already ha[d] a solid backbone" and was "very profitable at retail." Nonetheless, Kroger rejected ██████ never informing Albertsons that they were even in the mix of potential buyers. ██████ ████████████████████████████████████████████████ ████████████████████.

145. In evaluating prospective buyers, Kroger also focused on criteria that were not aligned with securing regulatory approval for the Merger. In October 2024,

Kroger admitted to the FTC that it had evaluated initial divestiture offers based on "value, transaction certainty, and buyer flexibility to acquire additional stores." This was at the expense of prioritizing criteria that would be critical to the FTC, such as a company's track record of running retail grocery stores, the strength of a company's management team, the reliability of a company's existing financing arrangement, and the depth and complexity of transitional services and non-store assets that would be required to support a buyer. While Kroger used some of these criteria to evaluate final bids, Kroger should have prioritized them throughout the buyer selection process.

146.    Kroger also artificially narrowed the field of potential buyers by insisting on a single buyer for all divested assets. In numerous other large merger transactions, the FTC had accepted proposals for multiple buyers to purchase divested assets. Assembling multiple buyers who could purchase stores in different geographical regions would avoid triggering new antitrust concerns from the divestiture transaction, as it would spread store ownership among more, not fewer, owners than prior to the Merger. For example, assembling multiple buyers could allow Kroger to sell stores and related assets in "clean sweeps," that is, larger bundles in specific geographies. Kroger refused even to consider that possibility. Its insistence on a single buyer substantially limited the number of potential buyers

64

for to-be-divested stores, as few prospective bidders had the size, management expertise, existing supply chain contracts, distribution infrastructure, and access to capital to purchase hundreds of store locations in a single transaction.

147.   The divestiture package Kroger offered to buyers further narrowed the number of potentially interested buyers—even buyers Kroger did not improperly exclude.   Kroger offered potential buyers an unattractive 413-store package of underperforming stores and paltry non-store assets.   As Albertsons already had warned Kroger, that package failed to adequately address regulatory concerns about local store concentration or set up a divestiture buyer to meaningfully compete.   Yet, as in its interactions with the FTC and Albertsons, Kroger did not react to potential buyers' concerns; rather, Kroger only offered take-it-or-leave-it bundles.   The results were predictable: of the approximately 60 companies that signed NDAs with Kroger and indicated initial interest, only 3 ultimately submitted formal bids.

148.   Kroger received formal bids from potential divestiture buyers by August 3, 2023, approximately a month before the date by which Kroger had told Albertsons that it would have an executed asset purchase agreement in place with a divestiture buyer.   This time crunch created new concerns, as it prevented Kroger from adequately considering those bids, going back to the market for additional bids,

negotiating better offers from existing bidders, or considering a proposal to work with multiple bidders in a joint process.

149.   Throughout June and July 2023, Kroger kept Albertsons in the dark regarding the process of selecting a divestiture buyer.  Kroger did not inform Albertsons of the details of its interactions with potential buyers, nor did it tell Albertsons that strong buyers were being turned away.  Kroger also did not include Albertsons in its process of assessing the bids that it received, even though a large number of stores that would be divested were current Albertsons stores.

150.   Without any input from Albertsons, Kroger ultimately chose C&S as the sole divestiture buyer.  Nearly a year after entering into the Merger Agreement, on September 8, 2023, Kroger and C&S entered into an APA.

151.   Kroger's choice of C&S raised several challenges that the FTC seized upon.  *First*, while C&S is a leading, large-scale competitor in grocery wholesale, C&S currently operates only 23 retail grocery stores, mostly in upstate New York, Vermont, and Wisconsin, and this lack of retail experience would raise questions about its ability to operate successfully an up-to-650-store supermarket chain, including fuel and pharmacy operations, across multiple states.  C&S also lacked any significant retail experience in states like Washington or Colorado, where Kroger anticipated needing to divest a meaningful number of stores.

152.   *Second*, C&S's existing banners for stores, limited to Piggly Wiggly and Grand Union banners, and private label brands, limited to Best Yet, are unknown to customers in Arizona, Colorado, Oregon, Washington, and California, where Kroger needed to divest stores.   C&S would need to invest in significant re-bannering of stores and Kroger would need to transfer lucrative private labels like "O Organic" and "Signature," associated with significant execution risk.   In many grocery stores, private label sales make up 25% of sale volume; any issues in transferring banners or brands could significantly undermine the future success of divested stores.

153.   *Third*, given the limited footprint of C&S's existing retail stores, Kroger would need to divest a broad array of non-store assets.   C&S required thousands of store associates, managers, back-office personnel, and a comprehensive IT solution that it did not have in order to run the divested stores.   And while C&S operated a large distribution network that supplied grocery stores around the country, that network had gaps in Arizona, Colorado, and Southern California, areas where Kroger was divesting a substantial number of stores.   Kroger therefore would need to divest distribution centers in those regions as well.

154.   *Fourth*, given its lack of a significant grocery retail business, C&S would require continued transition support from Kroger over a long period of time

67

to operate the divested stores, raising concerns about ongoing entanglements between competitors in these very markets.

155. *Fifth*, after Kroger selected C&S, Albertsons learned that C&S also has a history of acquiring stores and then selling them when they become unprofitable. As the FTC later highlighted in its preliminary injunction trial to stop the Merger, C&S acquired over 370 retail grocery stores between 2001 and 2012 but sold or closed all but three of those stores by 2012. Indeed, it was revealed at trial that C&S stated as recently as 2021 that any retail grocery stores it operates were intended to support its *wholesale* business, and the company stated in a 2021 quarterly report that "[w]e do not intend to grow our grocery retailing operations or to operate the retail grocery stores in the long term. We expect to divest our retail grocery stores as opportunities arise." Similarly, in 2023, C&S stated that "[f]rom time to time, we acquire retail store locations in connection with strategic transactions to maintain or expand our grocery wholesaling and distribution business."

156. *Sixth*, C&S would require months of fundraising negotiations with its bankers to obtain the financing necessary for it to purchase the required number of to-be-divested stores, which would delay its ability to enter any definitive agreement to acquire those stores. Given these attributes of C&S, Kroger and its sophisticated antitrust counsel surely knew that the FTC would closely scrutinize any plan to

preserve competition after the Merger by divesting stores to C&S.  While the FTC had approved C&S as a divestiture buyer in a 2022 merger between grocers Price Chopper and Tops, that divestiture was for just twelve stores.  C&S, however, has faced challenges operating these stores.  It has had to close one and the remaining stores have lost significant sales and are losing money.

157.    Kroger's choice of C&S ultimately would fuel plaintiffs' efforts to challenge the Merger.  The FTC, Colorado Attorney General, and Washington Attorney General focused much of their cases on C&S's perceived shortcomings as a divestiture buyer.  The FTC, for example, repeatedly emphasized C&S's thin and uneven track record in grocery retail.  The agency also noted what it perceived as tension between Kroger's arguments that (1) it needed to merge with Albertsons to obtain the scale to compete with Walmart, Costco, Amazon, and Target, and (2) C&S would be a viable competitor, even though its existing retail supermarket operations were nearly nonexistent, and it would acquire only a few hundred stores in the divestiture.  The Colorado and Washington Attorneys General echoed these points in their cases challenging the deal.  Regardless of whether those critiques of C&S are accurate, they would not have been made, or would not have persuaded the Court, had Kroger selected a buyer with a clear track record of retail success.

158.   Kroger's mismanagement of the search for a divestiture buyer thus left the Merger vulnerable to attacks from regulators and was emblematic of Kroger's broader failure to use "best efforts" and take "any and all actions" to secure timely antitrust approval.  While C&S may well be capable of succeeding as a divestiture operator, that is beside the point.  The point is that Kroger had an obligation to remove any and all regulatory concerns, and it selected C&S knowing that the selection was risky and would generate objections from the regulators.

## X.    Kroger Proposes an Inadequate Package of Assets to Divest to C&S

159.   Once Kroger selected C&S as a divestiture buyer, it was required to take any and all steps necessary to ensure that C&S had the tools regulators believed it needed to succeed so that the regulators would approve the Merger.

160.   Kroger failed to do so by refusing to assemble an adequate package of store and non-store assets to be divested.  From the outset of its interactions with potential buyers, Kroger prioritized negotiating a divestiture package that was consistent with its economic interests and the financial models it had built before signing the Merger Agreement—not its contractual obligations in seeking regulatory approval.

70

### A.    Kroger Rejects Albertsons' Input in Crafting its Proposed Divestiture Package

161.   By early June 2023, Kroger had developed a plan to divest 413 stores to the buyer that emerged from its then-ongoing divestiture process.  Kroger told this plan to Albertsons, but did not yet reveal it to the FTC until it had a buyer ready in September 2023.

162.   In June 2023, Albertsons met with Kroger and urged Kroger to add additional stores to its divestiture package.  Albertsons emphasized to Kroger that the divestiture process with the FTC was not a typical back-and-forth negotiation, and that Kroger needed to lead with an offer for a large and rigorously supported divestiture package.  Albertsons also expressed concern about Kroger's lack of communication with the FTC, and asked Kroger to schedule regular weekly meetings with the FTC to discuss substantive issues concerning the divestiture package.  Albertsons also expressed concern at the nature of Kroger's negotiations with the FTC, which were drawn out.  Kroger had no excuse for taking 10 months to increase its 238-store package to 413 stores, nor for its negotiations with divestiture buyers still being unresolved throughout the summer of 2023.

163.   In subsequent emails, meetings, and calls, Albertsons expressed concern about Kroger's proposed 413-store divestiture package, which was deficient for multiple reasons—in particular, because it did not adequately address the FTC's

71

concerns from the March 17, 2023 meeting about the number of stores that were being divested and how stores were being selected.  It also did not include adequate non-store assets for a prospective divestiture buyer.

164.   On July 19, 2023, Albertsons asked Kroger for a meeting to discuss its latest divestiture package.  On July 24, 2023, Albertsons emailed Kroger a list of approximately 100 additional stores for Kroger to consider adding to the package, along with supporting analysis from Albertsons' economists.

165.   The next day, on July 25, 2023, the Parties met to discuss Kroger's latest divestiture package.  Albertsons shared with Kroger detailed modeling results which showed that Kroger's 413-store package was unlikely to resolve the FTC's concerns about the Merger's potential anticompetitive effects.    Albertsons communicated that the stores in Kroger's proposed package clearly were not selected based on the guidelines and feedback from the FTC, since numerous geographies were not addressed and stores with obvious concentration issues were not being divested.  Albertsons expressed concern that the FTC would not view the 413-store offer as a good faith effort but, instead, as further lowballing.  Albertsons noted such an offer could cause the FTC to sue to block the transaction rather than engaging in further work on a divestiture package.  From its own economic analysis, Albertsons pointed Kroger to the specific stores it believed would go the furthest in

addressing regulators' local concentration concerns, which were selected based on the FTC's guidelines and feedback.

166. On July 27, 2023, following up from the Parties' meeting two days before, Albertsons emailed Kroger a revised list of stores for Kroger to consider adding to the divestiture package. The list included about 160-170 stores that Albertsons' economists determined were at incremental risk of enforcement after the 413-store divestiture, bringing the total divestiture size to approximately 580 stores. Again, Kroger ignored Albertsons' feedback.

167. Kroger acknowledged that additional stores needed to be added to its divestiture package. Nonetheless, across June, July, August, and September, Kroger did not add a single store to its divestiture package.

**B.    The Assets in the APA Are a Cherry-Picked Selection of 413 Stores and Paltry Non-Store Assets**

168. In the APA, Kroger agreed to sell, and C&S agreed to buy, 413 Kroger stores. Kroger alone picked the stores. C&S had no role in selecting the total number of stores or the store composition—Kroger developed the package and C&S had to take it or leave it.

169. The 413-store divestiture package was woefully inadequate in terms of the total number of stores, the selection of specific stores, and the scope of non-store assets.

73

170.   The 413 stores included in the package were not selected through an objective methodology.  Instead, Kroger once again cherry-picked the stores in an attempt to offload its least profitable stores to C&S, while holding on to its most profitable stores.  The package was designed for Kroger's economic benefit, at the expense of securing regulatory approval of the Merger.

171.  Kroger's CEO, Rodney McMullen, participated directly in that egregious breach of Kroger's best-efforts obligation.  In a September 2023 email exchange, which the Washington Attorney General featured prominently at trial, McMullen directed that a specific Seattle store be removed from the divestiture list because "this store has real estate that is worth a lot."

172.  McMullen's Kroger-first attitude infected the entire package, as a comparison of Kroger's non-divested stores with the stores included in the 413-store package proves.  In particular, Kroger hand-picked Kroger stores to divest with average sales that were substantially below stores it planned to retain—to the tune of tens of millions of dollars of sales per year.  The Kroger stores it chose to maintain had higher gross margins and EBITDA as well.  This trend was true overall and within specific metropolitan areas, like Seattle, where Kroger chose to divest only the worst, lowest performing Kroger stores while retaining the highest performers.  More than 50 of the stores that Kroger marked to divest had negative EBITDA for

74

the fiscal year 2022. Kroger's strategy was clear—Kroger tried to offload its worst performing stores in the 413-store package while keeping the best stores for itself.

173. In addition to including too few and poorly-selected stores, Kroger's divestiture package also withheld vital non-store assets that were necessary to persuade regulators that C&S was well-positioned to successfully enter the market, including manufacturing facilities, access to certain private labels, a technology stack, and transition services. For example, Kroger did not include the technology C&S would need to run a grocery store and gave C&S only 18 months to build its own systems. Kroger also refused to transfer either ownership of or a license to Albertsons' "O Organic" and "Signature" private label brands in the package, even though Kroger already had its own private label brands in those categories and knew those brands would improve C&S's ability to successfully operate the divested stores as well as make the package more palatable to the FTC and State regulators.[2]

174. At Kroger's request, Albertsons agreed to sign onto the APA with C&S as a party, even though it was not necessary to do so given the structure of the

---

[2] At the preliminary injunction hearing in the District of Oregon, C&S CEO Eric Winn testified that the private labels C&S would acquire from Albertsons—Open Nature, Waterfront Bistro, Debi Lilly Design, Ready Meals, and Primo Taglio—made up only 10–20% of Albertsons' total private label sales. Kroger refused to divest Albertsons' larger Signature and O Organics private labels. Mr. Winn also testified that the divestiture package did not include banners which would have reduced C&S's risk entering the market, nor did it include existing customer loyalty programs.

Merger: the divestiture was set to close following the closing of the Merger when Albertsons would be a wholly owned subsidiary of Kroger.

175.   Although Albertsons signed the APA, Albertsons did not endorse the divestiture package or agree that it was sufficient.  This was reflected in a separate Letter Agreement where both Albertsons and Kroger acknowledged and agreed that Albertsons' signing of the APA did not affect in any way the rights or obligations pursuant to the Merger Agreement or constitute an agreement or acknowledgement on the part of Albertsons that Kroger had complied with its obligations under the Merger Agreement.

### C.    The APA Allows Kroger to Increase the Divestiture Package to 650 Stores and Add Additional Non-Store Assets

176.   Consistent with the Merger Agreement, the APA for the divestiture package contemplated that Kroger could divest up to 650 stores to address antitrust concerns.  Section 2.11(a) of the APA provided that if Kroger "determine[d] in good faith" that it must sell more stores "to obtain . . . Clearances or an Order from a Governmental Entity," Kroger could require C&S to buy up to 237 more stores by submitting to C&S a "Put Notice," for a total of up to 650 stores.  Similarly, if "a Governmental Entity requires (or has otherwise indicated in connection with any Action by or before such Governmental Entity that it is unlikely to issue the Clearances or an Order . . .)," that section allows Kroger to exercise the same "Put

76

Notice" option and require C&S to buy up to 237 more stores, for a total of up to 650 stores.

177.   Section 6.2(f) of the APA also required the Parties to ". . . use their respective reasonable best efforts to modify or agree to such provisions as may be necessary to satisfy the FTC's requirements," which allowed Kroger and C&S to change or expand the divestiture package to meet regulatory requirements.

178.   Section 2.11 of the APA provided a formula to compensate Kroger for the additional stores sold pursuant to a Put Notice, based on the number and characteristics of the additional stores.  Regardless of the number and characteristics of the additional stores, however, the purchase price increase was capped at $725,000,000, up to a total maximum transaction price of $2.525 billion.

179.   Section 2.11(c) of the APA also contemplated Kroger adding non-store assets to the divestiture—specifically, "distribution centers or other assets (including transportation assets, offices or employees) or . . . modifications to the Transition Services Agreement that may be reasonably necessary to support such operations" of the divested stores.

180.   Thus, the APA enabled Kroger to meet its unqualified obligation under the Merger Agreement to divest whatever non-store assets were necessary to satisfy regulators.

181.   Section 2.11(e) of the APA further provided that "there shall be no change to the purchase price" paid by C&S to Kroger "on account of any [non-store assets] agreed to be transferred between [Kroger] and [C&S]."  In other words, if Kroger exercised a Put Notice, C&S was entitled to receive, at no additional cost, *all* additional non-store assets necessary to satisfy the Regulators of its ability to compete following the Closing, or to defend that ability in enforcement litigation.

182.   Despite these provisions, and despite specific concerns raised by Albertsons about the 413-store package provided for in the APA and the need to act before litigation, Kroger did not improve the divestiture package.

## XI.   Kroger Ignores Feedback from the FTC and Others Repeatedly Informing Kroger that Its Divestiture Package Is Deficient under the Antitrust Laws

183.   Even after C&S had been chosen and Kroger and C&S had formed a concrete divestment plan, Kroger continually delayed and prolonged final negotiations with the FTC—moving only incrementally up from its flawed 413-store proposal and never excising the core set of stores chosen for economic, not competitive reasons.  Kroger ignored feedback from the FTC, C&S, and Albertsons, who eagerly wanted to close the deal and offered viable paths to doing so.

184.   Kroger's 413-store divestiture proposal was itself a breach of its obligations under the Merger Agreement to remove antitrust impediments by making

78

"best efforts" and taking "any and all actions"—including the divestiture of unlimited non-store assets and up to 650 stores selected to give the Merger the best possible chance of antitrust approval (and not to protect Kroger's bottom line).

185.    Kroger further breached its obligations under the Merger Agreement through its handling of the subsequent steps in the regulatory process: having predictably failed to sell the FTC on its initial 238-store and 413-store divestiture proposals, Kroger had a duty to act "as promptly as practicable" to propose an appropriate set of stores and non-store assets that addressed the FTC's feedback, which it failed to do.  And Kroger was obligated to cooperate with Albertsons throughout this process, which it failed to do as well.

## A.    Kroger Proposes Its Inadequate 413-Store Package to the FTC

186.    The selection of C&S as buyer and the signed APA paved the way forward for the Parties to certify substantial compliance with the FTC's Second Request.  Under the then-operative timing agreement for the Merger, the date on which the Parties certified substantial compliance would begin a 60-day clock at the FTC, at the end of which the FTC was required to either sue or allow the Merger to go forward.

187.    Concerned about the FTC's reaction to the lowball, 413-store offer, Albertsons told Kroger that when it went back to the FTC to present C&S as the

divestiture buyer and the APA, Kroger needed to be clear that this was just a starting point for additional divestiture proposals, not another take-it-or-leave it offer from Kroger.  The Parties understood that if they moved quickly and proposed a divestiture offer that the FTC was likely to accept, they still could close the Merger by the end of the year.  But Kroger failed to incorporate Albertsons' advice, in violation of its commitment in Section 6.3(d) of the Merger Agreement to take "any and all actions necessary to avoid, eliminate, and resolve any and all impediments under any Antitrust Law."  Kroger thus caused negotiations to stretch into 2024—further endangering the Merger.

188.   On September 13, 2023, the Parties met with the FTC to discuss Kroger's selection of C&S as the divestiture buyer, the APA, and Kroger's latest divestiture proposal—the 413-store proposal.  During the call, the FTC provided initial criticism of Kroger's proposal, explaining that, just as with the initial 238-store package, Kroger had failed to follow the modeling approaches the FTC uses to analyze local competitive effects.  The FTC asked for additional information about how Kroger's economists had selected stores for divestiture.

189.   On October 6, 2023, the Parties had a follow-up call with the FTC about Kroger's 413-store proposal.  The FTC delivered more detailed feedback on the proposal and raised a number of questions.  The FTC remained confused about how

stores were being selected and how the 413-store package set up a divestiture buyer to be able to compete, asking "[w]hy divestiture assets that are geographically disperse and include a collection of components from two different companies will succeed." The FTC requested Kroger evaluate head-to-head competition between itself and Albertsons by calculating diversion ratios as part of its next proposal instead. The FTC continued to be concerned about how the Merger and divestiture would affect labor markets and asked for more information on that topic. Additionally, the FTC expressed concern about the logistics of transitioning stores from Kroger to C&S, questioning whether it required too much long-term support from Kroger.

190.    The FTC's concerns—including about specific local markets and non-store assets that were missing from the divestiture proposal—were readily addressable, and the Merger Agreement required Kroger to address them. Yet, for months after the October 6, 2023 meeting with the FTC, Kroger refused to do so. Even in later, revised iterations of its divestiture proposal, Kroger continued to build on the same defective package of 413 stores and to substantially limit which non-store assets it included.

191.    The Parties knew from prior experience with the FTC that by October 6, 2023, the FTC soon would discontinue remedy discussions and shift to litigation

preparation, underscoring the urgency with which Kroger needed to act to develop a satisfactory divestiture package. Albertsons urged a substantial increase to the 650 stores allowed under the Merger Agreement. Time was of the essence, as C&S would need time to conduct diligence on any new stores it was allocated to buy, and the FTC needed to review and assess any new proposals put forward by Kroger with adequate time before deciding on whether to sue. Yet, Kroger largely stopped engaging with the FTC and dragged its feet.

192.   On October 26, 2023, the FTC sent the Parties an email that reiterated its input and request for information about Kroger's divestiture package "in the interest of keeping the process moving." The FTC again requested that Kroger explain: (1) its methodology to select stores to be divested, (2) whether the package would resolve other areas of potential competitive concerns (*e.g.*, labor and pharmacy services), (3) the anticipated success of the divestiture assets, (4) Kroger's expert analysis of the 413-store package, and (5) what customer data the Parties can transfer to C&S. The FTC also asked that Kroger provide delinquent "[d]ocuments and information responsive to" requests that the FTC made over one month prior.

193.   Kroger's continued delays and the sentiment from the FTC that litigation was imminent alarmed Albertsons. Albertsons pushed Kroger to respond and address regulators' concerns quickly, but Kroger did not. It was not until later

82

in the Parties' communications that Kroger revealed the reason for this delay: rather than being guided by its commitment to take any and all actions in obtaining antitrust approval, Kroger's divestiture proposals were being driven and delayed by insistence that the divestiture package create optimal financial results for Kroger. In other words, Kroger was deliberately delaying its engagement with the FTC to engineer a package that would prioritize Kroger's financial interests over getting the deal done.

194.    Kroger's most senior executives suggested that this prioritization was justified, because they were acting according to their fiduciary duties to get the best deal for Kroger stockholders. But no fiduciary duty permitted Kroger to abdicate its contractual obligations under the Merger Agreement—including the obligation to take "any and all actions" necessary to obtain antitrust approval. Kroger already had entered into the Merger Agreement with full approval from its Board of Directors, reflecting the board's view that the Merger Agreement was in the interests of Kroger's stockholders. Kroger now had to live with the terms of that agreement, even if that meant offering a divestiture package that, viewed in isolation, was less than economically optimal for Kroger.

195.    Indeed, Kroger's counsel already had indicated that they understood the potential problems with the 413-store divestiture package, but that they were

constrained by client expectations from offering additional stores or selecting stores by a more robust methodology.  And whereas Kroger's economists represented to Albertsons that they were going back to the drawing board to propose a new divestiture package without a particular total number of stores in mind, that turned out not to be the case.

196.   Even after receiving feedback from Albertsons that made clear Kroger must prioritize addressing the FTC's and other regulators' antitrust concerns, Kroger continued to push back on the FTC's requests for additional information regarding its divestiture proposals and submitted proposals guided by internal financing considerations rather than Kroger's commitments in the Merger Agreement.

## B.     Kroger's Small Increase to 510 Stores Fails to Address the FTC's Concerns

197.   During the week of November 13, 2023—days before the deadline for the Parties' notice of intent to certify compliance with the FTC's Second Request and when the FTC likely already was preparing for litigation—Kroger finally responded to the FTC with a new package, and certified substantial compliance with the FTC's Second Request.  Even then, the proposed package was clearly insufficient and not responsive to regulatory concerns.

198.   On November 16, 2023, Kroger told the FTC it was considering increasing its proposed divestiture from 413 to 510 stores—still 140 stores less than

the 650-store divestiture threshold in the Merger Agreement and APA.  Kroger would delay for yet another month before officially committing to this 510-store proposal to the FTC.  Kroger's new offer also did not change the composition of the first 413 stores.  Kroger merely added 97 stores on top of that set.  This was despite the FTC's explicit demand that any divestiture reflect a reasoned methodology, not cherry picking, and its concerns about the stores in Kroger's 413-store divestiture package.  It was also despite Kroger's prior representations that its next proposal would represent a new, ground-up calculation created by its hired economic experts.

199.  The additional 97 stores that Kroger identified to divest as part of its 510-store proposal were selected using a diversion ratio calculation, as the FTC had instructed Kroger to use, but set up in such a way as to be deliberately helpful to Kroger.  In fact, Kroger admitted to Albertsons that aspects of how it had set up its diversion ratio analysis diverged from what the FTC had done for prior mergers and what the FTC had instructed for Kroger to do to calculate diversion ratios.  In analyzing sales diversions from Kroger or Albertsons, Kroger only flagged stores that were associated with a 25% diversion threshold, not a 20% threshold, a more conservative and more broadly followed approach.  Kroger also calculated the ratio using a dynamic model, instead of a static model, which was associated with a lower number of stores being identified.  Just changing Kroger's assumptions to a more

85

appropriate 20% threshold would have caused Kroger to identify at least 80 more stores for divestiture, and using a static model could have identified 120 more stores for divestiture beyond those Kroger presented to the FTC.

200.   In structuring its 510-store proposal, Kroger also did not address any other comments or concerns that the FTC had expressed in the months prior regarding local concentration issues in specific states and setting up a divestiture buyer for success with the right mix of non-store assets.  Nor did Kroger address the 160-170 stores that Albertsons had identified for divestiture in July 2023.  As a result of Kroger's mash-up approach, some local geographic areas like the Phoenix area would receive dozens of additional stores, while the areas around Seattle, Los Angeles, Portland, Dallas, Chicago, Las Vegas, and San Diego would receive three or fewer stores.  On net, California, Washington, and Illinois remained under-addressed.  Despite incorporating diversion ratio analysis for some of the stores it selected, Kroger's overall approach had still not changed—it focused only on maximizing value from the deal, and not on achieving approval by "any and all actions necessary," as the Merger Agreement required.

201.  On November 22, 2023, the FTC emailed the Parties a statistical analysis of Kroger's 413-store divestiture package and its recently-presented 510-store package.  Regarding the 413-store package, the FTC wrote that it was

"surprised to find that [Kroger's] divestiture fails to address dozens, if not hundreds of 'markets'" in which the proposed merger would presumptively have an anticompetitive effect.  The FTC again took issue with the methodology Kroger used to select the 413 stores that Kroger proposed to divest.  FTC reiterated its request for a more detailed explanation of Kroger's methodology.

202.   The FTC stated that Kroger's new 510-store package suffered from its reliance on the same flawed methodology as the inadequately-constructed 413-store list.  Simply adding 97 stores on top of the 413-store proposal based on the results of a poorly formulated diversion ratio analysis did not address the FTC's concerns with the 413-store set.  Unless Kroger could support its methodology for the selection of the 413 stores, Kroger needed to craft a new proposal from scratch with a sound economic rationale.

## C.    Kroger's Failure to Propose a Workable Package Leads to a Renegotiation of the Timing Agreement with the FTC

203.   Originally, the Parties had intended to complete the divestiture package and Merger by the end of 2023, or shortly thereafter.  After the certification of compliance with the Second Request on November 15, 2023 (and subsequent feedback from the FTC), that target closing date was still possible, as the compliance certification had put the FTC on a 60-day countdown to either sue to block the Merger or allow it to go forward.

87

204.   Kroger's continued failure to propose a workable divestiture package to the FTC destroyed the viability of that timeline.  Given that the FTC had indicated that Kroger needed to go back to the drawing board to get to a workable proposal, the FTC and Kroger renegotiated the timing agreement on December 15, 2023. Under the new agreement, the FTC could provide notice at any time that negotiations had stalled, starting a four-week countdown to the filing of litigation.

205.   Despite that additional time, Kroger did not follow the FTC's clear instructions regarding the stores in its proposal.  Albertsons urged Kroger to provide meaningful improvements, but Kroger did not heed Albertsons' advice.

206.   By December 6, 2023, Kroger still had not provided the FTC with the detailed explanation and support for the methodology it used to create its 413-store list, now the backbone of Kroger's operative 510-store proposal.  In a deposition of Kroger's then-Chief Financial Officer, Gary Millerchip, the FTC asked for an explanation of Kroger's methodology for selecting the 413 stores.  The FTC did not obtain satisfactory answers, but Millerchip confirmed that Kroger unilaterally created the 413-store list without input from C&S.

207.   Another week passed and Kroger still had not explained its methodology for constructing its store list.  On December 12, 2023, the FTC emailed the Parties and asked Kroger to "clarify the status of the current asset package."  The

88

FTC further asked whether Kroger had discussed the 510-store package with C&S and whether Kroger was considering adding any additional assets to the package.

208.   Alarmed that Kroger was not moving faster, Albertsons again advised Kroger to move quickly to answer the FTC's basic questions about the status of Kroger's divestiture package.   Despite the extension of the timing agreement, resulting from the FTC's obvious dissatisfaction with Kroger's proposals to date, Kroger could afford no further delay.   Nonetheless, Kroger put forward only incremental, minor improvements to its proposal from December 2023 through February 2024, largely continuing to ignore the FTC's concerns.

209.   During a telephone call with the Parties on December 20, 2023, the FTC told Kroger that its 510-store divestiture package still was inadequate, including because it would not position C&S to successfully enter the market.   Specifically, the FTC raised concerns about:

> a.   Challenges C&S would face entering the market because it would not be acquiring a stand-alone business but, instead, an assortment of assets from two different companies;
>
> b.   C&S's need to re-banner the majority of stores it would acquire;
>
> c.   C&S's acquisition of insufficient distribution and manufacturing assets;

d.     C&S not acquiring a well-known private brand; and

e.     Kroger not providing an adequate transition agreement for information technology, pharmacy, and other services.

210.   Again, Albertsons urged Kroger to take this feedback seriously and move quickly to address it to satisfy antitrust regulators, as the Parties' window to reach a settlement with regulators was closing rapidly.  In an email sent on December 27, 2023, Albertsons conveyed that Kroger's 510-store divestiture proposal failed to address local concentration issues in Arizona, Colorado, Illinois, and Idaho, and that Kroger's delay was holding up C&S's ability to perform due diligence of additional sores.  Non-store assets like re-bannering, distribution assets, manufacturing assets, private labels, data, and transitions services had not been adequately addressed yet either.

211.   On January 3, 2024, the FTC emailed the Parties and reiterated its request for "any responses to our November 22 feedback on your initial diversion analysis, [and] any updates you have on the divestiture package based on our feedback."  Hamstrung by its inability under the Merger Agreement to unilaterally approach the FTC, Albertsons was forced to stand by and watch as still more days ticked by without an adequate response by Kroger.

90

**D.    The FTC Asks for a Final Offer from Kroger, and Kroger Still Refuses to Cooperate, Forcing the FTC to Litigate**

212.    The FTC met with the Parties on January 11, 2024, and told Kroger that its economic analysis indicated that Kroger's proposals to date were inadequate.  The next day, the FTC emailed the Parties and requested an updated divestiture package—with supporting economic analysis—by no later than January 18, 2024.  This was, in essence, the FTC's request for Kroger's "best-and-final" offer.  The message was clear: the FTC would likely soon disengage from negotiations and prepare for litigation by providing the four weeks' notice provided for in the timing agreement entered into between the Parties and the FTC.

213.    Kroger still had a strong card left to play: it could increase its divestiture offer and improve the composition of its package to address concerns about geographic overlap.  Kroger also had highly motivated partners in C&S and Albertsons, which were eager to help get the deal through the regulatory process.  Yet, Kroger continued to insist on unsatisfactory divestiture packages which prioritized its own financial well-being, even though all other relevant parties, including Albertsons and the FTC, implored Kroger to make a satisfactory final offer and gave it multiple opportunities to do so.

214.    On January 16, 2024, anticipating that Kroger would be working to prepare that "best offer," C&S emailed Kroger and outlined a suggested approach

for addressing regulators' concerns.  That approach was tailored to structuring a package that regulators were likely to approve, addressing local store concentrations and increasing the total store count, as well as re-bannering, distribution and IT assets, private brands, and transition services.

215.  The next day, January 17, 2024, on the eve of Kroger's deadline to submit to the FTC an updated divestiture package (its best and final offer), the Parties were scheduled to meet to discuss a new proposal by Kroger to divest 541 stores (still 109 stores short of 650).  But Kroger cancelled the meeting and did not reschedule it—depriving Albertsons of the opportunity to provide meaningful feedback before the package was submitted to the FTC the next day, in violation of Section 6.3(b) of the Merger Agreement.

216.  In the meantime, Albertsons' attorneys and business executives repeatedly reached out to Kroger urging it to make its best and final offer with a divestiture package at or close to 650 stores.

217.  Instead, Kroger continued trickling out proposed stores for divestiture in dribs and drabs.  On January 18, 2024, after already being sued by Washington (as discussed below in Section XIV), Kroger wrote to the FTC proposing to increase its divestiture package from 510 stores to 541 stores—an irresponsibly and inexplicably small increase.  Kroger's proposal still did not address the FTC's core

92

concerns pertaining to the composition of the stores and other assets.  For example, the package failed to address the gaps that the FTC had identified in C&S's distribution centers and other infrastructure to operate the stores that were being divested.  Further, although purportedly drawn up from scratch using diversion ratio calculations, Kroger conceded that approximately 65-70% of the stores in its new proposal had been included in its 510-store proposal.  And the new proposal was, like Kroger's prior proposals, drafted unilaterally by Kroger without input from C&S.  In fact, C&S only learned of the package the day before Kroger submitted it to the FTC.

218.   On January 31, 2024, the FTC wrote to the Parties that Kroger's most recent 541-store divestiture offer was "largely unchanged" from its prior offer, as it "fail[ed] to address the numerous and substantial concerns that [the FTC has] previously identified," which had "only been corroborated upon further investigation."  Specifically, the FTC identified lingering "deficiencies in the list of individual stores proposed for divestiture" and noted that it "remain[ed] unconvinced that the package conveys sufficient assets to position [C&S] for success, that the transition services are appropriately tailored, and that C&S can be successful with this massive and complex new structure."  The FTC made clear that merely adding

stores to the list would not suffice if the proposal did not change the existing store composition and add other assets.

219.   After being presented with one inadequate package after another, the FTC decided that talks with Kroger no longer were productive.  In the same January 31, 2024 letter, the FTC informed the Parties that negotiations were over, and it was providing the four-week notice under the timing agreement between the Parties and the FTC, which meant that the Parties could not consummate the Merger prior to 11:59 PM on February 28, 2024.

220.   In an effort to avoid litigation with the FTC, Albertsons and C&S continued to press Kroger to make a viable proposal to the FTC.  Yet despite multiple entreaties and specific requests, Kroger refused to improve its proposal.

221.   On February 16, 2024, the FTC again told Kroger that in its view, Kroger's divestiture proposal offered only "dispersed" stores to C&S and not the prospect of a profitable, self-sustaining business.

222.   The following week, on February 20, 2024, FTC Chair Lina Khan reiterated the FTC's concern that Kroger's divestiture proposal merely offered a "hodgepodge" of assets that would not resolve the potential anticompetitive effects of the Merger, and would not adequately position C&S to successfully enter the market.  FTC Chair Khan and Commissioners Slaughter and Bedoya all indicated

94

that they agreed with the concerns that FTC Staff had raised over the past months, namely that the proposal was not designed to function as a standalone business and would not fully address the anti-competitive concerns raised by the FTC.

223.  On February 22, 2024, two FTC Commissioners held "last rites" meetings with the Parties—meetings that typically precede the filing of a lawsuit. Despite Albertsons' warnings, Kroger did not budge from its 541-store divestiture proposal in advance of those meetings.

224.  At the meetings, the FTC Commissioners unsurprisingly told Kroger that its proposed divestiture package was inadequate.  They informed Kroger that it needed to revise its proposed package to include more stores in specific geographical areas, and that other key changes were needed.  They reiterated concerns that the FTC had been communicating to Kroger for over a year about the need for Kroger to sell additional assets and banners, to no avail.  They expressed a concern about the proper "formula" for a successful divestiture.  They stated that the FTC repeatedly had communicated to Kroger that its proposed divestiture package included a disjointed "hodgepodge" of stores that may not coalesce into a successful business.

225.  Further, one FTC Commissioner made the view clear to the Parties that even as of this late date there was a productive resolution available for them, if they

95

could reach a negotiated settlement with the FTC. Such a reasonable settlement would require Kroger to divest an adequate number of stores and non-store assets but would allow the Merger to close and avoid a trial. Albertsons reiterated this message to Kroger and asked it to do so.

226. Kroger asked the FTC for until February 28, 2024—the very last day for the FTC to bring suit to challenge the Merger—to make a final proposal. Albertsons tried yet again to prevail upon Kroger to make a divestiture proposal that met its obligations under the Merger Agreement and to do so quickly. But on the eve of a lawsuit with the FTC and the specter of a potential nationwide injunction that would block the merger, Kroger refused and doubled down on its 541-store package.

## XII. Kroger Fails to Cooperate with Albertsons and Repeatedly Ignores Feedback from Albertsons

227. In addition to ignoring feedback from regulators about the deficiencies of its divestiture proposals, time and time, Kroger ignored entreaties from Albertsons throughout the relevant time period, in breach of Kroger's obligations under the Merger Agreement. Albertsons was a good partner to Kroger throughout their negotiations with regulators, but Kroger refused to hold up its end of the bargain.

96

A.    **Albertsons Cooperates with Kroger and Attempts to Aid Kroger in Seeking Regulatory Clearance for the Deal**

228.    Albertsons held up its obligations under the Merger Agreement in spades, providing constant support and aid to Kroger to attempt to get the Merger cleared.  Kroger rebuffed that support.

229.    From before the Parties' initial call with the FTC in October 2022, and continuing after the FTC filed suit against Kroger and Albertson in February 2024, Albertsons repeatedly attempted to work cooperatively with Kroger on antitrust strategy.  Before the Merger Agreement was signed, Albertsons' economists created an analysis of store overlaps, which they shared with Kroger's economists.  After the deal was signed, Albertsons stood ready to assist Kroger, providing feedback on talking points for meetings with the FTC, comments on white papers for regulators, and economic analyses of potential divestiture packages.  Economists hired by Kroger and Albertsons engaged in regulatory meetings to discuss divestiture packages, and Albertsons and Kroger attorneys and management teams were in frequent communications as well.

230.    Albertsons insisted from the outset of negotiations with regulators that Kroger offer a meaningful, robust divestiture package, and Albertsons pledged its support in efforts to do so.  Kroger rebuffed Albertsons' input, just as it did with regulators.  Kroger further cut Albertsons out of critical planning processes for

97

communicating with regulators, and did not share how it was selecting a divestiture bidder. Albertsons pleaded with Kroger to no avail in dozens of calls, emails, and letters to include it in planning meetings, to move more quickly and to be responsive to regulators, including in at least the following examples:

    a.    On June 27, 2023, Albertsons' general counsel conducted a call with Kroger's general counsel regarding coordination between the Parties;

    b.    On at least June 30 and July 3, 2023, outside counsel for Albertsons emailed outside counsel for Kroger regarding the divestiture bidder selection process; and

    c.    Through its general counsel, its outside counsel, and its business executives (including its CEO), Albertsons frequently contacted Kroger regarding its then-current divestiture proposals. These communications occurred on at least July 24, 2023; July 25, 2023; September 8, 2023; September 11, 2023; October 13, 2023; October 25, 2023; October 31, 2023; November 10, 2023; November 29, 2023; December 19, 2023; December 27, 2023; January 17, 2024; January 19, 2024; February 1, 2024; February 4, 2024; February 9, 2024; February 21, 2024; February 23,

2024; February 27, 2024; March 4, 2024; March 28, 2024; April 4, 2024; July 19, 2024; September 25, 2024; and October 9, 2024.

231.    In its communications with Kroger, Albertsons further emphasized the need for Kroger to address regulators' labor market concerns.  Although the Parties had ongoing communications about strategies for government and labor group outreach, Kroger was slow to address Albertsons' feedback, at certain points disregarding it altogether.  Albertsons, to the extent it was permitted under the terms of the Merger Agreement, ultimately moved forward with its own plans for public relations and government relations, such as through direct outreach to State antitrust regulators.  Kroger did not participate in those efforts.

232.    Kroger also failed to cooperate with Albertsons in its selection and preparation of its testifying expert economist, Dr. Mark Israel.  Kroger retained Dr. Israel—the Parties' primary economic expert supporting the Merger—unilaterally, without input from Albertsons. Kroger then denied Albertsons any meaningful opportunity to review and comment on key materials Dr. Israel produced—for example, giving Albertsons less than one full business day before the deadline for Dr. Israel's affirmative expert report to comment on hundreds of pages of new

99

material and failing to provide materials for a court-ordered economics tutorial until the day before the tutorial was set to take place.

233.   At trial, Dr. Israel was forced to admit that the Merger would be presumptively anticompetitive in at least 22 markets—a failure that the Oregon Court held was, "on its own . . . sufficient to find that the divestiture will not mitigate the merger's anticompetitive effects such that it is no longer likely to substantially lessen competition."  Dr. Israel's admission further demonstrates Kroger's failures to prepare an appropriate divestiture package consistent with Kroger's obligations under the Merger Agreement.

234.   Additionally, Kroger's refusal to coordinate with Albertsons and to address its well-reasoned concerns flew in the face of its obligation to work closely with Albertsons in presenting its divestiture strategy to the FTC, including its obligation in Section 6.3(b) of the Merger Agreement to "permit [Albertsons] to review in advance and incorporate their reasonable comments" in communications with the FTC.  Freezing out Albertsons' sound advice also contributed to Kroger's ultimate failure to address regulators' concerns, violating Kroger's duties to make "best efforts" and take "any and all actions" to remove antitrust impediments.

## B.    Albertsons Provides Kroger with Detailed Economic Analysis Showing a Path to Regulatory Approval, but Kroger Ignores It

235.    While pressing Kroger to address regulators' concerns, Albertsons provided specific economic analyses for Kroger to use in doing so, including at an in-person meeting between the Parties on July 25, 2023, and in communications on November 29, 2023, December 19, 2023, February 1, 2024, February 4, 2024, February 9, 2024, and February 21, 2024.  Kroger ignored this valuable information, as it did with Albertsons' other input.

236.    The FTC typically uses certain mathematical calculations to help guide its analysis of the competitive effects of a merger and how well those effects are mitigated by a divestiture package or other remedy.  One metric the FTC calculates is the Gross Upward Pricing Pressure Index ("GUPPI"), which measures a company's incentives to raise prices unilaterally after a merger, based on that company's pre-merger profit margins and the diversion ratio of sales between the two merging parties.  A GUPPI calculation measures a company's incentives to raise prices post-merger in the absence of any merger-induced synergies, entry by other firms, or competitor re-positioning.  A GUPPI calculation can help to determine the effect that a potential merger can have on the company's post-merger incentives to raise prices after it faces a lessening of competition.  Historically, the FTC has been more amenable to approving mergers resulting in "proportionately small" GUPPI

101

measurements.  In practice, this is typically a GUPPI below 5%, although the FTC has not officially adopted this threshold as a safe harbor for merger clearance review.

237.   In addition to being used as part of a GUPPI analysis, a "diversion ratio" can also be analyzed on its own.  A diversion ratio measures the proportion of consumers who would switch from one product to another in the face of a small price increase and helps to identify whether two products are close substitutes for each other.  This ratio helps regulators to understand the area of effective competition between products and sellers, which may constitute a relevant antitrust market. Agencies and private parties also evaluate an Herfindahl–Hirschman index ("HHI"), a common measure of market concentration calculated by squaring the market share of each firm competing in a market before and after a merger.

238.   Using these economic concepts and metrics that are often utilized by the FTC, Albertsons repeatedly provided Kroger with economic analyses and models regarding a divestiture proposal to remedy the FTC's and state Attorneys Generals' concerns.  In its correspondence to Kroger on November 29, 2023, December 19, 2023, February 1, 2024, February 4, 2024, February 9, 2024, and February 21, 2024, Albertsons offered Kroger its own economic analyses supporting a viable store divestiture proposal.

239.   For example, Albertsons' economists developed a store package using a 3% GUPPI limitation that would require a divestiture of fewer than 650 stores, thus demonstrating how Kroger could address the FTC's concerns about post-Merger concentration without triggering a Material Divestment Event under the Merger Agreement.  A 3% GUPPI limitation is considered conservative, as it is well below a 5% threshold commonly used as part of merger analysis, and therefore attractive to the FTC.  Albertsons shared this analysis with Kroger and repeatedly informed Kroger—including on February 1 and 4, 2024—that Albertsons' economists were available to assist Kroger's team with finalizing an updated, realistic proposal to the FTC.

240.   Albertsons' economists also evaluated the HHI index of numerous packages proposed by Kroger and communicated the results of those analyses to Kroger, in particular, that Kroger needed to divest more stores and a different mix of stores than it had included in its 238-, 413-, and 510-store packages.  These analyses matched feedback Kroger was receiving from the FTC, which flagged concerns with the HHI in local markets resulting from the merger.

241.   Kroger ignored Albertsons' analyses and persisted in proposing an inferior divestiture package, as measured by the FTC's accepted metrics.

242.   By freezing Albertsons out of this process, Kroger violated its contractual obligation to cooperate with Albertsons, as well as its obligations to use reasonable best efforts, best efforts, and to take any and all actions to secure regulatory approval of the Merger.

## XIII.  The FTC Files Suit to Enjoin the Merger

243.   On February 26, 2024, the FTC, joined by the states of Arizona, California, Illinois, Maryland, Nevada, New Mexico, Oregon, and Wyoming and the District of Columbia, filed a federal action against Kroger and Albertsons in the District of Oregon, seeking to enjoin the Merger nationwide as anticompetitive.

244.   Consistent with the FTC's prior criticisms, and with the concerns Albertsons had raised to Kroger time and again, the FTC alleged in its complaint that Kroger's proposed divestiture package did not include sufficient store and non-store assets.

245.   The FTC criticized the "hodgepodge" of stores that Kroger proposed to sell to C&S, as well as the failure to transfer necessary "banners, distribution centers, information technology, corporate contracts, loyalty programs, manufacturing assets, pharmacy resources, data analytics and e-commerce tools, employees, and others" that a successful supermarket business required.

104

246. The FTC's complaint also alleged that C&S would "need to construct a brand new supermarket business on the fly" because key assets were not included in Kroger's divestiture package.

247. The content of the FTC's complaint was not a surprise to Kroger. For months before it filed its complaint, the FTC repeatedly had expressed the same concerns to Kroger regarding deficiencies that the FTC perceived in Kroger's various divestiture packages, but Kroger failed to remedy the concerns.

## XIV. Kroger Ignores Feedback from State Antitrust Regulators that the Proposed Divestiture Package Is Deficient

248. The FTC was not the only regulator with whom the Parties would need to engage and from whom skepticism of the Merger would be expected. Kroger's foot-dragging to avoid proposing a more robust divestiture package resulted in needless scrutiny from state Attorneys General, which culminated in the states of Washington and Colorado filing independent lawsuits to block the Merger.

249. The Attorneys General of the District of Columbia, California, Arizona, Idaho, Illinois, and Washington commenced a multi-state investigation shortly after the announcement of the Merger. Additional states participated in reviewing materials produced to the FTC as a result of the Second Request. Both Kroger and Albertsons understood that state Attorneys General, like the FTC, would want to see

a divestiture package that ensured their constituents would be protected from anti-competitive effects.

250.    Albertsons sought to mitigate the risk of state enforcement action. Albertsons ensured Kroger was fully informed of its interactions with state Attorneys General.  Albertsons' General Counsel met with the Attorneys General of Arizona, California, Colorado, Nevada, Washington, and the District of Columbia in the fall and winter of 2023.  During those meetings, Albertsons' General Counsel provided information about the Merger and its likely effect on local competition in relevant states.  He also stood ready to answer regulators' questions, and often did, including in state-specific letters to Attorneys General offices in at least California, Colorado, Nevada, Washington, and the District of Columbia.  Albertsons also provided those offices information about the nature of competition that Albertsons faces locally and nationally, its track record for prior mergers, and how Albertsons planned to address employees at affected stores, among other information.

251.    Albertsons informed Kroger of its outreach and suggested that Kroger do the same.  Kroger ignored Albertsons.

252.    After Kroger selected C&S as the divestiture buyer in September 2023, state regulators sought information from C&S.  In compliance with the multi-state investigation, on October 31, 2023, C&S responded to questions from the California

106

Attorney General and explained the significant deficiencies of Kroger's 413-store divestiture package. C&S commented that the package included an ill-fitting mix of assets and banners from Albertsons and Kroger. C&S wrote that the package also did not include a full range of private brands or well-known brands, a cohesive IT system, or full-function distribution centers in every geographic region where divested stores operated.

253. On January 16, 2024, the State of Washington filed the first government enforcement action seeking to enjoin the Merger in Superior Court in Seattle. Washington alleged that Kroger's 413-store package was "woefully inadequate to restore the competition lost" through the Merger. It likewise expressed serious doubts as to C&S's ability to operate and rebanner the divested stores in Washington and serve as a viable competitor in Washington markets.

254. Instead of responding to Washington's lawsuit by improving its divestiture package, Kroger largely disregarded the allegations in the lawsuit as well as C&S's and Albertsons' similar comments related to the lawsuit.

255. For example, while the FTC was finalizing its view of the Merger and preparing for litigation, the State Attorneys General also expressed strong concerns with the inadequacy of Kroger's divestiture proposals. Kroger and Albertsons each met separately with Colorado's Attorney General Phil Weiser in early February,

where he gave specific and detailed feedback on the inadequacies of Kroger's divestiture strategy and asset package. Whereas Albertsons pleaded with Kroger to agree to a divestiture agreement that would address regulators' concerns, including the most recent issues stated by Attorney General Weiser pertaining to the Colorado area, Kroger did not improve its offer.

256.   Unsurprisingly, Kroger's continued failure led to another state Attorney General filing suit. On February 9, 2024, the Attorney General of Colorado informed C&S that he believed that Kroger was not acting in good faith because it had designed the divestiture package to cause the divestiture to fail. The Attorney General also stated the obvious: these ongoing and substantial divestiture negotiations should have taken place in 2023. The Attorney General outlined multiple deficiencies in the proposed divestiture package, including missing distribution centers, private label rights, banners, and access to loyalty data.

257.   The next week, on February 14, 2024, the State of Colorado sued Kroger and Albertsons in state court in Colorado, alleging that the Merger was anticompetitive and seeking to enjoin it.

258.   The Colorado Attorney General also contended that Kroger's proposed divestiture of stores was "woefully insufficient to restore the competition" eliminated by the Merger. Moreover, the Colorado Attorney General asserted that

108

Kroger's 413-store proposed package did not divest enough "infrastructure" to C&S to allow C&S to be a "viable competitor" in Colorado after the Merger. Colorado thus requested that the Court find the Merger unlawful under Colorado law and enjoin Kroger and Albertsons from consummating the transaction.

259. Specifically, the Colorado Attorney General alleged the following deficiencies with Kroger's proposed divestiture package, many of which C&S and Albertsons had urged Kroger to address in the preceding weeks and months:

a.   It did not include enough stores in Colorado to give C&S "adequate scale to compete effectively and cure the anticompetitive effects of the" Merger;

b.   There was a significant re-bannering risk as C&S would be "required to re-banner over 80% of divested stores across the country," including all but two in Colorado;

c.   There was high integration risk since C&S is not acquiring a standalone business line;

d.   C&S did "not have enough employees to run the business"; and

e.   C&S was "not getting sufficient distribution assets across the country."

109

260.   Kroger's failure to address the problems raised by the Washington and Colorado Attorneys General further illustrates Kroger's overall failure to take "any and all actions necessary to avoid, eliminate, and resolve … impediments under any Antitrust Law."

## XV.   C&S Offers Kroger a Final Path to Regulatory Approval, but Kroger Refuses

261.   After the three lawsuits were filed, C&S extended Kroger one final lifeline.   On March 1, 2024, C&S sent Kroger a term sheet that responded to regulators' outstanding concerns.   C&S offered to purchase a more highly concentrated package of stores in California, Nevada, and Washington and up to 650 stores in total.   C&S also requested improved banners in key geographies, more robust distribution assets, improved IT and integration support, improved transition support, and improved private labels.   C&S's offer thus represented a better path to avoid, eliminate, and resolve all impediments under antitrust law with respect to the Merger before the Outside Date.

262.   Despite Kroger's obligation to take "any and all actions" to remove any impediments to the Merger and the pending litigations to block the deal, Kroger rejected C&S's offer.   Kroger stated that it would only accept the terms in the March 1 letter if C&S would pay "market price," *i.e.*, several billion dollars more than C&S was willing to pay.   Kroger's insistence that C&S pay the "market price"

110

laid bare Kroger's willful rejection of its duty under the Merger Agreement to agree to a plan that would garner regulatory approval, whether the financial terms favored Kroger or not. Kroger did not consult Albertsons before rejecting C&S's proposal.

263. Kroger then made a counteroffer of divestiture packages of either 564 or 613 stores—still short of the 650-store divestiture threshold set forth in the Merger Agreement and APA. Both of these offers would be under "the terms set forth in the APA," or in other words, the terms that failed to address critical non-store assets and other FTC concerns. As a result, and contrary to Albertsons' advice, Kroger's counterproposal suffered from many of the same issues C&S's offer was designed to fix—including the lack of geographic diversity among stores, which the FTC had stressed was a dealbreaker.

264. To illustrate the point, two days after Kroger rejected C&S's offer (without consulting Albertsons), Albertsons sent Kroger an analysis of the Hosken-Tenn diversion model GUPPI for each Kroger proposal, which laid bare the clear deficiencies in Kroger's latest offer. Whereas C&S's offer for 650 stores resulted in no stores with GUPPI calculations above 3.5% and only 45 stores with a GUPPI above 3%, Kroger's 613-store proposal resulted in 95 stores above a 3% GUPPI, 24 stores above 3.5%, two stores above 4%, and one store above 5%. C&S's proposal was far superior and went meaningfully further in addressing regulatory concerns

111

about post-merger upward pricing pressure. This was especially the case in the local geographies regulators were most concerned about, including the areas around Dallas, Seattle, Las Vegas, Chicago, and Phoenix.

265.   Nonetheless, on March 10, 2024, without consulting with Albertsons in good faith as required under the Merger Agreement, Kroger submitted to C&S a "Put Notice" for an additional 237 stores, on top of the same nonviable 413 stores identified in the APA, for a total of 650 stores. Although the number of stores had been increased, the mix of stores continued to be inadequate because Kroger was still employing a flawed methodology in store selection, which the FTC had informed Kroger it would not accept. Kroger's 650 stores were clearly deficient when compared to the 650 stores in C&S's offer, as they did not address local concentration or non-store assets nearly as comprehensively.[3] For example, C&S already would be required to re-banner nearly 80% of the stores in Kroger's 413-store package, and yet Kroger was adding additional stores that C&S would need to re-banner. Kroger also included limited distribution and back-office support to operate the 237 stores it was adding. Like Kroger's prior offers, this offer was take

---

[3] For example, Kroger's package still resulted in 8 stores above the 3.5% GUPPI threshold, including two stores above 4% and one above 5%, compared to zero stores above those thresholds in C&S's offer.

it or leave it.  Further, when Albertsons tried to get clarity from Kroger about whether Kroger's economists had selected the new stores that were being added, Kroger would not clarify its methodology.

266.   C&S responded on March 15, 2024, refusing to purchase the 650 stores identified by Kroger.  C&S observed, among other things, that Kroger's Put Notice did not address the local concentration concerns raised by regulators related to the original 413-store divestiture package—the whole point of continuing to negotiate the divestiture while already defending against multiple litigations.  Aspects of Kroger's proposal arguably made the divestiture package worse than even Kroger's own prior offers, because C&S would be required to rebanner more stores and because C&S was not being provided adequate distribution resources to service the additional stores.  Simply put, adding additional stores onto an already deficient package would not resolve regulators' concerns about C&S's ability to enter and compete in the market.

267.  Three days later, on March 18, 2024, Kroger responded to C&S admitting that its proposal would not resolve all regulatory concerns.  Nonetheless, Kroger told C&S that Kroger's Put Notice was enforceable under the APA.[4]

---

[4] Kroger conceded that the divestiture package embodied in the Put Notice would not "resolve all regulatory concerns" the FTC had raised with Kroger's divestiture proposals,

113

268.   This Put Notice self-evidently failed to meet Kroger's obligations to Albertsons in the Merger Agreement.  In face of ongoing litigations, Kroger was required under the Merger Agreement to use its best efforts and to take any and all actions necessary to avoid, eliminate, and resolve any and all impediments under any antitrust law with respect to the Merger, and to take any and all actions to eliminate each and every impediment under any antitrust law to close the Merger before October 9, 2024.  Yet, by its own admission, the Put Notice was not issued with the aim of resolving the FTC's remaining concerns.

269.   For the next week, Kroger and C&S negotiated Kroger's latest proposal.  Kroger refused to make C&S an offer for the 650 stores and non-store assets that C&S requested.

270.   On March 25, 2024, Kroger sent C&S a new proposal, this time including only 579 stores.  Kroger's new 579-store proposal was both smaller and less responsive to the FTC's stated concerns than the 650-store package C&S had proposed.  The offer did not address local concentration issues nearly as well, and it provided for the transfer or temporary use of some additional non-store assets, but at a much lower level than C&S had requested on March 1, 2024.   Specific

---

including "concerns with rebannering," but took the position that this failure was irrelevant because, under the APA, "the Put Notice need not resolve all regulatory concerns."

geographies that the FTC had requested for Kroger to address remained under-addressed, including areas around Los Angeles, Las Vegas, Seattle, and San Diego. Kroger also did not agree to transfer banners that C&S had requested for months, including the Safeway banner, and it did not transfer plum private labels, like "Signature" and "O Organics."

271.    Albertsons warned Kroger that, yet again, its latest package did not go far enough in addressing the FTC's concerns and was not sufficient under its obligations.  For example, Kroger's new proposal resulted in 59 stores above the 3% GUPPI threshold and 8 stores above the 3.5% threshold, compared to only 45 stores above the 3% threshold in C&S's offer and no stores over the 3.5% threshold. Albertsons pleaded for Kroger to instead agree to the terms proposed by C&S on March 1, 2024.  Kroger did not do so.

272.    Because Kroger was unwilling to accept C&S's 650-store package, C&S responded with its own revised 579-store package.  Even though C&S's package included the same number of stores that Kroger had insisted on, Kroger refused to entertain the stores C&S selected for that offer, again putting its own self-interest ahead of its commitment to take "any and all actions" necessary for regulatory approval.

273.   Kroger and C&S continued to deliberate over a package of 579 stores and, on April 22, 2024, the Parties and C&S executed an Amended and Restated Asset Purchase Agreement ("A&R APA") for 579 stores.  This final set of stores was proposed entirely by Kroger; C&S did not have an input into the final store selection.

274.   Albertsons expressed strong concerns about the 579-store proposal's ability to satisfy regulators' concerns before it was publicly announced.  But Kroger refused to change its approach.  Albertsons also urged Kroger to include the same "Put Notice" framework in the A&R APA as had been included the original APA, so that the package could be increased if the FTC disapproved of it.  Kroger again pushed back, and the A&R APA ultimately only required the Parties to exercise "reasonable best efforts" to modify any provision, obligation, or agreement.

275.   Kroger's refusal to consider viable paths toward regulatory approval suggested by both Albertsons and C&S laid bare that its ultimate goal was not to uphold its agreement to take "any and all actions" necessary for regulatory approval, but rather to maximize the profitability of any proposed divestiture package, even at the risk of jeopardizing regulatory approval and, thus, the Merger.

RLF1 32016433v.1

## XVI.  During the Litigations to Enjoin the Merger, Kroger Continues Its Self-Serving Conduct

276.  As the litigations progressed and in the weeks leading up to the FTC preliminary injunction hearing and state trials, Kroger continued to breach its obligations under the Merger Agreement.  Kroger refused to cooperate with Albertsons to improve its divestiture package and ensure that its expert witness could support the Merger, in blatant violation of its obligations under the Merger Agreement to cooperate with Albertsons in good faith, and use reasonable best efforts, best efforts, and take any and all actions necessary to remove any impediment to closing the Merger.

277.  As litigation proceeded, the perceived deficiencies the FTC, state Attorneys General, C&S, and Albertsons had highlighted during negotiations were unsurprisingly front and center.  The plaintiffs in all three lawsuits exploited Kroger's shortcomings, featuring them prominently in opening statements, during the evidence, and in closing.  At trial, Kroger's expert was forced to concede that nearly two dozen geographic markets would have presumptively anticompetitive levels of concentration after the Merger, even accounting for the divestiture.

278.  Unsurprisingly, the FTC focused a significant portion of the preliminary injunction hearing and post-trial briefing on the inadequacies of the

divestiture package. That strategy was later replicated by Washington and Colorado in their respective trials.

279. The FTC, along with Washington and Colorado, highlighted that Kroger picked a divestiture buyer without experience running a large grocery retail operation. They highlighted C&S's struggles as a buyer in prior divestitures and characterized C&S as a "retail liquidator" because of its history of closing stores after acquisitions when they became unprofitable. Indeed, it came out at trial that Yael Cosset, a senior executive at Kroger who was heavily involved in divestiture planning, had communicated to others at Kroger that it was a "no brainer" to pick a different divestiture buyer over C&S. And the Washington Court expressly found that Kroger "selected C&S as the divestiture buyer over a buyer that other senior executives thought more capable."

280. The FTC and Washington highlighted that Kroger failed to provide C&S the banners or private labels it requested.

281. And the FTC and Washington highlighted that Kroger, not C&S (or Albertsons), picked the stores to be divested. Due to Kroger's failure to consider C&S's and Albertsons' views during the process, the FTC was able to obtain an admission from C&S's CEO Eric Winn at the preliminary injunction hearing that "C&S [did not] have a role in selecting the 579 stores in" the final April 2024

118

package.  In its closing arguments, Washington highlighted the example of one store that Kroger's management suggested be included in the divestiture package, but was vetoed by Kroger's CEO Rodney McMullen because the store was too valuable to Kroger.

282.   Also at the preliminary injunction hearing in Oregon, Kroger's own expert Dr. Israel agreed that Kroger's divestiture did not resolve all competitive concerns—a "remarkable concession," as the FTC emphasized in its post-trial brief, that "*alone dooms the divestiture*."  Instead of bolstering the case for the Merger as intended, because of Kroger's willful breach, Dr. Israel's testimony became a strong point for the FTC.

283.   On September 25, 2024, after the FTC preliminary injunction hearing concluded and while the Colorado and Washington trials were ongoing, Albertsons again contacted Kroger, pleading for it to improve its divestiture proposal.  Kroger did not act on this request.

284.   After the FTC, Colorado, and Washington trials concluded, Kroger remained obligated to make "best efforts" and take "any and all actions" to prevail while awaiting the Courts' decisions.  Yet, during Kroger's quarterly earnings call on December 5, 2024, with the Court decisions still outstanding, Kroger sabotaged its own defense by publicly walking back its representations to the relevant Courts

119

about the Merger's procompetitive benefits.  On the earnings call, Kroger CEO McMullen volunteered in his prepared remarks that "regardless of the outcome of the trials, Kroger is operating from a position of strength" and "we don't need to do mergers to make our business successful." Those gratuitous statements contradicted Kroger's closing argument in the District of Oregon preliminary injunction hearing, where its counsel had represented to the Court that the Merger would be procompetitive because Kroger "*needs the help of this merger to continue to succeed*." Kroger's counsel had also described the Merger as a "fundamental imperative" to respond to the "existential threat to the corner grocery store" posed by competitors like Walmart, Costco, and Amazon.  McMullen's comments on the December 2024 earnings call signaled that Kroger was not serious about its representations at trial.  While undermining its defense of the Merger, those comments aligned with Kroger's ulterior motive to weaken Albertsons as a future competitor by implying to the market that Albertsons' value to Kroger had diminished.

## XVII. Kroger's Failure to Abide by Its Contractual Obligations Results in the Merger Being Enjoined

285.   As a direct result of Kroger's refusal to work with Albertsons in good faith and abide by its contractual obligations, the U.S. District Court for the District

120

of Oregon enjoined the Merger on December 10, 2024.  The State of Washington King County Superior Court also enjoined the merger on the same day.

286.    The Oregon Court found that the stores Kroger included in the divestiture package were insufficient.  To that end, the Court repeatedly emphasized Kroger's economics expert's concession that at least 22 markets were presumptively anticompetitive, even after the divestiture.  "This evidence, on its own," the Court held, "is sufficient to find that the divestiture will not mitigate the merger's anticompetitive effect such that it is no longer likely to substantially lessen competition."

287.    The Oregon Court also criticized the non-store assets included in Kroger's divestiture package.  For example, the Court credited Plaintiffs' suggestion that "C&S may not be receiving the most desirable banners" and noted that C&S would have to rebanner extensively, including introducing entirely new banners in a number of markets.  The Court also emphasized that "C&S will have limited use of the Albertsons Signature and O Organics private label brands."  And the Court credited Plaintiffs' expert's testimony that "because defendants will have a more robust loyalty program, customer data, and targeted advertising, C&S is vulnerable to having defendants target its customers after the merger."  In short, as the Oregon

121

Court put it, "[t]he structure of the divestiture package . . . creates many risks for C&S that could make it difficult to compete."

288.   In addition, the Oregon Court endorsed the FTC's critiques of C&S as a divestiture buyer, finding that there were "serious concerns about C&S's ability to run a large-scale grocery business."  In particular, the Court emphasized that "C&S does not have any experience running a large portfolio of retail grocery businesses," and that C&S's "past divestiture purchases have not been successful."  The Court maintained that view even though C&S would have retained thousands of existing Kroger and Albertsons employees and executives.  Those employees' "presence," the Court held, "does not fully mitigate C&S' inexperience and lack of success in grocery retail and cannot overcome the difficulties inherent to the selection of assets" Kroger included in its divestiture package.

289.   The Washington Court identified many of the same deficiencies in Kroger's divestiture package and selection of a divestiture buyer.  As to the stores Kroger chose to include, the Washington Court held that "Kroger kept the best performing assets for itself," including by "retaining the UVillage QFC store in Seattle because Kroger CEO Rodney McMullen personally requested that it not be divested due to its significant real estate value."  As the Court found:  "Where it

could, Kroger followed a simple rule: if a store was a 'good EBITDA producer, . . . we wouldn't want to divest.'"

290.    Like the Oregon Court, the Washington Court credited the State's criticisms of C&S. The Washington Court concluded that "Kroger Picked an Inexperienced and Ill Equipped Divestiture Buyer" and that "Kroger was well aware of C&S's limited retail capabilities when it selected C&S as the divestiture buyer."

## XVIII.    Kroger's Thwarting the Merger Harms Albertsons

291.    Albertsons and its stockholders have suffered and will be reasonably certain to suffer harms as a result of Kroger's breaches of the Merger Agreement.

292.    *First*, Albertsons' stockholders are facing the loss of a considerable Merger premium that they expected to receive in return for Albertsons agreeing to enter into the Merger Agreement. Albertsons agreed to a transaction that valued the company at approximately $24.6 billion and would provide $34.10 per share in consideration to Albertsons' stockholders, representing a 32.8% premium over Albertsons' closing stock price of $25.67 on October 12, 2022, the day before news of the Merger became public. That loss to Albertsons' stockholders, totaling in the billions of dollars, is due directly and causally to Kroger's breach as are further stockholder losses that have followed.

123

293.    *Second*, Albertsons invested years of time, energy, and resources to try to make the Merger a success.  Albertsons hired scores of advisors from bankers to attorneys to economists to assist with all aspects of contract drafting, antitrust review, integration oversight, and investor relations, to the tune of millions of dollars in fees and costs.  Albertsons also invested considerable energy and resources to integration work with Kroger, and millions more in legal and expert consulting fees to defend the Merger in multiple litigations.  Albertsons continued to perform and stand ready to close even after the passage of the Outside Date.  Those are all sunk costs.

294.    *Third*, Albertsons has put itself at a competitive disadvantage vis-à-vis one of its largest competitors—Kroger—who has had an up-close look into almost every aspect of Albertsons' business, and other rivals, who have had two and a half years to invest and innovate while Albertsons was stuck in a standstill as a result of the Merger.  Under Section 6.1(a) of the Merger Agreement, Albertsons was prohibited from "conduct[ing] its business and the business of the Company Subsidiaries other than in the ordinary course consistent with past practices in any material respect."  The operating covenants forced Albertsons to consult with Kroger on a litany of business decisions.  As a result, for the past two years, Albertsons has been constrained in making any material changes in how it allocates existing capital

124

and investments.  The only exceptions to this stand-still requirement are if the change meets a limited category of exceptions or if Albertsons reveals its innovative strategies to Kroger and Kroger consents—which has its own downsides for Albertsons.  Due to these terms, Albertsons largely has been unable to react to and address changes in the grocery sector, such as the growing use of digital media and the increased competitiveness of ethnically-focused grocery stores.  Now, without the Merger, Albertsons is left to play catch up in an increasingly crowded field.  And, in instances where Albertsons sought Kroger's consent to make changes to its business or pay employees retention bonuses not contemplated by existing employment agreements to retain key personnel, Kroger refused, causing loss of personnel.  Albertsons agreed to the limitations in Section 6.1 only because Kroger had committed to use its best efforts and take any and all actions to remove regulatory impediments to closing the Merger—commitments Kroger breached.

295.   In addition to abusing its veto power over Albertsons' ability to make significant strategic decisions, Kroger used its position as the proposed buyer to denigrate Albertsons and weaken its competitive position—for example, by telling the market during Kroger's December 5, 2024 earnings call that Kroger did not "need" Albertsons for the future of its business, despite having publicly represented the opposite in antitrust litigation.

125

296.  *Fourth*, and relatedly, the failure of the Merger leaves Albertsons facing the very dilemma the Merger was intended to solve: how to better compete with grocery titans like Walmart, Costco, Amazon, and Target.  Albertsons has lost out on the ability to pursue competitive advantages and synergies like those that would have resulted from the Merger.  As Albertsons' counsel explained in open court, lacking similar economies of scale, Albertsons is unable to offer prices as low as its competitors.  Kroger and Albertsons had anticipated synergies in the billions of dollars as a result of supply chain and manufacturing consolidation, procurement optimization, new opportunities for brands and private labels, and optimization of certain corporate and back-office support.  Albertsons and Kroger had also anticipated significant new revenue from new projects like a national advertisement platform.  Without the Merger, Albertsons will be forced to recalibrate its strategy to attempt to achieve the kinds of benefits the Merger would have afforded.

## COUNT I

### (Breach of Contract, Merger Agreement § 6.3(a))

297.  Albertsons repeats and incorporates all of the allegations set forth in the preceding paragraphs as if they are fully set forth herein.

298.  Albertsons and Kroger entered into the Merger Agreement.

299.  The Merger Agreement is a binding contract.

126

300.   Albertsons performed all its obligations under the Merger Agreement.

301.   Section 6.3(a) of the Merger Agreement required Kroger to use its reasonable best efforts to "take or cause to be taken all actions . . . necessary, proper or advisable to cause the conditions to the Closing to be satisfied as promptly as reasonably practicable and to eliminate, and resolve any and all impediments under any Antitrust Law with respect to the Transactions."

302.   Through the actions and inactions described above, Kroger failed to use its reasonable best efforts to take the actions necessary to satisfy Closing conditions as promptly as reasonably practicable and eliminate any and all impediments under any antitrust law.  Those actions include, but are not limited to, Kroger's inadequate 238-store offer, Kroger mismanaging the process of identifying a divestiture buyer, Kroger's inadequate 413-store offer, Kroger's inadequate 510-store offer, Kroger's inadequate 541-store offer, Kroger declining C&S's 650-store offer, Kroger entering into an insufficient A&R APA, Kroger refusing to supplement the A&R APA, and Kroger failing to develop an adequate divestiture package in the more than two years since the Merger Agreement was signed.

303.   Through the actions and inactions described above, Kroger materially breached the Merger Agreement.

127

304.   Section 1.1 of the Merger Agreement defines "Willful Breach" as a "material breach … that is the consequence of an act or omission by the breaching [P]arty with the actual knowledge that the taking of such act (or, in the case of an omission, failure to take such act) would cause or constitute such material breach, regardless of whether breaching was the object of the act or failure to act."

305.   Kroger's breach of Section 6.3(a) of the Merger Agreement constituted a Willful Breach.  Kroger had actual knowledge that its actions and inactions violated the Merger Agreement and would make securing regulatory approval less likely.  Kroger chose to pursue its own economic interests by trying to hold on to as many valuable assets as it could through the Merger and divestiture, instead of striving to secure regulatory approval of the Merger, despite clear and consistent feedback from the FTC, the state Attorneys General, C&S, and Albertsons that its approach was unlikely to lead to regulatory approval.

306.   Kroger's willful breach of the "reasonable best efforts" provision of the Merger Agreement has caused and continues to cause significant damages to Albertsons.

307.   Kroger's willful breach of the "reasonable best efforts" provision of the Merger Agreement has caused and continues to cause irreparable harm to Albertsons.

308.    Kroger's willful breach of the "reasonable best efforts" provision of the Merger Agreement caused Albertsons to spend over two painstaking years attempting to consummate the Merger.    During that time, Albertsons suffered uncertainty regarding its future dealings, employee flight, investor doubts, and harm to its brand, and Albertsons was forced to forgo other strategic projects as it attempted to salvage the Merger.

**COUNT II**

**(Breach of Contract, Merger Agreement § 6.3(d))**

309.    Albertsons repeats and incorporates all of the allegations set forth in the preceding paragraphs as if they are fully set forth herein.

310.    Albertsons and Kroger entered into the Merger Agreement.

311.    The Merger Agreement is a binding contract.

312.    Albertsons performed all its obligations under the Merger Agreement.

313.    Section 6.3(d) of the Merger Agreement required Kroger to use its "best efforts to take, or cause to be taken, any and all actions necessary to avoid, eliminate, and resolve any and all impediments under any Antitrust Law with respect to the Transactions."

314.    Through the actions and inactions described above, Kroger failed to use its best efforts to avoid, eliminate, and resolve any and all impediments under the

129

antitrust law as promptly as practicable.  Those actions include, but are not limited to, Kroger's inadequate 238-store offer, Kroger mismanaging the process of identifying a divestiture buyer, Kroger's inadequate 413-store offer, Kroger's inadequate 510-store offer, Kroger's inadequate 541-store offer, Kroger declining C&S's 650-store offer, Kroger entering into an insufficient A&R APA, Kroger refusing to supplement the A&R APA, and generally, Kroger failing to develop an adequate divestiture package in the more than two years since the Merger Agreement was signed.

315.   Through the actions and inactions described above, Kroger materially breached the Merger Agreement.

316.   Section 1.1 of the Merger Agreement defines "Willful Breach" as a "material breach … that is the consequence of an act or omission by the breaching [P]arty with the actual knowledge that the taking of such act (or, in the case of an omission, failure to take such act) would cause or constitute such material breach, regardless of whether breaching was the object of the act or failure to act."

317.   Kroger's breach of Section 6.3(d) of the Merger Agreement constituted a Willful Breach.  Kroger had actual knowledge that its actions and inactions violated the Merger Agreement and would make securing regulatory approval less likely.  Kroger chose to pursue its own economic interests by trying to hold on to as

many valuable assets as it could through the Merger and divestiture, instead of striving to secure regulatory approval of the Merger, despite clear and consistent feedback from the FTC, the state Attorneys General, C&S, and Albertsons that its approach was unlikely to lead to regulatory approval.

318.   Kroger's willful breach of the "best efforts" provision of the Merger Agreement has caused and continues to cause significant damages to Albertsons.

319.   Kroger's willful breach of the "best efforts" and provision of the Merger Agreement has caused and continues to cause irreparable harm to Albertsons.

320.   Kroger's willful breach of the "best efforts" provision of the Merger Agreement caused Albertsons to spend over two painstaking years attempting to consummate the Merger.   During that time, Albertsons suffered uncertainty regarding its future dealings, employee flight, investor doubts, harm to its brand, and Albertsons was forced to forgo other strategic projects as it attempted to salvage the Merger.

## COUNT III

### (Breach of Contract, Merger Agreement § 6.3(e))

321.   Albertsons repeats and incorporates all of the allegations set forth in the preceding paragraphs as if they are fully set forth herein.

131

322. Albertsons and Kroger entered into the Merger Agreement.

323. The Merger Agreement is a binding contract.

324. Albertsons performed all its obligations under the Merger Agreement.

325. Section 6.3(e) of the Merger Agreement required Kroger to "take any and all actions . . . to eliminate each and every impediment under any Antitrust Law to close the" Merger before the October 9, 2024 Outside Date if a proceeding is instituted or threatened challenging the Merger as violating any antitrust law.

326. One or more proceedings were threatened, and then instituted, that challenged the Merger on the grounds that it violated the antitrust laws.

327. Through the actions and inactions described above, Kroger failed to take any and all actions to eliminate each and every impediment under any antitrust law to close the Merger before the October 9, 2024 Outside Date. Those actions include, but are not limited to, Kroger's inadequate 238-store offer, Kroger mismanaging the process of identifying a divestiture buyer, Kroger's inadequate 413-store offer, Kroger's inadequate 510-store offer, Kroger's inadequate 541-store offer, Kroger declining C&S's 650-store offer, Kroger entering into an insufficient A&R APA, Kroger refusing to supplement the A&R APA, and generally, Kroger failing to develop an adequate divestiture package in the more than two years since the Merger Agreement was signed.

RLF1 32016433v.1

328.   Through the actions and inactions described above, Kroger materially breached the Merger Agreement.

329.   Section 1.1 of the Merger Agreement defines "Willful Breach" as a "material breach … that is the consequence of an act or omission by the breaching [P]arty with the actual knowledge that the taking of such act (or, in the case of an omission, failure to take such act) would cause or constitute such material breach, regardless of whether breaching was the object of the act or failure to act."

330.   Kroger's breach of Section 6.3(e) of the Merger Agreement constituted a Willful Breach.  Kroger had actual knowledge that its actions and inactions violated the Merger Agreement and would make securing regulatory approval less likely.  Kroger chose to pursue its own economic interests by trying to hold on to as many valuable assets as it could through the Merger and divestiture, instead of striving to secure regulatory approval of the Merger, and despite clear and consistent feedback from the FTC, the state Attorneys General, C&S, and Albertsons that its approach was unlikely to lead to regulatory approval.

331.   Kroger's breach of the "any and all actions" provision of the Merger Agreement has caused and continues to cause significant damages to Albertsons.

332.   Kroger's breach of the "any and all actions" provision of the Merger Agreement has caused and continues to cause irreparable harm to Albertsons.

133

333.    Kroger's breach of the "any and all actions" provision of the Merger Agreement caused Albertsons to spend over two painstaking years attempting to consummate the Merger.  During that time, Albertsons suffered uncertainty regarding its future dealings, employee flight, investor doubts, harm to its brand, and Albertsons was forced to forgo other strategic projects as it attempted to salvage the Merger.

## COUNT IV

### (Breach of Contract, Merger Agreement § 6.3(b))

334.    Albertsons repeats and incorporates all of the allegations set forth in the preceding paragraphs as if they are fully set forth herein.

335.    Albertsons and Kroger entered into the Merger Agreement.

336.    The Merger Agreement is a binding contract.

337.    Albertsons performed all its obligations under the Merger Agreement.

338.    Section 6.3(b) of the Merger Agreement required Kroger to "work together in good faith" with Albertsons to resolve any disagreements regarding regulatory strategy.

339.    Through the actions and inactions described above, Kroger failed to "work together in good faith" with Albertsons to resolve any disagreements regarding regulatory strategy.

340.   Through the actions and inactions described above, Kroger materially breached the Merger Agreement.

341.   Section 1.1 of the Merger Agreement defines "Willful Breach" as a "material breach … that is the consequence of an act or omission by the breaching [P]arty with the actual knowledge that the taking of such act (or, in the case of an omission, failure to take such act) would cause or constitute such material breach, regardless of whether breaching was the object of the act or failure to act."

342.   Kroger's breach of Section 6.3(b) of the Merger Agreement constituted a Willful Breach.  Kroger had actual knowledge that, by refusing to work together in good faith with Albertsons, it was violating the Merger Agreement and making it less likely that the Parties would secure regulatory approval of the Merger.  Kroger chose to pursue its own economic interests by trying to hold on to as many valuable assets as it could through the Merger and divestiture process.

343.   Kroger's willful breach of the "good faith" provision of the Merger Agreement has caused and continues to cause significant damages to Albertsons.

344.   Kroger's willful breach of the "good faith" provision of the Merger Agreement has caused and continues to cause irreparable harm to Albertsons.

345.   Kroger's willful breach of the "good faith" provision of the Merger Agreement caused Albertsons to spend over two painstaking years attempting to

135

consummate the Merger. During that time, Albertsons suffered uncertainty regarding its future dealings, employee flight, investor doubts, harm to its brand, and Albertsons was forced to forgo other strategic projects as it attempted to salvage the Merger.

## COUNT V

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

346.    Albertsons repeats and incorporates all of the allegations set forth in the preceding paragraphs as if they are fully set forth herein.

347.    Albertsons and Kroger entered into the Merger Agreement. The Merger Agreement is a binding contract.

348.    The purpose of the Merger Agreement was to benefit both Kroger and Albertsons and to create a combined entity better positioned to compete against rivals like Walmart, Costco, Target, and Amazon—not to give Kroger a competitive advantage over Albertsons.

349.    Pursuant to the implied covenant of good faith and fair dealing, Kroger had an implied duty not to use its position under the Merger Agreement as the putative buyer, and the party responsible for leading the development and implementation of the strategy to obtain regulatory approval, to damage Albertsons.

136

Kroger was obligated to work in good faith toward regulatory approval for the Merger.

350.   Kroger willfully inflicted competitive harm on Albertsons as part of a broader effort to prioritize Kroger's financial interests at the expense of its express and implied obligations to Albertsons under the Merger Agreement.  Kroger dragged out the regulatory process for more than two years, knowing that its regulatory strategy put the Merger at risk.  During that period, Albertsons suffered uncertainty regarding its future dealings, employee flight, investor doubts, and harm to its brand, and Albertsons was forced to forgo other strategic projects as it attempted to salvage the Merger.

351.   At the same time that Kroger was dilatory in its negotiations with regulators, it was pushing full steam ahead on extensive integration efforts, including review of critical business documents from Albertsons.  Over the course of two-and-a-half-years, Kroger gained unmatched insights into Albertsons' core capabilities, including how it operates its supply chain, merchandising, and contracting.  Kroger continued to seek that information up until the eve of the Oregon and Washington decisions, giving itself a competitive advantage at Albertsons' expense.

352.  Kroger further sought to harm Albertsons as a competitor by denigrating Albertsons in public communications regarding the Merger, including

Kroger's comments during its December 5, 2024 earnings call that Kroger no longer "need[ed]" Albertsons.

353.   Kroger's bad faith actions and inaction violated the covenant of good faith and fair dealing that is implied in the Merger Agreement.  Those actions and omissions deprived Albertsons of the benefit of its bargain with Kroger because they prevented the Merger Agreement from being consummated and prolonged the period during which the Merger was under regulatory review.

## PRAYER FOR RELIEF

WHEREFORE, and based on the foregoing, Albertsons respectfully requests that the Court grant the following relief:

a.   Enter judgment in Albertsons' favor, finding that Kroger willfully breached the Merger Agreement;

b.   Award to Albertsons damages in an amount to be determined at trial, including but not limited damages due to Albertsons' stockholders pursuant to Section 9.5 of the Merger Agreement;

c.   Award Albertsons all the attorney's fees and costs it has incurred and incurs in the future in this action;

d.   Award Albertsons all available interest; and

e.   Award all such other and further relief as this Court deems just and appropriate.

139

*/s/ Blake Rohrbacher*

Blake Rohrbacher (#4750)

*OF COUNSEL*:

Kyle H. Lachmund (#6842)

Sandy Xu (#6966)

Enu Mainigi

Elizabeth J. Freud (#6803)

Craig D. Singer

RICHARDS, LAYTON & FINGER, P.A.

Steven Pyser

920 North King Street

WILLIAMS & CONNOLLY LLP

Wilmington, Delaware 19801

680 Maine Avenue, SW

(302) 651-7700

Washington, DC 20024

rohrbacher@rlf.com

(202) 434-5000

lachmund@rlf.com

xu@rlf.com

Philippe Z. Selendy

freud@rlf.com

Jennifer M. Selendy

David S. Flugman

SELENDY GAY PLLC

1290 Avenue of the Americas

New York, New York 10104

(212) 390-9000

Mike Cowie

DECHERT LLP

1900 K Street NW

Washington, DC 20006

(202) 261-3300

Dated: December 10, 2024

*Attorneys for Plaintiff Albertsons Companies, Inc.*

140