Joseph M. Alioto (SBN 42680)
Tatiana V. Wallace (SBN 233939)
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone: (415) 434-8900
Email:  jmalioto@aliotolaw.com


[Additional Counsel Listed on Last Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Christine Whalen, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>Kroger Co., Albertsons Companies, Inc., and Cerberus Capital Management, L.P.,<br><br>Defendants. | Case No.: 23-cv-00459-VC<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO RENEW THEIR MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**<br><br>Hearing Date: January 30, 2025<br>Time: 10:00 AM<br>Place: Courtroom 4, 17th Floor<br>Judge: Honorable Vince Chhabria |

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

    A.     This Case Is Not "Moot" ............................................................................ 3

    B.     Plaintiffs Have Stated a Cause of Action .................................................. 3

         1.     Standard of Review ....................................................................... 3

         2.     This Motion Is In Effect a Motion for Reconsideration ................ 3

         3.     Defendants' Standing Argument is Misleading ............................. 4

         4.     The Findings in the State of Washington Court Corroborate Plaintiffs' Allegations ..................................................................... 5

         5.     Plaintiffs Have Adequately Alleged That They Have Shopped at Albertsons or Kroger Stores or Both ............................................. 6

         6.     Plaintiffs Have Adequately Alleged That They Are Threatened With Loss or Damage From the Merger ....................................... 8

         7.     Plaintiffs Have Alleged Detailed Market Share Percentages Among Identified Competitors And Have Provided High HHI Numbers Demonstrating a Prima Facie Case for Unlawful Concentration and Impact ............................................................ 11

         8.     Undue Concentration in *Any* Market Is a Violation of Section 7 ...... 14

CONCLUSION ............................................................................................................ 15

## TABLE OF AUTHORITIES

**Cases**

*Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325 (7th Cir. 1986) ...................... 9

*Bell Atlantic v. Twombly,* 550 U.S. 544 (2007) ................................................................ 3

*Brown Shoe Co. Inc. v. United States*, 370 U.S. 294 (1962) ...................................................... 6

*California v. American Stores*, 495 U.S. 271 (1990) ....................................................... passim

*Christian Schmidt Brewing Co. v. G. Heilman Brew.,* 600 F.Supp. 1326 (E.D.Mich.),……11

*Citizen Publishing v. United States,* 394 U.S. 131 (1969)……………………………………..1

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ................................................................ 4

*FTC v. Elders Grain, Inc.*, 868 F.2d 901 (7th Cir. 1989)…………………………………….9

*FTC v. Kroger Company*, No.: 3:24-cv-00347-AN (D.OR., December 10, 2024)…………..4

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015)…………………………………….14,15

*Hawaii v. Standard Oil*, 405 U.S. 251 (1972)……………………………………………..3

*Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116 (9th Cir. 2008).................................... 4

*Marathon Oil Co. v. Mobil Corp.*, 530 F.Supp. 315 (N.D.Ohio)……………………………11

*Phillips v. County of Allegheny*, 515 F.3d 224 (3d Cir. 2008) ................................................ 4

*Reiter v. Sonotone*, 442 U.S. 330 (1979)…………………………………………………. 2

*St. Alphonsus Medical Center v. St. Luke's Health*, 778 F.3d 775 (9th Cir. 2015) ........ 9, 10,12

*United States v. Anthem, Inc.*, 236 F. Supp. 3d 171(D.D.C. 2017)…………………… 12, 14

*United States v. Borden Co.*, 347 U.S. 514 (1954) ................................................................ 3

*United States v. Falstaff Brewing Corporation*, 410 U.S. 526 (1973)………………………8

*United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) ........................... 13, 18

*United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966)…………………………………..15

*United States v. Philadelphia Nat'l Bank*, 374 U.S. 321 (1963) ............................................ 18

*United States v. Von's Grocery Co.*, 384 U.S. 270 (1966) ................................. . . 14

*United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36(D.D.C. 2011)……………………….10

*Washington v. The Kroger Co, et al.*, NO. 24-2-00977-9 SEA
(King County Superior Court, December 10, 2024)…………………………………..passim

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 US 100 (1969)……………………… 8

**Other Authorities**:

Adam Smith, *Wealth of Nations*, Book IV, Chapter VIII, Univ. Chicago Press Ed.

**PRELIMINARY STATEMENT**

Defendants Kroger's and Albertsons' renewed motion to dismiss should be denied. The only changes in the law and the facts since the Court denied their motions to dismiss the Second Amended Complaint have been decidedly against them. Three different tribunals, after weeks of trial and hearings, decided against Kroger and Albertsons. Neither appealed. Indeed, both completely capitulated by disavowing the merger. So, as a matter of fact and law, the Defendants have conceded the illegality of their merger, and therefore judgment should be entered in favor of these Plaintiffs and Plaintiffs should be awarded attorneys' fees and costs pursuant to the mandate of Section 16 of the Clayton Act.

There is more. Immediately after their resounding defeats, all fidelity to their unlawful venture fell apart with the stunning lawsuit filed by Albertsons charging Kroger with bad-faith merger negotiations designed to cripple Albertsons ability to compete in any post-acquisition market. Albertsons charged Kroger with a litany of abuses, obfuscations, and perverse promises, all of which ineluctably led to Albertsons' ultimate charge that Kroger intentionally and willfully violated the "implied covenant of good faith and fair dealing" – in short, bad faith merger negotiations by the largest grocery store in the nation used against its major competitor, the second largest grocery store in the nation. The allegations of Albertsons against Kroger, if true, could easily support a claim against Kroger for violating Section 2 of the Sherman Act.

From the very beginning, these Plaintiffs alleged that Kroger's requirement that Albertsons distribute its total 2022 profit – $4 billion – to its shareholders, would require Albertsons to replenish its treasury by substantially increasing its debt. Not only has Albertsons complained bitterly that it has been taken advantage of, but it has been suggested that Albertsons may not survive, or, at least, may be required to sell a number of its stores. In this regard, the law is clear that because of Kroger's anticompetitive conduct, Kroger would not be allowed to buy any of Albertsons' stores. *Citizen Publishing v. United States,* 394 U.S. 131, at 138 (1969).

The victories over the acquisition were heralded by the FTC, the Attorneys General of Washington and Colorado, and the attorneys general of the many states that joined with them, including Arizona, California, Illinois, Maryland, Nevada, New Mexico, Oregon, Wyoming and the District of Columbia. All of the statements by the victorious governmental agencies touted the importance of the victory to the consumers, like the Plaintiffs in this case.

The Bureau of Competition Director, Henry Liu, has stated as follows: "This historic win protects millions of Americans across the country from higher prices for essential groceries – from milk, to bread, to eggs – ultimately allowing consumers to keep more money in their pockets." The Attorney General of the District of Columbia, Brian Schwalb, stated: "This is a huge win . . . at a time when so many people across the country are struggling to afford basic necessities, including groceries." The Attorney General of Colorado stated: "All along, we have made the case that the Kroger-Albertson merger is illegal and bad for consumers. It is bad for grocery shoppers who are already feeling pinched at the check-Bob out counter." The FTC has stated: "The victory would protect millions of Americans from higher grocery prices."

The case before this Court is and has been the only consumer case. As noted by the FTC, the Attorney Generals, the specific anticompetitive target of this merger has been to combat higher grocery prices to consumers, the exact same threat that is alleged by the consumer Plaintiffs in this case. Consumers are the ultimate beneficiaries of competition but also are the victims of monopolies. The Supreme Court has said that the antitrust laws were passed for consumers: ". . . we described the Sherman Act as conceived of primarily as a remedy for `[t]he people of the United States as individuals,' especially consumers," *Reiter v. Sonotone*, 442 U.S. 330, at 343 (1979).

The Congress specifically granted power to consumers to sue for injunctions that violated Section 7 of the Clayton Act. The Supreme Court specifically encouraged consumers and private

parties to sue for redress under the antitrust laws. *California v. American Stores,* 495 US 271 (1990) (Justice Stevens decided). Indeed, the foundation of the free enterprise system is directed to consumers, as Adam Smith has stated: "Consumption is the sole end and purpose of all production." Adam Smith, *Wealth of Nations*, Book IV, Chapter VIII, Univ. Chicago Press Ed.

    A.    **This Case Is Not "Moot"**

For the reasons stated in Plaintiffs fully briefed reply in support of the Motion to Enter Judgment for Plaintiffs (ECF 150), which Plaintiffs respectfully incorporate by reference, this case is not moot, and the Supreme Court has not held otherwise. *United States v. Borden Co.*, 347 U.S. 514, 515 (1954) ("private and public actions *may proceed simultaneously or in disregard of each other.*"). Plaintiffs represent the only consumer case against this merger and the only case that currently seeks a federal injunction.

The definition of "moot" is when a plaintiff no longer has a personal stake in the outcome of the case. Section 16 is not satisfied, and the case does not end until reasonable attorneys' fees and costs are awarded to the plaintiffs. The failure to grant attorneys' fees and costs as mandated by Section 16 is contrary to the purpose and intent of both Congress in passing Section 16 and the Supreme Court Opinions in *California v. American Stores*, *supra*, and *Hawaii v. Standard Oil*, 405 U.S. 251, at 262 (1972), both of which encouraged lawsuits to enforce the antitrust laws by "private [plaintiff] attorneys general"). The statute provides for compensation to the plaintiff who "substantially prevails". Plaintiffs here did not lose. Defendants lost.

    B.    **Plaintiffs Have Stated a Cause of Action**

    1.    <u>Standard of Review.</u> The Court is required to take all allegations as true, and Plaintiffs are entitled to all inferences that may fairly be drawn from those allegations. *Bell Atlantic v. Twombly,* 550 U.S. 544, 555 (2007).

    2.    <u>This Motion Is In Effect a Motion for Reconsideration.</u> Defendants' Motion to Renew is in actuality nothing more than a motion for reconsideration. But, all of the facts and all of the law since

the Court denied their Motion to Dismiss has been decidedly against the Defendants, including three adverse tribunal decisions, their complete capitulation by publicly stating the abandonment of their unlawful contract, and the new suit by Albertsons against Kroger alleging billions of dollars in damage.

On December 10, 2024, the state court in *Washington v. The Kroger Co, et al.*, NO. 24-2-00977-9 SEA (King County Superior Court), Honorable Marshall L. Ferguson, decided after a lengthy trial on the merits that Defendants' merger in fact violates its state anti-merger statute - which is identical to Section 7 of the Clayton Act - and permanently enjoined the merger. And on the same day the Federal District Court in Oregon, in *FTC v. Kroger Company*, No.: 3:24-cv-00347-AN (D. OR. December 10, 2024), the Honorable Adrienne Nelson, also issued a preliminary injunction against the merger. Both Courts' decisions now corroborate the allegations of Plaintiffs' SAC. Indeed, these decisions accepted the same relevant markets alleged by the Plaintiffs and rejected the relevant markets suggested by the Defendants. In addition, these decisions eviscerated the Defendants' C&S divestiture ploy as incompetent.

3.  <u>Defendant's Standing Argument Is Misleading</u>. Article III of the Constitution addresses "case or controversy" in both law and <u>equity</u>. Section 16 of the Clayton Act addresses the "threatened loss or damage" that will occur in the future. In *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013), which was a declaratory judgment action filed the day after the passage of a surveillance statute, the Court was presented with a constitutional challenge to that statue. The Court acknowledged that the injury must be "imminent" to pass muster under the constitution and required that "[T]hreatened injury must be 'certainly impending' to constitute injury in fact. . . " which it did not find in that case. In our case, however, as distinguished from *Clapper*, there is nothing more impending than a merger agreement which hangs over consumers, including the Plaintiffs, like the sword of Damocles. The Defendants are attempting to mislead the Court into believing that the Plaintiffs are required to show injury in fact, or actual injury, as in a Clayton, Section 4 case, for something that has not happened yet,

but which is certainly imminent and impending, and able to drop at any time. The Plaintiffs brought this action under Clayton, Section 16 because of the threat of impending loss or damage, not under Section 4, which requires injury in fact.

Indeed, as demonstrated by the Supreme Court's decision in *American Stores*, a grocery store case, the Supreme court encouraged the use of Section 16 in private anti-merger cases in order to arrest the mergers in their "incipiency" - as was said in *Brown Shoe* - before they grow into a cancer. The threat of "loss or damage" claimed by these Plaintiffs is exactly the kind of impending injury that the Supreme Court recognized to be the potential anticompetitive effects of an illegal merger: "expansion through merger is more likely to reduce available consumer choice while providing no increase in industry capacity, jobs or output." *Brown Shoe v. United States*, 370 U.S. 294 (1962)(Ftnt. 72).

4. <u>The Findings by the State of Washington Court Corroborate Plaintiffs' Allegations</u>

<u>Product Market</u>. Supermarkets are the relevant product market. Defendants treat supermarkets as their primary competitors. Findings of Fact ("FOF"), *Washington v. The Kroger Co.*, NO. 24-2-00977-9 SEA (King County Superior Court, December 10, 2024), ¶¶8, 46, 60, 65, 147-52. These findings corroborate Plaintiffs' allegations of the Product Market as "the retail sale of food and other grocery products through grocery supermarket chains." (SAC, ¶¶ 29, 72-78).

<u>Geographic Market</u>. City areas which vary in size are a relevant geographic market and grocery retailers typically draw from a small trade area. (FOF, ¶92, 362, 364, 366.) These findings corroborate Plaintiffs' allegations that "smaller local relevant geographic markets exist within individual states. Supermarket chains compete for customers in local areas where their consumer customers are concentrated . . . Relevant geographic submarkets may include areas limited to properly defined neighborhoods or city submarkets" (SAC, ¶¶ 79-85).

<u>Anticompetitive Effect of Higher Prices and Reduced Quality</u>. It is likely that Kroger will raise prices once competition from Albertsons is absent. Kroger has done so in the past. (FOF, ¶¶ 179-180; 184). These findings corroborate Plaintiffs' allegations that prices will likely rise, and that

consumers and Plaintiffs will likely pay higher prices for their groceries if the merger is consummated. (SAC, ¶¶ 88-89; 99; 130; 144; 173-180).

5. <u>Plaintiffs Have Adequately Alleged That They Have Shopped at Albertsons or Kroger Stores or Both.</u> For purposes of standing, Plaintiffs have alleged generally that many of the "Plaintiffs are direct consumers of Defendants' supermarket services" (SAC, ¶ 146). More particularly, Plaintiffs have detailed each Plaintiff's shopping habits and identified where each Plaintiff shops when at home or when regularly traveling to vacation destinations or to second homes or to visit friends and relatives. (See ¶¶ 116, 118, 121, 124, 129, 135, 137, 140, 147 – 170). The following are examples of local markets where the Defendants presently compete head-to-head and where Plaintiffs currently shop because they either live there, work there or regularly travel there on vacation.

In the Seattle market, Plaintiff Stensrud, who lives in the area, has regularly shopped and will continue to shop at the Safeway (Albertsons) stores and at Kroger's QFC and Fred Meyers stores in his neighborhood, all of which are within 5 miles of his home. (SAC, ¶ 116) There are no adequate substitutes in his mind to the supermarkets where he currently shops. (SAC, ¶161) In addition, Plaintiff Michael Malaney, although he does not live in Seattle, regularly visits there three or four times every year to be with his daughter. When he is there, he shops at the Safeway (Albertsons), Fred Meyer (Kroger) and QFC (Kroger) stores located near his daughter. (SAC, ¶116, 147)

In Snoqualmie, WA, a small submarket 30 miles east of Seattle, there are six grocery stores, two of which are supermarkets operated by Albertsons and one of which is a supermarket operated by Kroger. Plaintiff Don Fry shops at the Safeway there, and at the Kroger store there, when he regularly visits his son who lives in Snoqualmie. (SAC, ¶ 117-118) The Safeway (Albertsons) is located within 1 mile of his son's home; the Fred Meyer (Kroger) is farther away and therefore not a good option. (SAC, ¶ 160)

In Dallas, Plaintiff Valarie Jolly regularly shops at the Albertsons and at the Kroger stores where she works near the Dallas-Fort Worth Airport. There are also a Tom Thumb (Albertsons),

6
PLAINTIFFS' OPPOSITION TO RENEWED MOTIONS TO DISMISS SECOND AMENDED COMPLAINT

Target, Central Market, Market Street and other Big Box stores nearby her work. She intends to continue to shop at these stores since where she lives there are no good shopping opportunities. (SAC, ¶ 121, 165) Plaintiff Pamela Ward shops in Dallas at the Albertsons, the Tom Thumb (Albertsons), and the Kroger stores when she visits her son who lives there. (SAC, ¶ 163)

In Colorado Springs, CO, there are both Albertsons and Kroger stores where Plaintiff Jocelyn Gardner lives and regularly shops. Plaintiff uses the nearest King Soopers (Kroger) and intends to continue to shop there. Besides the King Soopers in Colorado Springs, there are Safeway (Albertsons) and others. The Safeway stores are not a reasonable option because they are more expensive. Plaintiff is concerned that if Kroger is permitted to purchase the Safeway stores in her area, the King Soopers prices will rise to the level of the Safeway stores' pricing. (SAC, ¶158).

Plaintiffs Len Marazzo and Jose Brito both live in Reno, NV, and both regularly shop at the Defendants' stores there. Both intend to continue to shop at the Defendants' Safeway (Albertsons) and Smith's (Kroger) stores in their area. (SAC, ¶ 136-137) The other supermarkets nearby are not an option for Plaintiff Brito, however, because they are too expensive. (SAC, ¶149).

Plaintiff Don Fry lives in Tucson, AZ, and has shopped and intends to continue to shop at the Kroger and Albertsons owned stores there. (SAC, ¶ 135) The Albertsons store where he shops is located within 4 miles of his home, and the Fry's (Kroger) market is 6 miles away. (SAC, ¶ 160)

In Fairbanks, Alaska, Plaintiff Pamela Ward regularly shops and intends to continue to shop at both the Albertsons and the Kroger stores there when she regularly visits her family there. According to Alaska State Representatives Spohnholz and Fields, f these stores were to merge, it would be catastrophic to competition there. (SAC, ¶163): "This merger would reduce market competition and *result in further price inflation* in food and household necessities." (SAC, ¶ 130)

In addition to the markets set out above, there are geographic markets where Plaintiffs shop at Defendants' stores but where Defendants do not compete head-to-head. (SAC, ¶ 138-140)

Albertsons currently owns and operates 225 stores in Maine, New Hampshire, Vermont, New York, Massachusetts, Connecticut, Rhode Island and Pennsylvania without competition from Kroger. (SAC, ¶ 139) Kroger now proposes to buy these markets outright instead of competing against them. Kroger's business plan to simply take over the Albertsons stores and substitute its name for the Albertsons marquee in the northeastern United States has previously been found to be unlawful and has been enjoined by the Supreme Court in *United States v. Falstaff Brewing Corporation*, 410 U.S. 526 (1973). Plaintiffs Gary Talewsky, Harry Garavanian, Gabe Garavanian and Bill Rubinsohn all live in this area of the Northeast United States where there are currently no Kroger stores but where Kroger has proposed a wholesale purchase of the Albertsons stores. Harry Garavanian lives in Nashua, NH, and regularly shops at the Shaw's (Albertsons ) store there. Plaintiff Bill Rubinsohn lives in Philadelphia, and regularly shops at both the two Albertsons Acme supermarkets located near his home. He plans to continue to shop at both stores. Plaintiff Gabriel Garavanian lives in Tyngsboro, Massachusetts and regularly shops and will continue to shop at the Albertsons Shaw's market in close-by Nashua, NH. And Plaintiff Gary Talewsky lives in Foxboro, Massachusetts during the summer months and regularly shops and will continue to shop at the Albertsons Shaw's store when he is there. Shaw's controls 60% of the grocery market in Foxboro. (SAC, ¶ 140). This is the very conduct condemned in *Falstaff, supra*.

6.     <u>Plaintiffs Have Adequately Alleged That They Are Threatened With Loss or Damage From the Merger</u>. Section 16 of the Clayton Act authorizes private plaintiffs to obtain injunctive relief for any "threatened loss or damage" resulting from a violation of the antitrust laws. 15 U.S.C. § 26. There is no requirement of "injury in fact" as Defendants insist on blindly asserting. Section 16 requires only "'threatened' injury," and injunctive relief is available "even though the plaintiff has not yet suffered actual injury." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 US 100, 130 (1969). A private plaintiff "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws." *Id*. Indeed, because Section 7 is in effect "a prediction"

of future conduct, the Seventh Circuit has said that all "doubts are to be resolved against the transaction." *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989)  Among other things, "'antitrust injury' ... means injury from higher prices or lower output, the principal vices proscribed by the antitrust laws." *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1334 (7th Cir. 1986) (citing *Brunswick*, 429 U.S. 477).[1]  The Ninth Circuit also recently held in *St. Alphonsus Medical Center* that "Section 7 does not require certainty of proof that a merger or other acquisition has or will cause higher prices in the affected market. All that is necessary is that the merger create an *appreciable danger* of such consequences in the future." *St. Alphonsus*, 778 F.3d at 1389.

Plaintiffs have adequately alleged an anticompetitive effect of the merger, that prices may rise if the merger is consummated:

- Economic studies have shown that post-merger prices do not decrease but rather increase between 3 and 7 percent. (SAC, ¶ 86)

- Even a short-term reduction in competition in the urban neighborhoods can result in higher prices and reductions in quality. (SAC, ¶ 87)  As a result of reduced competition, consumers are likely to and may pay more for their groceries and enjoy worse service. (SAC, ¶ 88)

- Kroger's CEO admitted in October, 2022 that "We've been very comfortable with our ability to pass on the increases [from inflation] we've seen at this point. And we would expect that to continue to be the case." (SAC, ¶ 89)

- Studies have shown that prices after mergers normally increase by 12-13% and the quality of services diminishes. (SAC, ¶ 144)  A study by the American Economic Association found that "mergers between two firms in the same industry lead to an average price increase of 4%." (SAC, ¶ 177)

---

[1] Defendants misguidedly argue against standing that some Plaintiffs do not purchase groceries from either Defendant.  This ignores the many Plaintiffs who do.  As the District Court in Boston recently said in denying summary judgment against private plaintiffs in *Garavanian v. JetBlue*: "He only needs 1 [plaintiff to enjoin the merger]." (ECF 99)

- The DOJ has stated that "mergers can lead to higher prices and reduced innovation" and that "mergers that eliminate significant competition are more likely to harm consumers." (SAC, ¶ 174) The FTC has stated that "mergers can reduce competition and lead to higher prices, less innovation, and lower quality goods and services." (SAC, ¶ 175)

- The European Commission has stated that "mergers can lead to higher prices for consumers, less innovation, and lower quality goods and services." (SAC, ¶ 176)

- The 2008 merger of Anheuser-Busch and InBev led to higher beer prices in the United States. (SAC, ¶ 179) The 2017 merger of Dow Chemical and DuPont led to higher prices for pesticides and chemicals. (SAC, ¶ 179) The 2018 merger of AT&T and Time Warner led to higher prices for cable TV and broadband services. (SAC, ¶ 179)

- According to the letter of Alaska State Reps Spohnholz and Fields to FTC Chair Lina Kahn dated October 21, 2022, "This merger would reduce market competition and result in further price inflation in food and household necessities." (SAC, ¶ 130)

In most merger cases, the Plaintiff relies on indirect evidence of concentrated market shares, which alone has been held to be sufficient to establish a Plaintiff's prima facie case of a violation of Section 7. *See St. Alphonsus Medical Center v. St. Luke's Health System, Ltd.*, 778 F.3d 775, 785 (9th Cir. 2015) ("prima facie case can be established simply by showing high market share"). In fact, Courts have recognized that eliminating head-to-head competition such as here can alone cause a substantial lessening in competition. *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 81 (D.D.C. 2011) ("The elimination of competition between two firms that results from their merger may alone constitute a substantial lessening of competition.")

In the present case, however, Plaintiffs have alleged the threat that prices will rise, which is a harbinger of anticompetitive harm. Moreover, the state court in Washington has found as fact that prices will likely rise in the event of the merger of these supermarkets. This finding flatly corroborates the allegations of anticompetitive effect alleged by the Plaintiffs in this case.

*California v. American Stores*, *supra*, was a *private action* involving the grocery industry where the state was acting as a private plaintiff.[2] The district court decision in that case sets out a comprehensive analysis of Section 7 liability. (See *American Stores*, at pp.1128-1132.) The court in that grocery case used the defendants' own version of an expanded Metropolitan Statistical Area (MSA) (similar to our CBSA) as its geographic market to support liability. In this case, this merger's anticompetitive harms may be felt in hundreds of communities across the nation, threatening consumers and these Plaintiffs with the direct and "imminent" threat of harm because, as they have alleged, Plaintiffs routinely shop in markets that may be impacted by price increases.

As is graphically demonstrated by Plaintiffs' charts in the SAC showing the location of Kroger and Albertsons Stores nationally and by State Region and by Local Community (SAC, ¶ 68-70), the proposed merger may lessen competition in at least 22 states across the nation where the Defendants currently compete, and "potential competition" may be harmed in many more. *All twenty-four* Plaintiffs are threatened with impending antitrust injury because they are grocery consumers in these impacted markets.

7.  <u>Plaintiffs Have Alleged Detailed Market Share Percentages Among Identified Competitors And Have Provided High HHI Numbers Demonstrating a Prima Facie Case for Unlawful Concentration and Impact</u>. In the overlapping markets in which Albertsons and Kroger compete head-to-head Plaintiffs have alleged that the merger may lessen actual competition and may, in the words of Section 16, "threaten[] loss or damage" to consumers, including the Plaintiffs, by eliminating a potential competitor, increasing concentration, raising prices, reducing capacity,

---

[2] And there have been many other private cases granting injunctions against mergers as well. See, e.g., to name of few, *Christian Schmidt Brewing Co. v. G. Heilman Brewing Co., Inc.*, 600 F.Supp. 1326 (E.D.Mich.), *aff'd*, 753 F.2d 1354 (6th Cir.1985) (proposed merger found to substantially lessen competition based on statistical evidence of post-merger market share of 31%, HHI increase from 1746 to 2120, and general trend toward concentration); and *Marathon Oil Co. v. Mobil Corp.*, 530 F.Supp. 315 (N.D.Ohio), *aff'd*, 669 F.2d 378 (6th Cir.1981) (acquisition enjoined based on post-merger combined market share of 10-20% in relevant markets, four-firm concentration increase from 48% to 53% on average, and general trend toward concentration.)

and limiting consumer choice. (SAC, ¶ 99) All of these factors were found to be present in the Washington State Court's Findings on this merger. (See cited FOF paragraphs *infra*).

In the Ninth Circuit's opinion in *St. Alphonsus Med. Center v. St. Luke's Health System*, 778 F.3d 775 (9th Cir. 2015), the Ninth Circuit held that an "extremely high HHI on its own establishes the prima facie case" and that, quoting *Hospital Corp of America*, "Section 7 does not require proof that a merger or other acquisition has caused higher prices in the affected market. All that is required is an appreciable *danger* of such consequences in the future." *St. Alphonsus, supra* at page 778. The Court went on to say that other factors, such as a "history of cooperation" and "high entry barriers" contribute to the violation, *Id*. at 778, and cited other cases where high HHI, high market concentration and high entry barriers resulted in the establishment of prima facie violations of Section 7. (*See* cases cited in *Alphonsus* at 788.)

For example, Plaintiff Clyde Stensrud *lives and works*[3] in the Seattle area. If the merger proceeds, Kroger will have a complete and unchallenged *monopoly* in that area, rendering the merger facially unlawful and essentially un-rebuttable under the law. Plaintiffs have identified the supermarkets and groceries in the market (SAC, ¶¶ 113); have alleged that the Kroger market share would rise from 33.4% to 53.04% (SAC, ¶¶ 114); and have alleged that the merger will cause the market concentration index (known as the "HHI") to increase by 1,967(!) points to 3,198 – dramatically above the 2,500 post-merger and 200-point thresholds that establish a merger's presumptive illegality under the law. (SAC, ¶¶ 113-116) (*See St. Alphonsus*, 778 F.3d at 786 ("[m]ergers that increase the HHI more than 200 points and result in highly concentrated markets

---

[3] Defendants wrongly argue that Plaintiffs have only transitory relationships with the markets affected by the acquisition, but this is not the case. Plaintiffs live and work in those market areas and for those where they do not live, they have a significant regular presence due to business and family relationships. It should also be reiterated that Plaintiffs need only show that one plaintiff has been affected "in any section of the country" in order to successfully prohibit the merger. *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 193 (D.D.C. 2017).

[*i.e.* 2,500 HHI or higher]" are presumptively anticompetitive). Plaintiffs' figures supporting these market share calculations are derived from the industry standard 2023 Grocery Industry Market Share Report, prepared by Chain Store Guide. (SAC, ¶¶ 115, fn.17)

Plaintiff Jocelyn Gardner *lives* in Colorado Springs, CO where once again Kroger will have a complete monopoly post-acquisition. The Kroger market share will rise from 20.9% to 39.05%. (SAC, ¶ 122)  And the merger will cause the HHI in that market area to increase by 759 points to 2,375, three times the benchmark increase recognized by the courts. (SAC, ¶¶ 123-24)

In Fairbanks, Alaska, Plaintiff Pamela Ward, *who shops there when she regularly visits relatives there*, is confronted with a monopoly if the acquisition is permitted. In Fairbanks, the Kroger share would rise from 30.1% to 47.72%. (SAC, ¶¶ 127)  The HHI will increase by 1061 from 2,193 to 3,254, four times the benchmark increase recognized by the courts. (SAC, ¶¶ 128)

Plaintiffs have alleged similar dramatic market share increases for Kroger in the additional markets of Snoqualmie, WA (SAC, ¶¶ 117-118); Dallas, TX (16.57% to 27.23% share; 403 increased HHI) (SAC, ¶¶ 119-121); Tucson, AZ (pre-acquisition share of 21.71%, with a post-acquisition share totaling 40.54%; HHI increase of 951 from 1338 to 2289) (SAC, ¶¶ 131-135); and Reno, NV (8.15% increase in share to 15.23%) (SAC, ¶¶ 136-137) where Plaintiffs Don Fry, Valarie Jolly, Len Marazzo and Jose Brito *live, work, or regularly vacation or visit with relatives*.

The law "does not require proof that a merger or other acquisition has caused higher prices in the affected market. All that is necessary is that the merger create an appreciable danger of such consequences in the future." *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 49 (D.D.C. 2011), citing *Hospital Corp.*[4]  Some mergers are *presumptively* illegal.  In the *Philadelphia National Bank* case, 30% was enough: "The merger of appellees will result in a single bank's controlling at least 30% of the commercial banking business in the four-county Philadelphia metropolitan area.

---

[4] Although increased prices are not a requirement for violation, Plaintiffs have indeed alleged significant evidence that prices will increase if the merger is successful. (SAC, ¶¶ 86-89;99;130;144; 173-180).

Without attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat." *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 363-64 (1963). Because they are "so inherently likely to lessen competition substantially that [they] must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." *Id*. In this case the merger will amount to 36% of the national market. (See Chart, ECF 28-4).

8. <u>Undue Concentration in *Any* Market Is a Violation of Section 7</u>. A "relevant market" for purposes of Section 7 was recently defined in *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 24 (D.D.C. 2015) as comprised of both a "relevant product market" describing "the product and services with which the defendants' products compete," and a "relevant geographic market" which "identifies the geographic area in which the defendant competes in marketing its products or service." *Id*. at 24. Importantly, proof that a merger may substantially lessen competition in *any one* market—no matter its size—and no matter that it is only one of a number of markets in which Defendants do business—suffices to show that the merger violates the antitrust laws. *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 193 (D.D.C. 2017).

<u>Product Market</u>. Plaintiffs have alleged that supermarkets compete primarily with other supermarkets providing one-stop shopping opportunities for food and grocery products. In public statements Defendants have readily admitted that the relevant product market is the retail sale of food and other grocery products in supermarkets. (SAC, ¶¶ 72-77) Plaintiffs have alleged the product scope, the target audience, the pricing strategy, the competition and the dynamics that distinguish supermarkets from big box general retail stores and that support Plaintiffs' allegations that general retail stores should be excluded from the product market. (SAC, ¶78) Only supermarkets were the product market in *California Stores* and in *United States v. Von's Grocery Co.*, 384 U.S. 270 (1966) and only supermarkets have been found to be the product market in the recent Washington (FOF, ¶¶ 92, 362-66) and Oregon decisions.

Geographic Market. With regard to the appropriate geographic markets, Plaintiffs have alleged markets including the entire United States (SAC, ¶ 79), as well as "smaller local relevant geographic markets . . . within individual states. . . .where their consumer customers are concentrated." (SAC, ¶ 80) Plaintiffs need not "delineat[e] . . [each geographic market] by metes and bounds as a surveyor would lay off a plot of ground." *United States v. Pabst Brewing Co.*, 384 U.S. 546, 549 (1966); *FTC v. Sysco Corp., supra* at 48. In *American Stores* the Court used the Metropolitan Statistical Area (MSA) as the market, which is similar to the CBSA that Plaintiffs have used to quantify their geographic market in this case. Experts will permit Plaintiffs to fully refine the relevant macro and micro geographic markets from national to regional to state to metro area to even smaller relevant micro markets that may exist within each of the alleged CBSAs – as was done in the Washington State case - that involve Plaintiffs directly. (FOF, ¶¶ 362-66)

## CONCLUSION

Plaintiffs have a stake in the pursuit of a federal court injunction against the acquisition of Albertsons by Kroger, and, pursuant to Section 16 of the Clayton Act, in the award to these individual Plaintiffs of reasonable attorneys' fees and costs of suit. Plaintiffs' allegations of market and anticompetitive harm have been corroborated by the Washington State Findings and by the Oregon injunction. For these reasons, and for the reasons stated above, Defendants' renewed motion to dismiss should be denied.

Dated:  January 7, 2025            Respectfully submitted:

By:   */s/ Joseph M. Alioto*
      Joseph M. Alioto (SBN 42680)
      Tatiana V. Wallace (SBN 233939)
      ALIOTO LAW FIRM
      One Sansome Street, Suite 3500
      San Francisco, CA 94104
      Telephone: (415) 434-8900
      Email: jmalioto@aliotolaw.com

      *Attorneys for Plaintiffs*

15
PLAINTIFFS' OPPOSITION TO RENEWED MOTIONS TO DISMISS SECOND AMENDED COMPLAINT

ADDITIONAL PLAINTIFFS COUNSEL:

Lawrence G. Papale (SBN 67068)
LAW OFFICES OF LAWRENCE G. PAPALE
1308 Main Street, Suite 117
St. Helena, CA 94574
Telephone: (707) 963-1704
Email: lgpapale@papalelaw.com

Josephine Alioto (SNB 282989)
THE VEEN FIRM
20 Haight Street
San Francisco CA 94102
Telephone: (415) 673-4800
Email: jalioto@veenfirm.com

Christopher A Nedeau (SBN 81297)
NEDEAU LAW PC
154 Baker Street
San Francisco, CA 94117-2111
Telephone: (415) 516-4010
Email: cnedeau@nedeaulaw.net